IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

Clerk, U.S. District Court
Southern District of Texas
FILED

JAN 13 2017

David J. Bradley, Clerk of Court

| | |
|---|---|
| Bobbie Lee Haverkamp,<br>        Plaintiff, | §<br>§<br>§ |
| -VS- | §<br>§ |
| University Directors of Mental<br>Helath Services for U.T.M.B.,<br>Dr. Joseph Penn, | §<br>§<br>§ |
| University Regional or Senior<br>Medical Directors<br>Dr. Lannette Linthicum,<br>        Defendants. | §<br>§<br>§<br>§<br>§ |

Civil Action No._____

COMPLAINT

**Plaintiff's Memorandum Brief in Support
of his Filed Prisoner's Complaint under
The Civil Rights Act, 42 U.S.C. § 1983.**

TO THE HONORABLE JUSTICES OF SAID COURT:

Now Comes, Bobbie Lee Haverkamp, pro se, in the above-styled and numbered cause files this a Prisoner Complaint under the Civil Right Act, pursuant to 42 U.S.C. § 1983. Requesting that for cause shown that this Court will "Grant" Plaintiff's relief sought through this Civil Rights Act § 1983. Plaintiff requests that any reference to the Plaintiff be refered to as follows: Ms, She, or Her dur to Plaintiff's Gender Identity Disorder, (GID).

I.

**Jurisdiction/Venue**

1).   This  is a Civil Action authorized by 42 U.S.C. Section 1983, to redress the deprivation, under the color of state law, of rights secured by the Constitution of the United States.  The Court has jurisdiction under 28 U.S.C. Section 1331 and 1343(a)(3).  Plaintiff seeks delaratory relief pursuant to 28 U.S.C. Section 2201 and 2202.  Plaintiff claims for injuction relief are authorized by 28 U.S.C. Section 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2). The Corpus Christi Division for the Southern District is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to this claim occured.

## II.

### PLAINTIFFS

3). Plaintiff, Bobbie Lee Haverkamp is and was at all times mentioned herein a Prisoner of the State of Texas in custody of the Texas Department of Criminal Justice-CID. The Plaintiff is currently confined in the William G. McConnell State Prison in Beeville, Texas 78102.

## III.

### DEFENDANT'S

4). Defendant, Joseph Penn is the Director of the University of Texas Medical Branch, a medical contractor that is contracted by the Texas Department Criminal Justice-CID. He is legally responsible for the overall psychiatry operations, policy making and approving authority for treatment plans of the University of Texas Medical Branch Psychiatry on contract to the Texas Department of Criminal Justice-CID. Dr. Joseph Penn address in Quailty Services UTMB, 301 University Drive, Galveston, Texas 77555, c/o Gigi Jamison, secretary.

5). Defendant, Lannette Linthicum is the Director of the University of Texas Medical Branch, a Medical Contractor of the University of Texas Medical Branch contracted by the Texas Department of Criminal Justice-CID for medical care for their prisoners. Doctor Linthicum is legally responsible for the overall medical procedure, treatment plans and final approving authority of any treatment plans the correction Manage Health Care policy of UTMB to the Texas Department of Criminal Justice-CID. Her address is Dr. Lannette Linthicum, Two Finanical Plaza, Suite 625, Huntsville, Texas 77340.

6).   Each Defendant is sued individually and in their OFFICIAL capacity.   At all times mentioned in this suit and complaint each Defendant acted under the Color of State Law.

## IV.

### Exhaustion of Legal Remedies.

7).   Plaintiff Haverkamp used the Prisoner Grievance procedure available at the Texas McConnell State Prison to try and resolve the problem. The Final Step Two was completed on the following date:

Treatment Plan for Gender Reassignment Surgery   Feb 10, 2016   .

Gender Related Items      March 11, 2016 .

Education Materials      Feb 19, 2016 .

8).   Plaintiff also seeks a jury trial on all issues triable by a jury.

9).   Plaintiff request that this Honorable Court will read and consider this writ liberally. Plaintiff, Pro se, is not an attorney or an individual versed in law. Therefore, "SHE" implores of this Court to liberally interpret what "She" is trying to convey to this Honorable Court.

## V.

### Question For Jury Review

19).  Has the Plaintiff received an appropriate unabridged Standard of Care conforming to the University of Texas Medical Branch Correctional Manage Health Care Policy "G-51.11; which UTMB-CMHO has reference and adopted from the World Professional Association for Transgender Health, Standards of Care Version 7, accordant  to expected standards, treatment to treat and cure "Disorder of Gender Dysporia" should effectively mirrow that which would be available to the Plaintiff if "SHE" were living in a non-institutional setting. Plaintiff's circumstance of institutional confinement should not present

any hinderance to Gender Reassignment Surgery.

## VI.

### Address to Court

11).  The United States Supreme Court has never held that a "Law Abiding" Private Citizen has a right to adequate medical treatment. However, it is clearly establish that an Offender has such a right and Prison Officials must ensure that an Offender in its custody receives adequate medical treatment.

12).  In the United States Supreme Court case Farmer v. Brennan, 511 U.S. § 25, 144 S.Ct. (1990).  Has explain that a person with Gender Dysporia or Gender Identity Disorder (GID), have a rare "Psychiatric Disorder." In which a person feels persistenty uncomfortable about "Their" Anatomical Gender and who typically seek medical treatment.  Including Hormone Therapy and subsequently "Reassignment Surgery" to bring about a permanent gender change.

13).  The consensus among Medical professionals is that "Transgenderalism" is a serious medical condition that requires treatment and should be treated no differently than any other disorder. its not a Free-Chosen "Gender preference" or any condition produced by a Life Experience.

14).  A person suffering from the medical condition known as "Gender Identity Disorder" (GID).  Has the anatomy of a male, but the feelings and thought process consistent with the opposite gender, female, or has the anatomy of a female, but the feelings and thought process consistent with the opposite gender, male.

15).  The Courts have considered Gender Dysporia a serious medical condition and medical need for the purpose of the 8th Amendment to the united States Constitution.

16).  For those who are diagnosed with GID, adequate care requires treatment

by a qualified medical personnel who can provide services that are of quality acceptable when measured by prudent Professional Standards in the community.

17). Prison Administrators or Medical Directors are thus obligated to determine whether an Offender has a minor or serious medical need. If so, to provide "Them" with atleast some treatment.

18). Plaintiff was first diagnosed with GID on June 6, 2013, at the Texas Prison Jester 4 Medical facility of TDCJ-CID, by Dr. Philip Farley, Psychiatric Doctor.

19). Plaintiff's GID evaluation was accomplished by the medical staff at the Jester 4 Unit. It was formulated by the medical professionals employed by the University of Texas Medical Branch and not by prison administrators as is required by law.

20). There is no underlying distinction between the right to medical care for "Physical ills" and its 'Psycological or Psychiatric' counter part.

21). The Plaintiff comes under the Defendants correctional managed contract Health Care Policy G-51.11, and is refered to as an Offender's Mental and Health needs for treatment with GID (Gender Identity Disorder).

22). As early as February 8, 2013, Plaintiff was informed by Ms. Alexander of the Mental health Department at the McConnell Unit that treatment for GID might mean that Plaintiff might undergo Hormone treatments, but Gender Reassignment Surgery would most likely not occur.

23). The Court can interpret the reasoning here to mean that a GID patient, regardless of how serious the medical need for the "Treatment" of GID may be. Only "Half" of the treatment is allowed.

In this case only "Hormone treatment," the first prong, yet the second prong,

#23-Cont.

the other conclusive second prong "Half," Gender Reassignment Surgery is denied. Totality of treatment will not happen through UTMB, its Directors or Medical Personnel.

24). A serious medical need is one which has been diagnosed by a physician, requiring treatment and a serious medical need is present whenever the failure to treat a Prisoners condition could result in further significant injury or unnecessary wanton infliction of pain or a future risk of pain.

25). The 8th Amendment can be violated when the Defendants failure to treat a person's (Prisoner's) condition and said failure results in pain even if it does not worsen the patients conditions.

26). Plaintiff is suffering from GID. Plaintiff has a serious diagnosed need for the complete treatment for G.I.D., including the "Gender Reassignment Surgery."

27). Yet the Plaintiff is being denied the necessary medical treatments to accomplish the complete treatment for GID, by virtue of the Defendants tactics, which effectively delays Plaintiff's care for GID, through surgery.

28). If adequate care requires treatment by qualified Medical Personnel. Who provides the services that are quality acceptable when measured by Prudent Professional Standards and adequate care is tailored to an Offenders particular medical needs and is based on medical evaluation? Then the Plaintiff has no adequate standard medical care according to the Defendants World Profession- al Association for Transgender Health (WPATH) of prudent professional standards that would reflect a non-Institutional setting for Standard of Care.

### WPATH Standard of Care and Applicability of the Standard of Care to people living in Institutional Environments

29).  The  standards  of  Care  in  their entirety apply  to all Transsexuals, Transgenders and  Transgender  non-conforming  peoples.   Irrespective of their housing situation.

People  should  not  be  discriminated  against in their access to appropriate health  care  based  on  where they live. Including Institutional Environments such  as  prisons  or  long  or intermediate term Health Care facilities. See, (Brown 2009).

30).  Health  Care  for  Transsexuals,  Transgenders and Non-conforming Trans-gender  people  living  in  an  institutional  environment should reflect that which would be available to them  if  they  were  living  in a Non-Institional setting within the same community.

### VII.
### Penological Concerns
### Address to Court

31).  The  treatment  which  a  Offender receives in prison and the conditions in  which  said  Offender  is  confined  are subject to the scrutiny under the 8th Amendment to the United States Constitution concerning "Cruel  and Unusual Punishment."

32).  This Constitutional Amendment  imposes  duties on Prison Administrations and  Officials who must ensure that Offenders receive adequate food, clothing, shelter  and  medical  care/treatment.  Also  must take reasonable measures to ensure and guarantee the safety and the well being of all Offenders and charges in their care.

33). The Defendants cannot cite "Penological" concerns as a valid reason for denying serious medical needs to the Plaintiff. TDCJ-CID houses Offenders with AIDs, HIV Positive, Hepatitis, Infectious, Amputee's and other document-ed medical care needs requiring serious medical accommodations.

34). When an Offender needs Psych. Care, TDCJ-CID can transfer the special medical care patient to Jester 4 PSYCH Unit, or to an alternate Unit which is similarly situated to accept and house the patient.

35). The Texas Prison System commands an annual Budget in the excess of Five (5) Billion dollars. They do not find Plaintiff's medical needs a prom-blem or inconvenience due to "Penological concerns or Her safety." TDCJ-CID has in the past transported the Plaintiff to a hospital at Galveston for Thyroid promblems. This trip has been made in excess of ten times for evalua-tion, treatment/surgery, recovery, and then back to "Her assigned Unit in Diball, Texas. Additionally, Plaintiff has been bussed from the McConnell Unit in Beeville, Texas, across south Texas to Houston, Texas to the Jester 4 Psych. Unit for evaluation and diagnosis for G.I.D.

36). The transportation of Offenders to hospitals, other Units or to other regions for serious medical needs is so routine as to be common place.

37). As a GID, there has not been a Correctional Officer or Administration Official on the McConnell Unit or the Penal System in general, who has ever mistreated the Plaintiff for being what "SHE" is, a Transgender. In further of Plaintiff's safety concerns, if any, the Texas McConnell Prison Unit has a modern security camera system in operation, that can keeps continous vig-il upoon Plaintiff as well as the security of the general population.

38). The implementation of the Safe Prison Act Policy by TDCJ-CID, which has a zero (o) tolerance policy towards any type of sexual misconduct, abuse,

or actions, has engendered an enhanced secure environment for every Dorm, Cell, or Cell Block within the prison population "community."

39). Every Correctional Officer, employee, and /or Official of TDCJ-CID is well aware of the "Safe Prison Act Policy" and well enforce the policy upon the slightest of suspicion. The Plaintiff has appeared in person before the Unit Classification Committee (UCC) to discuss "Her" safety as a Transgender and to ensure the "SHE" was not being pressured into any act against her will i.e., sexual favors.

## VIII.

### Defendants as Medical Contrators
### Address to the Court.

40). The Defendants, through their employers are in effect contractors for medical services with the TDCJ-CID Offenders. This contract is "For Profit" Contract. Providing more intense medical treatments cost UTMB a potentally significant decrease in the "PROFIT MARGIN." The Defendants contract is for several Million dollars, thus, the less service they provide or sub-contract, the greater the "Profit Margin."

41). Whenever, Defendants fails to treat any condition, cause delay, hinder or interfere with medical services or when Defendants fails to provide surgical services such as Gender Reassignment Surgery, Defendants increases their monetary profit.

42). In **Farmer**, supra, the United States Supreme Court has ruled that it would not be reasonable to deny an Offender adequate medical care, because it would be expensive to do so. Minimally adequate care usually requires access to the expensive equipment which hospitals and clinics have at their disposal. Such as CAT and MIR Scanners, Dialysis machies for renal patients,

or the administration and despensation of prescribe medication. Hormone treatment is just another type of dispensing of medical and medication treatment. Hormone treatment is the first prong of the two prong treatment for G.I.D. The second prong is for reassignment surgery which to date has become very routine in its application.

## IX.
### The Budgetary Restrictions

43).  Budgetary restrictions are a violation under the 8th Amendment. Many medical professional have stated that the surgical procedure for Gender Reassignment would be no more expensive than an Offender having treatment for cancer, treatment for renal failure or any various other medical concerns.

44).  Plaintiff was re-examined a second time by a Psychiatry Expert, Dr. Walter Y Meyer·, who expertise lies in the treatment of GID. Upon the completion of Dr. Meyer examination on October 17, 2014, Dr. Meyers prescribed the hormone "Estrodial" a Estrogenic hormone for the Plaintiff's hormone treatment plan.

45).  Dr. Meyer· further ordered that the Plaintiff had to be on the hormone treatment plan for a 12 month period prior to Dr. Meyer's referal for reassignment surgery. Thus, providing Plaintiff confirmation of the standard of care under WPATH treatment plan with Gender Reassignment Surgery to compllete the medical process and allow the Plaintiff to live a normal productive life.

46).  It should be notice that the Defendants gave their approval for the prescription of the Hormone Estrodiol in accordance with Policy 51.11, Treatment of Offenders with Gender Disorders with a hormone treatment plan, Policy 51.11 speaks that the Defendants are also the approving authories for treatment plan.

47). Yet the Defendant act to delay and/or intentionally interfere with medical treatment by not readily providing a treatment plan which indicates when Gender Reassignment will take place. The Defendants have refused to provide Plaintiff with any specialized consultation if its not mandated by Court Order.

48). This delay tactic is a violation in itself of the 8th Amendment. Specialty consultation with surgeon who perform GID surgery would show that Gender Reassignment Surgery is not mere experimental procedure. Its not Intrusive Medicine and its not Elective Medical Procedure for the Plaintiff. Surgery for GID is not cosmetic, but constitutes a very effective and prescribed treatment plan, to not provide specialty consultation, deprives the Plaintiff of the Basic Human need to cure the Disorder.

49). The delay and intentional interference with medical treatment by the Defendants has cause the Plaintiff worry, mental pain, auguish and a feeling of worthlessness.

50). A jury can infer diliberate delay on the Basic of the Directors treatment decisions and decide for theirself if the Defendants WPATH medical care for a Transgender, such as in Plaintiff's, is appropriate.

51). When it is a fact that Defendants who began the process to "Cure" the Plaintiff's medical condition then for what ever reason they denied and delay the second prong procedure through their delay of a treatment plan that would include Gender Reassignment Surgery,

## X.
### Defendants Interfere Non-Medical Factors

52). The Defendants delay by a factor that substituted the second prong of the care fore Transgender with Supportive Therapy and then Hormone Therapy,

these two are the easiest and cheapest way out.

53).   The  Plaintiff  although  has  been provided figuratively with an asprin "Cure." This does not constitute medical care which should reflect WPATH's Standard of Care. With Surgery to "Complete" Defendants two (2) prong procedure.

54).   Many  medical  professionals  have expressed skepticism concerning cases which  would  suggest that something less than hormone treatments and surgical procedures were adequate remedies to  cure  GID.  These are issues for a jury, trier of fact.

## XI.
## Political Fears of Defendants

55).   The Defendants fears of public  criticisms  is so for afield of accepted professional  standards  as  to  raise  a adverse infrance by a jury under the **Farmers** standard, supra.

56).   The  national  Center  for  Transgender Equality on May 30, 2014, in the Department  of  Health  and  Human  Services ruled that a medicare policy from the 1980's that catogorically excluded transgender related medical procedures, regardless  of  medical  needs  is  unreasonable  and invalid based on today's Modern Medical Science.

57).   The Office of Personnell management announced that Government Contracted Health Insurer's could start covering the cast of Gender Reassignment Surgeries for Federal Employees, Retirees and their surviors, ending a forty (40) year prohibition.  Two  week  prior,  a  decades  old rule preventing medicare from financing  such  procedures  was  overturn  within the Depatment of Health and Human Services.

58).   Any  concerns  by  the  Defendants  regarding  political criticism would be misplaced and out dated. The medical contract that the Defendants have with

TDCJ-CID address the Standard of Care through treatment plans and hormone therapy which the Plaintiff is entitled to in the correctional manage health care policy 51.11, for Treatment of Offenders with Gender Disorder.

59). The political and public are concern with the implementation of Policy G-51.11 and the correct Standard of Care that includes Gender Reassignment in the treatment plan.

The Defendants cannot allege or cite any Texas Department of Criminal Justice-CID .

60). From the Director of TDCJ-CID to any Correctional Officer has ever denied, delayed or interfered with Plaintiff's medical treatment when it came down to Plaintiff serious medical need of G.I.D.

## XII.
### Who's Responsible at the Correctional Side

61). Policy G-51.11, Treatment of Offenders with Gender Disorders, clearly states that the "University Directors of Mental health Services and the University Regional" or Senior Medical Director will be the approving authority for treatment plans and hormone therapy related to GID.

Dr. Joseph Penn is the Director of Mental Health Services; Dr. Lannette Linthicum is Senior Medical Director, both Directors are responsible for a approval of treatment plans for Transgenders.

## XIII.
### The Grievance Process
### Address to the Court

62). On July 23, 2015, an I-60 request from was presented to McConnell local Prison Medical Deaprtment requesting information regarding treatment plans for GID including Gender Reassignment Surgery. Plaintiff met with Dr. Kwanto, UTMB local doctor on August 4, 2015. The clinic notes revealed no treatment

plans and no treatment plan to provide a care for GID in place.

63). The Plaintiff was in Galveston, Texas on Sept. 15, 2015 for an appoint-
ment with Dr. Walter Myers and UTMB laison agent, nurse Hicks. The Plaintiff
was told that it would take ninety    (90) days in the free-world to have
Gender Reassignment Surgery performed. Typically, free-world surgeons would
want to do their own evaluations and any medical recommendations would be
readily available for surgery.

64). Agent Hicks, UTMB liason explained to the Plaintiff that UTMB did not
have any surgeons who could perform Gender Reassignment Surgery nor did Texas
Tech Medical have anyone, he further added that in Texas there existed no
surgeons who did these type of surgeries. See Facts Sept 15, 2015

## XIV.
### Plaintiff offers Solutions
### for
### Absent of Gender Reassignment Surgeons.

65). The Defendants are a medical contractor, one operating for profit.
Any contractor can affirm that any work not performed by the contractor is
sub-contracted to , ● sub-contractors to perform any specialized precision
work not within the principle contractors capacity. In UTMB case, surgeons
who perform Gender Reassignment Surgery can be sub-contracted to fulfill WPATH
Standards of Care complance. Not doing it is a denied of acess to Health
Care staff who are qualified to address the Plaintiff's medical problem,
and issues for trier of fact, a jury.

66). This failure by the Directors has caused anxiety for the PLaintiff
as well as mental pain and emotional distress. The feeling of being abandoned
by a medical staff who is supposed to watch over ˙Her" will not go away.   The
feeling that SHE is damage goods persists as one not worthy of proper medi-

cal care and treatment.

## XV.
### UTMB Delay

67). There has been intentional delay by the Defendants to provide a treatment plan that provide a cure for GID. The cure I seek, Reassignment Gender Surgery.

68). The Plaintiff allowed a thirty (30) day grace period before acceding to TDCJ-CID Grievance process, which is the proper institutional protocal for initiating Grievance medical complaints. My grievance issue is three things, what is the treatment plan for when Gender Reassignment Surgery takes place, when does a Offender recieve gender related items ———————— that was prescribed as a medically and psy. necessity. ret the Directors fail to release the item and what education materials will be used to prepare the Plaintiff for Gender Reassignment Surgery.

69). The Defendants answer was complete silence, which speaks volumes on the direction the grievance process was going.

70). The Grievance process routinely takes about 150 days to investigate and answer. This duration in a reasonable and sufficient time to sort out particulars regarding who would perform surgery. Plenty of time to hold a conference among providers to work out any treatment plan utilizing surgery as THE CARE FOR GID. Under **Farmers**, supra, knowledge can be demonstrated by circumstantial evidence.

71). Any jury may conclude that the Defendants approving authorities, Dr. Penn and Dr. Linthicum knew their stall tacticinvolved risk that was so obvious a layman could see the risk of depression to the Plaintiff and the risk of future harm of mental pain and worry was obvious.

72). The Defendants made the Plaintiff fulfill requirements under hormone therapy for the WPATH Standard of Care. At the time of filing the suit, the 12 months on hormone as required by WPATH were done, in fact, the Plaintiff has been on Hormone 18 months to date. The Plaintiff was prescribe a Bra for the gender role "SHE" has lived for the past 18 months, plus the 22 months in Psy counseling. Plaintiff was required to take the Hormone at the 'Pill Window' at 3AM/3PM everyday. Plaintiff was always required to travel to Galveston, Texas for appointment for Gender Dysporia, the Plaintiff never missed an appointment.

73). The Plaintiff ask the question to Ms. Alexander, why begain Hormones if Gender Reassignment surgery was not obtainable option?

74). When the Plaintiff met with Dr. Myers, the Plaintiff was prescribe Hormone and related to the Plaintiff that after 12 months of hormone treatment, that Gender Surgery was the next logical opinion. Any deviation from the Standard of Care which should mirrow what would be available to the Plaintiff if SHE was living in a non-institutional setting should be decided by a jury trial.

75). This unwarranted delay is causing a set-back for the Plaintiff, worry and anxiety to the extent the Plaintiff is in constant auguished state and mental pain now. Continually worrying about "split in two" Gender and the guilt that racks "Her Mind," of why "SHE" was made this way.

76). Without a treatment plan which includes surgery as a cure. The Plaintiff fall prey to the Directors intentional tactic of interference and hinderance of medical treatment by failing to provide definitive direction and failing to provide or readily furnish concise guidelines for the local medical staff to follow. These are issues for a Jury, to deliberate and decide.

End of address to Court:

## XVI.

### Fact and Legal Claims

77). Plaintiff feels strongly concerning "HER" right to be treated according to what is a rare, and serious medical issue. A disorder which can be and should be corrected.

78). The United States Constitution protects and guarantees the rights of the Plaintiff. To deny the Plaintiff the necessary medical treatment and care which is available to those similarly situated as the Plaintiff, of incarcerated circumstances constitutes "Cruel and Unusual Punishment." Which is a violation of the 8th Amendment.

79). As well as violating the 14th Amendment which states that, "no individual will be treated differently than another similarly situated individuals."

80). Equal Protection Clause, Due Process and Due Course of Law are guaranteed rights under the 14th Amendments and found within the Defendant's WPATH Standard of Care for Transgenders that the Plaintiff should not be discriminated against.

81). Transgenders are a very discrete minority and have a immitable trait they cannot change. Transgenders have been historically discriminated through laws that are passed against them. A case in point is the Marriage Act of one man-one woman, the Federal Department of Health and Human Services with a ban on Transgender surgeries since 1980, and because Transgenders lack protection cannot protect theirselfs through the political process. The Defendants are well aware of the verability of Transgenders and the fact discrimination against Transgenders is not noticeable in such a tiny insignificant minority of 212 Transgenders compared to 200.000 inmates that are heterosexual as reported by TDCJ prison system in the Black/pink Newspaper dated Feb/Mar. 2016.

The Plaintiff for these reasons ask the Court to treat my Status as a Transgender as a QUASI SUSPECT CLASSIFICATION because the past history of treatment of Transgenders need more protection than usual but not as much as suspect classification groups.

FACTS
YEAR 2013
PAGE 1.

**June**

# FACTS

## YEAR 2014

### Page 1.

OCTOBER 17, 2014....Plaintiff was re-examined and evaluated a second time by Dr. Walter Meyer, a Gender Identity Doctor and Psy.

Dr. Meyer had a Nurse Hicks from Texas Tech that acted as a liasion agent.

Dr. Meyer told the Plaintiff after 12 months on hormones he would recommend surgery for Gender Reassignment.

Nurse Hicks informed the Plaintiff that she did not have to have surgery to keep her Transgender Status.

The Plaintiff told both Dr. Meyer and Nurse Hicks, she wanted time to think about this, because for 20 years in prison no-one would tell Her what was wrong with her.

Nurse Hicks informed the Plaintiff that Texas Tech did not treat GID and had no Doctors that did.

Dr. Meyer prescribed the drug Estrodoil 1mg/twice a day with a follow up in 90 days.

Directors Penn and Linthicum of UTMB approved the hormone treatment plan as approving authorities under Policy G-51.11, Treatment of Offenders with Gender Disorders

Estotogen taken 3am/3pm every day.

OCTOBER 20, 2014....Plaintiff sent a letter to Dr. Meyer requesting Gender Reassignment at the earlist date possible, also a I-60 was sent to make a note in the file. 

I-60 on the following page incorporated in the FACTS 2014.

NOVEMBER 5, 2014....A blood test was order for hormone Levels.

21)

(To local Meds)
Bobbie

Please make note in File.

1) The GID Doctor said I would be on hormones (1) one year before gender re-Asignment surgery.

2) On Oct 22, 2014, I request surgery one-year After taking hormones

Schedule PSC
10/23/14  0130
Gameira

Hoverly
19-Z-24
Oct 22, 2014

OCT 23 2014

22

Jan 15, 2015 _____ Letter to Dr. Myer About Hormone Levels

Feb 14, 2015 _____ Letter to Dr Myer, Reconfirming I wanted the Gender Reassignment Surgery from our first meeting in Oct 17, 2014 and Oct 30, 2014 Letter

Feb 14, 2015 ____ Letter to Dr. Penn seeking answers on Gender Reassignment surgery. Discuss lack of treatment Plan for Gender Reassignment Surgery

March 8, 2015 ____ Letter to Dr Myer that summaried our March visit. The Main Point, I am supposed to be able to talk to a Gender Reassignment Surgen in the June visit.

March 21, 2015 ____ Letter to Ms Alexander, telling her Dr Meyer said I was 3 months into the 12 months requirement before Gender Surgery. Also my testone were 20 and Estrogen 50 right where he wanted them

April 27, 2015 _____ I reconfirm my desire for Gender Reassignment Surgery

Aug 4, 2015 _____ Met with Dr. Kwarteng, the McConnell Local Unit Doctor and he saw no treatment plan in his clinic notes

23

September 15, 2015

Met with Dr Meyer and Nurse Hicks the Texas Tech liaison agent. Dr Meyer explain that if I was in the free world it would take 90 days to have Gender Reassignment Surgery But because I was in Prison I didn't have a way to get it done. I ask if I was not in prison could I get a recomendation. Dr Meyer said yes he would certainly make the recomendation

Note   So, the Medical Need is here, Both Psy and Medically but because I'm in Prison cant do it.

"Nurse Hicks continue the meeting explaining that Texas Tech did not treat GID and all the years I was up there they didn't have anyone. Also UTMB didn't have any surgeon that could preform Gender Reasignment surgery"

I thought a moment and said I had the solution to the promblem. My solution was a "RedEye". Put a surgeon on a "Red Eye Flight" out of Arizona at 3AM arrive at Hobby @ 6AM, Surgery at 10AM, Back on the plane at 2pm —— Home by 7pm

Dr Meyer said it was something to Negotiate with Ms Ortiz

84

Also, Nurse Hicks said TDCJ woulden't pay
for Gender Reassignment surgery, I ask what did
TDCJ have to do with anything Medical — they
didn't object to my Thyroid Surgery, In all my
years in prison TDCJ never interfer in Medical,
they got the Health Care Policy.

Sept 15, 2015  cont.

Also Nurse Hicks said TDCJ wouldn't pay for Gender Reassignment surgery. I ask what did TDCJ have to do with anything Medical —— they didn't object to my Thyroid Surgery. In all my years in prison TDCJ never interfer in Medical, they got the Health Care Policy.

September 20, 2015 — Letter to Director Lentheam, Ask in this Letter what the final cure for Gender Dyphonia? Discuss UTMB as a Medical Contractor and Standard of Care under WPATH

Sept 21, 2015 — Letter to Dr Meyer wanted to Know the workings of the Department of who Access elegblity, prepose and refer for Surgery

Sept 22, 2015 — Letter to Dr Penn when will you prepare me for surgery, where is Educational Materials

My Notes

① Started Estogen Pills Oct 17, 2014 According to WPATH I have to be on Hormones one-year, Nolard Completed WPATH Requirements Oct 17, 2015

② New Rules, now Dr Myer wants me at the higher doze for a year or 3mg/twice a day will complete Dec 15, 2016

③ I decided to go along with this

Bobby

26

Feb 14, 2016 ——— Letter to Dr. Penn seeking Answers to Gender Reassignment surgery. Explain I went thru all of UTMB Requirements Also completed WPATH Requirement. I am at stage 5 now, prepare for surgery.

Feb 14, 2016 ——— Reconfirm I still want Gender Reassignment Surgery

March 8, 2016 ——— Dr Myers said I am supposed to talk to a surgeon that performs surgery

March 15, 2016 ——— Letter to Ms Alexander, telling her Dr Myers said UTMB is going to have to get used to the fact Gender Reassignment Surgery is going to happen.

March 21, 2016 ——— Note to Court

After the March 8, 2016 meeting with Dr Myers I reviewed the Step 1 and Step 2 Grievance and it said I had to be on Higher Estrogen for one-year Dr Myers said I was 3 months into the 12 month requirement ——— Dr Myers said I was the leader of the Pack, for Gender Surgery

March 30, 2016 — Letter to Dr Penn about the March 8, meeting with Dr Meyer and the fact as of March 8, 2016 I had 4 months before surgery.

April 15, 2016 — Letter to Dr Penn Is there anything else other requirements in Psy that has to be done?

May — 2016 — Summary of meeting with PREA / State Prisons ① Able now to get Long Hair

May 2016 — Letter to Dr Meyer about Long Hair Pass

May 2016 — Letter to Dr Penn about Long Hair Pass

June 15, 2016 — Letter to Dr Meyer about surgery for Gender reassignment.

June 20, 2016 — Letter to Dr Penn on Lack of Education Materials. Was Dr. Penn Aware at the Podium Asleep at the wheel

June 22, 2016 — Letter to Dr Penn continuing I want that Surgery And I want him to talk to me.

Fat 2016 (3)

June 28, 2016 _____ Letter to Dr. Penn on problem of Dr. Meyer only being able to recommend — OK, Who does the prescription the Local Doctor that knows nothing about GID's.

Oct 5, 2016 _____ Met with Dr. Myer, he added a new Requirement that he wanted me on 5mg of Estrogen with shots for a year.

① WPATH requires only a year ___Completed Oct 17, 2015

② 2nd Rule on 6mg/day ___Completed Dec 15, 2016

I changed over to shots to 5mg due to Prison convenience —

The 5mg shots are the same as 6mg of Pills.

③ Even if we go with the New Requirement ___ We still will be in Court to Answer — When?

I could very well be completed on the shots — I started in say in June, July, Aug, Sept, Oct Nov, Dec ____ total 7 months, leaves 5 months

I'm filing in Jan, I met the WPATH and the 1 year on higher dose. All Dr. Meyer is doing is stalling —

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 5/16/2012 | NUMBER: G-51.11 |
|---|---|---|
| | Reviewed: 07/13 | |
| | Replaces: 01/06 | |
| | Formulated: 01/06 | Page 2 of 3 |

## TREATMENT OF OFFENDERS WITH GENDER DISORDERS

C. Medical evaluation will include a complete physical examination with special emphasis on the genitalia and secondary sex characteristics.

D. Mental Health evaluation will be conducted by a qualified mental health professional (QMHP). If conducted by a non-psychiatrist, the evaluation and any supporting information must be reviewed by a psychiatrist. Only a licensed psychiatrist may make the diagnosis of GID within TDCJ.

E. If there are differences of professional opinion as to diagnosis or need for hormone therapy, a special multidisciplinary GID committee shall convene to review the case and make a final determination. This committee will include Regional or Senior mental health and medical directors from each University and TDCJ medical and mental health representatives appointed by the Director of the Health Services Division. The GID committee may seek other expert opinions or invite other participants as it deems appropriate.

III.  When a diagnosis of Gender Identity Disorder is made –

A. Mental health counseling will be offered.

B. Current, accepted standards of care and the offender's physical and mental health will determine if advancement of therapy is indicated.

    1. If hormone therapy is indicated, hormone therapy will be requested through the non-formulary process. Documentation of patient education and written consent are required prior to submission of the non-formulary request (see Attachments A-1 and A-2).

    2. If hormone therapy is prescribed, the offender will be followed in chronic care clinic with regular assessments for complications of hormone therapy (e.g. hypertension, liver disease, heart disease, breast cancer, etc.).

IV.  The University Directors of Mental Health Services and University Regional or Senior Medical Directors will be the approving authorities for treatment plans and hormone therapy related to GID.

V.  Facility medical staff will assure the facility warden and TDCJ Health Services Liaison are immediately notified of all offenders alleging or presenting with signs or symptoms of a gender disorder.

4–4

30 - 31- 32

# Chelsea Manning Told She Can Have Gender Reassignment Surgery, Lawyer Says

By JONAH ENGEL BROMWICHSEPT. 13, 2016, New York Times
Chelsea Manning, who announced that she was female the day after being sentenced to prison in 2013 for leaking government files, has been told that the United States military will allow her to proceed with gender reassignment surgery, her lawyer said on Tuesday.



"Chelsea has received word from the military that they are moving forward with the recommendation for surgery," said Chase Strangio, a lawyer for the American Civil Liberties Union. Mr. Strangio said that he did not know whether the Army had clarified who would pay for Ms. Manning's treatment.

Lt. Col. Patrick R. Seiber, an Army spokesman, declined to comment because the matter concerned the health of an inmate. In a statement provided by her lawyer, Ms. Manning, 28, praised the decision, but wondered why it had not come sooner. "I am unendingly relieved that the military is finally doing the right thing," she said. "I applaud them for that. This is all that I wanted — for them to let me be me. But it is hard not to wonder why it has taken so long."

"The surgery was recommended back in April 2016," she said. "The recommendations for my hair length were back in 2014." [...] The decision to allow Ms. Manning to proceed with the surgery appeared to be emblematic of a gradual shift in the military's position on transgender service members.

In August 2013, Ms. Manning was sentenced to 35 years in prison for leaking government files to WikiLeaks. A day after her sentencing, Ms. Manning, who was then known as Pfc. Bradley Manning, issued a statement saying that she was female and was changing her name to Chelsea. She requested hormone therapy "as soon as possible."

At the time, a spokeswoman for the Army prison at Fort Leavenworth, Kan., where Ms. Manning was being held, said that the prison did not provide hormone therapy or gender reassignment surgery. In February 2015, the Defense Department approved Ms. Manning's request for hormone therapy. The next month, a military court recognized her as a woman.

A Department of Defense memo dated June 30, 2016, overturned a ban on open service by transgender people in the military and made it clear that the military would allow active service members to transition genders. Before, service members who were receiving medical treatment related to gender transition were discharged.

Ms. Manning had not believed that the change in policy would apply to her, Mr. Strangio said, and she was later charged by the military with offenses stemming from a suicide attempt in early July. She still faces those charges, he said.

"It was clear that one of the main drivers of her mental health crisis was that there was really no hope that she would ever receive the care that she needs," Mr. Strangio said. "This is a really important beacon of hope for her."

Mr. Strangio said that Ms. Manning had been given "some indication" on Monday that a compromise might be worked out with respect to her treatment. On Tuesday, she was shown a treatment protocol that had a number of recommendations for her in writing, he said, confirming that a doctor's recommendation from April that she be treated for gender dysphoria was being followed.

In her statement, Ms. Manning said, "I hope this sets a precedent for the thousands of trans people behind me hoping they will be given the treatment they need."

# Two-Spirit Society supports Standing Rock

September 8, 2016

Honorable Chairman Archambault*:

On behalf of the Indian Canyon Two-Spirit Society, we are writing to express our support for the Standing Rock Sioux Tribe and the Sacred Stone Spirit Camp. We support the critically important work you are doing to protect the Missouri River from the Dakota Access Pipeline (DAPL).

The Dakota Access Pipeline poses a serious threat to the water, land, health, and way of life for all communities that live along the shores and tributaries of the Missouri River. We urge President Barack Obama, Secretary of the Interior Sally Jewell, and Assistant Secretary of Indian Affairs Lawrence Roberts to take any and all steps necessary to protect the Missouri River, including ordering a permanent stop to the construction of the Dakota Access Pipeline.

We support the work you are doing to defend key cultural and spiritual sites, including human graves, at the confluence of the Cannon Ball and Missouri Rivers, which would be bulldozed if the pipeline followed the proposed path.

As Two-Spirit people, as Indigenous people, and as fellow human beings who drink water, we thank you for working to ensure clean water sources for all our relations. We recognize that your efforts have impacts far beyond the borders of the Standing Rock Indian Reservation: we are all connected, and we all stand to benefit from clean water. You are protecting the water for all of us, and for the generations yet to come.

California is experiencing a severe drought, and in our region, water is extremely scarce. This makes us acutely aware of the importance of protecting our water. The Lakota phrase "Mni wich6ni,"water is life, is a truth that the Ohlone people also recognize.

The violent actions, including the use of attack dogs, that DAPL's private security force has perpetrated against the people who are peacefully defending Standing Rock's homelands, your ancestors' graves, your cultural sites, and your sacred waters, is unacceptable. We condemn the actions of the law enforcement personnel who stood by and witnessed these illegal and unethical acts without intervening; they are acting without honor, and we reject their actions as inhumane.

We condemn the falsehoods that law enforcement spokespersons are spreading to the media, attempting to turn public opinion against the water defenders. The roadblocks and other forms of harassment and intimidation that the North Dakota Highway Patrol and the Morton County Sheriff's office have implemented in order to interfere with people who are exercising their constitutional right to assemble peacefully should be reported by the media. We encourage all journalists to report the facts and realities of those defending our natural resources from further contamination.

We applaud your actions, and offer you our support in this time. We understand the importance of water, and the seriousness of the situation. Our thoughts and prayers are with you, and with all who have joined you at the Sacred Stone Spirit Camp. Our community stands with you. Please contact us if we can be of further assistance.

All Our Relations,

Kanyon Sayers-Roods, Zephyr Elise, Joshua Aidan Dunn, and Mary Montes
Leadership Council, Indian Canyon Two-Spirit Society

CC: President Secretary of the Interior Sally Jewell;Assistant Secretary of Indian Affairs Lawrence Roberts; North Dakota Highway Patrol Superintendent Colonel Michael Gerhart; Morton County Sheriff Kyle Kirchmeier; CEO Kelcy Warren of Energy Tranfer Partners LP

*Chairman David Archambault of the Standing Rock Sioux tribe



2-Spirits

TDCJ #702013
MCCONNELL UNIT
3001 South Emily Dr.
Beeville, Texas 78102


January 15, 2015

Dr. Walter J. Meyer
815 Market Ave.
Galveston, Texas 77550


Dear Dr. Meyer,


1. You prescribed Estriodaul for my Gender Dsyporia on October 17, 2016. In this conference you said about Blood work that would monitor my Estrogen levels and would bump it up as needed.

2.  I have been on Estrogen for about 3 months come Jan. 17, 2015
 There has been a pause in giving me my hormones medications due to getting it renewed.

3. Would this not be the perfect time to recheck the hormone levels and bump them up. What I have in mind for the proper doses is to park my Estrogen right in the middle of a bell curve for estrogen intake.
    As always you're my Doctor and have final input, but would you get involved here.

4.  Dr. Meyer, today is Jan. 15, 2015 -let us use this letter to reconfirm my desire for sex-reassignment surgery after Nov.17, 2015, at the earliest possible day.

5.  I am happy now and look forward to a complete change, everything just seems brighter.


                              With love and great respect


                              _____



cc. Trans-Pride Inititive
    Ms Mocha Jesse Scroggiaws
     Ms Brandy Porter
    Ms Ashley Mettinez



                         3 4

March 21,2015

To: Ms Alexzander/Ms Bennit
    McConnell Psy Dept.

From: Ms Bobbie David Haverkamp
      #702013

Dear Ms Alexzander and Ms Bennit,

The GID Doctor said I was 3 months into the 12 month requirement
for Gender Reassinment surgery, seems I have to be on the Higher
levels before I get the go ahead. My TEST is 20 which the Doc said
was lower than most females and the Estrogen is at 50 right where
he wanted it.

Now, What happens next?   Are there any Pre-requirements in the
Psy department before surgery ?  I don't want to be caught napping
on this.   The reason I bring this up, in the March 8,2016 meeting
Dr. Meyers wanted to know where the release form was?, I like to of
died right there....hastly I thought, yes Ms Alexzander has one from
Jan 2013.  Anyway I signed one real fast and dated it March 8, 2016.

Now, I understamd the Local level cannot talk about Gender Dysphoa,
that's fine but Local can certainly help with a T.V. Conferace onthis
Pre-Psy requirements...is there anything else?

On the funstuff, the Doc. asked about the McConnell Unit and whatit
was like...I told him the Unit was so advance in treatment of  GID
and securtiy...Personally, you two know the McConnell Unit open up
the GID Clinic in Galveston,...the Psy Department here was at least
2 years if not 3 years ahead of everyone.
   That Beaumont Unit certainly cannot say that, they had the market
corner in Gays, yet never did anything....except to follow after the
McConnell Unit in sending patients to Galveston.

Well, thats it, because this is not a grievable issue according to the
Grievance Department...this makes it a fair question to ask Dr. Penn..
so would you forward this letter to him. I know he will be thrilled
to answer and be helpfull.

With Deep Respect                    **MAR 2 8 2016**

*Ms Bobbie*

PS. There 212 Reg Trans in the sytem. And you got about 10%
as of Now, with more coming - JOY

35

FACTS
YEAR 2015
Page 4

September 20, 2015

Ms. Bobbie D. haverKamp,#702013
MCCONNELL UNIT
3001 South Emily Dr.
Beeville, Texas 78102

Director of Medical Service for UTMB
Ms. Lynette Linthicum, M.D.
Galveston Hospital Unit
Galveston, Texas 77550


Dear Director Linthicum:

    I an a Transgender patient of UTMB's Correctional Care. I have been
in counseling with UTMB's Psy Dept., on the McConnell unit under the guidance
of Ms. Alexzander for 22 months. The sessions were about Gender Identity
Disorder. Upon Ms. Alexzander recommendation I was sent to Jester 4-Psy Hospi-
tal, where two UTMB Psy Doctors diagnosis me for G.I.D. Shortly thereafter,
I was sent to Galvester for another evaluation. This evaluation was performed
by UTMB's Psy Doctor Walter Meyers, G.I.D. Doctor. Dr. Meyers conclusion
was I was prescribe Estrodial 1mg/twice a day. I saw the Doctor 90 days later,
the meds were increased to 2mg/twice a day.

    Six months later, Sept. 15, 2015, I came back for a re-examination. This
examination on Sept. 15, 2015, reveal that I had no Blood-work except at
the start. Dr. Meyers stop Blood-work being done at the Hospital when he
found out that I had been off my meds for 3 days and my Estrodial was not
KOP (Keep-on-person) and did not travel with me. Dr. Meyer was appall when
he found out my Estrodial was stop cold turkey for 10 days. This was due
to the Darrington Nurse demanding the meds be sent, via the Care Chain Bus
was re-routed and delivered the meds to Darrington . Yet on my return, the
meds didn't follow and I ran out. The McConnell unit would not re-order till
the due date.

    The Sept 15, 2015, examination also revealed the Bra that Dr. Meyers
ordered March 27, 2015 never was ordered due to the male P.A. saying "consider
this retaliation, I don't feel its a medical necessisty and this is a Male
Prison." Dr. Meyers re-order the Bra, it remains to be seen if its issued
to me.

    Director, these are problems that are being looked at. However, one
additional problem came up___what is the final cure for G.I.D.? When? Where?
Who?

    Under WPATH Standard of Care I have to be on hormones one years before
being eligible for Gender Reassignment Surgery. Yet, in the Sept. 15,2015, dis-
cussion I was told that UTMB did not have surgeon to do Gender Reassignment

36

surgery. Arizona and Philadelphia, Pa.were the only places you could get this done.

After thought, the other solution is offered by the Airline industry called a "Red Eye Flight." Arizona or Philadelphia, catch a plane at 3AM, get to Hobby International Houston, Texas at 7AM, surgery in Galveston at 10AM, finish with surgery 2PM, back on the plane at 5PM and home by 9PM. Simple, huh.

UTMB is a Medical contractor. The nature of contracting is you subcontract out work to other surgeries that specialize, ok, UTMB doesn't do Gender Reassignment, contract a specialist that does.

Director Linthicum, I am a UTMB patient on Gender Identity Disorder form start to finish.

I want to be cured, tell me when you will start the process for Gender Surgery?

I need some in-put from you - could I hear from you by Oct. 20, 2015. Looking for answers for a cure, starting Oct. 2015, I will start my 4th year at this.

<div align="center">With great respect,</div>

Ms. Bobbie

cc:   files
      Trans-Pride Inititive
      Dr. Walter Meyers - Galveston Hospital
      Director of Medical Services -Doctor
      Lynette Linthicum



FACTS
YEAR 2015
Page 6

September 21, 2015

From:  Ms. Bobbie D. HaverKamp
       TDCJ# 702013-ML
       3001 South Emily Drive
       Beeville, Texas 78102

Dear Dr. Walter Meyers:

     1). This letter is a summary of our Sept. 15, 2015, meeting. In our meeting, you examine my breast for growth, which you said the growth was significant.

     Also, the Bra issue came up again and you was to re-submit the Bra, but now its a Medical an Psy - necessity.

     Dr. Meyers, in the Hospital cold A/C, mu breast draw up but out in the field they swell. Now to the point of being very noticeable. The Bra cannot come soon enough.

     2). We discuss Prchiectomy, but I did not feel any conclusions were drawn due to the start/stop of the Estrodial.

     3). You were going to be in negotiations with someone about making the Estrodial KOP (Keep-on-Person).

     A side note to this is McConnell Nurse Syner sent 12 pills with me for 3 days. I never received one of them. My next dosage was Sept. 17, 2015. I am due for a Blood Work Sept. 30, 2015, just like you order.

     4). I am receiving the 100mg of Spirololatone.

     5). I have wrote the Director of UTMB to discuss when the cure will be started, I've been at this starting on my 4th year Oct. 2015, that's long enough, the Directors have some answers I need them.

     6). The Psy. Dept., now comes back into the workings, having to Access Eligibility, Prepare and Refer for surgery. I put in my request Sept. 21, 2015.

     Please, I don't mean to or want to feel that I am being pushy, but I won't let go. Before I even came to you as a patient, I had already did 22 months of counseling with UTMB Psy. Department. My point here is I've

been pursuing this a long time and the cure is in sight. To live a normal life, whole, not two pieces, I won't give this up.

8). Once the Blood-Work comes back, I want to know the results and if we increase the Hormones again.

Dr. Walter, when we know the results the Orchiectomy Surgery comes back-up. In my case Orchiectomy helps control Hormones and could lower my dosage of Estrodial which is not a bad thing. I will need a referal from you, and I will take it from there by going back to the local Doctor and start the process. I want Nell Gather, from Trans-Pride Institute to call you. All medical release are being prepare for you and her by me and McConnell Medical Dept.

9). I feel confident UTMB will fund the surgery's to prepare the Orchiectomy and re-assigment surgery. When UTMB's Surgeries took out my Thyroid, it was a 4 hours ordeal going around nerves, vocal cords muscles. A Gender Re-assignment will be a snap for them, surgery at 10 AM, home by 5 watching the Dallas Cowboys.

10). I am to see you in 90-days about Dec. 15, 2015, or after the 1st of the year 2016.

In conclusion, who's your assistance? That GID Clinic in Galveston better be ready for some patients. You have the entire TDCJ population to examine.

With great love and respect,

_____
Ms. Bobbie Haverkamp

cc:  Trans-Pride
     Director UTMB
     Dr. Walter Meyers
     files

Page 21 of
39

FACTS
YEAR 2015
PAGE - 8

MS. BOBBIE D. HAVERKAMP #702013
W.G. MCCONNELL UNIT
301 SOUTH EMILY DR.
BEEVILLE, TEXAS 78102

SEPTEMBER 22, 2015

Director of Mental Health
Dr. Penn
P.O. Box 09
Huntsville, Texas
77342

Dear Dr. Penn:

Hi, I am a certified UTMB Transgender, went to Jester 4 for the GID Diagnosis and further
evaluation in Galveston. I have been started on horomones. So, Far, I am starting my 4th year
G.I.D. program. I am very close to completeing my 12 months requirements under UTMB S standard
of care with WPATH for gender surgery.

When I read the standards of care, page 26 "Assess Eligibility, prepare and refer for surgery.
This is under UTMB's World Professional Association for Transgender Health."

My question isd just what takes place now in helping me be psycologocally and practically
prepared. Are you going to start any classes on edification and proper behaviors as a female?
Dp you furnish any televison educational materials on the final phase of Transgenders?

The standard of care places the preperation at UTMB'S Psy services for a Transgender. As
a 4th year UTMB Transgender, I am certainly ready for the surgery and most important, surgery
as the cure.

Look to hear from you the end of October 2015, this is the final month before the next phase
to start and finish the procedure.

With the greatest respect ,

_____
Ms. Bobbie Haverkamp

cc:file
    Nell Gaehber-Transpride Initive
    Director of Medical Health- Lynette Linthicum
    of Galveston, Texas
    Director of Mental Heal;th- Dr. Penn
    of Huntsville, Texas

40

December 15, 2015


Plaintiff met with Dr. Meyer, The Plaintiff ask him to let me try to get a Gender reassignment surgery. Dr. Meyer was very reluctant, so the plaintiff changed course.

Dr. Meyer did say he would write a letter of recommendation for surgery but would not put it in the files.

Dr. Meyer increased the estrodial to 3mg/twice a day. Plaintiff was measured for a bra, Plaintiff has been at this since March 2015 and have gotten no where on this issue... Its beyond me.


END OF NOTES FOR YEAR 2015

Feb 14, 2016
From: Ms. Bobbie David Haverkamp
      TDCJ# 702013
      McConnell Unit
      3001 South Emily dr.
      Beeville, Texas 78102

To: Dr. Joseph Penn
    Director of Mental Health UTMB CORRECTIONAL SIDE
    301 University Dr.
    Galveston,Texas 77555   C/O GiGi Jamison secetary


Dear Dr. Penn,
     I am a patient under MMHC Policy G-51.11 for gender dysporia. I have spent 22 months
in counseling with Ms. Alexander Psy dept on the McConnell Unit. and then started horomones
treatment as of to date Ive been on horomones for 16 months. All in all about 36 months
in the program.

Dr. Penn I am seeking answers to what comes next? Firm Answers. I did the grievance program
and was informeed by step 2 medical grievance program at the office of professional standards
that my request for a treatment plan that shows when Gender reassignment surgery occurs
is not available through the offender Grievance program.

Under WPATH standards of care. I have to be on horomones for one (1) year before surgery
can be considered. At the present Feb 14, 2016 I have been on Horomones for 14 months and
even if UTMB hurried. I could be on horomones 24 months before surgery. Dr. Penn under
WPATH 12 months is all that is required and 24 months is more then enough for any maxium
benifits to my body.

Because this is policy explicit really not grievable issue with professional standards.
I have signed a release of information to Ms. Nell Gather of Texas Pride Initive P.o. box
3982, Dallas, Texas Phone 214-449-1439 to discuss my concerns regarding gender reassignment
surgery. Ms. Gather knows that I shun publicity and like to work very quietly at what I
do. Ms. Gather will maintain a strict silence in these matters.

The problem is policy G-51.11 really doesnt say anything. Yet when I go to WPATH it says
the following: Page 23 Tasks Related to assessment and referral.

1. Assess Gender Dysphoria... This was done at Jester 4 and Galveston.
2. Provide information regarding options for Gender Idenity and expression and possible
medical interventions.
        Ms. Alexander did this for 22 months.
3. Assess, Diagnose and discuss treatment options for coaexisting health eoncerns.
     I have already went through this aside from the usual stuff it was no big dseal and
I passed.
4. If applicable assess eligibility prepare and refer for horomone therapy.

Dr, Penn I am in this stage as of now. I would like to add my body took to the horomones
like a duck to water, my insulin has been lowered I feel great and bareing and set backs
look to the future.

#5 IF APPLICABLE ASSESS ELIGIBILITY, PREPARE FOR SURGERY.


A2

This is where I am at right now but I have nothing to go on and its stage I am in need of your help and diredtion. You can see that I have did every step but the last one and its back of direction that worries me.

With this in mind I am authorizing Ms. Gather of Trans-Pride Inttive to discuss Gender Reassignment surgery and wht when where it will take place.

In closing this letter is trying to clear questions. Let me be clear on this point, there is no space between us no rift only lack of communication.

Please expect Ms. Gather to contact you.

<div align="center">With the greatest respect and love</div>

<div align="center">Ms. Bobbie David Haverkamp</div>

cc:File
    Ms. Gather Trans Pride Initive
    Ms. Alexander- McConnell Unit Pschy dept

Trans Pride Initive
P.Ol. Box 3982
Dallas, Texas 75208

**FACTS**
**YEAR 2016**
**PAGE 1**

Sunday Feb. 14, 2016                    This is Valentines Day.

From: Ms. Bobbie D. Haverkamp
TDC#702013
        McConnell Unit
        3001 South Emily Dr.
        Beeville, Texas 78102

To: Dr. Walter J. Meyer III
    Psych. Facmity-Pop

Dear Dr. Meyer,

I am sbheduled to see you In March 2016 about Gender Dycphoris. you increased my estrogen
to 3mg/twice a day. I am feeling real good. wts under control and the insulin was reduced
to 20 mg at night... it was30 at night but it got reduced.

When we met with Texas Tech nurse Hicks I got cencern about no surgery and did write to see
where they were and I wrote UTMB on a grievance form and got a answer. I think itsxfgax good
but I want to run it through you.

The office of profesional standards in Galveston is saying this. "The specialist must follow
CMHC policy G-51.11, with all attachments. to provide youwith treatments for this condition.
Also this had to be on horomones for a year before you would consider me for gender reassignemnt.

Dr. Meyer good news... Ive been on horomones for 16 months so I can be considered for surgery.
I want to discuss this with you and see between now and then if I can get some educational
books on this subject. You just tell me the books and give me a address and I'll order the
books myself.

More good news... Ix The McConnell Unit is starting to break down, we are provided barriors
to be stropped search in now and everyone up to speed, we are girls/ Thay are very careful
where I'm housed now.. of couosre now many have breast like I do, but the respect and understandin
is here.

More good news the local doctor called me to his office and said he ordered the bra. which
cannot come s oon enough the way I show. To have some more fun I aske him to order me Red
bras, he punched it in and some one some where om the Texas prison system is waking up to
a form that saying the MCconnell Unit wants two red bra's 44b? Have coffee over this. It seems
the local doctor does the sending not you.

Oh yeas they are reading your reporets here what ever you put in to do... will go. If I get
a referal for gender surgery, I will get sent to Galvestons Surgery  department in Galveston.
For osme reason the local medical ha s to be on the ground floor of all this. It seems the
local medical doctor  does the sending not you.

See you soon.

PAGE 31 OF ___

44

*Facts*
*year 2016 p 4*

March 8, 2016

From: Ms Bobbie David Haverkamp
      #702013
      MCConnell Unit
      3001 S. Emily
      Beeville, Texas 78102


Dear Dr. Meyers,
            The March 8, 2016 was very uplifting for me and to be able to
look at the blood test results and know that the estrogen levels were now
considered high enough to began the count down for Gender Reassignment surgery
was like my ship coming into safe harbor.

It is just wonderful to know that you brought this point safely and secure,
its exciting to know that I had 3 months on the 12 month requirement to be
on the higher estrogen levels before surgery.   Thank-you with all the love
and respect a letter can convey.

I discuss with the local Doctor at the McConnell Unit the high sugar levels,
he rechecked them and it was between 85 and 130, which is OK. It the travel
thru Darrington that is the problem...no medication...none period.


In Summary of our visted:

1. see you in june 2016

2. at the june vist I will have 6 months done on the 12 month requirements.

3. I am supposed to be able to talk to a surgen that performs gender surgery.

4. In the june meeting I hope to discuss what needs to be done in a Pre-surgey
   situation.

5. Last, we were going to change over to shots. I ask the Local Doctor about
   this and he said it was no probblem at all.


                            Thank you Doctor, I am seeing a end.

                            Ms Robbie

71 D of 36

Feb 14, 2016

Ms Alexander,

① Do not return ___ this letter is for information purposes only

② Here was the Promblem — I am at the Last Step, Surgery But have No Treatment Plan, so I grieved it. The Step II from Proflesional Services in Galveston said it was not a grievable issue.

③ So, Letter to Dr. Penn and Trans-Pride.

④ Heck, let someone Else worry about it — sort of saint-like for me.

⑤ Oh — to Bring you up-to-date : Dr Kwarten did order my Bra. As a side note I ask him to order Red ones. Where ever that order went, someone is walking up to The McConnell Unit wants (2) Red Bra's ?!!

Hope you see the humor ___ just to keep you abreast.

Love

Bob Sue

FEB 22 2016

4F60B

Travis-Pride copy to be added to a copy of the UTMB Suit.
year 2016 P 5

March 8, 2016

Met with GID Doctor Meyers in Galveston UTMB Hospital. Took blood work and it came back _20_ on the testosterone, which Dr. Meyers said it was lower thabn most women have and the Estradiolwas at _50_ which was right where it needed to be for the higher estrogen levels The subject of gender reasignment enter the conversation and Dr. Meyers said I had to be on this level for 12 months before surgery and I was 3 months into the 12 months requirements of 12 months. I asked him aboout UTMB and Dr. Meyers said UTMB is going to have to face the inevitablethat Gender Reasignment surgery is going to happen. He would bring this up in the staff meeting. I ask where does this leave me, he said I was the leader tof the pack. I reminded him I always wanted the surgery, He said was aware of this and I always kept my appointments, He was aware of this. I thank him for bringing me safely in with no complications at all, the fact he started slow brought me to safe harbor. I told him at the end of 9 months I have been at this for 5 years, he said he was aware of this. Next appointment in 3 months and then its 6 months more and then surgery and a end to this, YES!

Also, he is going to start me on hormone shots the next time...seems he uses the pills to lower the test. and when we get it to where it needs to be, we go to shots, which is fine with me... no more 2AM morning stuff, Sleep at last.

I wanted to talk to a Gender Reasignment surgen, Dr. Myers said normally you don't talk to them except about one month before surgery, but I told him he knew how I was I liked to think about this because of my sitution, he said when I came back he would see what he could do.

Also, had to sign Medical Hormone release March 8, 2016 — add its 14 months later. I did sign one for Ms Alexander Jan 2013

46



FACTS
YEAR 2016
PAGE 4

March 8, 2016

From: Ms. Bobbie D. Haverkamp
      #702013
      McConnell Unit
      3001 South Emily Dr.
      Beeville,Texas 78102


Dear Dr. Meyers:

   The March 8, 2016 was very uplifting for me and to be able to look at the blood test results and knowe that the estrogen levels were now considered high enough to began the count down for gender reassignment surgery was like my ship coming into safe harbour.

   I discuss with the local doctor at the McConnell Unit the high sugar levels, he rechecked them and it was between 85 and 130, which is OK. It's the travel thru Darrington that is the problem... no medication... none period.

   In summary of our visited:

   1. See you in June 2016.

   2. At the June visit I will have 6 months done on the 12 month requirements.

   3. I am supposed to be able to talk to a surgeon that performs gender surgery.

   4. In the June meeting I hope to discuss what needs to be done in presurgery situation.

   5. Last we were going to change over to shots. I have asked the local doctor about this and he said it was no problem at all.


                    Thank you Doctor, I am seeing a end,

March 30, 2016

From: Ms Robbie David Haverkamp
      #702013
      McConnell Unit
      3001 S  Emily Dr.
      Beeville, Texas 78102


To: Dr. Joseph Penn
    301 Universit Drive
    Galveston, Texas 77555   c/o Gigi Jamison secrety.


Dear Dr. Penn,

Hi, I'm a transgender under care of UTMB and enrolled in the Gender
Dysphora Clinic.

I met with the GID Doctor on March 8, 2016 and was told that I was 3 months
into the 12 month requirement of higher estrogen before gender re-assign-
ment surgery.

The question is, Is there anything else in the Pny. Depaert ment  that I
have todo to fullfill . Anything at all?

Any help will be appree

49

FACTS
YEAR - 2016
Page - 7

April 15, 2016

From:   Ms. Bobbie D. Haverkamp
        TDCJ#702013
        McConnell Unit
        3001 S. Emily Dr.
        Beeville, Texas 78102

To:     Director Joseph Penn/Mental Health
        Quailty Services
        301 University Drive
        Galveston, Texas 77555

        C/o  Gig Johnson

Dear Dr. Penn:

I am a transgender and local Psy Health does not treat my condition, so I am legal to write you.

I have been in the Gender Dysphoria program for 4 years plus, and only UTMB has taken care of me.

I started officially in Jan. 2013 and for 32 months did counseling for GID, then started Hormones. At the present, I have been on hormones for 14 months and have satisfied the requirements under the World Professional Association for Transgender Health before Gender Reasignment Surgery of only 12 months on hormones.

After a March 8, 2016 meeting with Dr. Meyers he wanted me to complete a 12 month program of Estrogens at a higher level, which he said I was already 3 month into the 12 months. This left about 9 month to complete which will be around December 2016.

I am anxious over this, but accepted it and as the clock counts down, the question is what now?

Dr. Penn, a straight question: Is there any other requirements in Psy that need to be done?

From what I've read I have done everything ask of me and more. Your attention to the matter will be appreciated.

I am feeling great, my body took to the hormones like a duck to water. I am ready to have surgery and from the first, my goal has always been surgery.

With the Greatest Respect,

_____
Ms. Bobbie

cc:   files
      Trans-Pride



March 21, 2016   Wrote a letter to Ms Alexzander of McConnell Psy
                 Department and Ms long of UTMB Medical Practic
manerger was there any thing that need to be done in a Pre-Gender
Reasignment Surgery.

March 21, 2016

Note to the Courts:

Originally, I had plan to file the 1983 Suit against UTMB's Directors

but after the March 8,2016 meeting with Dr. Meyers I reviewed the

Step 1 and Step 2 grivances, they said That I had to be on higher

estrogen levels for one (1) year before being consider for gender

reasignment surgery.

    Although this is not the treatment plan I had envision it isa

treatment plan in that I have to be on higher estrogen for one year.

With this in mind, and the fact Dr. Meyers said I was 3 months into

the 12 month requirement I will go ahead and complete the additional

9 months and see if this can be worked out of Court. I will give

Dr. Meyers credit, he's been plugging at getting the estrogen higher

and acheived this in the March 8,2016 meeting. And Dr. Meyres said

UTMB was going to have to face the inevable that Gender reasignment

was going to happen. and I was the leader of the pack.

So, I am on hold and see him in June2016 he sizd I was/ or he's going

try and let me talk to a surgen.

51

May 10, 2016

To: UTMB Local

12A-44

From: Ms Bobbie David Haverkamp
        # 702013

MAY 25 2016

Hi,

① (Safe Prisons Sgt Meyers) said because
I was GID, had a Diagnosis of GID,
was a register Trans-gender (I could
grow my hair long with a pass from
the Doctor

② I am requesting a Pass from Medical
that its OK for me to have my hair

long.

Ms Bobbie

chart review

Please discuss c̄ GD Clinic.
And will follow with the warden.  2 Attach _____
                                                          5/24/16 _____

52

May    ,2016


Ms. Bobbie David HaverKamp
#702013
McConnell Unit


Dr. Myer




Dear Dr. Myer:

    On May 6, 2016, the Transgender had a meeting with PREA/Safe Prisons, Sgt. Myers and Officer Brako.

1).    This meeting producted that if a Transgender had a Medical Pass that allowed her to grow her hair to shoulder length they would honor the Pass.

2).    To grow your hair, a girl had to be a Registered Transgender under Doctors care for Gender Dysporia.

3).    I qualified to grow my hair longer. I have been seriously considering going to lock-up before I let them cut my hair -- if I have to go to Segregation, I am getting myself ready, hopefully I won't have to go.

                    Sincerely,


                    *Ms Bobbie Haver*
                    Ms. Bobbie HaverKamp


cc:  files
     Ms. Long - McConnell
     Trans - Pride Institute
     Dr. Penn




53

May     , 2016

Ms. Bobbie David HaverKamp
#702013
McConnell Unit

Director Joseph Penn
Psy Director
Galveston, Texas

Dear Dr. Penn:

    Hi, this is Ms. Bobbie HaverKamp, McConnell Unit. As a
Transqender, both of it is known the local Unit does n't treat
GID.

1). To keep you abreast of development:
    The Transgender met with PREA/Safe Prisons McConnell Unit
on May 6, 2016, and the meeting produced that Transgenders with
a Medical Pass could grow their hair to shoulder length. This
is the right step for me, I have been seriously considering
Lock-up before I let a Inmate barber give me a man's hair-cut.
I just don't want it cut.

    Safe-Prisons said they knew I was Registered as a Transgender
under Doctor/Psy care. So with that said, with a Medical Pass
for longer hair it will be no problem.

2). Make-up; Sgt. Myers said the reason they don't allow us
to wear make-up is we become easy targets for predators. Yet, on
the flip side, wearing make-up allows us to be spotted by the
guards right away. The old saying applies here, A girl in a
Red Dress you know where she's at.

    A transgender in make-up allows us to be    spotted    right
away. In my case, I can run but never can hide. Transgender
from the McConnell to Galveston knows me as well as staff from
the McConnell to Darrington to Galveston, so make-up won't make
a difference for me.

    No reply is necessary, I'm sending this by local Psy Unit
to also keep them up on changes coming.

                         With Greatest Respect,

                         *Ms Bogss.e*
                         Ms. Bobbie


cc:  files
     Ms. Alexzander


5A

May    , 2016

From:   Ms. Bobbie David HaverKamp
        #702013
        McConnell

To:     PREA/Safe Prisons McConnell Unit
        SGT. MYERS-Safe Prison
        Officer BRAKO

        RE: Summary of May 6, 2016 - Meeting with Transgenders.

1).  Hair Length: The consensus of PREA/Safe Prisons is that if
     your a Register Transgender and diagnis by a Doctor with
     Gender Dysporia and have a pass that allows you to grow
     your hair to female length, the pass Pass will be honor
     by PREA Staff and Safe prison.

     Now, there are Transgenders that are Register as Transgenders
     only with Safe Prison that do not have the Gender Dysporia
     Evaluation, these people will not be allowed to grow their
     hair to female length due to the fact they have no Medical
     Pass that confirms the Psy/Medical nessisity.

2).  Make-up:  PREA/Safe Prison reasoning for denying make-up
     is due to a predator being able to single a Transgender
     out readly in a crowd.

     The meeting produced a opposite effect in that make-up
     allows a guard to readly identify us in a crowd and provides
     recognition - there's a old saying "you always know where
     the girl with the red dress is at."

     **The meeting produces no conclusion.**

3).  Housing:

     The problem was mainly going to Galveston and coming back
     and going into Ad. Seg. A-Pod for 45 day awaiting housing.

     Officer Brako said to write him a I-60 and request the
     Pod we want to go back to - he could not guarantee the
     same house, but the same Pod was possible.

     My note: I requested F-Pod, here's why.

     1) I do not go on 2-row or 3-row showers, only 1-row. When
     I shower, I ensure that I am alone out of other view, no
     peeking.
     2) I do not allow other Offender at my door, if they need
     my attention, they must stand to the side and knock until
     I answer.
     3) I do not allow any sexual innuendo toward myself, its
     not lady like to allow this.
     4) I don't appreciated girly pictures around me. They
     degrade and bring mens to slave level. You own a 100 pictures
     means you are a slave to degrading woman.

                              -5-

5)   I know the people on F POD, the good people, the so-so, the low lifes.

No one has to like me, but they do have to give me my respect.

6)   The  Pod know 1 sit only on the bench, the girls bench does'nt infringe upon their territory.   Further, I reframe from sitting at the tables in the dayroom.

Closing:

It takes time to educate a Pod  of  Men  to  the  standards I  expect  or  who  I  am. I don't want to keep re-educating a Pod. So, please,  F-POD, not any housing.

Work:

I ask Mr. Palmer  about  a  Mechanic job -- turned down flat (sort of) -- he said their  were  40  guys  ahead  of me. So I  ask  for  Preventive  maintenance,  no real effort. So I ask  for the Needleman job. I had to go to the Head-Manager, he said he would put me in the Needleman Job.

Three  hours  later  I  had  to  decline, the reason 45 days in  Seg.-45  days  in G.P. - 3 days Galveston - 45 days back in Seg.

I  can't  treat  people  like  that, trying to give me a job only to be in Seg. 45 days out of 90 days.

No real solution here?


The  meeting  has  18  reg. Transgenders. The McConnell Unit is light years ahead of TDCJ

7)   Ha partitions  installed  in front of dayroom commodes what a relief! Now, I can tinkle   in   priviacy.  The  PREA gots blessed,  yet  the  Pod  likes  them to -- the men seem calmer.

*Ms. Bobbie Haver...*
Ms.  Bobbie HaverKamp

cc:  files
     Trans-Pride Institute
     Safe-Prisons

From: Ms Bobbie David HAVERKAMP
        # 702013
        Mc Connell Unit

To:    Director of UTMB Mental Health - Dr. Joseph Penn
        Director of UTMB Medical Health - Dr. Lanwette Linthicum


Dear Dr. Joseph and Dr Lanwette,
                                I ask for women's Briefs at
the Local McConnell Level and Ms Long, McConnells Practic Manager
denied the request saying, it was not "Medically Necessary."
        I object and object strongly.
    I have no-one to turn to except Dr Joseph and Dr. Lanwette.
        Ms Longs decision to denie Women's Brief is discrimination
approch for people living in an institutional setting. I have had 22 months
of Psychology Counseling, then started 18 months of Hormone Pills, at
the present on July 1, 2016 I was switch to hormone shots with a
prescription Bra, a UTMB body all the way.
        In institional settings, guards will strip me ———— its quite
a shock for them to see a Bra and the shock turns to gender
related abuse by facial expressions with one wearing Men's Boxers.
While McConnell Safe Prisons will do what they can to control
this type of abuse, they certainly cannot control every guard
I come in contact with.
        Ms Long, the Practic Manager denial is not well founded.
Transgender treatment is diverse health care and in my situation
maybe evolving due to the unique promblems I am Encountering.
        From what I am reviewing into, Psychology / Medically
Necessary do go together in a patients diagnosis but they
do not carry Equal weight in the treatment of Transgenders.
        A case in point is the Bra I am wearing. It
may be argued that Psychology its not necessary, while.

57

medically to support the _____ to _____ _____ _____ necessary.

Ms Long's approach says "Medically Necessary", if its not there, overrules any diagnosis.

I say she's wrong.

The goal in treating Gender Dysporia patients is allowing the patients to express the Gender and to provide serious relief from Gender Dysporia.

When you go with Ms Long's thinking, the Gender Patient goes to the Black Market, cuts up T-Shirts that cost $8-$10 and has them sewed into panties. Once she is on the Black Market she's in open to exploitation — both in the terms of money and sexual favors.

The drive for relief will cloud a Transgender's judgement Big Time.

Once she is fitted with Black Market panties, it is a very short step for a Predator to win her over by saying, "Damn girl lets see what you got."

In my situation, Yes, I was on the Black Market for a Bra — and yes there was unwanted advances, but once I was prescribe and Issue a Medically Bra, no predators had a opening for me being seduced into exposing myself.

Dr. Joseph, Dr Lannette you need to seriously rethink this through — treatment of transgenders is not Black or White but more of moving in the grey.

Med Awareness
Ms Bobbi ?

July 18, 2012

From: Ms Bebbie David Haverkamp
       # 702013
       McConnell
       3001 S. Emily
       Beeville, Texas 78102

To: Dr Alan Dulio
    American Institute for
    Plastic Surgery
    6220 W. Plano Parkway
    Plano, Texas
              75093

Dear Dr. Dulio,

Please, I ask for a kindness. I am a transgender inmate under UTMB care — I was diagnosis by UTMB, spent 22 months in Psy. Counseling, then UTMB started me on hormone pills for 16 months then switch me to Hormone Shots every 2 weeks. I am under UTMB's care all the way.

Dr. Dulio, we are having trouble finding a Gender Surgeon that would come to the Galveston Hospital and do a Gender Re-assignment Surgery.

I was wondering, if you would give me a letter stating you would be willing to do a Gender Reassignment Surgery for me. UTMB will work out payment and the details, all I need is a acceptance letter to give the Directors of UTMB.

After care, is no prombleam for me — UTMB will furnish this with no prombleam.

Dr. Dulio any help will be appreaded —

Love and Great Respect

Ms Bebbie David Haverkamp

59

June 22,2016


From: Ms Bobbie David Haverkamp
      #702013
      McConnell Unit
      3001 South Emily Drive
      Beeville , Texas 78102


To: Director Josph Penn, Director of mental Helath for UTMB
    Mental Health Serivce
    UTMB- CMC Operations
    200 River Pointe , Suite 200
    Conroe, Tx 77304

Dear Dr. Penn,
              Ms Alexzander at the McConnell Unit said you gave me permission
to write to you, I hope this letter makes it because I am tired of  the
Office of Professional Standards telling me to go through the Practic
Manager and I dont even know if she forwards my stuff. Also, you are
my Psy Doctor because no one here at the McConnel treats GID and Galveston
Hospital has only the Gid clinic.

Dr. Joseph your it by default.

First I'm a transgender on hormones for 18 months, and in 6 months will
have completed the 24 month requirement for gender reassignment surgery.

The problem is everyone is telling me Texas dosent have any surgens that
do gender reasignment surgery.
     Ok, we have a plus here, UTMB will do the surgery if they had someone that
would do it.

My soultion is to take one of them young Doctores with a ego as wide as
the Grand Canyon,put a Book in front of him, study up on the subject and
lets do surgery. We need an expert, that's what we go Star Trek T.V.
Doctors in Space for...someone on TV and beams in on us and talks my youg
Doctor trough the surgery.

Ok, Dr. Joseph..what your soulition...we need a surgern in November.

I need for you to talk to me, I'm getting worryed and lonely thinking you
are so far up that you've forgot about me , Bobbie your GID patienr that's
been at this for 4 years. I'm a UTMB baby all the way..you diagnoises me,
fed me hormones, counseled me in Psd..decdare I was GID and proceed to
feiniunes me.( which I love).

Ok, Dr. Joseph I need some TLC in the way of when will I be in surgery?


                                        Love Ms Bobbie.

June 28,2016

From: Ms Bobbie David Haverkamp
      #702013
      MConnel Unit

To: Director Joesph Penn of UTMB Mental Health
    UTMB Correctional Managed care
    200 River Pointe Drive
    Suite 200
    Conroe, Texas 77304

Dear Dr. Joseph,

This is Bobbie your patient transgender on the Mcconnel Unit, we got a problem.

I went to Galveston and had my vist with Dr, Meyer and talked about the direction I needed to go in. Dr.Meyer is telling me he can only make recommendetions and the local Doctor has to prescript any changes.

Dr. Joseph what gives?, this is disreceptiual as all get out, we got me going to Galveston to vist a renoune GID Doctor that can't practice but only recomend. And now I'm going to see the local Doctor that knows nothing about GID's and how our mind works.

The Local P.A. are out on a limb with this stuff, Dr. Meyer orders the for our health and Psy needs and the Local medical team carrys it out. If you do it any other way, you put everyone including the transgender in harms way, on medical and leagal.
]
I want you to issue me a pass where Dr. Meyer can order for me thru the local medical team.

You know Dr. Joseph...here's a address that I'm going to have this person call you to start to head off probblems for transgenders. When Nell gather calls you need to pay attention. All transgenders go thru Trans Pride for everything. Thgis   is a ral bonus for you is we can keep everythng in-house and you got a outfit that can get changes to the transgenders Texas only population like overnight.

Here's who's going to call you. Nell Gather of Trans-Pride PO 3982 Dallas Texas 75208.

Oh, I got my 2-bras and they are nice and I feel better. Now you need to Lighten up Dr. Josepn, the bras are something that Mother Treasa wouyld be proud to wear, I was expecting a Linda Lovelace style. Remember coummunacation is the key to probblem solving.

                          Love you much,

                          Ms Bobbie

Oct 13, 2016

From:   Ms Bobbie David Haverkamp
        # 702013
        Mc Connell
        3001 S. Emily
        Beeville, Texas 78102

To:   Dr. Joseph Penn   Director of Mental Health Service.

Dear Dr. Joseph,

Hi, hope your OK. Life got al the dicey for me And your my psk Doctor so I need you to step up to the Plate and call the shots.

Here's what's going on: I got to Galveston and Dr. Meyer recommends me Pantiee and a Long Hair Pass. The P.A. Echeveny did his part, and made the report out And sent it to Dr. Kwarteng the local Doctor.

Here's the Pramblem ___ Pantiee and Long Hair pass they Are going to say is not Medical But Psy Dept. That's You

It wont be long, the Warden, the Doctor Are going to come down on me like that house that fell on the Wicked witch in the Wizard of Oz.

Dr. Joseph, this in Nov starts my 5th year in the program.

OK, we need a long Hair Policy ___ How long?, When, Where, How.

I've Been on Hormones 2 solid years, in Psy Counseling Before Hormones 2 years.

I want a exception to the Rule pass till you get this worked out.

There comes a point to where will to see myself its a mental issue — I am at that point. I need your help. Now. Warden Furr is Black But still a Red neck cowboy. And I dont think I got a prayer with out Policy on Long Hair for Trans'gender, Where's it at. It aint going Away, so lets wade in here and get it settled. You know everyone on transgender issues is pivoting on the McConnell Unit.

I want Trans-Pride Involved here, Nell Gather - P.O. 3982, Dallas, Texas
75208

I am sending this to Nell and I will ask her to contact you, Dr Kwarteng And Warden Furr.

They will send this to you By Star Trek wire, so you well get it And think on it

Oh, I may get shipped
to Tim-Buck-Too But dont worry
I well stay in close contact

Love
Ms Bobb. O

P.S. Doctor Joseph,
Get on top of this, I'm not going to get hammer
because theers no Policy for Trans'genders. 62 ✓

From: Ms Bobbie David Haverkings
        # 702013
        McConnell Unit
        3001 S Emily
        Beeville, Texas 78102

To: Dr. Joseph Penn
     Director of UTMB Mental Health — Texas

Dear Dr. Joseph,
        Hi, this is your patient Ms Bobbie of the McConnell Unit. Hope you got my letter of having to form a Interdisciplinary Medical Team for the Treatment of Gender Dysphoria. This is sort of a real life one step for Gender Related problems I am having.

I have never like the ideal of Ms Alexander and the Local Mental Health Department out of the loop on my Medical Treatment, so with the New Interdisciplinary Medical Team we are allow point.

        Dr. Joseph, we need to Bring our Team to a understanding. Policy 51.11 of the Correctional Health Care Policy for the Treatment of Gender Dysphoria is not And I repeat NOT static medicen But comes under DYNAMIC Medicine in that as my Body changes the treatment has to change with it.

        Policy 51.11 is a Femininezation Policy And Everyone has to accept this. Dr. Joseph, Dog here a Bone to chew on _____ TDCJ-ID is already up to speed on the Femininezation, I went from Dorm living to 4Building to 7Building H-Pod which is very restritive, we don't work, don't go no where, except in Day room when I travel ____ I'm under direct supervision at all times, So Penal Concerns are in the Back of the Bus. TDCJ-ID has got Transgender covered. Enough ____ Give me my Bone Back!!

'63

Case 2:17-cv-00018   Document 2   Filed in TXSD on 01/13/17   Page 64 of 117

Here the main problem, I've completed wPATH requirement for 12 months on Hormones before Gender Reassignment Surgery, Dr Thayer said I had to be on 3mg/twice a day for a year — I complete this in Nov 2016.

Now the New requirement is he wants me on shots for a year _____ I'll complete this April 2017.

Dr Joseph, I'm fed up — I want you to tell me when Gender Reassignment Surgery will take place.

Everytime I come up to a Ready to Have Surgery — there's New requirements.

I dont want to go to Court, lets try not to go.

Dr Joseph — When does surgery happen for me? This is the main question Now.

Looking forward to a Answer.
Remember Communication is the Key to Understanding —
We need to see each other on that T.V. monitor ___ Me + You And Ms Alexander. sort of Dog to Dog. And one Kitten

With Great Regret
Ms Babb, e

63

Refer to Mental Health
10/20/14  0455

**Irene B. Cussins RN, BSN**

Ms Alexzander — Psy Dept
McConnell Medical

Would you please send this to Dr. Joseph. Also, I want to
talk to him on the TV, he's my Doctor —
Ms Robbie

Refer to Mental Health
10/20/14  0755

**Irene B. Cussins RN, BSN**

Ms Alexzander — Psy Dept
McConnell Medical

Would you please send this to Dr. Joseph. Also, I want to
talk to him on the T.V., he's my Doctor —

63                    Ms Bobbae

Return to Haverkamp # 7020 13
Not a sick call request          12A-03

From: Ms Bobbie David Haverkamp
#702013   3A 1-18 B
McConnell   Seg A-3

Scheduled S. Alexander, MD

**OCT 19 2016**

Dear Ms Alexzader,

Hi, I thought about this Panties / Long Hair Policy —

Dr. Joseph Needs to be Aware that Policy 51.11 Treatment for Offenders with Gender Dysphoria is Also a policy for femininization for Offenders with Gender Dysphoria. Here's where I am at — I dont want to be on a collision course with TDCJ-ID on Hair Policy. This is the reason I need a Pass for Long Hair / Panties.

Ms Alexzander you know that when I was seven my father held me down And cut off my hair — it was heumiliation that I have never got over.

TDCJ-ID will run a team on me to get what they want — if that happens Im gone. I wont go through that Again. Nurse Randall pull me Back, my sugar level was 20, its real painless, No Blood, nothing, Just go to sleep.

I have to be reasonable — You And Dr. Joseph have to have time to work out a policy. That's fine with me But I need a Tempory Pass for a Year on Long Hair / Panties. This protectes me from TDCJ-ID Policys-

I may be skipical in the future, that's the future — I live in the present and today is Oct 17, 2016 the present. Dr. Joseph were'nt talks to me so I feel like I'm on my own And I got to make it on my own, my way.

With the Greatest Respect
Ms Bobbie

TO: Haverkamp 702013 12 AO3

~~Ms Alexander~~

~~Psy - McDowell~~

not a sick call request / seen 10/20/16

Oct 24, 2016

From: Ms Bobbie David HaverKamp        To: Ms Alexander
      # 702013                             McConnell
      McConnell    3A 1-18
      Seg A-3

To: Dr. Joseph Penn — Mental Health Director of UTMB

Dear Dr. Joseph,

Say, what gives!! I come Back to the McConnell Unit with Dr. Meyer recommendation for Panties/Long Hair Pass. I ran into a Ms Lawson — the Director of Medical, she's over. Dr Kwarteng And she's says McConnell isn't ordering Bra's Panties or Long Hair Pass.

OK, what does ____ Dr Meyer recommendation ain't worth the paper its written on. The McConnell unit Medical Don't give a flip what he says or writes.

You got me stuck out — Where is MY Access to heath care staff gab. fiel to address GID. I'm not going to do the Bra Battle again. You address the prowlblem with these people, I didn't ask for Gender Dysporia But I got to deal with it. I'm writing to the Medical Board about Ms Lawson, Right Now — No one will help —

oh- heres a copy of your + Dr. Lanutto                In trouble on McConnell
     St#1 with Director Lawson,              Ms Bobbie

64

CORRECTIONAL MANAGED HEALTH CARE
CALCULATION OF COSTS FOR PATIENT HEALTH INFORMATION (2/2009)
FACILITIES

Attachment B
H-61.1
01/08

Haverkamp, David
#702013

| TIME SPENT | NUMBER OF PAGES | PERSONNEL COSTS | OVERHEAD COSTS | AMOUNT |
|---|---|---|---|---|
| Under 15 minutes | 1 – 50 | | | $0.10 a page |
| 30 minutes | 51-200 | $7.50 | $1.50 | $9.00 |
| 45 minutes | 201-300 | $11.25 | $2.25 | $13.50 |
| 1 hour | 301-400 | $15.00 | $3.00 | $18.00 |
| 1 hour 15 minutes | 401-500 | $18.75 | $3.75 | $22.50 |
| 1 hour 30 minutes | 501-600 | $22.50 | $4.50 | $27.00 |
| 1 hour 45 minutes | 601-700 | $26.25 | $5.25 | $31.50 |
| 2 hours | 701-800 | $30.00 | $6.00 | $36.00 |
| 2 hours 15 minutes | 801-900 | $33.50 | $6.75 | $40.25 |
| 2 hours 30 minutes | 901-1000 | $37.50 | $7.50 | $45.00 |
| 2 hours 45 minutes | 1001-1100 | $41.25 | $8.25 | $49.50 |
| 3 hours | 1101-1200 | $45.00 | $9.00 | $54.00 |
| 3 hours 15 minutes | 1201-1300 | $48.75 | $9.75 | $58.50 |
| 3 hours 30 minutes | 1301-1400 | $52.50 | $10.50 | $63.00 |
| 3 hours 45 minutes | 1401-1500 | $56.25 | $11.25 | $67.50 |
| 4 hours | 1501-1600 | $60.00 | $12.00 | $72.00 |

|  | Number | Total |
|---|---|---|
| Standard-size Paper Copies | 37 @ $.10/page | $ 3.70 |
| Personnel Costs | | $ _____ |
| Overhead Costs | | $ _____ |
| **Total Charges** | | $ _____ |

X        Legal Claims

In a reading of Barrett v. Copan, 292 F. Supp. 2d 281 (D. N.H. 2003), for the Plaintiff to assert viable cause of action for inadequate medical care she must state facts sufficient to allege that the Plaintiff has a serious medical need for which adequate care has not been provided and allege that responsible prison official was aware of need or of facts from which a need could be inferred, and still failed to provide treatment.

Plaintiff, a Pro Se Complaint is not an attorney or an individual based in law, she implores the Court to liberally interpret what she is trying to convey to His Honorable Court.

In order to establish a violation of the 8th Amendment the Plaintiff must show the Defendant's own standard of care. Which states that the Plaintiff should not be discriminated against regarding appropriate health care based upon where they live.

In order to establish a violation of the 8th Amendment the Plaintiff must show two (2) things:

(1) a deprivation of a Basic Human need such as medical care under the Defendant's own Standard of Care. Which state that the Plaintiff should not be discriminated against regarding appropriate health care based upon where they live. Institutional health care should reflect the medical care which would be available to them if they were living in a Non-Institutional environment setting. See World Professional Association for

65        (1)

Transgender Health, 7th Version.

 &copy; the Plaintiff must show "Deliberate Indifference" on part of one or more Defendants:

 Deliberate Indifference to a prisoner's serious medical need, is when Defendants Deny, Delay, or Intentionally interfere with medical treatment. See Hallett v. Morgan, 296 F. 3d 732, 744 (9th Cir.)

 The Plaintiff will try to convey to this Court that she will try to present "Well-pleaded factual averments," not Bald-face assertion. the Plaintiff understands that this is a preliminary stage of review and she has come a very long way to present this to the Court.

 A factual problem that will surface at the onset of the preliminary review is, "what Standard of Care are the Defendants Using for Medical Care for transgenders?"

 The Plaintiff has been under the Defendant's care for four (4) years and the Defendants will not discuss what Standard of Care she is being treated with. the care the Plaintiff receives does not comport with Standard of Care for Gender Dyspora that are recognized of the professional medical community.

 The Plaintiff has worote letters on top of letters to the Defendant's and not one letter was ever answered.

 The Defendants are named in the suit due to the fact, under the Correctional Health Care Policy G-51.11, the Defendants approve all treatment plans. There is an affirmative link.

66

(2)

whether through direct participation or through conduct that amounts to condonation on tacit authorization. Both Defendants are either a primary actor individual or a prime mover behind the violations and problems the Plaintiff is encoun-

Paragraph IV (below) shows the Court the Defendant's direct affirmative link to the treatment plans and hormone therapy re-lated to G.I.D.

| Correctional Managed Health Care | Effective Date: 5/16/2012 | Number G-51.11 |
| | Reviewed: 07/13 | |
| | Replaces: 01/06 | |
| | Formulated: 01/06 | Page 2 of 3 |
| Treatment of Offenders With Gender Disorders | | |

IV. The University Director of Mental Health Services and University Regional or Senior Medical Directors will be the approving authorities for treatment plans and hormone ther-apy related to G.I.D.

V. Facility medical staff will assure the facility warden and TDCJ Health Services Liaison are immediately notified of all offenders alleging or presenting with signs or symp-toms of a gender disorder.

### Legal Claim #1

The Defendants have a policy where all medications are given "KOP," as keep On Person. The only medication not given KOP is very expensive medication or narcotic medicine.

In pill form, Estradoil is not expensive medicine, nor is it a narcotic medicine. Yet the Defendants harass and discriminate against the Plaintiff by making her get fully dressed, go outside the building, stand in line in weather to receive one pill at 2:30 Am. No offenders, except those on narcotic or very expensive

medication are regarded to do this.

The Defendants further discriminate by denying the Estradoil to be stocked at a main unit transfer point, the Darrington Unit. To further discriminate, the Defendants will not stock Estradiol at the Galveston Hospital (Estradoil is a female Hormone Drug), other offenders have their drugs in stock

Estradiol is the common drug, Dr. Myer G.I.D. Doctor prescribes. It come in 1mg. tablets and is dispensed in 1 to 4 tablet twice a day.

In a four (4) day trip from the McConnell Unit to Galveston Hospital and back, the Defendants have set up a policy where Hormone treatment is denied to the Plaintiff.

Given the Fact, texas tech medical sends all G.I.D. inmate patients coming out of the Amarillo area, go to the Robertson Unit then to the Byrd Unit in Huntsville and then to the Galveston Hospital. A complete to and back 6 day trip without the Estradiol hormone and there could be further delay at the Byrd Unit in Huntsville or in Galveston Hospital.

The Defendants are directly responsible for this policy and the see/saw effect of lack of hormones causes the Plaintiff pain and worry.

The court can certainly contact the Darrington Unit intake nurse on the problem. She fusses about the lack of medication for G.I.D. inmates.

Legal Claim #2

The Defendants, Director Joseph Penn, M.D. and Lanette Linthicum, M.D., are responsible for an individual's treatment plan with a Standard of Care that is timely and consistent in accordance that is acceptable by the medical community.

The Plaintiff has asked many times what Standard of Care is the Plaintiff being treated under. The answer is complete silence.

Correctional Health Care Policy G-51.11 reference the World Professional Association for Transgender Health, aka, WPATH, while the policy ~~refers~~ provides references the actual Treatment Plan the Defendants are to approve they will not discuss, while hormone therapy is administered the actual Treatment Plan has never been revealed to the Plaintiff.

the Federal Courts recognized WPATH as the prevailing Standards for the treatment of transgenders. the Defendants disregard the standards, the care the Plaintiff receives is a substantial departure from accepted professional on Standards that's not based on accepted medical Professional Judgment, thereby exposing the Plaintiff to risk and future risk from basically no Standard of Care.

the Defendants knew of and by having no policy. Approval to disregard the WPATH Standards. It is a direct violation of the 14th Amendment that the Plaintiff is to

69          (5)

have a Standard of Care that is acceptable in the medical Community as offer other offenders in Prison

It also can be shown that it is a Violation of the 8th Amendment that denial of Medical Care that is acceptable by Professional medical Community by the Defendants they show deliberate indifference by intentionally interfering with medical treatment that is accepted in the community.

## Legal Claim #3

The Defendants, Dr. Joseph Penn, M.D. and Dr. Lanette Linthicum, M.D., both medical contractors know of and treat offenders with different aliments that require surgery as a cure, these offenders have proper consultation and access to expertise for surgery as their cure.

The Defendants are aware that the Plaintiff as a transgender is denied proper consultation for Gender Reassignment Surgery and disregard these needs and the risk of harm stemming from Gender Dysporia, while other offenders in similar circumstances have full access to specialized consultation for surgery.

While the Defendants have provided some treatment consistent with Standard of Care for Gender Dysporia, it does not follow that they have necessarilly provided the Plaintiff with Constitutionally adequate treatment.

It is a Violation of the 14th Amendment that the

70                    (6)

Plaintiff is treated different from other offenders because the Plaintiff is a Transgender. When the Defendants treat surgery different with one Non-Transgender receiving surgery for their disorder but another class of offenders Label Transgender is denied surgery such as the Plaintiff the 14th Amendment and Equal Protection is violated.

As of this date on filing the 42 § 1983 action, the Defendants will not state what Standard of Care the Plaintiff is being treated under. A total deprivation of Medical Care to a prisoner is not necessary condition for finding a Constitutional Violation, delay, denial, and intentionally interfere with Medical Treatment can also constitute Deliberate Indifference. Such as the Defendants actions.

The Plaintiff has been under the Defendants Standard of Care for four (4) years and have to have access to proper consultation for Gender Reassignment surgery. Other offenders have a known Standard of Care that includes surgery, the Plaintiff is denied this medical consultation and surgery.

The Plaintiff acknowledges that she does not enjoy a Constitutional right to the treatment of her choice, yet the treatment the Defendants has to provide must be adequate to address the Plaintiff serious medical needs. Gender Reassignment is part of the cure for Gender Dysporia to address this serious Medical Need. Other offenders have surgery to address their serious medical needs, the Plaintiff should also be allowed.

## Legal Claim #4

The Defendants discriminate against the Plaintiff by refusing to provide female items that will help them cope with Gender Dysporia. The Defendants refuse saving legitimate Penological interest of prison security and female items makes Transgenders subject to victimization. These concerns are outdated in the modern TDCJ-ID because the Department recognizes and houses offenders that identify as heterosexual, homosexual, bisexual, lesbian and transgenders.

(7)

The Texas guard population have transgender guards, female-to-male, or male-to-female. Texas prisoners have bisexual, heterosexual or homosexual guards and lesbian guards are also common. To date, all transgender that are registered, on hormones, issued a bra are housed separate from the general population. We are fed separate, go to commissary separate, medical separate. Any contact with General Population is on modern security concerns.

The basic need of transgender is to obtain female items that help cope with the Disorder. The Standard of care addressed in WPATH that Institutional transgenders should have access to female items, that mirror the freeworld. These items pose no threat to security or security problems. To deny these items is Discrimination based on Antonomical sex and being in a so-called Male Prison. Other offenders have cologne, body wash, Male Black Ice, aftershave lotion and are separated from Protective Custody, yet Transgenders in Protective Custody are treated with discrimination. they are not allowed to purchase items that are female according to their medical Diagnosis Gender. This invokes the Equal Protection Clause based on Discrimination. Konitzer v. Frank, 711 F. Supp. 2d 874, 908-911 (E.D. Wis. 210_).

## Legal Claim #5

The Defendants discriminate against the Plaintiff by making medical decisions based on financial and political cerns. to prove a fact, circumstantial evidence may be used for a jury to draw on inference from.

The Defendants are paid medical contractors to the State of Texas. In Federal Court, THE STATE OF TEXAS and the United States are in a legal and political battle to deny access to marriage between same-sex couples thru the Defense of marriage Act. When same-sex couples cannot access the simple rite of marriage then Transgenders such as the Plaintiff

72                    (8)

that are need of Gender Reassignment Surgery are denied due to Political factors.

Correctional Manage Health Care Policy G-51.11 was formulated in Jan. 2006 and as to-date not one person has access surgery for Gender Dysporia. In Sept. 15, 2015 meeting with Dr. Meyer and Nurse Hick, the Plaintiff was told very plainly TDCJ would not pay for the surgery. The Plaintiff replied, "I've been in prison for 24 years and at NO time, under NO circumstances has TDCJ ever interferred with my medical treatment.

In fact, I had a Non-G.I.D. related surgery called removal of my thyroid which TDCJ never interfered with. So it didn't make any sense to say TDCJ won't pay for the gender reassignment surgery. When the Defendants signed the texas Prison Health Care Policy G-51.11, all treatment plans include surgery as a cure "are included."

The Defendants are well aware of the Plaintiff medical needs, but continue to ignore the risk because of financial and political consequences. It is a clear violation of the Plaintiff's 14th Rights and Equal Protection.

## Legal Claim #6

The Defendants discriminate against the Plaintiff by refusing to provide the total care for her Gender Dysporia Disorders by not providing Gender Reassignment surgery. the Defendants cannot say because they have provided some treatment their standard of care is acceptable medical treatment.

As far back as 1997, the American Medical Association under Maggert v. Hawk. 131 F.3d 670 cite the care for transsexual consist not of psychiatric treatment designed to make the patient content with his Biological sexual Identity, that does

73                    (9)

not work, but of Estrogen Therapy designed to create the Standard characteristics of a woman, followed by surgical removal of the genitals and construction of a vagina with substituted penile tissues.

The Defendant cannot advance to the Court that their are not surgeons that perform this surgery. Once Policy G-51.11 was made part of the Correctional Health Care Policy and Guidelines, the Defendants put TDCJ on notice that the Defendants would do the complete femininization under Policy G-51.11.

Other offenders in need of surgery are allowed to complete their care, yet the Defendants discriminate against the Plaintiff by providing only hormone therapy. This is akin to only providing Aspirin to an offender that qualifies for surgery.

The Defendants Standard of care discriminate against the Plaintiff by not providing surgery as other offenders have.

## Legal Claim #7

The Plaintiff is being discriminated against by not being able to access WPATH Standard of Care. It is the Plaintiff that makes the decision of whether or not to have Gender Reassignment surgery. The Defendants take this choice and automatically say no, other offenders are given a choice of their health care and surgery.

The Defendants are aware that WPATH Standard of care puts the decision to have surgery with the Plaintiff. Yet the Defendants discriminates by denying "Her" the choice of does or does not "She" want surgery. Other offenders are given a choices the Standard Defendants reply is: " Its your Life, its Your decision" this is not the care for the ~~Plaintiff~~ Plaintiff, the Defendants have said "No." This is a Blanket Policy against only Transgenders.

The Defendants are knowingly aware of the preparation the Plaintiff has done for surgery and they disregard the future risk of emotional harm to the Plaintiff in violation of "her" 14th and 8th Amendment rights.

(10)

>A           ~~Legal Claim #8~~

## Legal Claim #8

The Plaintiff is discriminated by not being able to go to the McConnell Psychotic provider and discuss Gender Dysporia. Other offenders are allowed to discuss their disorders, but the Plaintiff was told by Ms. Bennet she could not discuss Gender Dysporia, this violated the Plaintiff's rights not to be discriminated against. The 8th Amendment requires that Plaintiff will be treated no different than other offenders.

The Defendants knowingly have stopped the McConnell Unit Psychiatric Department from talking to the Plaintiff about Transgender and "HER" Psychological problem she faces.

The Defendants will not "Unit level" access to Psychiatric medical staff that has experience in Gender Dysporia, nor will they provide tele-conference with any Psychiatric Counseling Staff.

The Directors are fully aware of their actions and approval has to come from the Directors for any treatment plan for the Plaintiff.

## Legal Claim #9

Plaintiff is discriminated against by the Defendants refusal to provide Educational materials that help the Plaintiff understand the changes in her body. Defendants refused any reference material in the WPATH Standard of Care. Other offenders are provided with Educational materials about HIV & AIDS, kidney failure, Heart disease, etc., but not an offender with Gender Dysporia.

The Defendants under their own WPATH Standard of Care have reference material at the end of the Standard of Care that allows the Plaintiff to fully grasp the effects of Gender change upon "Her" mind and body.

Both Defendants deny this Educational material knowing the worry, frustration and anxiety the Plaintiff is going through. Both Defendants have 'stone walled' the Plaintiff in "Her" trying to access the reference material at WPATH Standard of care. Other offenders have complete access to Educational material for their serious medical needs.

75          (11)

The Defendants knowingly violated the 14th Amendment not to discriminate against the Plaintiff by treatment from other offenders. the 8th Amendment is violated because Educational material are a Basic Human need for understanding a disorder. The Defendants show Deliberate Indifference by delay and interfering with Plaintiff's medical treatment.

## Legal Claim #10

Denial of WPATH standard of care for Gender Reassignment Surgery based on security concerns:

the Defendants discriminate against the Plaintiff by advancing Prison concerns should stop treatment for transgenders for Gender Reassignment surgery and to allow the complete feminization poses a security threat by promoting or provoking sexual activity or assault.

the Plaintiff recognizes that it has been and remains, permissible for Prison officials to concern the security implications of medical care Prescribe for transgender health.

TDCJ-ID is fully aware that UTMB's Correctional Health Care Policy G-51.11 treatment for offenders with Gender Dysporia is a feminization policy and a medical process for those aware of the diagnosed and treated with Gender Dysporia. TDCJ-ID is well aware of the vulnerability of transgender prisoners and the implications that Gender Reassignment surgery has to this vulnerability. All penological concerns are addressed in full by the implication of the Prison Rape Elimination Act, aka PREA, under PREA §115.342. Placement of residents in housing, bed, Programs, educations and work assignments and its individual determination ensures the safety of each transgender on an individual bases.

The Defendants advancement that sexual orientation for penal concerns not rationally or self-evidentry related to petential disciplinary and security problems which could arise from heterosexual inmates in interactions with homosexual or transgender inmates.

TDCJ is a modern Prison complex under severe scrutiny by independent outside agencies that audit the Prison Agency for compliance to state and federal laws. The McConnell unit of Beeville is one of the six designated for safekeeping.

72                    (12)

TDCJ is in full compliance with PREA, all classes of offenders are housed, Lesbians, Gays, Bisexual, Homosexual, Heterosexual, and transgenders. In the care of transgenders they are housed separate, fed separate, go to commissary separate and medicated separate. As additional security all cleaning and janitorial work on a transgender section is performed by Transgenders.

The Defendants denials of Gender Reassignment Surgery land on Renological security concerns invokes the Equal Protection clause and discrimination. these are matters for Jury consideration.

## Legal Claim #11

The Defendant discriminates against the Plaintiff by saying TDCJ-ID will not pay for the services, yet provide no policy, no official reason, or anything to justify their denial that will verify this statement.

Other offenders do not have this created situation, a case in point the Plaintiff had major thyroid surgery and never did the Defendant say this. yet when the Defendants diagnose the Plaintiff, start treating her with hormones, the surgery for Gender Reassignment is denied because TDCJ-ID will not pay for it.

## Legal claim #12

Plaintiff was discriminated by the Defendants by not being offered a CHANCE to get an outside consultant for Gender Reassignment surgery. other offenders are given this opportunity if they can pay the required fee for specialized procedures, for example, those assigned to the Gatesville area and are Veterans, can go to the Veterens Hospital in Waco, tx.

## Legal claim #13

The Defendants discriminate against the Plaintiff by not providing a multidisciplinary team on the local level where the Plaintiff can come to the Defendants have the

(13)

Plaintiff going to different Departments to try to fill her medical needs.

A case in point is Bras, Panties, Long Hair Pass- as late as Nov. 2016 at the stiles unit the Plaintiff was told to go to Laundry to get her bras and Panties, yet in an answer from the Stiles Laundry they didn't provide these items.

The Defendants further discriminate by providing such a disconnected, delayed medical services as to forego the Plaintiff to ask for an outside organization to make sauce of what the Defendants are doing.

Enclosed is a letter, Exhibit A, to the TDCJ- ID. ombudsman officer seeking answers for the outside advocates understanding. The Plaintiff now incorporate the request fully for information by Trans Pride Initiative, Nell gathers and the Plaintiff knows she may not be able to explain her errors fully to the court. Yet the Letter of inquiry will aid the Court to the Discrimination that is taking Place.

See ERROR # 1A

Legal Claim #13

**SUBJECT:** State briefly the problem on which you desire assistance.

Hi, I'm a transgender, Presently a Bra/Panties. UTMB says I have to contact your office for these items to be issued to me.

Need a layin to discuss sizes.

Name: Haverkamp, Ms.Bobbie David   No: 702013   Unit: Stiles
Living Quarters: 73A-18B   Work Assignment: Unassign Medical

**DISPOSITION:** (Inmate will not write in this space) at this time the laundry dept does not issue bras.

Mr. Gundey



**TRANS PRIDE
INITIATIVE**

administration—is mentally abusive and constitutes cruel and unusual treatment.

Gender dysphoria is a condition that constitutes a serious medical and mental health need that is treatable under the SOC, and the efficacy of the SOC in treatment is accepted by the American Medical Association, the American Psychological Association, the National Commission on Correctional Health Care, and other major professional healthcare organizations setting standards for acceptable medical practice. TDCJ's Correctional Managed Health Care Policy A-01.1 states that the purpose of the CMHC policy is to "ensure offenders have access to care to meet their serious medical, dental and mental health needs," and "to ensure there are no unreasonable barriers to an offender's access to health services." The treatment of Ms. Haverkamp, as well as other incarcerated transgender persons in the TDCJ system, exemplifies unreasonable barriers and TDCJ's failure to provide access to care meeting the serious medical needs of transgender persons.

TDCJ staff have denied Ms. Haverkamp's request for psychotherapy related to gender dysphoria at McConnell Unit, which was previously provided. TDCJ staff have denied Ms. Haverkamp's request for social role transition. Specifically, Ms. Haverkamp has been denied possession of bras in the same amount as any other woman in TDCJ custody, possession of panties as any other woman in TDCJ custody, permission to grow her hair to the same length as any other woman in TDCJ custody, and access to commissary items the same as any other woman in TDCJ custody, all of which are a denial of essential parts of Ms. Haverkamp's social role transition noted to be medically necessary by the Specialty Clinic consultant and under the SOC. The Specialty Clinic has also placed unreasonable barriers to Ms. Haverkamp's request for surgical intervention, most likely at the behest (expressed or implied) of TDCJ administration. Specifically, Ms. Haverkamp is being denied an orchiectomy, vaginoplasty, and related surgical interventions considered medically necessary for the treatment of her gender dysphoria. Ms. Haverkamp has also been forced against her will into housing that is the equivalent of "protective custody" under PREA regulations, yet in violation of PREA 115.43 limits her access to "programs, privileges, education, and work opportunities."

The following are necessary to comply with CMHC policy and to address the PREA violations.

**1) Allow access to psychotherapy for gender dysphoria.** Currently, psychotherapists at TDCJ units are being told not to provide gender dysphoria-specific help to transgender persons. This prohibition must end, and appropriate counseling services provided.

The requirement that persons needing psychotherapy have an appointment with the Specialty Clinic only for this counseling (apparently justified under paragraphs II.D. and III. of CMHC Policy G-51.11) is inappropriate to professional standards for medical treatment. Appointments at this clinic are available at most twice a year and seldom include meaningful counseling related to dealing with dysphoria in the TDCJ environment, which is structured to delegitimize

8 2



Legal Claim #14

**TRANS PRIDE INITIATIVE**

**February – April, 2016**—Ms. Haverkamp is informed that her unit counselor can no longer discuss gender dysphoria issues with Ms. Haverkamp, which constitutes **denial of psychotherapy for gender dysphoria, a denial of medically necessary care.** In March, the Specialty Clinic consultant reverses his decision to refer Ms. Haverkamp for genital surgery, possibly under duress from TDCJ administration. Instead, the consultant sets a new requirement that **her hormone levels must be at their March 2016 level for nine more months before he will provide a referral to surgery.** The consultant notes that he agrees that genital surgery is for her a medical necessity, but TDCJ was refusing to approve. The consultant also promises that as part of her treatment plan, she will be able to speak with a surgeon who can perform the surgery. However, the consultant also provides false information that there are no surgeons in Texas providing genital surgery. It is highly unlikely that the consultant was not acquainted with the work of the American Institute for Plastic Surgery, a Texas provider well known for their surgical procedures for transgender persons.

**May – September, 2016**—After a year of denying her a bra—necessary for both safety reasons (covering her developing breasts so she avoids unwanted attention) and as an essential part of her social role transition—TDCJ medical staff finally provide a bra only after significant advocacy on her own part and the part of third-party advocates. However, TDCJ staff use the bra as an excuse to deny Ms. Haverkamp work opportunities and force her to enter safekeeping against her will. This is a possible violation of PREA 115.43(a) and (b) because it constitutes segregated housing equivalent to "protective custody"; because "all available alternatives" to such placement appear to have not been assessed; and because safekeeping limits access to programs, privileges, education, and work opportunities. Safekeeping serves essentially as "protective custody" in TDCJ facilities, even if TDCJ defines it otherwise in an effort to avoid compliance issues. Ms. Haverkamp continues to request items necessary for her social role transition. Her requests are denied, and she begins experiencing heightened retaliation for advocating for her rights to medically necessary treatment.

**October 12, 2016**—The Specialty Clinic consultant again reverses his decision concerning surgery and says **she now has to undergo a further year of estrogen injections at 5mg every 15 days to meet "qualifications."**

## Actions Required to Address Medical Denial and PREA Violations

Doubtless, the "qualifications" for the surgery that Ms. Haverkamp has been promised will be moved each time she meets stated requirements. This is continuing to happen in spite of the Specialty Clinic consultant's assertions that surgery is medically necessary, that she qualifies for surgery, and that if she were in the free world she would be referred for surgery. Thus it is solely due to TDCJ's interference with UTMB's practice of medicine that Ms. Haverkamp is being denied medically necessary care. The practice of setting goals, then continually moving those goals when obtained—most likely under implied or direct instruction from TDCJ

**TRANS PRIDE
INITIATIVE**

## Medical History

The following medical history denotes continuous and willful neglect of Ms. Haverkamp's health and well-being by TDCJ staff and personnel, who have taken every opportunity to deny or delay access to known and well understood treatment options for her gender dysphoria.

**1996 – 2010** — Ms. Haverkamp began specific research into her gender identity in 1996. In 1998, her identity was investigated as a thyroid problem or considered a result of a thyroid problem, and treatment commenced. Thyroid treatment was continued until 2010, when her thyroid was removed. Removal of her thyroid to treat gender dysphoria should be considered medical malpractice if there were not sufficient indications warranting thyroid removal otherwise. Her identification as a woman did not diminish after the removal of her thyroid.

**January – August, 2013** — Ms. Haverkamp begins seeing a McConnell Unit counselor about gender identity issues. Counselor notes indications of gender dysphoria and requests assessment. Counselor records depression and thoughts of self-harm due to the lack of access to treatment. During assessment at Jester IV, medical staff indicate Ms. Haverkamp will be able to start hormones but refuse to provide a diagnosis of gender dysphoria, blocking her access to hormone therapy. With advocacy from her unit counselor and herself, Ms. Haverkamp is able to obtain a referral for hormones in August 2013. However, Ms. Haverkamp is told that she will have to agree to unacceptable housing and work changes if she consents to hormone therapy. She refuses treatment for that reason, but during the ensuing months finds her mental health deteriorates to an unacceptable degree because of the decision to refuse treatment.

**March – September, 2014** — Unable to deny treatment any longer, Ms. Haverkamp again requests hormone therapy in March 2014. Treatment is denied. Ms. Haverkamp begins filing grievances and contacting third-party advocates about the denial of medically necessary care. Only after seven months of advocacy for her well being from both Ms. Haverkamp and the outside advocates is she finally approved for hormone therapy in September 2014.

**October – December, 2014** — Ms. Haverkamp is told by Specialty Clinic consultant that **after a year on hormones she would be able to have genital surgery, indicating agreement that surgery is part of Ms. Haverkamp's gender dysphoria treatment plan and providing a time frame for surgery.** Retaliatory threats to her housing continue, in spite of having support where she is housed, having no problems where she is housed, and in direct contradiction to her own views about her safety. During this time, Ms. Haverkamp begins requesting gender appropriate clothing, commissary items, and permission to grow her hair in compliance with the same TDCJ rules for other women in TDCJ custody, all essential parts of her social role transition as treatment for her gender dysphoria. She is denied treatment in spite of multiple requests from the Specialty Clinic consultant. In late 2014, the Specialty Clinic consultant **states he will write a letter recommending surgery as she has met the one-year requirement initially stated.**

ERROR
Legal Claim #14

ERROR #14, has 4 parts. #1, #2-2a-2b, #3, #4. ERROR 14 is incorporated in the suit to aid the Court and Defendants to the cause of Discrimination against the Plaintiff and aid is better understanding.

re: denial of necessary medical care, Ms. Bobbie (David) Haverkamp, TDCJ #702013, Stiles Unit

████████Texas Department of Criminal Justice Ombudsman Coordinator:

As per request by Gigi Jamison of UTMB Quality Services, and as coordinated by Ms. Jamison with the Ombudsman Office, in a telephone call on February 11, 2016, I am directing this to your office for distribution to the proper TDCJ and UTMB offices, as appropriate. This letter should be forwarded to the Patient Liaison Program and the PREA Ombudsman Coordinator.

I am writing on behalf of a transgender woman named Bobbie Haverkamp, currently housed at the Stiles Unit and assigned Texas Department of Criminal Justice (TDCJ) number 702013. Ms. Haverkamp has been patiently seeking proper treatment for her gender dysphoria for at least four years, and the repeated denial, delay, and misdirection from TDCJ and the University of Texas Medical Branch Gender Dysphoria Specialty Clinic consultant constitutes not only a denial of medical care but also cruel and unusual treatment that violates TDCJ policy and PREA regulations, and may constitute a violation of the Eighth Amendment to the US Constitution.

Ms. Haverkamp has been diagnosed with gender dysphoria. TDCJ and UTMB medical staff and administration are well aware that treatment of this condition is a serious medical need, and inadequate treatment jeopardizes an individual's physical health and mental well-being. These agencies are also aware that the accepted treatment for gender dysphoria is provided by the World Professional Association for Transgender Health Standards of Care (SOC), and that the SOC clearly states that treatment includes psychotherapy, hormone therapy, social role transition, and surgical interventions, as suitable to the needs of individual patients. Failure to provide treatment places persons with gender dysphoria at substantial risk of serious harm that includes depression, anxiety, mental impairment, physical self-harm, and suicide. Refusal to provide treatment in spite of being aware of the serious harm caused by failure to treat and by the intentional delay of treatment indicates deliberate indifference to a serious medical need. Deliberate indifference to treatment of gender dysphoria in the TDCJ system just this year has caused multiple instances of self-harm, suicide attempts, and at least one self-performed genital amputation. Neither TDCJ nor UTMB can deny knowledge of the risk of denying or delaying appropriate treatment for gender dysphoria.



c̄ jal Clean # ☐ 1A

**TRANS PRIDE
INITIATIVE**

gender identities that do not align with one's birth gender. This is insufficient and constitutes
cruel and unusual treatment by withholding mental health care from those who have a serious
medical need for such psychotherapy. To be compliant with CMHC Policy A-01.1, the SOC, and
basic medical standards, psychotherapists must be permitted to provide counseling for
incarcerated transgender persons, and must be required to adhere to the SOC and the American
Psychological Association's "Guidelines for Psychological Practice With Transgender and
Gender Nonconforming People."

**2) Comply with the SOC requirements for social role transition.** An essential part of treatment
for gender dysphoria is social role transition. TDCJ not only fails to allow social role transition
(placing multiple unreasonable barriers in the way), TDCJ exercises significant effort to deny
social role transition and invalidate the gender of transgender persons. This undermines
treatment of gender dysphoria and in itself constitutes systemic cruel and unusual treatment.

**2a) Denial of access to clothing items.** Gender appropriate clothing is extremely
important to the social role transition. Ms. Haverkamp was repeatedly denied access to bras,
then once provided, that access resulted in her being placed into safekeeping against her will.
For Ms. Haverkamp and other transgender women, bra access is also being conditioned on
subjective assessments of presence of "sufficient" breast tissue. Trans women should be allowed
bras as medically necessary for treatment and social role transition regardless of subjective
assessments of the "appropriate" presence of breast tissue. Likewise, trans men are forced to
wear bras in compliance with gender stereotypes. Trans men who have had top surgery should
never be required to wear bras, and those who have not had top surgery must be allowed to
wear binders for appropriate social role transition as treatment for gender dysphoria.

Gender appropriate clothing also includes underclothes covering genitalia. Masculine identified
transgender persons must be allowed the same underclothes as all other men in TDCJ custody,
and feminine identified transgender persons must be allowed the same underclothes as all other
women in TDCJ custody. Denying access to gender appropriate clothing denies the social role
transition that can be an essential part of treatment for many persons with gender dysphoria.

**2b) Denial of access to commissary items and property.** Gender appropriate
commissary items are also extremely important to the social role transition defined as an
essential part of the treatment for gender dysphoria. Ms. Haverkamp's access to commissary
items, and access for all other transgender women, must be the same as that provided all other
women in TDCJ custody. Access to commissary items for transgender men must be the same as
that provided all other men in TDCJ custody.

**3) Allow access to surgical interventions.** Ms. Haverkamp has been told that genital surgery is
medically necessary for her and that in the free world she would be referred for surgery. She
has been told she could speak with a surgeon, then that promise was withdrawn. She was told

83



**TRANS PRIDE INITIATIVE**

she would meet qualifications for surgery after 12 months on hormones, then that promise was withdrawn when she met the qualification. She was told she would meet qualifications for surgery after a year of specific lab results, then that promise was withdrawn when she met the qualification. She has now been told again she would meet qualifications for surgery after a year of estrogen injections. Continually moving the qualifications for medically necessary treatment does not constitute treatment and is not simply poor care but is mentally abusive.

**4) End forced placement in safekeeping or end safekeeping program restrictions.** Ms. Haverkamp was forcefully taken from general population, where she felt she was safe and could access beneficial programs. She was placed in housing that is the equivalent of "protective custody" under PREA regulations, but housing that is not in compliance with PREA 115.43 requirements for such protective custody. Forced placement in protective custody (or it's TDCJ equivalent) must end, or persons in safekeeping must be allowed the same program access as those in general population.

## Conclusion

Treatment with hormones alone does not constitute appropriate medically necessary treatment for gender dysphoria. Treatment includes, as per individual need, access to psychotherapy to specifically address gender dysphoria, access to clothing and commissary items that are necessary to a social role transition, and surgical interventions appropriate to individual medically necessary care. Currently, TDCJ enforces what effectively constitutes a ban on these medically necessary treatments that are essential for compliance with standard medical practice.

We look forward to learning that TDCJ 1) has changed it's policy banning most of it's mental health staff from discussing gender dysphoria with incarcerated transgender persons; 2) has established policy allowing access to gender appropriate clothing, commissary items, and all other gender-appropriate goods and services for transgender persons; 3) has put in place policy that is compliant with medical industry standards and the SOC for the treatment of gender dysphoria through surgical interventions where medically necessary, and 4) has ended the PREA noncompliant use of safekeeping.

Sincerely,

Nell Gaither, President
Trans Pride Initiative

Legal Claim 15

The Defendants thru their local Practice Manager Ms. Lawson descriminate by allowing the McConnell Practice Manager to deney transgender related items that was recommended by Dr. Meyer of the Gender Clinic in Galveston, Texas.

The Plaintiff on Oct 24, 2016 wrote the Defendants about this and received no reply. A step 1 grievance was wrote on Ms Lawson, and its dispeared too.

The Defendants discrwate against the Plaintiff for being a Transgender, other nontransgenders have access to local medical staff that follows the Galveston Hospital Directions on medical care. The Plaintiff is discrwated against by the Defendants using a Non-Medical Personel Ms Lawson to deny Gender related items from the Galveston Hospital.

## Conclusion

119).  Plaintiff feels very strongly concerning "Her" right to be treated according to what is a rare, and serious medical issue. A disorder which can be and should be corrected.

120). The United States Constitution protects and guarantees the rights of the Plaintiff. To deny Plaintiff the necessary medical treatment and care. Care which is available to those similarly situated as the Plaintiff, of incarcerated circumstances, constitutes "Cruel and Unusual Punishment." Which is a violation of the 8th Amendment. As well as violating the Plaintiff 14 th Amendment, which states that no individual will be treated differently than another similarly situated individuals. Equal Protection Clause, Due Process Clause and Due Course of Law are guaranteed rights under the 14th Amendment and found within the Defendant's WPATH Standards of Care for Transgender that the Plaintiff should not be dscriminated against.

121).  The Plaintiff would like to remind the Court that "She" did not ask for this affliction. "She" did not seek it out and embrace this condition. "She" did not , nor could "She" freely choose this condition as a Sexual Preference. Transgenderalism is a serious medical condition. This is not just Plaintiff's own personal statement, but rather this is the wide concerns of the Medical Profession. Which is involved in GID treatment, such as UTMB own Doctor's Philip Farley and Walter J. Myers.

122).  G.I.D. affect 1 in 1,000 males. Gid is a rare condition/affliction. Most GID diagnosed persons undergo Hormone Treatment first they undergo Gender Reassignment Surgery.

123).  Plaintiff is only asking for Essential and Necessary Treatment, medi-

cally to correct a 'Recognized' medical disorder. Which has been medically diagnosed and which has been substantiated by UTMB Psy. Doctors Farley and Medical Doctor Myers.

124). The Defendants own WPATH Standard of Care, version 7, specifically state that "people should not be discriminated against in their access to appropriate Health Care based on where they live. Including Institutional environments." While in California, United States District Court Judge Jon Tigar ruled that a Transgender Prisoner "must be" provided with Sexual Reassignment surgery!! As promptly as possible. Denial of sexual reassignment surgery for any Transgender with a serious medical need, living a gender role which is congruent with one's Gender Identify, is a violation of Plaintiff's rights to "adequate" medical care under the 8th Amendment. Which protects against Cruel and Unusual Punishments

125). It is Plaintiff belief, without a treatment plan which includes surgery as a cure. The Plaintiff falls prey to the UTMB's System's of intentional tactic of interference and hinderance of medical treatment., by failing to provide definitive direction and failing to provide or readily furnish concise guidelines for UTMB Medical Staff to follow. These are issue for a Jury to deliberate and decide.

126). A declaration that the acts and omissions described herein violated Plaintiffs rights under the Constitution of the United States.

### Prayer For Relief

127). **WHEREFORE, PREMISE CONSIDERED,** Plaintiff respectfully prays that this Honorable Court will in all things "Grant" such reliefs to which Plaintiff is so entitled to.



Page 94 of 31

128).   To include a preliminary and permanent injunction ordering Defendants Dr. Joseph Penn and Dr. Lannette Linthicum to provide a Treatment Plam that includes a Standard of Care to show when Gender Reassignment surgery will take place with 90 days of date of injunction. Provide Educational Material to show effect of GID present and future, provide female clothing that was prescribe, namely, ███ by Dr. Walter Meyers, M.D., GID Physician.

129).   Plaintiff so moves and prays that this Civil Rights Act, 42 U.S.C. § 1983 complaint be "Granted" in it's entirety. Plaintiff requests that this Honorable Court will read and consider this suit liberally. Plaintiff operates Pro Se, is not an attorney of an individual versed in law. Therefore, Plaintiff impores this Court to liberally interpret what "She" is trying toconvey to this Honorable Court.

130).   Conclusively, plaintiff prays for such relief, general of special at law or equity. Which this Honorable Court "might Deem" just, proper and equitable.

EXECUTED on this the _10_ th day of _January_, 201_7_.

Respectfully submitted,

_Ms. Bobbie Lee Haverkamp_

Ms. Bobbie Lee Haverkamp, PLAINTIFF
TDCJ-CID Offender # 702013
William G. McConnell Unit
3001 South Emily Drive
Beeville, Texas 78102

87

# Texas Department of Criminal Justice

## STEP 1

**OFFENDER GRIEVANCE FORM**

12A/25 '44

Offender Name: **HAVERKAMP**       TDCJ # **702013**

Unit: **McConnell**   Housing Assignment: **3C-34B (2)**

Unit where incident occurred: **Galveston / McConnell**

**OFFICE USE ONLY**

Grievance #: 2016002594107

Date Received: Oct. 19, 2015

Date Due: Nov 23, 2015

Grievance Code: 1011

Investigator ID #: 1950

Extension Date: 01-02-16

Date Ret'd to Offender: DEC 30 2015

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? **Director Dr. Lynette Linthicum M.D**   When? **Sept 20, 2015**

What was their response? **No Response**

What action was taken? **No Action taken.**

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

On Oct 13, 2014 in Galveston I met with Dr Walter Meyers (GID Doctor) and UTMB Negotiator Agent. Dr Meyers told me I had to be on Hormone a year before he would recommend Gender re-asignment. The UTMB Negotiator Agent said I did not have to have Gender Reasigment Surgery to keep my Transgender Status. After thought I told him I want the Gender-Reasigment Surgery. Throu out the year on Hormone Jan 15, 2015 I have confirm with Dr. Meyers I want Gender Reasigment Surgery. And UTMB Negotiator.

Then on Sept 15, 2015. UTMB's Negotiator told me UTMB could not do the surgery because no-one in UTMB performed this surgery. He also explain there was No-one in Texas that did this Surgery.

Under Policy 51.11 Treatment of Offenders with Gender Disorders) it is the University Directors of Mental Health and Medical Directors will be the approving authorities for treatment plans).

Gender Reasigment falls under Medical and is firmly on Director Dr Lynette Linthicum M.D for Gender Re-asigment Surgery. A letter was wrote Sept 20, 2015 asking about surgery and the process, when will it start. I've been at this, I've started, my 4th year and have ask for a cure, Gender Reasigment surgery.

Dr Linthicum denies me medical care by not providing me with Surgeons that perform Gender-reasigment. Her denial of Care is causing me anxiety to the point of mental Pain.

I-127 Front (Revised 11-2010)       YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM       (OVER)

Appendix F

I am a UTMB Gender Disorder Patient, qui . start to finish Yester)
4 UTMB Doctors diagnois me with G.I.D. Ms Alvarzardo UTMB McLenuce
Unit By Provider counsel me for 22 months Before being Diagnois.
UTMB Dr Meyers GID Docter prescribe Hormones and follow up care
for He requirem 1-year under the S.O.C WPATH. Dr Penn, Director of Mental
Health recommended Hormone Therpy to Medical, Also I am prescribe
a Bra due to femenization of my Body. This in my 4th year, its time for
surgery to relieve the mental pains and worry that I'm starting
to have.

---

Action Requested to resolve your Complaint. I want Gender Re-Asigment Surgery and a
treatment Plan that shows what takes place and when.

Offender Signature: Haverkamp                                Date: Oct 19, 2015

Grievance Response:

Offender Haverkamp, David TDCJ #702013 you are requesting to know when you can have Gender Reassignment Surgery. You were
seen at Hospital Galveston on 12/15/15. You inquired about surgery then but were told you must be on a replacement or higher
estrogen for at least one year before surgery can even be considered.

Signature Authority: K Long, PM        K. LONG        Date: 12.29.15
                                      Practice Manager
If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response.
State the reason for appeal on the Step 2 Form.

Returned because:      *Resubmit this form when the corrections are made.

- [ ] 1. Grievable time period has expired.
- [ ] 2. Submission in excess of 1 every 7 days. *
- [ ] 3. Originals not submitted. *
- [ ] 4. Inappropriate/Excessive attachments. *
- [ ] 5. No documented attempt at informal resolution. *
- [ ] 6. No requested relief is stated. *
- [ ] 7. Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8. The issue presented is not grievable.
- [ ] 9. Redundant, Refer to grievance #
- [ ] 10. Illegible/Incomprehensible. *
- [ ] 11. Inappropriate. *

UGI Printed Name/Signature: _____

Application of the screening criteria for this grievance is not expected to adversely
Affect the offender's health.

Medical Signature Authority: _____

I-127 Back (Revised 11-2010)

**OFFICE USE ONLY**

Initial Submission      UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

2nd Submission          UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

3rd Submission          UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

Appendix F

FEB 11 &



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER GRIEVANCE FORM**

4F-60B

Offender Name: HAVERKAMP, David   TDCJ # 902013

Unit: McConnell   Housing Assignment: Agg Seg A-25.

Unit where incident occurred: McConnell / Galveston.

| OFFICE USE ONLY |
| --- |
| Grievance #: 2016 02 3967 |
| UGI Recd Date: 01/05/16 |
| HQ Recd Date: JAN 11 2016 |
| Date Due: 2.19 |
| Grievance Code: 611 |
| Investigator ID#: _____ |
| Extension Date: _____ |

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be Specific).** *I am dissatisfied with the response at Step 1 because...*

I am Asking for a Treatment Plan for Gender Reassigment Surgery that shows how Dr Joseph Penn Mental Health is going to psycological prepare me and will prepare me for surgery under the World Professional Association for Transgender Health. I have ask Dr. Lanvette Linthicum to let me counsel with surgens who perform this surgery. The step 1 says "explore replacement or higher Estrogen for one year before surgery can even be considered, OK — Lets do the math, Hormones started Oct 17, 2015 = 2 months, all of 2015 = 12 month and it will be 80 Days = 2½ months. This is 16½ months of hormone replacement. This more than fulfills the World Professional Association for Transgender Health that UTMB has to conform with in the community for acceptable standards. I can't go the the Psy Dept at McConnell because I've been told even mention Gender Disorder they can't and won't help. I don't have any other Disorders except Gender Dysporia and being in the twilight Zone with no firm treatment plan is causing me mental pain, I didn't ask for this. Its not a free choice like a salad buffey, but I'm stuck with it. Now, with no help, I'm asking for a Written Treatment Plan from the Director of Mental and Medical that I am Approved for Gender Reassignment sorgery. After the Sept 15, 2015 meeting

I-128 Front (Revised 11-2010)   **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**   (OVER)

Appendix G

89

I was under the impression Gender Surgery was in doubt because no Surgeons, UTMB's a Medical Contractor they can Sub-contract the Surgery, To settle this: I want a letter saying I will be approved for Gender Re-Asignment surgery. Period.

**Offender Signature:** Houerleary Bobbie David          **Date:** Jan 5, 2015

**Grievance Response:**

A review of the Step 1 medical grievance has been completed regarding your complaint on 10/17/2014 the Hospital Galveston provider told you, you had to be on hormones for a year before you would be considered for gender-reassignment. Your complaint of denial as well as request for gender-reassignment surgery and a treatment plan that shows what takes place and when was also reviewed.

Review of the medical records indicated you have been seen at Hospital Galveston (HG) in the Gender Dysphoria (GD) Specialty Clinic for your gender identity concerns. The specialists must follow the CMHC Policy G-51.11, with all attachments, to provide you with treatment for this condition. You may wish to review this policy, in its entirety, through the Law Library at your convenience. All medications, treatments, and referrals are based on the clinical findings of the provider at the time of their assessment. While you maintain the right to refuse any services offered, you do not have the liberty to dictate what medications, treatments, or appointments will be prescribed. You are encouraged to work with the medical providers and staff to ensure the best outcome for your health care needs.

Your requested remedy is not available through the Offender Grievance Program. Please refer to your Offender Orientation Handbook for the appropriate timelines and remedies available to you through this program. No further action is warranted for this issue at this time.   2.01

STEP II MEDICAL GRIEVANCE PROGRAM
OFFICE OF PROFESSIONAL STANDARDS
TDCJ HEALTH SERVICES DIVISION

**Signature Authority:** _____          **Date:** 2-2-16

**Returned because:**     *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible.*

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments.*

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate.*

**CGO Staff Signature:** _____

| OFFICE USE ONLY | |
|---|---|
| **Initial Submission** | **CGO Initials:** _____ |
| Date UGI Recd:_____ | |
| Date CGO Recd:_____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments : _____ | |
| Date Returned to Offender:_____ | |
| **2nd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments : _____ | |
| Date Returned to Offender: _____ | |
| **3rd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments : _____ | |
| Date Returned to Offender: _____ | |

I-128 Back (Revised 11-2010)                    Appendix G

Bra Issue



**Texas Department of Criminal Justice**

# STEP 2     OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY |
|---|
| Grievance #: 2016030820 |
| UGI Recd Date: 1-28-16   FEB 03 2016 |
| HQ Recd Date: |
| Date Due: 3.13 |
| Grievance Code: 624 |
| Investigator ID#: |
| Extension Date: |

Offender Name: HAVERKAMP Bobbie David   TDCJ # 702013

Unit: McConnell   Housing Assignment: CCB CCB3 12A64

Unit where incident occurred: McConnell Unit

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

---

**Give reason for appeal (Be Specific).** *I am dissatisfied with the response at Step 1 because...*

The issue is that a Gender Identy Doctors that specialize in Gender Dysporia prescribe a Bra because its Medical and Pycological Necessity for the Disorder. The Bra was prescribed yet local medical staff stops the progress and delay medical treatment Based on the Mental and Medical Directors not approving the request. Other GID offenders on other units are prescribe a Bra, wear the Bra to satisfy a Medical and Pcyloeal Necessity. "Medically and Pycological" go together when treating Gender Dysporia. The Act of wearing femune under-clothes is part of the treatment of GID. The Local Medical do not treat GID, they follow prescribe order from Specialty Treatment Doctors that treat Disorders. When the Directors allow local Medical Staff to override Galveston Hospital its is medical indifference and is a stall tactic to deny, delay or interfer with treatment of GID. I've Been at this since March 2015 and no more — UTMB to me is not going to Budge with out a Court order, so be it.

---

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

_____
_____
_____
_____
_____

**Offender Signature:** Bobbie David Haverkamp     **Date:** 1-25-16

**Grievance Response:**

A review of the Step 1 medical grievance has been completed regarding your complaint the physician assistant named at Step 1 said he was not ordering the bra out of retaliation and the provider does not think it is a medical necessity identifying this as a man's prison. Your complaint the Galveston Gender Disorder Doctor reordered the bra saying it is a medical and psychological necessity and the doctor now said he was to talk to the director was reviewed. A review by this coordinator was also completed in reference to report you were informed it had to be to determine if the bra was a medical necessity or security issue.

A Step 2 medical grievance coordinator interviewed you on 2/17/2016. You reported the unit provider had ordered a bra on your behalf on 2/9/2016. According to your health record you have been assessed with gender dysphoria and the specialty provider measured you for a bra on 12/15/2015. On 2/9/2016, the unit healthcare provider ordered two size 44B bras for six months. Facility medical administrative personnel were contacted on your behalf and confirmed the bras have been ordered from supply.

No retaliation was identified during the course of this investigation. No further action is warranted from this office for this grievance issue. 2.01

**Signature Authority:** STEP II MEDICAL GRIEVANCE PROGRAM OFFICE OF PROFESSIONAL STANDARDS TDCJ HEALTH SERVICES DIVISION     **Date:** 2-22-16

**Returned because:**   *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible.*

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments.*

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.*

☐ 6. Inappropriate.*

**CGO Staff Signature:** _____

| OFFICE USE ONLY | |
|---|---|
| **Initial Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____ Screened    ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **2nd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____ Screened    ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **3rd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____ Screened    ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |



# Texas Department of Criminal Justice

## STEP 1  OFFENDER GRIEVANCE FORM

**OFFICE USE ONLY**

Grievance #: 2016032820
Date Received: Oct. 26, 2015
Date Due: Dec. 5, 2015
Grievance Code: 1024
Investigator ID #: (45) 2226
Extension Date: 1-24-16
Date Retd to Offender: JAN 2 5 2016

**Offender Name:** Haverkamp Bobbie David   **TDCJ #** 702013   12AB-25

**Unit:** M/L   **Housing Assignment:** 3E-61B

**Unit where incident occurred:** McConnell Unit 4F-60B

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

**Who did you talk to (name, title)?** Director of Mental Health - Dr. Penn / Director of Medical Health - Dr. Linthicum  **When?** Oct 28, 2015

**What was their response?** No Response

**What action was taken?** No Actions

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

I started Hormone Therpy Oct 17, 2014 under the Directors of Mental and Medical Health. This treatment hormone Therpy is Approved under the World Professional Association for Transgender Health The Directors have created a situation where a Transgender is Discriminated against by the Directors, having No written Policy of When, Where or How a Bra is issued to a Transgender on Estrogen.

Here's how the Directors Discrimate against a Transgender.

1) You go to Galveston and the GID Doctor orders a Bra

2) You come Back to your Unit, the P.A. ECHaverry says he's not ordering the Bra because its retaliation, he doesn't think its a Medical Necessity And this is a Mans Prison.

3) 4 months later your Back to Galveston, the GID Doctor now re-orders the Bra saying its a Medical and Psycological Necessity

4) I come Back to the McConnell Unit And Dr. Kwarteng, says he has to see the Warden Sept 29, 2015 about the Bra.

5) Now its Oct 22, 2015 And I see Dr Kwarteng Again—Now he says he has to talk to Director Linthicum about the Bra. Is the Bra really a Medical Necessity or a Necessity/Security Issue Since April 23, 2015 I have been dealing with this Bra Issue — thats 6 months) And the ran-Around is not just random But is deliberate by the Directors). The Local Medical Providers have No Dealings with Transgenders, There is Not one Medical Provider, Nurse or Clerk

---

**I-127 Front** (Revised 11-2010)   **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**   (OVER)

Appendix F

that Knows what to to _____ the
Bra. The Local Providers are _____ the Dark on what is UTMB's
Policy on Bra Issue, they don't Even Know how long Before you get after you enter¿¿
This No Policy on the Bra Issue is deliberate by Director
of Mental Health Dr Penn. And Director of Medical Health
Dr Linthicum, its humiliating for a transgender to have to
go to strange people to try and get items that were prescribed as Medically and
Psycoial Necessary. This is Deliberate Medical Indiffence by the
Directors by having a Policy 5.1.11 But no way to access the Bra
and no way Local Medical People can do their work. This is Discrimation

**Action Requested to resolve your Complaint**
Issue the Bra, Go to J.d. Penny's Buy one, I will Pay for it
The Discrimation has to stop. Issue the Bra

Offender Signature: _Haverkamp_                    Date: Oct 26, 2015

**Grievance Response:**

Offender Haverkamp, David TDCJ# 702013 you are requesting to be issued a bra. You will be issued a bra if it is medically necessary.
Bras are not issued for cosmetic purposes. When a provider feels you medically require a bra you will be issued one.

Signature Authority: _K. Long, PM_   K. LONG            Date: 01.13.16
                                     Practice Manager
If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response.
State the reason for appeal on the Step 2 Form.

**Returned because:**          *Resubmit this form when the corrections are made.*

☐ 1. Grievable time period has expired.
☐ 2. Submission in excess of 1 every 7 days. *
☐ 3. Originals not submitted. *
☐ 4. Inappropriate/Excessive attachments. *
☐ 5. No documented attempt at informal resolution. *
☐ 6. No requested relief is stated. *
☐ 7. Malicious use of vulgar, indecent, or physically threatening language. *
☐ 8. The issue presented is not grievable.
☐ 9. Redundant, Refer to grievance #_____
☐ 10. Illegible/Incomprehensible. *
☐ 11. Inappropriate. *

UGI Printed Name/Signature: _____

**Application of the screening criteria for this grievance is not expected to adversely
Affect the offender's health.**

Medical Signature Authority: _____

I-127 Back (Revised 11-2010)

**OFFICE USE ONLY**

Initial Submission     UGI Initials: _____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

Submission     UGI Initials: _____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

3rd Submission     UGI Initials: _____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

Appendix F

# Texas Department of Criminal Justice

## STEP 1

### OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY | |
|---|---|
| Grievance #: | 2016048981 |
| Date Received: | 11.24.15 |
| Date Due: | 01.03.16 |
| Grievance Code: | 024 |
| Investigator ID #: | 1950 |
| Extension Date: | 02.17.16 |
| Date Retd to Offender: | JAN 13 2016 |

Offender Name: HAVERKAMP Bobbie David   TDCJ # 702013

Unit: McConnell   Housing Assignment: 3G-69B 12A-25

Unit where incident occurred: McConnell Medical

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing. Director of Medical Health- Mrs Linicumth Galveston

Who did you talk to (name, title)? Ms Corbin - P.A.   When? Nov 23, 2015 - 10:45am

What was their response? Was completly in the Dark

What action was taken? None

---

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

I was prescribed a Bra in March 2015 by Dr Meyers CID Doctor Galveston, the McConnell Medical staff reached their own conclusions and would not order the Bra Because it wasn't Medically necessary.

I then went Back to Galveston on Sept 5, 2015 and Dr Meyers reorder the Bra as Medically and Pey necessity.

When I return, now the Medical McConnell staff says well is it a Medical necessity as a Security/Laundry necessity.

I waited had another appointment and the Excuse now is the Warden has to approve it.

I saw UCC in Nov 2015 and the Major said I was Approved for a Bra.

I wrote complains that to's my I-60 are not returning to me, and I get an appointment with Ms Corbin. At no time have I ever had an appointment with Ms Corbin — she look at my Breasts, said I could have and that was it.

This is a stall tactic and my point here, is without a treatment plan I am falling prey to UTMB's the Directors of UTMB Medical and Mental Health with their interference and hinderance to provide definitive direction and concese guidelines.

This Bra issue has been going on since March 2015 with No end in sight Except delay.

---

I-127 Front (Revised 11-2010)   **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**   (OVER)

92

Appendix F

This course of "back" and cause I cause of anxiety and it worry
which I don't need, Under Hallett v. Morgan 296 F 3d 732
Deberte Indifference to a prisoner serious medical needs)
is when UTMB personal deny, delay or intentionaly interfer
with medical treatment.

Action Requested to resolve your Complaint. **Issue the Bra**

Offender Signature: **Bobbie Darel Haverkamp**          Date: **Nov 23, 2015**

**Grievance Response:**

Offender Haverkamp, David TDCJ #702013 you are requesting to have a bra. You will be issued a bra if it is medically necessary.

Bras are not prescribed due to cosmetic reasons. When you are medically required to wear a bra your provider will issue one.

**K. LONG**

Signature Authority: **K. Ying, PM** Practice Manager          Date: **01.07.16**

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response.
State the reason for appeal on the Step 2 Form.

Returned because:          *Resubmit this form when the corrections are made.

- [ ] 1. Grievable time period has expired.
- [ ] 2. Submission in excess of 1 every 7 days. *
- [ ] 3. Originals not submitted. *
- [ ] 4. Inappropriate/Excessive attachments. *
- [ ] 5. No documented attempt at informal resolution. *
- [ ] 6. No requested relief is stated. *
- [ ] 7. Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8. The issue presented is not grievable.
- [ ] 9. Redundant, Refer to grievance #_____
- [ ] 10. Illegible/Incomprehensible. *
- [ ] 11. Inappropriate. *

UGI Printed Name/Signature: _____

Application of the screening criteria for this grievance is not expected to adversely
Affect the offender's health.

Medical Signature Authority: _____

| OFFICE USE ONLY | |
|---|---|
| Initial Submission | UGI Initials: _____ |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |
| 2nd Submission | UGI Initials: _____ |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |
| 3rd Submission | UGI Initials: _____ |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |

I-127 Back (Revised 11-2010)

Appendix F



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER GRIEVANCE FORM**

Offender Name: Haverkamp Bobbie David    TDCJ # 702013

Unit: McConnell    Housing Assignment: 12 A - 200 64

Unit where incident occurred: McConnell

| OFFICE USE ONLY | |
| --- | --- |
| Grievance #: | 2016048981 |
| UGI Recd Date: | 1-20-16 |
| HQ Recd Date: | JAN 25 2016 |
| Date Due: | 03-05 |
| Grievance Code: | 624 |
| Investigator ID#: | |
| Extension Date: | |

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

---

Give reason for appeal (Be Specific).    *I am dissatisfied with the response at Step 1 because...*

I was prescribe a Bra by two (2) Different Medical Doctors in UTMB Galveston, Texas. Both Doctors re-orderthe Bra as a Medical and Psycological Necessity for Haverkamp. The McConnell Staff Medical has no Experience with Gender Dysporia, Ms Corbin certainly has no Experience to Know what is "Medically and Psycological Necessity" in the issue of a Bra. The U.C.C. Major made it appoint to let Haverkamp Know the Bra was Approved by McConnell Warden on Nov 2015. The Practic Mannger Long has no Medical license and certainly no Experience in deciding when it is "Medically and Psycologial necessity". This is a stall tactic by the Directors Joseph Penn and Directors Lannnette Linthicum of Mental and Medical Health to stop the issue of a Treatment Plan under the World Professional Association for Transgender Health in regards to Gender Reassignment As a care for Gender Dysporia. I am falling prey to the Directors in telence and hindrance to provide definitive direction and consice guide lines. Under WPATH Guidelines I am allowed to wear feminine underwear.

---

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

_____

_____

_____

_____

_____

**Offender Signature:** Bobbie David Hawkins 702013   **Date:** 1-19-16

**Grievance Response:**

A review of the Step 1 medical grievance has been completed regarding your complaint you were prescribed a bra in March 2015 by the Gender Disorder Doctor named from Hospital Galveston.  However, the McConnell medical staff reached their own conclusions and would not order the bra because it was not medically necessary.  Your complaint you went back and saw UCC (Unit Classification Committee) in November 2015 and the major said you were approved for bras was also reviewed.

Review of your Health Records indicates you were given appropriate information in the Step 1 grievance response.   You were most recently assessed by a unit level healthcare provider who ordered two bras  size 44B for six months.

Your grievance issue was resolved at the unit level with no further action warranted through the grievance process.  2.01

**STEP II MEDICAL GRIEVANCE PROGRAM
OFFICE OF PROFESSIONAL STANDARDS
TDCJ HEALTH SERVICES DIVISION**

**Signature Authority:** _____   **Date:** 2-22-16

**Returned because:**   *Resubmit this form when corrections are made.*

☐ 1.  **Grievable time period has expired.**

☐ 2.  **Illegible/Incomprehensible.***

☐ 3.  **Originals not submitted. ***

☐ 4.  **Inappropriate/Excessive attachments.***

☐ 5.  **Malicious use of vulgar, indecent, or physically threatening language.***

☐ 6.  **Inappropriate.***

**CGO Staff Signature:** _____

| OFFICE USE ONLY | |
|---|---|
| **Initial Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____Screened      ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **2nd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____Screened      ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **3rd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____Screened      ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |

**I-128 Back (Revised 11-2010)**                              **Appendix G**

# Texas Department of Criminal Justice

## STEP 1

**OFFENDER GRIEVANCE FORM**

OFFICE USE ONLY

Grievance #: 2016038487

Date Received: 11.05.15

Date Due: 12.15.15

Grievance Code: 303

Investigator ID #: 2226/95D

Extension Date: 04.24.16

Date Retd to Offender: JAN 25 2016

Offender Name: HAVERKAMP Bobbie David   TDCJ # ~~702013~~

Unit: M/L   Housing Assignment: ~~2247~~ B4F-60B

Unit where incident occurred: McConnell

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing. Directors of Mental/Medical Health UTMB

Who did you talk to (name, title)? ~~Director Glenn Pope~~ and Ms Long, Practic Manag   When? Oct 25, 2015

What was their response? Law Library on Oct 29, 2015 sent me Medical Ref for Polic 51-11

What action was taken? None — Law Library was not privy to Reference manual

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

The Directors of Mental and Medical Health have a Policy 51-11 (Treatment of Offenders with Transgender Issues). Policy 51-11 has reference at the end that I requested thru ~~correspondence with~~ Ms Long Practic Manager. The References are:

① World Professional Association for Transgender Health Standards of Care for Health of Transexual Transgender and Gender Nonconforming People 7th Version

② The Endocrine Society's Clinical Guidelines, Endocrine Treatment of Transexual Persons Journal of Clinical Endocrinology and Metabolism.

UTMB Health Officials, the Directors, ~~Glenn Pope~~ and Ms Long Practic manager serve as educators for people with Gender Dysphoria. The entire medical team knew the above References did not appear in the Law Library because they didn't include them in the Health Manual. I am feeling the impact of stigma from the people above. Other offenders have pamphlets on the walls about hyper-tension, Aids, HIV, Turbe losis) But UTMB Directors refused to provide Education Materials in the above Ref to me. This is causing me anxiety and Worry. This denying me materials

---

I-127 Front (Revised 11-2010)   **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**   (OVER)

Appendix F

that would help e is a Direct Discrimation by the Directors of Mental and Medical Help There is no way to be prepared for surgery if UTMB won't ever Provide the Above Reference materials. All of this is in the local Units Computers. Basely Ms Lowe has no intention of Providing Reading Material that would Aid me in my worry about my mental and Medical health Thereby discrimination against me. The Directors of Mental and Medical Health Back this descrimination to me 100%

---

**Action Requested to resolve your Complaint.** Give me the Above Reference Material used in Policy 57.11 — Treatment of Offender with Gender Disorders

**Offender Signature:** Bossie Dord Haverling        **Date:** Nov 5, 2015

**Grievance Response:**

**Your complaint has been reviewed.  Investigation revealed that there is currently no pamphlet on Gender Identity Disorder.  No further action is warranted.**

Warden C. Furr

**Signature Authority:** _C. Furr_        **Date:** _JAN 2 2 2016_

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**        *Resubmit this form when the corrections are made.

- [ ] 1.  Grievable time period has expired.
- [ ] 2.  Submission in excess of 1 every 7 days. *
- [ ] 3.  Originals not submitted. *
- [ ] 4.  Inappropriate/Excessive attachments. *
- [ ] 5.  No documented attempt at informal resolution. *
- [ ] 6.  No requested relief is stated. *
- [ ] 7.  Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8.  The issue presented is not grievable.
- [ ] 9.  Redundant, Refer to grievance #_____
- [ ] 10.  Illegible/Incomprehensible. *
- [ ] 11.  Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:** _____

### OFFICE USE ONLY

Initial Submission        UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

**2nd Submission**        UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

**3rd Submission**        UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

**I-127 Back** (Revised 11-2010)

Appendix F



**Texas Department of Criminal Justice**

# STEP 2 OFFENDER GRIEVANCE FORM

OFFICE USE ONLY

Grievance # 2016 038487

UGI Recd Date: 2-1-16

HQ Recd Date: FEB 05 2016

Date Due: 3.17

Grievance Code: 303

Investigator ID#: Dan

Extension Date: _____

Offender Name: Haverkamp Bobbie David   TDCJ # 702013

Unit: McConnell ✓   Housing Assignment: 4F-60b

Unit where incident occurred: McConnell Medical Unit

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

---

**Give reason for appeal (Be Specific).**   *I am dissatisfied with the response at Step 1 because...*

A grievance is supposed to solve problems, I have spent 80 days waiting
on an answer that says yes your right no educational materials , case
closed. I want that reference material that i requested in the Step 1.
Also I just got this Jan 29, 2016 @ 12:AM.

---

I-128 Front (Revised 11-2010)      **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**      (OVER)

Appendix G

94

_____

_____

_____

_____

_____

**Offender Signature:** Bobbie David Haverkamp          **Date:** FEB 6 JAN 50, 2015

**Grievance Response:**

An investigation has been conducted into your complaint. Please be advised; you may request an appointment at any time to speak directly with a health care provider to address any questions or concerns you may have. There was no conclusive evidence of policy violations found to substantiate your claims of discrimination. No further action warranted by this office.

**Signature Authority:** _____ **B. PARKER** _____          **Date:** _____ FEB 1 0 2016

**Returned because:**    *Resubmit this form when corrections are made.*

☐ **1. Grievable time period has expired.**

☐ **2. Illegible/Incomprehensible.***

☐ **3. Originals not submitted. ***

☐ **4. Inappropriate/Excessive attachments.***

☐ **5. Malicious use of vulgar, indecent, or physically threatening language.**

☐ **6. Inappropriate.***

**CGO Staff Signature:** _____

| OFFICE USE ONLY | |
|---|---|
| **Initial Submission** | **CGO Initials:** _____ |
| Date UGI Rec'd:_____ | |
| Date CGO Rec'd:_____ | |
| (check one) ____Screened    ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender:_____ | |
| **2ⁿᵈ Submission** | **CGO Initials:** _____ |
| Date UGI Rec'd:_____ | |
| Date CGO Rec'd:_____ | |
| (check one) ____Screened    ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender:_____ | |
| **3ʳᵈ Submission** | **CGO Initials:** _____ |
| Date UGI Rec'd:_____ | |
| Date CGO Rec'd:_____ | |
| (check one) ____Screened    ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender:_____ | |

**I-128 Back** (Revised 11-2010)                    **Appendix G**

This Step 1 fell dead —
No Extentions, I never
could fund where it went

*[signature]*

12-23-16

The Step 2 was never filed _

This Step 1, just fell Dead _

No Extiontions, Nothing

Hawley

12 - 23 - 16

This Step 1 fell dead —
No Extentions, I never
could fund where it went

[signature]

12-23-16

# Texas Department of Criminal Justice

## STEP 1

## OFFENDER
## GRIEVANCE FORM

OFFICE USE ONLY

Grievance #: _____

Date Received: _____

Date Due: _____

Grievance Code: _____

Investigator ID #: _____

Extension Date: _____

Date Retd to Offender: _____

Offender Name: _Hauer Kamp_　　TDCJ # _702013_

Unit: _n/a_　　Housing Assignment: _Seg A-3_

Unit where incident occurred: _McConnell Medical_

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? _Dir. Lawson McConnell but Dr. Lovette Lithman | Dr. Joscat Penn | Dir of UTMB_　When? _Oct 24, 2016_

What was their response? _P.A. Ridenour said Dir Lawson McConnell Med Dir overrated Dr Myer GID clinic_

What action was taken? _The Local Medical Team won't order Bra's, Panties, or issue Long Hair PASS_

---

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

_I went to Galveston to CID Clinic for Transgenders, Dr Mayer head of the above recommended Panties and a Long Hair Pass. I put in a I-GID form, what Dr Mayer wanted. I saw P.A. Rodriguez and she said McLawson said the McConnell Unit was not ordering Bra's, Panties or issuing Long Hair Pass. P.A. Rodriguez said McLawson was the Director of Medical at McConnell and when Dr Kwarteng, Director Penn of Mental Health, Director Lithman of Mental Health and Director Lawson of the McConnell Unit deny access to medical health care staff qualified to address Gender Dysporia._

_Dr Penn and Dr Lwathan are both charged with reasonably under G-51.II of the Health Care Policy with the treatment of Transgender to formulate treatment plans that are in concern with Medical units Mental. there is called a interdisplinary Medical Team. Director Penn, Director Lwathan and Director Lawson of the McConnell Unit deny, ignore and trash the recommendation of the GID Clinic, thereby by causing medical conditions that constitute serious medical needs. Denial of Medical Staff that can address Gender Dysporia and the local facility to prepare for this Medical Board Review. Director Lawson of the McConnell Unit intentionally interfere with treatment recommended. There was no reason given except UTMB wasn't ordering Bra's Panties or Long Hair Passes, basically female items for Transgenders. Not Providing Medical Personal on the local level to treat Gender Dysporia amounts to Discrimination and failure to carry out treatment recommended by Dr. Mayer. Dr. Penn, Dr. Lwathan, Dir Lawson render services by unqualified personnel for Gender Dysporia_

---

I-127 Front (Revised 11-2010)　　**YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**　　(OVER)

Appendix F

_There are grounds for Texas Medical Board Review?_

**Action Requested to resolve your Complaint.** _Provide health care staff at the Local McConnell_
_Level 6 address Gender Dysporia of Female Items - Bra's, Panties, Long Hair Pass_

**Offender Signature:** _Ms. Bobbie Dearl Haverty_                          **Date:** _Oct 29, 2016_

**Grievance Response:**

**Signature Authority:** _____          **Date:** _____

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**          *Resubmit this form when the corrections are made.

☐ 1. Grievable time period has expired.

☐ 2. Submission in excess of 1 every 7 days. *

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments. *

☐ 5. No documented attempt at informal resolution. *

☐ 6. No requested relief is stated. *

☐ 7. Malicious use of vulgar, indecent, or physically threatening language. *

☐ 8. The issue presented is not grievable.

☐ 9. Redundant, Refer to grievance #_____

☐ 10. Illegible/Incomprehensible. *

☐ 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:** _____

**I-127 Back** (Revised 11-2010)

<div style="border:1px solid">

## OFFICE USE ONLY

**Initial Submission**          **UGI Initials:** _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

**2ⁿᵈ Submission**          **UGI Initials:** _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

**3ʳᵈ Submission**          **UGI Initials:** _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

</div>

**Appendix F**

Ms Bobbie David Haverkamp
#702013
Stiles Unit
3060 FM 3514
Beaumont, Texas
77706

UNITED STATES POSTAL SERVICE

1026

78401

U.S. POSTAGE
PAID
NEDERLAND, TX
77627
JAN 11, 17
AMOUNT
$0.00
R2304H108465-08

U.S. District Court
Southern District of Texas
1133 North Shoreline Blvd
Corpus Christi, Texas
78401

Legal Mail

TRACKED ★ ★ ★ INSURED ★

PRIORITY ★ MAIL ★

UNITED STATES POSTAL SERVICE.
Use Only

Label 107R, July 2013

Expected Delivery Day: 01/13/2017

USPS TRACKING NUMBER