UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DAVID ALLEN HAVERKAMP; aka | § | |
| BOBBIE LEE HAVERKAMP, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:17-CV-18 |
| | § | |
| JOSEPH PENN, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION
TO GRANT DEFENDANTS' MOTION TO DISMISS**

Plaintiff,[1] proceeding *pro se* and *in forma pauperis*, is an inmate incarcerated at the Stiles Unit of the Texas Department of Criminal Justice, Criminal Institutions Division in Beaumont, Texas.  Plaintiff filed this lawsuit pursuant to 42 U.S.C. § 1983, complaining that she is discriminated against because she has been diagnosed with a gender identity disorder, but medical officials are refusing to provide gender reassignment surgery. (D.E. 1).  Pending before the Court is Defendants' Motion to Dismiss (D.E. 90).  For the reasons discussed below, the undersigned recommends that Defendants' Motion to Dismiss be GRANTED.

**I.     JURISDICTION**

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

---

[1] Plaintiff requests that the Court utilize feminine pronouns when referring to Plaintiff.  (D.E. 2, p. 1).  The undersigned, therefore, will refer to Plaintiff in this Memorandum and recommendation as her preferred gender of female, using feminine pronouns.

## II.      PROCEDURAL BACKGROUND

Plaintiff was convicted on August 4, 1994, on two counts of aggravated sexual assault and was sentenced to forty-five (45) years in prison on each count to be served concurrently.  In her civil rights action, Plaintiff asserts violations of her constitutional rights based on the failure of the TDCJ to provide her with gender reassignment surgery for her gender dysphoria[2] or Gender Identity Disorder (GID). (D.E. 2, p. 17). Plaintiff has named Dr. Joseph Penn and Dr. Lannette Linthicum as defendants in their individual and official capacities. (D.E. 2, pp. 2-3**).**  Plaintiff seeks an injunction ordering Defendants to provide her with gender reassignment surgery, and declaratory judgment affirming her rights to necessary treatment and care. (D.E. 2, pp. 1, 17).

On August 23, 2017, the undersigned conducted a telephone conference with Plaintiff and each defendant's counsel.  Prior to the telephone conference, the parties had filed numerous motions with the Court. The undersigned considered argument on Defendants' motion to stay this case pending the resolution of a case containing similar issues on appeal before the Fifth Circuit Court of Appeals, *Gibson v. Collier*, No. 16-51148 (5th Cir. filed Sep. 12, 2016).  At the hearing, the undersigned concluded that it was appropriate to grant Defendants' motion in part.  The parties did not object at the hearing to the undersigned's determination to deny the remaining pending motions without prejudice to renew either after *Gibson* is decided or at any other time the undersigned determines to lift the stay.

---

[2] Gender dysphoria "refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manuel of Mental Disorders* 451 (5th ed. 2013).

During the hearing, the undersigned raised the issue as to whether the proper defendants have been named in this case. Counsel for Defendant Linthicum, Celamaine Cunniff, stated that Dr. Penn is not an appropriate party in this case and that the appropriate defendants in this case hinge on the type of relief sought by Plaintiff. Ms. Cunniff further stated that: (1) in the event Plaintiff only seeks gender reassignment surgery, the appropriate defendant would be Dr. Owen Murray from the University of Texas Medical Branch (UTMB); and (2) if Plaintiff seeks a policy change or a new policy regarding care for transgender inmates, the appropriate defendants would be the principal members of the Correctional Managed Health Care (CMHC) committee.

Given the information provided by Ms. Cunniff, the undersigned proposed that Plaintiff name Dr. Murray and each of the CMHC principal committee members in their official capacities as Plaintiff only seeks injunctive relief in this case. Ms. Cunniff then requested an opportunity to gather the names of the CMHC principal committee members in order to file an advisory with the Court.  The undersigned ultimately directed Plaintiff to file an amended complaint that clearly details who Plaintiff is suing, what the claims are, and the relief Plaintiff seeks in this case. The undersigned allowed Plaintiff to name the defendants as John and Jane Does, which would allow the Court to ascertain the precise parties at a later date through an advisory filed by Defendants' counsel.

On August 24, 2017, the undersigned entered a written order to memorialize the rulings from the telephone conference. (D.E. 60). Specifically, the undersigned: (1) granted Defendants' motion to stay in part by staying the case, including all discovery matter, until the Fifth Circuit issued its decision in *Gibson*; (2) denied the motion to stay

in part to the extent that Plaintiff was directed to file an amended complaint within sixty days; and (3) denied all remaining motions without prejudice to renew either after *Gibson* is decided₃ or at any other time the undersigned decides to lift the stay.  (D.E. 60).

Plaintiff filed his Amended Complaint on October 5, 2017, naming several John and Jane Does as defendants. (D.E. 62, p. 3).  By Order entered on February 28, 2018, the undersigned directed counsel for Defendants to file an advisory listing each of the CMHC principal committee members as defendants.  (D.E. 70, p. 4).  On March 19, 2018, counsel for Defendants filed their Advisory listing ten CMHC principal committee members as defendants including Dr. Linthicum.  (D.E. 71).  The undersigned subsequently ordered Dr. Murray and the nine new defendants to file their answer or otherwise plead within forty-five days after the Fifth Circuit issued its decision in *Gibson*. (D.E. 73).  On September 11, 2018, the undersigned ordered Dr. Raimer to be served in this case.  (D.E. 79).  Like the other named defendants, Dr. Raimer was directed to answer or otherwise plead within forty-five days after the Court issued its *Gibson* decision.  (D.E. 83).

On March 29, 2019, the Fifth Circuit issued its decision in *Gibson*.  *See Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019).  On May 23, 2019, the undersigned vacated the stay in this case and directed all Defendants, who had not previously done so, to file their answer or other responsive pleadings on or before June 13, 2019.  (D.E. 88).

On June 13, 2019, Defendants Linthicum, Murray, Jumper, Hudson, Penn, and Mills (collectively referred to hereinafter as "Defendants") filed their Motion to Dismiss. (D.E. 90).  Plaintiff subsequently filed his response.  (D.E. 91).  On July 2, 2019,

Defendants filed their reply.  (D.E. 93).  Plaintiff subsequently filed his rebuttal to the reply.  (D.E. 94).

## III.   PLAINTIFF'S ALLEGATIONS AND CLAIMS

In his Amended Complaint, Plaintiff alleges the following facts.  On June 6, 2013, University of Texas Psychiatric Doctor Philip Farley diagnosed Plaintiff with gender dysphoria.  (D.E. 62, p. 12).  On October 17, 2014, Dr. Walter Meyer examined Plaintiff and prescribed her with hormone therapy for one year and a referral for gender reassignment surgery.  (D.E. 62, p. 12).  According to Plaintiff, "defendants gave their approval for the prescription of the hormone [E]strodil."  (D.E. 62, p. 12).

Following the meeting with Dr. Meyer, a nurse explained to Plaintiff that she would not lose her transgender status upon refusing the surgery.  (D.E. 62, p. 13) Plaintiff nevertheless accepted the "offer of Gender Reassignment Surgery" on October 22, 2014.  (D.E. 62, p. 13).  Plaintiff considered herself, therefore, to be a "certified Transgender woman."  (D.E. 62, p. 13).

As of March 9, 2016, Plaintiff was three months into her 12-month hormone therapy, which was a requirement for surgery.  (D.E. 62, p. 14).  Dr. Meyer stated that "UTMB is going to have to face the inevitable that Gender Reassignment Surgery is going to happen."  (D.E. 62, p. 14).  On March 26, 2016, Defendants stopped treating Plaintiff for gender dysphoria and discontinued providing her with a long-hair pass, panties, and a bra.  (D.E. 62, p. 14).  Defendants effectively communicated to Plaintiff that Dr. Meyer's recommendation would not be honored.  (D.E. 62, p. 14).

According to Plaintiff, the standard of care she has received does not comport with the standard of care for Gender Dysphoria recognized by the general medical community. (D.E. 62, pp. 12, 15).  According to Plaintiff, CMHC Policy G-51.11 provides a treatment plan and hormone therapy related to GID.  (D.E. 62, pp. 8-9).  While this policy references the standard of care set forth by the World Professional Association for Transgender Health (WPATH), Plaintiff indicates that Defendants are disregarding some aspects of the WPATH standard of care.  (D.E. 62, p. 12).   Plaintiff then listed the following somewhat repetitive claims in her Amended Complaint:

(1) Defendants' policy discriminates against Plaintiff as a transgender inmate by: (1) allowing cisgender[3] or non-transgender women possession of non-expensive or non-narcotic medication on a KOP (keep on person) basis while Plaintiff is forced to get fully dressed and made to stand outside in the weather at 2:30 a.m. in the morning to obtain pills for hormone therapy; and (2) forcing Plaintiff to switch to hormone shots while non-transgender women obtain the hormones in pill form.

(2) While a standard of care applies to medical treatments rendered to non-transgender women, Defendants refuse to apply the same standard to care to Plaintiff in devising a "treatment plan to treat and cure [the] gender dysphoria."

(3) While denying Plaintiff "proper consultation for gender dysphoria and gender reassignment surgery," Defendants allow cisgender female inmates to have full access to specialized consultation for her surgery.

(4) Defendants deny Plaintiff access to clothing, cosmetics, and hygiene products as they are approved for cisgender women but not for transgender women because they are "male" at birth.

---

[3] A cisgender individual is one whose gender corresponds to his or her sex at birth.  *See Cisgender, Oxford English Dictionary* (3d ed. 2015).

(5) Defendants, while being aware of Plaintiff's medical needs for treatment for her gender dysphoria, continue to ignore Plaintiff and deny her fair treatment due to financial and political preferences.

(6) Defendants allow a non-transgender woman to have vaginoplasty surgery anytime but discriminate against Plaintiff by not allowing her to have a vaginoplasty procedure or otherwise providing total care and a cure for Plaintiff's gender dysphoria.

(7) Defendants discriminate against Plaintiff through their blanket denial of providing gender reassignment surgery, which violates policy and Plaintiff's contract with Defendants.

(8) Defendants discriminate against Plaintiff by allowing non-transgender women access to mental health care that addresses gender issues while at the same time denying Plaintiff as a transgender woman appropriate mental health care for her Gender Dysphoria.

(9) Defendants discriminate against Plaintiff by refusing to provide educational materials to assist her in understanding the changes in her body while cisgender women are allowed the opportunity to understand changes in their bodies.

(10) Defendants discriminate against Plaintiff by erroneously relying upon prison security concerns to deny Plaintiff gender reassignment surgery, feminine clothing access, cosmetic access, and feminine hygiene access along with appropriate educational materials.

(11) Defendants discriminate against Plaintiff by refusing to pay for the gender reassignment surgery when there is no medical necessity to withhold treatment, especially when non-transgender women get the surgeries they need.

(12) Defendants discriminate against Plaintiff by failing to offer her an outside consultant for gender reassignment surgery while other offenders who are not transgender get outside medical contractors.

(13) Defendants discriminate against Plaintiff by denying Plaintiff access to bras, panties, long hair passes, cosmetics, and feminine hygiene items while cisgender women have no problems receiving such items.

(14) Defendants discriminated against Plaintiff by directing Ms. Lawson, an unlicensed medical practice manager, to deny Plaintiff panties, bras, and long hair passes while cisgender women are not denied the same.

(D.E. 62, pp. 15-37; 62-1, pp. 1-19).

With respect to each of her claims, Plaintiff asserts that Defendants have violated the Equal Protection Clause under the Fourteenth Amendment.  Plaintiff seeks relief as follows: (1) gender reassignment surgery in accordance with the applicable policy; (2) replacement or higher estrogen for at least one year; (3) a standard of care and treatment plan acceptable to the medical community and tailored to Plaintiff's request for gender reassignment surgery; (4) an experienced psychiatric doctor in treating gender dysphoria; (5) proper clothing, cosmetics, and hygiene items for a female; (6) medical care that can bring Plaintiff's skin characteristics in line with her female identity; (7) a medical pass for Plaintiff to grow her hair to standard female length; (8) a coordinator to bring this case to a close; and (9) educational material on gender dysphoria as referenced "in WPATH standard of care."  (D.E. 62, pp. 8-11).

## IV.    DISCUSSION

### A.    Applicable Legal Standards

Under Rule 12(b)(1), a case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citing *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1887 (2d Cir. 1996)). Lack of subject matter jurisdiction may be found in three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the

record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Once the subject matter jurisdiction has been challenged, the party asserting jurisdiction retains the burden of proof that jurisdiction truly does exist. *Id.*

Federal Rule of Civil Procedure 12(b)(6), in turn, provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its *face.*'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

A claim is said to be plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. "[A] plaintiff's obligation to prove the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 554-55. When considering a motion to dismiss, district courts are "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### B. Analysis of Constitutional Claims

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To

prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived her of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).

### (1)   *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment states that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV § 1.   The Equal Protection Clause directs that similarly situated people should be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). "Its basics are rote: equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." *Wood v. Collier*, 836 F.3d 534, 538-39 (5th Cir. 2016) (citations and quotations marks omitted).

Equal protection jurisprudence typically has been concerned with governmental classifications that affect some groups of citizens differently than others. *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 601 (2008). Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an identifiable group. *Id.*

Defendants contend in their motion to dismiss that Plaintiff's equal protection claims fail to state a claim for relief. (D.E. 90, pp. 9-13). According to Defendants, the Equal Protection Clause does not require that biological males who identify as females be treated in law as though they were the same as biological females who identify as females. (D.E 90, p. 11). Plaintiff counters that he has presented valid Fourteenth

Amendment claims under the Equal Protection Clause for discrimination, sex-stereotyping and breach of contract.  (D.E. 94, p. 8).

In *Williams v. Kelly*, No. 17-12993, 2018 WL 4403381 (E.D. La. Aug. 27, 2018), an anatomical male prisoner suffering from gender dysphoria asserted equal protections claims similar to those claims advanced by Plaintiff.  Specifically, Williams claimed that prison officials intentionally treated "her differently than non-transgender female inmates seeking vaginoplasty due to her gender status by barring her from such treatment or, at a minimum, holding her to more onerous standard."  *Id.* at *2.  Thus, Williams claimed that prison officials violated her equal protection rights by discriminating against her on the basis of her transgender status.  *Id.* at *3.

The Louisiana magistrate judge first recognized that Williams' equal protection claims did "not fit within an equal protection analysis."  *Id.* at *12.  The court noted that Williams did not allege that she was being treated differently than inmates diagnosed with gender dysphoria.  *Id.*  Instead, Williams complained that, as a transgender inmate, she was being denied sex reassignment surgery while cisgender female inmates were being provided with surgical interventions such as a vaginoplasty for the treatment of certain medical conditions.  *Id.*  The *Williams* court determined that "because plaintiff is not "similarly situated" to the prisoners she uses as a basis of comparison, her equal protection claim necessarily fails."  *Id.*

In another district court case, a transgender female inmate named Mark Campbell also claimed a violation of her equal protection rights, asserting that defendants denied her effective medical treatment that is available to cisgender female inmates.  *Campbell*

11 / 17

*v. Kallas*, No. 16-cv-261, 2018 WL 2089351 (W.D. Wis. May 4, 2018), *overruled on other grounds*, *Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019).  The Wisconsin district court held that: (1) classification based on sex triggers "heightened scrutiny," where the burden rests on the state to prove that sex-based classification serves an important governmental interest and that the discriminatory means employed are substantially related to achieving those objectives; (2) neither the Seventh Circuit nor the Supreme Court had determined whether transgender status should be treated with similar scrutiny; and (3) regardless whether classification on the basis of transgender status triggers "heightened scrutiny," Campbell's equal protection claim was subject to dismissal on summary judgment.  *Id.* at 10.

In rejecting Campbell's equal protection claim, the Wisconsin district court recognized that the Supreme Court "has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances."  *Id.* (quoting *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469 (1981)).  The *Campbell* court explained that:

> A cisgender female inmate need not undergo a real-life experience or hormone therapy or have persistent, well-documented gender dysphoria before obtaining vaginoplasty because a vaginoplasty for a transgender female inmate (that is, a biological male) is necessarily a different type of surgical procedure than for a cisgender female inmate (that is, a biological female). The biological female already has a vagina; the biological male doesn't. The government has an interest in ensuring that inmates receive appropriate, effective medical treatment. *Employing different decision-making policies for different types of medical procedures does not violate the Equal Protection Clause.*

*Id.* (emphasis supplied).

12 / 17

In this case, Plaintiff alleges that Defendants have taken the following discriminatory actions against her as a transgender female inmate: (1) allowing cisgender women to possess medication on a KOP basis while forcing Plaintiff get dressed early in the morning an go outside to obtain pills for hormone therapy; (2) forcing Plaintiff switch to hormone shots while cisgender female inmates take hormone therapy in pill form; (3) failing to provide Plaintiff with the same standard of care to treat her gender dysphoria as the standard of care rendered to provide curative treatment to non-transgender female inmates; (4) denying Plaintiff proper medical consultation for gender dysphoria and gender reassignment surgery while allowing cisgender female inmates full access to special consultation; (5) denying Plaintiff access to female clothing long-hair passes, cosmetics, and hygiene products even though such products are approved and provided for cisgender women; (6) allowing a non-transgender woman to have vaginoplasty surgery anytime while denying Plaintiff a vaginoplasty procedure or otherwise providing a cure for Plaintiff's gender Dysphoria; (7) allowing non-transgender women access to mental health care that addresses gender issues while at the same time denying Plaintiff as a transgender woman appropriate mental health care for her gender dysphoria; (8) refusing to provide Plaintiff with educational materials to assist her in understanding the changes in her body while cisgender women are allowed the opportunity to understand changes in their bodies; (9) refusing to pay for the gender reassignment surgery when there is no medical necessity to withhold treatment, especially when non-transgender women get the surgeries they need; and (10) failing to offer Plaintiff an outside

consultant for gender reassignment surgery while other offenders who are not transgender get outside medical contractors.  (D.E. 62, pp. 15-37; 62-1, pp. 1-19).

The common thread tying together all of Plaintiff's equal protections claims is her assertion that Defendants treat cisgender or non-transgender women more favorably than transgender women as it pertains to surgical options, mental health options, education, and access to female clothes and feminine products.   Like the claims asserted in *Williams* and *Campbell*, Plaintiff presents no allegations to suggest that she is being treated differently than other biological male prisoners suffering from gender dysphoria.   Rather, all of Plaintiff's allegations rise from her general claim that Defendants treat Plaintiff, a transgender female inmate, less favorably than cisgender female inmates.

In applying the reasoning set forth in *Williams* and *Campbell*, however, the undersigned finds that Plaintiff is not similarly situated to cisgender female inmates. Plaintiff as a transgender female seeks different types of medical procedures and therapy compared to procedures and related therapy for cisgender female inmates.  As explained by the Wisconsin district court, such differences are due to the fact that Plaintiff, as a biological male, does not have a vagina while a cisgender female inmate does.  *Campbell*, 2018 WL 20889351, at *10.

Furthermore, the mental health support, educational materials, and outside medical support sought by Plaintif also are materially different from those materials and support necessary for general medical issues suffered by cisgender female inmates.  The fact that different policies and practices are being employed for cisgender female inmates as compared to transgender female inmates regarding the availability and access to medical

resources, as well as access to certain clothing and feminine products, does not violate the Equal Protection Clause. *See Campbell*, 2018 WL 2089351, at \*10; *see also Cunningham v. Beavers*, 858 F.2d 269, 272 (5th Cir. 1988) ("The Equal Protection Clause directs that all persons similarly situated shall be treated alike; it does not require classes of people different in fact or opinion to be treated in law as though they were the same.").

Accordingly, even when accepting Plaintiff's allegations as true, she has failed to state a plausible equal protection claim with respect to all of her allegations that cisgender female inmates are being treated more favorably than she is as a transgender inmate. The undersigned recommends, therefore, that Defendants' Motion to Dismiss (D.E. 90) be GRANTED as to her equal protection claims.[4]

### (2) Eighth Amendment

Defendants contend in their Motion to Dismiss that, to the extent Plaintiff claims her Eighth Amendment rights have been violated, such claims are now foreclosed by the Fifth Circuit's recent decision in *Gibson v. Collier*, 920 F.3d 212, 224-28 (5th Cir. 2019). In *Gibson*, the Fifth Circuit held that there was no deliberate indifference to a transgender inmate's medical needs where the inmate was treated with means accepted within the medical community other than sex reassignment surgery, such as counseling and hormone therapy. Plaintiff, however, acknowledges that she does not raise an Eighth Amendment claim in this case. (D.E. 94, p. 4). Accordingly, it is unnecessary to

---

[4] Defendants also contend that the Eleventh Amendment bars Plaintiff's equal protections claims. (D.E. 90, pp. 13-14). However, because Plaintiff's claims fail to state a claim for relief, it is unnecessary to consider Defendants' Eleventh Amendment argument.

consider any Eighth Amendment claim in connection with Defendants' Motion to Dismiss as no such claim is before the Court.

### C. State Law Claim

In her amended complaint, Plaintiff appears to advance a state law claim for breach of contract. Plaintiff alleges that she was offered the option of having a gender reassignment surgery through the recommendation of Dr. Meyer, that she accepted the offer, but that Dr. Meyer's recommendation was not honored. (D.E. 62, pp. 13-14). Liberally construed, Plaintiff claims that the "blanket denial" of sex reassignment surgery breached the contract arising in connection with Policy CMHC Policy G-51.11 between Plaintiff and Defendants. (D.E. 62, pp. 26-28). It is respectfully recommended, however, that Plaintiff's breach of contract claim under state law be dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3) (supplemental jurisdiction may be declined if "the district court has dismissed all claims over which it has original jurisdiction").

## V.   RECOMMENDATION

For the foregoing reasons, it is respectfully recommended that Defendants' Motion to Dismiss (D.E. 90) be GRANTED and that Plaintiff's equal protection claims be DISMISSED with prejudice for failure to state a claim. It is respectfully recommended further that the Court DECLINE supplemental jurisdiction with respect to Plaintiff's state

law claim for breach of contract and that such claim be DISMISSED without prejudice to being raised in state court.

Respectfully submitted this 19th day of November, 2019.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).