IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| DAVID ALLEN HAVERKAMP, ALSO KNOWN AS BOBBIE LEE HAVERKAMP,<br>   *Plaintiff*,<br><br>v.<br><br>DR. ROBERT GREENBERG, DR. LANNETTE LINTHICUM, PRESTON JOHNSON, JR., DR. JEFFREY BEESON, DR. JOHN BURRUSS, ERIN WYRICK, DR. PHILIP KEISER, DR. CYNTHIA JUMPER, JOE PEREZ, *in their official capacities*,<br><br>and<br><br>DR. OWEN MURRAY, *in his official capacity*,<br><br>   *Defendants*. | CIVIL ACTION 2:17-cv-00018 |

## **SECOND AMENDED COMPLAINT**

Plaintiff David Allen Haverkamp, also known as Bobbie Lee Haverkamp, files this Second Amended Complaint.

Nature of the Action

1. Plaintiff Bobbie Lee Haverkamp, who identifies as a transgender woman, is incarcerated by the Texas Department of Criminal Justice ("TDCJ") in a men's prison in Beaumont, Texas.

2. Haverkamp's constitutional rights have been and continue to be violated by the Defendants' continued and consistent deliberate violation of her rights to Equal Protection under the Fourteenth Amendment to the United States Constitution.

3. Haverkamp brings this civil rights action under 42 U.S.C. § 1983 seeking declaratory and prospective injunctive relief to redress Defendants' failure to provide Haverkamp with medically necessary gender reassignment surgery and other treatments in violation of her rights to Equal Protection under the Fourteenth Amendment to the United States Constitution, after helping Haverkamp undergo gender transition, including chemical castration, making her similarly situated to cisgendered prisoners who seek the same treatment.

## Jurisdiction and Venue

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States, and pursuant to 28 U.S.C. § 2201 because an actual controversy exists within this Court's jurisdiction.

5. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 because the majority of events giving rise to this action occurred in the District and because Defendants are subject to personal jurisdiction in this District.

## Parties

6. Plaintiff Bobbie Lee Haverkamp identifies as a transgender woman. Haverkamp is incarcerated by the Texas Department of Criminal Justice (TDCJ) in the Stiles Unit, a men's prison located at 3060 FM3514, Beaumont, TX 77705.

7. Defendants Dr. Jeffrey Beeson, Dr. John Burruss, Dr. Robert Greenberg, Preston Johnson, Dr. Cynthia Jumper, Dr. Philip Keiser, and Dr. Lannette Linthicum are members of the Correctional Managed Health Care Committee (the "Committee") and are sued in their official

capacities for declaratory and injunctive relief. Defendants have previously appeared and answered in this cause.

8. Upon information and belief, Defendants Erin Wyrick, and Joe Perez are residents of Texas and adult citizens of the United States. They are members of the Correctional Managed Health Care Committee and are sued in their official capacities for declaratory and injunctive relief. They be served summons wherever found.

9. Defendant Lannette Linthicum, MD is the Director of the Texas Department of Criminal Justice Health Services Division and is a Member of the Texas Correctional Managed Health Care Committee. She is sued in her official capacity. As Director of the Texas Department of Criminal Justice Health Services Division, Defendant Linthicum is responsible for ensuring that TDCJ health care policies, directives, and protocols are properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines, including those that relate to care for gender dysphoria. As Director of the TDCJ Health Services Division, Defendant Linthicum oversees the Office of Professional Standards, which is responsible for review of all second step medical grievances. Moreover, as a member of the Texas Correctional Managed Health Care Committee, Linthicum is responsible for the development of statewide policies and procedures for the delivery of correctional health care, including Correctional Managed Health Care Policy G-51.11 covering treatment for gender dysphoria.

10. Defendant Dr. Owen Murray is the Executive Director of Clinical Services and Chief Physician Executive for the University of Texas Medical Branch ("UTMB") Correctional Managed Care program. Dr. Murray also serves as the Committee's Joint Medical Directors Working Group and conducted a review and adoption of the Inmate Health Services Plan. Dr. Murray's responsibilities are as follows: "UTMB-CMC provides complete medical, mental health,

and dental services to approximately 105,000 offenders within the Texas Department of Criminal Justice, employs approximately 3800 individuals and provides services in approximately 100 facilities throughout the state. Dr. Murray is responsible, along with his colleagues, for program development, quality assurance, outcomes management, formulary and disease management guideline development, utilization review, risk management, offender correspondence, peer review, CME and staff development, litigation co-ordination, facility financial management, and business development." Dr. Murray is also responsible for the Committee's review and adoption of the "Inmate Health Services Plan," which governs treatment of TDCJ inmates.[1]

11. At all relevant times, Defendants were each "persons" under 42 U.S.C. § 1983 and acted under color of state law to deprive Haverkamp of federal rights by persistently denying Haverkamp desperately needed and medically necessary treatment while providing the same or similar treatment to those similarly situated to Plaintiff, as set forth more specifically herein.

12. Haverkamp reserves the right, consistent with all applicable rules and court orders, to amend this Complaint to include additional officials should it become apparent that such officials' inclusion is necessary to grant the prospective declaratory or injunctive relief requested herein

Factual Allegations

13. Haverkamp repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth and fully restated herein.

---

[1] *See* December 8, 2021 Minutes of the Correctional Managed Health Care Committee.

A.      **Statutory Background**

14.     The Texas Department of Criminal Justice ("TDCJ") contracts with the University of Texas Medical Branch ("UTMB") to provide medical and psychiatric services to inmates, including Haverkamp.

15.     The policies that govern medical care for TDCJ inmates are promulgated by Texas's Correctional Managed Healthcare Committee ("the Committee"), a statutorily created arm of the State. Tex. Gov't Code § 501.148(a)(1). By statute, the Committee is composed of private physicians appointed by the governor; an employee of TDCJ; physicians employed by, inter alia, UTMB; and physicians employed by other medical schools. *Id.* § 501.133.

16.     Members of the Committee are tasked with enforcing the State's policy when there is a dispute between a treating physician and the prison system. Tex. Gov't Code § 501.148(a)(2). The procedures in the Committee's Policy Statement CMHCC-A-03 provide that "the TDCJ shall investigate medical grievances, ensure access to medical care, conduct periodic operational reviews of medical care provided at its units and monitor the quality of care."

17.     Members of the Committee are responsible for "develop[ing] and approv[ing] a managed health plan" that "specifies the types and general level of care" for inmates and "ensures continued access to needed care in the correctional health care system." *Id.* § 501.146(a). The Committee is also charged with furnishing "advice," "providing medical expertise," and "assisting" TDCJ in implementing its statewide health policies. *Id.* § 501.148(b).

18.     During the relevant time period (2015–2017) when Haverkamp was denied treatment, Dr. Linthicum served as the Executive Director of the Committee, and under the Committee policy in place at the time, Linthicum was delegated the "authority to administer, organize, manage, and supervise the daily operations of the correctional managed health care plan"

and "is responsible for the day-to-day operation and management of the Committee's responsibilities." CMHCC-A-03 § III.A–B (Rev. 2). Since then, in June 2020, the Committee has amended its policies to remove that role.

19. The Contract between TDCJ and the Committee requires the Committee to establish procedures for monitoring the quality of care delivered by the health care providers and "for enforcing compliance with contract provisions, including requiring corrective action if care does not meet expectations as determined by quality of care monitoring activities."

20. The Committee "coordinates the development of statewide policies for the delivery of correctional health care and serves as a representative forum for decision making in terms of overall health care policy. CMHCC representatives are empowered by their respective organizations to represent them on health care matters and make decisions that are binding on their organizations."[2]

21. UTMB is responsible for providing medical care to inmates at the Stiles Unit. UTMB is "responsible for the provision of medically necessary health care services. Responsibilities include recruiting and hiring health care personnel to staff the prison medical departments, diagnosing prisoners' health problems, and providing treatment or making referrals to specialists. These services include unit primary care services, all specialty care services, all pharmaceuticals, community provider outpatient and ancillary services, and all in-patient hospital services."[3]

B.  **Gender Dysphoria and WPATH Standards of Care**

22. Gender dysphoria ("GD") is a recognized medical condition identified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. DSM-

---

[2] https://www.tdcj.texas.gov/divisions/cmhc/index.html
[3] https://www.tdcj.texas.gov/divisions/cmhc/index.html

V (5th ed. 2013). GD is a serious health condition that involves a strong conflict between a person's physical gender and the gender with which the person identifies and a persistent discomfort with the person's anatomical sex. The conflict between a person's gender identity and anatomical sex causes individuals with gender dysphoria extreme psychological distress.

23. The World Professional Association for Transgender Health ("WPATH") is the leading professional association for medical professionals who specialize in the medical treatment of individuals with GD. Based on decades of clinical experience and research, WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("SOC") which provide clinical guidance for medical professionals.[4]

24. The WPATH SOC dictates that treatment is medically necessary for people with gender dysphoria. The SOC further states that the therapeutic approach includes hormone therapy, living full time as an individual of the gender matching one's identity, and that the course of treatment may differ from person to person depending upon individualized medical evaluations. The SOC also recognizes that GRS is medically necessary for many people with GD. In addition to the psychological and medical treatments involved in the therapeutic approach, the SOC

---

[4] Many federal courts have found that the World Professional Association of Transgender Health Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("SOC") "are the internationally recognized guidelines for the treatment of individuals with gender dysphoria." *Edmo v. Corazon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019); *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1111 (D. Idaho 2018); *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), *mooted in part and vacated in part on other grounds by Keohane v. Fla. Dept of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1170 (N.D. Cal.), *appeal dismissed & remanded*, 802 F.3d 1090 (9th Cir. 2015); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 231–32 (D. Mass. 2012). *But see Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) ("[T]he WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over [GCS]."); *cf. Kosilek v. Spencer*, 774 F.3d 63, 76–79 (1st Cir. 2014) (recounting testimony questioning the WPATH Standards of Care). Additionally, many of the major medical and mental health groups in the United States—including the American Medical Association, the American Medical Student Association, the American Psychiatric Association, the American Psychological Association, the American Family Practice Association, the Endocrine Society, the National Association of Social Workers, the American Academy of Plastic Surgeons, the American College of Surgeons, Health Professionals Advancing LGBTQ Equality, the HIV Medicine Association, the Lesbian, Bisexual, Gay and Transgender Physician Assistant Caucus, and Mental Health America—recognize the WPATH Standards of Care as representing the consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric people.

recommends additional components of treatment to help alleviate gender dysphoria, including light make up, electrolysis, and voice therapy.

25. The WPATH SOC also provides: "The SOC in their entirety apply to all transsexual, transgender, and gender-nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long-/intermediate-term health care facilities."

26. According to the WPATH SOC, vaginoplasty is one type of GRS procedure used to treat male-to-female transgender patients. Vaginoplasty is a surgical procedure that is also used, when medically necessary, to treat non-transgender females suffering from other medical conditions (for example, cystocele).

27. Under the medical standards established in the WPATH SOC, a transgender individual should achieve a real-life experience—that is, "12 continuous months of living in a gender role that is congruent with their gender identity"—before receiving SRS, including vaginoplasty.

28. Cisgender female inmates of TDCJ who require vaginoplasty surgery are provided such treatment.

29. Policy Number G-51.11, as set forth in the Correctional Managed Health Care Policy Manual, directs that inmates in Plaintiff's situation are evaluated by appropriate medical and mental health professionals and treatment is determined "on a case-by-case basis as clinically indicated."

C. **Haverkamp is prescribed hormone therapy and gender-reassignment surgery**

30. On June 6, 2013, Dr. Philip Farley diagnosed Haverkamp with Gender Identity Disorder.[5]

31. On October 17, 2014, Haverkamp was examined by Doctor Walter Meyer at UTMB's clinic. At that appointment, Dr. Meyer prescribed a 12-month course of hormone therapy consisting of the hormone Estradiol and a referral for gender-reassignment surgery at the end of that period. During this appointment, Dr. Meyer confirmed that sex-reassignment surgery was available to Haverkamp.

32. On October 22, 2014, Haverkamp accepted the offer for gender-reassignment surgery and requested the surgery "at the earliest possible time."

33. On March 27, 2015, six months after beginning taking Estradiol, Haverkamp was examined again by Dr. Meyer, who stated that Haverkamp "needed at least a year on enough estrogen to suppress the endogenous testosterone production before being considered eligible for surgery."

34. At an outpatient follow-up visit on December 12, 2015, Dr. Meyer recommended "further increases in his estradiol replacements" and told Haverkamp that "he needs to be on replacement or higher estrogen for at least one year before [surgery] can be even considered." Consistent with that recommendation, Dr. Meyer prescribed "estradiol therapy and increase it further to completely suppress the testosterone."

---

[5] In the 2021 revision to Policy G51.11, Defendants recently substituted the label "Gender Dysphoria" for the former "Gender Identity Disorder." *See* CMHC Policy # G51.11 (2021) (attached hereto as Exhibit A). GD refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUEL OF MENTAL DISORDERS 451 (5th ed. 2013).

35. Shortly afterward, Haverkamp filed a Step One grievance seeking confirmation of when she could receive the gender reassignment surgery. The TDCJ denied the grievance, explaining that "you must be on a replacement or higher estrogen for at least one year before surgery can even be considered":

36. On January 5, 2016, Haverkamp filed a Step Two grievance regarding the denial of treatment. On February 2, 2016, the TDCJ disagreed with Dr. Meyers's recommendation and denied Haverkamp's Step Two grievance: "A review of the medical records indicated you have been seen at the [UTMB] Gender Dysphoria (GD) Specialty Clinic for your gender identity concerns. The specialists must follow the CMHC Policy G-51.11, with all attachments, to provide you with treatment for this condition."

> I was under the impression Gender Surgery was in doubt because no Surgeons, UTMB's a Medical Contractor they can Sub-contract the Surgery. To settle this: I want a letter saying I will be approved for Gender Re-Asignment surgery. Period.
>
> Offender Signature: Haverkamp Bobbie David   Date: Jan 5, 2015
>
> **Grievance Response:**
>
> A review of the Step 1 medical grievance has been completed regarding your complaint on 10/17/2014 the Hospital Galveston provider told you, you had to be on hormones for a year before you would be considered for gender-reassignment. Your complaint of denial as well as request for gender-reassignment surgery and a treatment plan that shows what takes place and when was also reviewed.
>
> Review of the medical records indicated you have been seen at Hospital Galveston (HG) in the Gender Dysphoria (GD) Specialty Clinic for your gender identity concerns. The specialists must follow the CMHC Policy G-51.11, with all attachments, to provide you with treatment for this condition. You may wish to review this policy, in its entirety, through the Law Library at your convenience. All medications, treatments, and referrals are based on the clinical findings of the provider at the time of their assessment. While you maintain the right to refuse any services offered, you do not have the liberty to dictate what medications, treatments, or appointments will be prescribed. You are encouraged to work with the medical providers and staff to ensure the best outcome for your health care needs.
>
> Your requested remedy is not available through the Offender Grievance Program. Please refer to your Offender Orientation Handbook for the appropriate timelines and remedies available to you through this program. No further action is warranted for this issue at this time. 2.0
>
> STEP II MEDICAL GRIEVANCE PROGRAM
> OFFICE OF PROFESSIONAL STANDARDS
> TDCJ HEALTH SERVICES DIVISION
>
> Signature Authority: ___   Date: 2-2-16

37. As of March 9, 2016, Haverkamp had been taking Estradiol for more than one year, and was more than three months into her twelve-month increased therapy (after Dr. Meyer prescribed such treatment on December 12, 2015 to "completely suppress the testosterone"), which

was a pre-condition to the prescribed surgery. As a natural progression of the treatment, Haverkamp has undergone gender transition, including chemical castration.

38. At the March 8, 2016 follow-up appointment, Dr. Meyer told Haverkamp that he "need to stay on a high-dose estradiol for at least a year before we would even consider the recommendation for surgery." At that meeting, Dr. Meyer also told Haverkamp that "UTMB is going to have to face the inevitable that gender reassignment surgery is going to happen." Shortly after that meeting, Haverkamp wrote a letter to Dr. Meyers to confirm:



39. However, on March 26, 2016, UTMB changed course and communicated to Haverkamp that she would not receive gender reassignment surgery.

40. Since March 26, 2016, Defendants have not provided Haverkamp with requested long-hair pass, panties, cosmetics, and other female items that are offered to cisgendered female inmates.

Count I: Violation of the Equal Protection Clause

41.     Plaintiff repeats and re alleges the allegations contained in the preceding paragraphs as if set forth and fully restated herein.

42.     Dr. Owen Murray, in his official capacity as Executive Director of Clinical Services and Chief Physician Executive is responsible for supervising Haverkamp's treatment at UTMB, including at the UTMB Gender Identity Clinic and at the UTMB Department of Psychiatry and Behavioral Science.

43.     Dr. Murray was responsible for overseeing the diagnoses and recommendations of UTMB. Dr. Meyer recommended gender reassignment surgery to Haverkamp and continued to prescribe increased levels of hormones to Haverkamp as a prerequisite for gender reassignment surgery after twelve months. This assisted Haverkamp in undergoing gender transition, including by chemical castration, making her similarly situated to cisgendered female inmates. Dr. Meyer continually recommended that Haverkamp would be eligible for surgery after additional time taking hormones up to and including on March 8, 2016. On information and belief, Dr. Murray was responsible for denying Dr. Meyers's recommended course of treatment for gender reassignment surgery after March 8, 2016 and continuing to deny such treatment.

44.     Due to the natural progression of the prescribed treatment provided to Plaintiff by Defendants, Plaintiff is similarly situated to a cisgender female who requires vaginoplasty surgery. Haverkamp is similarly situated to cisgendered female prisoners, and Defendants violate equal protection by treating Haverkamp in a dissimilar manner.

45.     Dr. Linthicum, in her official capacity for overseeing Step Two grievances, is responsible for the February 2, 2016 denial of Haverkamp's grievance seeking medically necessary gender reassignment surgery, after such surgery was recommended to Haverkamp by Dr. Meyer.

Dr. Linthicum was personally responsible for denying that grievance and Dr. Meyer's recommended course of treatment.

46. Defendants continue to deny Haverkamp medically necessary treatment, including gender-reassignment surgery, while the State provides adequate care, including medically necessary vaginoplasty to cisgendered women with serious medical needs.

47. By failing to provide gender reassignment surgery to Haverkamp while incarcerated, Defendants have deprived Haverkamp of her right to equal protection under the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

48. Haverkamp seeks a prohibitory injunction to prevent Defendants Owen Murray and Linthicum continuing to block her prescribed course of treatment while allowing other similarly situated cisgendered inmates to receive such treatment.

### Count II: Violation of the Equal Protection Clause

49. Plaintiff repeats ad realleges the allegations contained int eh preceding paragraphs as if set forth and fully restated herein.

50. In the alternative, Haverkamp seeks prospective injunctive relief against Defendants Greenberg, Linthicum, Johnson, Beeson, Burruss, Wyrick, Perez, and Jumper, in their official capacities as members of the Correctional Managed Health Care Committee.

51. Defendants are responsible for promulgating, overseeing, and implementing Policy G-51.11, as set forth in the Correctional Managed Health Care Policy Manual, which directs that similarly situated individuals are evaluated by appropriate medical and mental health professionals and treatment is determined on a case-by-case basis as clinically indicated. Although Policy G-51.11 is silent as to gender reassignment surgery, the Committee and the TDCJ enforce the policy

in a manner that gender reassignment surgery is never allowed, even when medically necessary, when such surgery is provided to cisgendered female inmates.

52. The Committee Defendants are responsible for implementing Policy G-51.11, which was specifically referenced in the February 2, 2016 denial of Haverkamp's grievance and that resulted in the denial of Haverkamp's rights under the Equal Protection Clause.

53. Haverkamp seeks a prohibitory injunction to prevent Defendants from implementing the Policy G-51-11 in a manner that results in the continuing denial of Haverkamp's rights under the Equal Protection Clause.

Count 3: Violation of the Equal Protection Clause: Denial of Long-Hair Pass and Female Items

54. Haverkamp repeats and re alleges the allegations contained in the preceding paragraphs as if set forth and fully restated herein.

55. Defendants continue to deny Haverkamp necessaries and commissary items that are available to similarly situated cisgendered female inmates, including a long-hair pass, panties, appropriate clothing, cosmetics, and other hygiene items.

Prayer

56. Defendants continue to deny Haverkamp the medically necessary gender-reassignment surgery.

57. Haverkamp seeks an injunction ordering Defendants to provide her with gender reassignment surgery, after assisting her undergo transition.

58. In the alternative, Haverkamp seeks a prospective injunction prohibiting Defendants from implementing Policy G-51-11 in a manner that prohibits gender reassignment surgery.

59. Haverkamp seeks a prospective injunction requiring:

a. Appropriate clothing, panties, cosmetics, and female hygiene items;

b. A medical pass for Plaintiff to grow her hair to standard female length;

c. Necessary and proper treatment pursuant to Plaintiff's diagnosis of GD, including electrolysis and voice therapy;

d. A coordinator to bring this case to a close; and,

e. Educational materials related to GD as referenced in the WPATH SOC.

f. Awarding all other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Ace M. Factor
Ace M. Factor
TBN: 24118923
SDTX: 3707964
SUSMAN GODFREY, L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 653-7826
Fax: (713) 654-6666
**Attorney for Plaintiff Bobbie Lee Haverkamp**

**Certificate of Service**

I certify that on March 25, 2022, a true and correct copy of this document properly was served on counsel of record via electronic filing in accordance with the Southern District of Texas Procedures for Electronic filing.

/s/ Ace M. Factor
Ace M. Factor