**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| DAVID ALLEN HAVERKAMP, ALSO KNOWN AS BOBBIE LEE HAVERKAMP, | § § § § | |
| *Plaintiff*, | § § | CIVIL ACTION 2:17-cv-00018 |
| v. | § § | |
| LANNETTE LINTHICUM, ET AL., | § § | |
| *Defendants.* | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 12(C) MOTION AND RULE 12(d) MOTION FOR CONVERSION TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff Bobbie Lee Haverkamp files this Response to Defendants' Rule 12(c) Motion for Judgment on the Pleadings challenging the Court's subject matter jurisdiction. Plaintiff also moves, pursuant to Rule 12(d), for conversion of Defendants' Rule 12(c) Motion and the attached 642 pages of materials outside the pleadings to a motion for summary judgment.

The Court should deny Defendants' styled Rule 12(c) motion for judgment on the pleadings for at least the following reasons:

1. After the Fifth Circuit remanded this case for additional discovery regarding the proper *Ex parte Young* defendants, Defendants' counsel represented that the current defendants have the authority to provide all relief sought through this lawsuit. In a May 16, 2023 email opposing adding additional defendants, Defendants' counsel stated: "*Dr. Murray ... along with the other named Defendants, has the authority to provide all relief sought through this lawsuit.*" Ex. 1.

2. The documentary evidence and testimony by UTMB's and TDCJ's corporate representatives confirm that Defendants Dr. Owen Murray and Dr. Lannette Linthicum have sufficient connections and authority to enforcing the policies and practices causing the ongoing violations of Haverkamp's federal rights.

3. Ample evidence confirms that Haverkamp has Article III standing based on (a) TDCJ's denials of Haverkamp's grievances and (b) based on Haverkamp's ongoing and "persistent and significant" distress caused by Defendants' denials of sex-reassignment surgery (SRS)

and    panties    as    treatments    for    Haverkamp's    Gender    Dysphoria.

4. Haverkamp's claims seeking panties and cosmetics are not moot.

5. Genuine disputes of material fact exist regarding whether UTMB and TDCJ providers have the authority to refer or recommend SRS as a treatment for Gender Dysphoria. Defendants argue that providers have the authority to recommend such treatment for inmates under Policy G-51-11. That argument conflicts with UTMB's corporate representative testimony that the providers "*do not know that they have the ability to refer inmates for surgery*" and that "since 2014, [he has] *never told any Gender Dysphoria Specialty Clinic consultant that they have the authority to refer an inmate for sex reassignment surgery.*"

Haverkamp respectfully requests that the Court deny Defendants' motion for judgment on the pleadings.

## I.    Summary Judgment Evidence

Pursuant to Rule 56, Haverkamp incorporates by reference as if fully set forth herein the following summary judgment evidence:

| | |
|---|---|
| 1. | May 16, 2023 email from Assistant Attorney General Michael Calb |
| 2. | Expert Report of Dr. Walter J. Meyer, III |
| 3. | Grievance Records and Denials (Haverkamp001–075). |
| 4. | Eric Guerrero's TDCJ Corporate Representative Deposition Testimony |
| 5. | Dr. Owen Murray's TDCJ and UTMB Corporate Representative Deposition Testimony |
| 6. | Dr. Joseph Penn's TDCJ and UTMB Corporate Representative Deposition Testimony |
| 7. | Gender Dysphoria Encounter Reports (Haverkamp12690) |
| 8. | TDCJ/UTMB Contract |
| 9. | Various emails from Lanette Linthicum |
| 10. | TDCJ Gender Dysphoria Fact Sheet (TDCJ0000850–851) |
| 11. | Email between Drs. Penn, Linthicum, and Murray (TDCJ0000226-000027) |

## II.    Plaintiff's Rule 12(d) Motion to Convert Defendants' Rule 12(c) Motion to a Motion for Summary Judgment.

The Court should convert Defendants' Fifteen-Month-Post-Answer Rule 12(c) motion and the attached 642 pages of evidence outside the pleadings to a motion for summary judgment.

Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion

*must* be treated as one for summary judgment under Rule 56." Rule 12(d) applies only to motions "under Rule 12(b)(6) or 12(c)" like Defendants' Rule 12(c) motion here.

Here, Defendants moved for dismissal "under Rule 12(b)(6) or 12(c)" and attached 642 pages of evidence outside the pleadings to that motion, including expert affidavits, deposition testimony, and medical records. *See* ECF No. 329-1, 329-2, 329-3, 329-4. Accordingly, the Court must convert Defendants' Rule 12(c) motion to one for summary judgment.

Defendants cite a 1979 Fifth Circuit case to argue that "courts are barred" from converting a motion to dismiss for lack of subject matter jurisdiction to a motion for summary judgment. *See Green v. Forney Eng'g Co.*, 589 F.2d 243, 246 (5th Cir. 1979). In *Green*, the Fifth Circuit explained that "[a] Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction cannot be converted into a motion for summary judgment." *Id.* But *Green* does not stand for the proposition that courts are barred from converting *all* motions challenging a court's jurisdiction to a motion for summary judgment. Instead, consistent with Rule 12(d)'s application to only Rule 12(b)(6) and Rule 12(c) motions, *Green* holds only that courts are prohibited from converting a *Rule 12(b)(1)* motion to dismiss to a motion for summary judgment.

Haverkamp requests that the Court convert Defendants' Rule 12(c) motion to one for summary judgment and consider all evidence in the light most favorable to Plaintiff as the nonmovant and resolve all reasonable doubts about the facts in favor of Plaintiff. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

## III.   Facts

Haverkamp is a transgender woman in TDCJ custody who was diagnosed with Gender Dysphoria in 2013. In October 2014, Haverkamp was prescribed a course of hormone therapy with a recommendation for SRS after 12 months as a treatment for Haverkamp's Gender Dysphoria. .

Haverkamp's treating physician Dr. Walter Meyer's report summarizes Haverkamp's medical records and medical treatment and includes a detailed timeline of Haverkamp's treatment. Ex. 2 at ¶¶49–55. Haverkamp incorporates by reference herein the treatment timeline and opinions and conclusions in that report, as well as the medical records cited therein.

In short, although Dr. Meyer recommended Haverkamp for SRS and determined that Haverkamp met all eligibility criteria for that treatment, Dr. Meyer was prohibited from referring Haverkamp for surgery after Haverkamp completed that course of treatment. *Id.* ¶¶49–55, After Haverkamp completed more than 12 months of hormone therapy, Dr. Meyer informed Haverkamp that TDCJ would not pay for SRS. At present, after more than 9 years of hormone therapy, Haverkamp's testosterone levels have been completely suppressed and Haverkamp has been chemically castrated. *Id.* ¶52. Since at least March 2016, Haverkamp has had sex steroid hormones typical for females, and Haverkamp's testosterone levels are in the reference range appropriate for females. *Id.*

Starting in December 2015, Haverkamp filed numerous Step 1 and 2 grievance requests seeking sex reassignment surgery. Ex. 3. All those grievances were denied, including in December 2015 and February 2016. *Id.* Those denials explained that Haverkamp "must be on replacement or higher estrogen for at least one year before surgery can even be considered." *Id.* TDCJ's Step 2 Grievance Denial was based on Policy G-51-11: "The specialists must follow the CMHC Policy G-51.11, with all attachments, to provide you with treatment for this condition." Policy G-51-11 is only Policy cited in those grievance denials. Ex. 4 (Guerrero Dep.) at 56:5–10.

Policy G-51.11 is silent regarding SRS. TDCJ and UTMB corporate representatives have testified that the policy "does not prohibit" sex reassignment surgery and that providers have complete discretion to refer inmates for that treatment.  However, the evidence confirms that TDCJ

and UTMB have never conducted SRS for any inmate in TDCJ custody and have never considered whether SRS can be a medically necessary treatment for any of the over 500 transgender inmates in TDCJ custody. Ex. 2 ¶¶83–93. As discussed in greater detail in Haverkamp's response to Defendants' MSJ, there are material factual disputes regarding Defendants' implementation of that policy.

Haverkamp has also repeatedly requested to be issued panties, to grow long hair, and to be issued female cosmetic items, including at least in September 2017, May 2018, 2020, and 2021. All those requests were denied.  Ex. 2 at ¶¶100–105 (citing Haverkamp-6283-6289, 6276-6277, 5084, 001-075, 12057-12279, 12023-12056). To date, Haverkamp has not been provided panties, cosmetics, or other hygiene items. Guerrero Dep. at 63:4-20, 67:20-68:8.

## IV.   The current defendants are proper defendants under *Ex parte Young*.

To be an appropriate defendant under *Ex parte Young*, a state actor must both possess "the authority to enforce the challenged law" and have a "'sufficient connection [to] the enforcement' of the challenged act." *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021). Whether a suit may proceed under *Ex Parte Young* does "not require an analysis of the merits of the claim. Rather, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* at 669 (citations omitted). Taking an "active role" in enforcing state policy or "compulsion or constraint" pursuant to state policy meets that standard. *City of Austin v. Paxton*, 943 F.3d 993, 999 (5th Cir. 2019). A board's decisionmaking power over whether a challenged policy permits certain procedures to be reimbursed by the state meets that requirement. *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010).

Here, after Defendants appealed on jurisdictional grounds and the Fifth Circuit remanded, the Court appointed Haverkamp counsel and the parties engaged in discovery, including relating to the appropriate defendants under *Ex parte Young*. After taking written discovery and a deposition of Defendant Dr. Murray as a corporate representative witness for UTMB and TDCJ, Plaintiff's counsel asked Defendants' counsel if they were opposed to adding Dr. Joseph Penn and others as additional defendants based on recent testimony regarding Dr. Penn's oversight and management of the UTMB/TDCJ Gender Dysphoria clinic. Defendants' counsel opposed that request. Defendants' counsel stated the current named defendants have "the authority to provide all relief sought through this lawsuit" and that an amended complaint identifying additional defendants "is unnecessary":

> b. I also notice that Dr. Penn used to be a party to this case but is no longer listed as a party. Based on Dr. Murray's recent testimony that Dr. Penn has primary responsibility for managing the Gender Dysphoria clinic and would be responsible for reviewing any treatment recommendation, are Defendants opposed to my re-addition of Dr. Penn as a defendant? We oppose re-adding Dr. Penn as a defendant. We also believe it is unnecessary from Plaintiff's perspective. Dr. Murray is Dr. Penn's superior and, along with the other named Defendants, has the authority to provide all of the relief sought through this lawsuit. In other words, if an injunction were to be issued against Dr. Murray in his official capacity, he and the other named Defendants would have the power to ensure that the terms of the injunction were satisfied, including by delegating tasks to Dr. Penn, if necessary.

Ex. 1 (May 16, 2023 Email response in red from Assistant Attorney General Michael Calb).

Five months later, Defendants filed this Motion challenging the Court's jurisdiction arguing that Dr. Murray and the named defendants do *not* have the authority to provide the relief sought in this lawsuit. Defendants argue that the current named Defendants—UTMB Medical Director Dr. Owen Murray, TDCJ Medical Director and Health Services Division Director Dr. Lannette Linthicum, and the members of the TDCJ Correctional Managed Healthcare

Committee—are not proper defendants because "Haverkamp cannot show that of the Defendants have the authority and duty to enforce a policy which denies [her] SRS, panties, or makeup." Motion at 6.

The current named defendants are the appropriate parties and have a sufficient connection to the denial of Haverkamp's requests for sex reassignment surgery. Dr. Murray, in his role as UTMB's Medical Director, is an appropriate defendant based on his authority to enforce and implement policies regarding treatment decisions relating to SRS for inmates experiencing Gender Dysphoria. Dr. Linthicum is an appropriate defendant based on her role as TDCJ's Medical Director and Director of Health Services and based on Dr. Murray's testimony that he would be required to consult with her regarding treatment decisions regarding SRS and based on her responsibilities for maintaining TDCJ's contractual obligations in the Inmate Health Services Plan. Dr. Linthicum additionally is an appropriate defendant based on her authority to implement TDCJ's policies that in all instances deny panties to all inmates in male facilities.

## A.    UTMB Medical Director Dr. Owen Murray

Defendants' argument that Dr. Murray is not an appropriate defendant is inconsistent with Defendants' May 16, 2023 representation that "*Dr. Murray is Dr. Penn's superior and, along with the other named Defendants, has the authority to provide all of the relief sought through this lawsuit.*" Ex. 1. Plaintiff's counsel relied on that representation that the current named defendants had the authority to provide all of the relief sought through this lawsuit and did not file an amended complaint.

In addition to that representation by Defendants' counsel, as a factual matter, Dr. Murray, as UTMB Medical Director, is responsible for overseeing inmate medical care and enforcing the Policy that is causing Defendants' ongoing denial of Plaintiff's constitutional rights.

7

Dr. Murray is the provider at UTMB who has the authority to "approve a provider's request for sex reassignment surgery" for an inmate experiencing Gender Dysphoria. Ex. 5 (Murray Dep.) at 45:3–46:1; 47:4–14. Dr. Murray testified that he (a) "has the authority to approve that treatment," (b) "there are no constraints" on Dr. Murray's authority to approve SRS as a treatment for Gender Dysphoria, and (c) "[t]here is no policy" that "would govern [his] decision as to whether to approve a provider's request for gender reassignment surgery." *Id.* at 30:23–31:22; 41:4–42:10. When asked whether he has "sole discretion to approve a provider's request for sex reassignment surgery for a particular inmate," Dr. Murray testified that "Regarding this particular surgery, as I said, I would have that authority. But I would have to – I would talk with Dr. Linthicum with – as the TDCJ medical director, and, potentially the joint medical directors. I would get them involved." *Id.* at 46:3–47:14. Dr. Murray also oversees and supervises Dr. Joseph Penn, who manages the UTMB Gender Dysphoria Specialty Clinic that provides treatment and diagnoses for Haverkamp and other transgender inmates. *Id.* at 29:5–7.

Moreover, Dr. Walter Meyer's conclusions and testimony based on his experience as the founder and former manager of the UTMB Gender Dysphoria Specialty Clinic confirm that Dr. Murray was responsible for enforcing the policies that resulted in the denials of Haverkamp's requests for SRS:

> While I was at the UTMB/TDCJ Gender Dysphoria Specialty Clinic, I understood that Policy G-51.11's lack of any mention of sex-reassignment surgery, as well as TDCJ's and UTMB's on-the-ground implementation of that policy, imposed a prohibition on sex-reassignment surgery as a treatment for Gender Dysphoria.
> . . .
>
> When I accepted the job at the Clinic, I was expressly told by at least Dr. Murray and Dr. Penn that "this clinic would not offer surgery" as a treatment for Gender Dysphoria. It was my understanding that I could do psychotherapy with the inmate and prescribe cross-gender hormones, but that I could not recommend surgery. While I treated inmates at the UTMB/TDCJ Gender Dysphoria Specialty Clinic from 2013 through 2018, I and the other Gender Dysphoria Specialty Clinic consultants were prohibited from recommending or

8

referring any inmate for sex-reassignment surgery as a treatment for Gender Dysphoria. I was expressly told on several occasions by Dr. Penn, Dr. Murray, and others that we were not allowed to refer or recommend inmates for surgery as a treatment for Gender Dysphoria. Based on my experience at the UTMB/TDCJ Gender Dysphoria Specialty Clinic, it is my opinion that TDCJ and UTMB had a prohibition on sex-reassignment surgery as a treatment for Gender Dysphoria. It is my opinion that the prohibition on referrals or recommendations for surgery was justified by the application of Policy G-51.11.

Ex. 2 at ¶¶89, 93.

Based on Dr. Murray's involvement with Haverkamp's treatment and his authority to enforce the policies relating to SRS, Dr. Murray is an appropriate defendant.

**B.      TDCJ Medical Director and Health Services Division Director Dr. Lanette Linthicum**

TDCJ Medical Director and Health Services Division Director Dr. Linthicum has the requisite authority to enforce the policies resulting in Defendants' ongoing denial of Haverkamp's rights.

As TDCJ Medical Director, Dr. Linthicum is involved with making decisions regarding SRS. Dr. Murray testified that he would be required to consult with Dr. Linthicum regarding any decision regarding SRS. And the TDCJ corporate representative likewise testified that Dr. Linthicum would be responsible for decisions considering surgery. Guerrero Dep. at 47:21–48:4 ("And at that point, surgery was a possibility for Haverkamp; is that right?  A. Yes, sir. Q. And who at TDCJ would be involved with that decision about considering surgery?  A. It would be, that I know of, a discussion with Dr. Owen Murray and the UTMB medical staff down in Galveston. And, of course, they do communicate with Dr. Linthicum, that's the director over Health Services."). Dr. Linthicum also was involved in reviewing Dr. Joseph Penn's conclusions regarding SRS as a treatment for Haverkamp. Ex. 6 (Penn Dep.) at 30:23–31:6. Dr. Linthicum and

Dr. Murray also receive monthly gender dysphoria summary reports identifying the number and treatments of transgender inmates in TDCJ custody. Ex. 7.

Additionally, pursuant to Section 1.11 of the Inmate Health Services Plan, Dr. Linthicum is responsible for "overseeing the Health Care Services provided to TDCJ Inmates under this Contract." Ex. 8. As TDCJ Medical Director, Dr. Linthicum decided and communicated that SRS is an "elective" treatment that is not covered by the Inmate Health Services Plan. Ex. 9. She has stated to others at TDCJ and in the Health Services Division's written responses to reporters: "[T]he TDCJ correctional managed health care program offers an offender health care plan as required by statute. There are essentially two levels of care provided: medically mandatory care without which there would be a loss of life or limb and medically necessary care. Gender reassignment surgery is in a category of elective surgery and is currently not covered in the offender health care plan." *Id.*

> **4. Has any TDCJ inmate ever received surgery to treat gender dysphoria? If not, would TDCJ provide gender reassignment surgery to a transgender inmate if recommended by a doctor under G-51.11?**
>
> The TDCJ Correctional Managed Health Care Program offers an offender health care plan as required by Texas statute. There are essentially two levels of care provided to TDCJ offenders: 1) medically mandatory care without which there would be loss of life or limb and 2) medically necessary care. Gender reassignment surgery is in a different category of elective surgery and is not currently covered in the TDCJ offender health care plan.

*Id.* Similarly, TDCJ's Gender Dysphoria Fact Sheet, which Dr. Linthicum received, states: "Inmates cannot receive surgery to change their sex, which would be considered elective and not medically necessary." Ex. 10.

In addition to her responsibilities regarding treatment decisions relating to SRS, Dr. Linthicum is responsible for enforcing and reviewing TDCJ's policies that deny panties to male inmates in all instances. Guerrero Dep. 109:16–111:16. Dr. Linthicum oversaw those policies and

the communicated with Dr. Penn regarding the implementation of those policies. Ex. 11; Penn Dep. at 174:10-175:17.

### C.    Members of the Correctional Managed Healthcare Committee

Haverkamp seeks an injunction prohibiting Defendants from implementing Policy G-51.11 in a manner that prohibits SRS as a treatment for Gender Dysphoria. To the extent the appropriate relief requires a change to Policy G-51.11—which is silent regarding SRS—the members of the Correctional Managed Healthcare Committee are the appropriate defendants.

Because there are genuine disputes of fact material to how Policy G-51.11 is implemented as that policy relates to SRS, judgment on the pleadings dismissing the Committee Members is premature until those disputes are resolved.

### V.    Haverkamp's claim seeking panties is not moot.

More than 5 years after Haverkamp filed this lawsuit in 2017, Defendants in June 2022 changed their policies relating only to long hair.

But Defendants have not changed their policy relating to panties, which are prohibited in all male facilities. Haverkamp has repeatedly requested to be issued panties and to be issued female cosmetic items, including at least in September 2017, May 2018, 2020, and 2021. All those requests were denied. Guerrero Dep. at 63:4–20; 68:1–8; *see also* Ex. 2 at ¶¶100–105.

Documentary evidence and testimony confirm that TDCJ's policies prohibit panties in all male facilities. TDCJ's corporate representative testified that TDCJ's policies and practices prohibit panties in all instances in male facilities. Guerrero Dep. at 100:2–101:12, 104:3–17, 105:12–106:25, 109:6–26, 112:4–24. TDCJ has not done any analysis of purported threats that would be caused by providing transgender inmates with panties. Guerrero Dep. at 104:3–17. TDCJ also has never "considered whether allowing transgender inmates to be allocated panties if a doctor

11

determined that it was medically necessary to treat the inmate's gender dysphoria." *Id.* at 105:12–19.

In addition to prohibiting the panties in male facilities, TDCJ's and UTMB's policies and practices prohibit TDCJ and UTMB medical providers from prescribing, recommending, or deeming medically necessary panties as a treatment for transgender inmates:

> Q. And is it your understanding that that was TDCJ's policy at the time, the policy being not making any recommendations or orders for panties or other undergarments for TDCJ Offenders?
> A. Yes.
> Q. Are you aware of the policy on panties or undergarments changing at any time from 2018 through present?
> A. I do not."

*Id.* at 112:4–12. It is also TDCJ's policy for TDCJ and UTMB medical providers to "avoid any language in their evaluations or notes regarding anxiety or distress relating to an inability to have undergarments." *Id.* at 111:5–12; Ex. 11. There is factual dispute regarding whether TDCJ's prohibition panties and cosmetics for all male inmates outweighs the medical necessity of providing those items to treat inmates with Gender Dysphoria. Ex. 2 ¶104.

## VI.   Haverkamp has Article III standing based on TDCJ's and UTMB's denials of medically necessary sex reassignment surgery, panties, and cosmetics.

Defendants argue that Haverkamp lacks Article III standing because she has not demonstrated a concrete, particularized, or actual injury. In the alternative, they argue that Haverkamp's injuries are not traceable to the named Defendants. Motion at 12–13.

Ample evidence supports that Haverkamp has suffered a concrete and particularized injury based on Defendants' denials panties and SRS as a treatment for Haverkamp's gender dysphoria. For example, Dr. Walter Meyer's, Haverkamp's treating physician from 2013 through 2018, conclusions confirm that Haverkamp has suffered an ongoing, concrete, and particularized injury based on Defendants' denials of medically necessary treatment based on at least the following:

It is my opinion that Haverkamp meets all DSM-V criteria for Gender Dysphoria and is eligible for sex-reassignment surgery. ¶20.

It is my opinion that TDCJ and UTMB have denied Haverkamp's many requests for sex-reassignment surgery as a treatment for Gender Dysphoria and have denied Haverkamp medically necessary treatment. ¶22.

It is my opinion that the provision of panties to Haverkamp is a medically necessary treatment for Haverkamp's Gender Dysphoria, that TDCJ has denied Haverkamp's requests for panties, and that TDCJ's policies and practices prohibit the provision of panties in all instances in male facilities. ¶27.

Gender Dysphoria has caused Haverkamp significant distress for many years, which continues through present. Haverkamp's medical records further indicate that Haverkamp has expressed thoughts regarding auto-penectomy to mental health care providers on several occasions since October 2013. The medical records (as discussed further below) confirm that Haverkamp's distress caused by being denied sex-reassignment surgery and gender-affirming treatments is persistent and significant. ¶50.

Haverkamp has done everything she can to live fully as a woman while in prison. . . . Haverkamp has not been allowed to wear women's panties because TDCJ's policies prohibit those from being deemed medically necessary for inmates in male TDCJ facilities. ¶51.

After years of hormone therapy, Haverkamp's testosterone levels have been completely suppressed and Haverkamp has been chemically castrated. Haverkamp's most recent produced medical records show that that Haverkamp's endogenous testosterone levels were "21.5 ng/dl" in September 2021 and were "11.1 ng/dl" in March 2022.  Since at least March 2016, Haverkamp has had sex steroid hormones typical for females, and Haverkamp's testosterone levels are in the reference range appropriate for females. Haverkamp has some secondary sex characteristics of a woman: female breasts, softened skin, diminution of body hair, absence of male pattern baldness, and genital changes. ¶52.

While hormone therapy is an essential element of treatment of Gender Dysphoria, that treatment alone is not sufficient to treat Haverkamp's Gender Dysphoria. Haverkamp's feelings of dysphoria and desire to be the female gender date back to age 7. They have not remitted. Haverkamp has a strong desire to be rid of Haverkamp's male sex characteristics. Although Haverkamp's feelings of dysphoria are occasionally reduced by estradiol treatment, Haverkamp's feelings of dysphoria are persistent. Haverkamp continues to request and need surgery as a treatment for Gender Dysphoria, despite Haverkamp's testosterone levels being completely suppressed since at least March 2016, being chemically castrated, and having testosterone levels (11.1 ng/dl) well below the female range. Haverkamp's requests for hormone therapy and surgery have been unrelenting for years, and Haverkamp has been compliant in all requests to return for treatment for Gender Dysphoria. ¶60.

> Haverkamp has persistently requested surgical treatment. UTMB and TDCJ personnel have repeatedly denied providing Haverkamp with medically necessary treatment. UTMB and TDCJ personnel continue to ignore Haverkamp's serious, urgent, and longstanding medical need for gender-affirming surgery as a treatment for Gender Dysphoria. ¶99.

None of these conclusions has been challenged or excluded.

In addition to Haverkamp's injuries attributable to , TDCJ's denial of Haverkamp's grievances are an independent basis to confer Haverkamp standing.

Haverkamp's injuries are traceable to the named defendants. As discussed in greater detail above at Section IV, the evidence confirms that Haverkamp's injuries relating to TDCJ's denial of panties are directly traceable to (a) Dr. Murray, through his authority to approve SRS as a treatment for gender dysphoria, his involvement with the denials of Haverkamp's requests for surgery, and his oversight of Dr. Penn and the UTMB gender identity clinic. Haverkamp's injuries are traceable to Dr. Linthicum based on her involvement with treatment decisions relating to SRS and her oversight and implementation of the TDCJ policies and practices denying Haverkamp panties.

## VII.   Haverkamp seeks proper *Ex parte Young* relief.

Haverkamp seeks proper *Ex parte Young* relief. "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Haverkamp has met that standard because she alleges an ongoing Equal Protection Clause violation and seeks only forward-looking relief. Haverkamp seeks (a) an injunction ordering Defendants to provide SRS as a treatment for her gender dysphoria, (b) a prospective injunction prohibiting Defendants from implementing Policy G-51-11 in a manner that results in a manner

that prohibits SRS, and (c) a prospective injunction requiring, among other things, panties and cosmetics. Complaint ¶¶56–59.

Haverkamp is suing state officials for prospective injunctive relief to end an ongoing violation of her constitutional rights. When "a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984).

Haverkamp does not seek money damages or equitable restitution. Thus, her suit serves the *Ex parte Young* purpose of seeking the courts' assistance in ensuring that state officials comply with their federal constitutional duties. *Ex parte Young* suits like this one seeking injunctions to require state officials to provide constitutionally mandated medical care to prisoners are commonplace. *See, e.g.*, *Delaughter v. Woodall*, 909 F.3d 130, 137 (5th Cir. 2018) (holding that the "straightforward" *Verizon* inquiry "indicates the *Ex parte Young* exception applie[d]" where the plaintiff alleged "that defendants violated his Eighth Amendment rights by failing to provide required hip surgery and requested in his prayer for relief that he 'receive the surgery that he needs.'"). The Fifth Circuit likewise allows suits seeking injunctions in *Ex parte Young* cases to ensure that state officers comply with federal law. *E.g.*, *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020); *Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 324 (5th Cir. 2008).

Haverkamp's requested relief is appropriately characterized as prospective relief and is permissible under *Ex parte Young*.

## VIII.   Genuine Disputes of Material Fact Preclude Summary Judgment.

As discussed in greater detail in Haverkamp's Response to Defendants' Motion for Summary Judgment, genuine disputes of material fact exist regarding whether UTMB and TDCJ

providers have ever had the authority to refer or recommend SRS as a treatment for Gender Dysphoria. Haverkamp incorporates by reference the arguments in that Response.

For example, Defendants argue that Haverkamp's treating physicians and the clinicians at TDCJ/UTMB's Gender Dysphoria Specialty Clinic have the authority and discretion to initiate a surgical referral as a treatment for SRS. *E.g.*, Motion at 9. *See* Murray Dep. at 48:25–49:12. But there are genuine disputes of material fact regarding whether that referral authority exists. For example, Dr. Joseph Penn, the manager of UTMB's Gender Dysphoria Clinic, testified that the providers "do not know that they have the ability to refer inmates for surgery" and that "since 2014, [he has] never told any Gender Dysphoria Specialty Clinic consultant that they have the authority to refer an inmate for sex reassignment surgery." *See* Penn Dep. at 228:19-229, 216:4-217:12, 218:8-220:15. The first time Dr. Penn ever offered to tell the clinicians he supervises at the clinic that they have that authority was during his July 2023 deposition in this matter. *Id.*

Similarly, in contrast to Defendants' arguments that Policy G-51-11 does not prohibit SRS, the summary judgment evidence shows Dr. Linthicum and TDCJ have determined that that "inmates cannot receive surgery to change their sex" and that SRS is an "elective" treatment that is not covered by the Inmate Health Services Plan. And TDCJ's 2021 Gender Dysphoria Fact Sheet: "Inmates cannot receive surgery to change their sex, which would be considered elective and not medically necessary." Exs. 9, 10.

## IX.   Conclusion

The Court should convert Defendants' Rule 12(c) motion to a motion for summary judgment and deny that motion. In the alternative, if the Court determines that the current Defendants are not the appropriate defendants, Haverkamp respectfully requests leave to amend her pleadings to identify the appropriate defendants.

Date: November 13, 2023                    Respectfully submitted,

                                           /S/ *Ace M. Factor*
                                           Ace M. Factor
                                           State Bar No. 24118923
                                           Southern District ID No. 3707964
                                           Chanler A. Langham
                                           State Bar No. 24053314
                                           Southern District ID No. 659756
                                           Susman Godfrey L.L.P.
                                           1000 Louisiana Street, Suite 5100
                                           Houston, Texas 77002-5096
                                           Telephone: (713) 653-7826
                                           Fax: (713) 654-6666
                                           *Attorneys for Plaintiff*
                                           *Bobbie Lee Haverkamp*


## CERTIFICATE OF WORD COUNT

Pursuant to Court Procedure 16(c), I certify that this motion contains 4,784 words.


                                           /S/ *Ace M. Factor*
                                           Ace M. Factor


## CERTIFICATE OF SERVICE

I certify that on November 13, 2023, a true and correct copy of this document properly was served on counsel of record via electronic filing in accordance with the Southern District of Texas Procedures for Electronic filing.

                                           /S/ *Ace M. Factor*
                                           Ace M. Factor