# EXHIBIT 4

# In the Matter Of:

*HAVERKAMP v*

*LANETTE LINTHICUM*

*ERIC GUERRERO*

*July 20, 2023*

HAVERKAMP v.
LANETTE LINTHICUM
2:17-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 3 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

## Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                 CORPUS CHRISTI DIVISION
3   BOBBIE LEE HAVERKAMP A/K/A      )
    DAVID ALLEN HAVERKAMP,          )
4       Plaintiff,                  )
                                    )  NO. 2:17-cv-00018
5   vs.                             )
                                    )
6   LANETTE LINTHICUM, ET AL.,      )
        Defendants.                 )
7
8   *******************************************
9              ORAL DEPOSITION OF
10                 ERIC GUERRERO
11               30(b)(6) WITNESS
12                JULY 20, 2023
13                  VOLUME 1
14  *******************************************
15      ORAL DEPOSITION OF ERIC GUERRERO, produced as a
16  witness at the instance of the Plaintiff, and duly sworn,
17  was taken in the above-styled and numbered cause on
18  July 20, 2023, from 2:03 p.m. to 5:55 p.m., via Zoom
19  videoconference before CHRYSTAL H. McDANIEL, Certified
20  Shorthand Reporter in and for the State of Texas, reported
21  by machine shorthand, pursuant to the Federal Rules of
22  Civil Procedure and the provisions stated on the record or
23  attached hereto.
24
25
```

## Page 2

```
1              APPEARANCES
                 Remotely
2
3   FOR THE PLAINTIFF:
4       ACE M. FACTOR
        SUSMAN GODFREY, LLP
5       1000 Louisiana Street, Suite 5100
        Houston, Texas 77002-5096
6       713.653.7826/713.654.6666 (fax)
        afactor@susmangodfrey.com
7
8   FOR THE DEFENDANTS:
9       MICHAEL CALB
        OFFICE OF ATTORNEY GENERAL
10      Assistant Attorney General
        PO Box 12548
11      Austin, Texas 78711-2548
        512.463.2080
12      michael.calb@oag.texas.gov
13  FOR THE DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
14      JENNIFER CHILDRESS
        TDCJ GENERAL COUNSEL
15      Price Daniel Building
        PO Box 13084
16      Austin, Texas 78701
        512.475.4384
17      jennifer.childress@tdcj.texas.gov
    FOR THE DEFENDANT DR. PHILLIP KEISER:
18
19      JOHN R. STRAWN, JR.
        STRAWN PICKENS, LLP
20      Pennzoil Place, South Tower
        711 Louisiana Street, Suite 1850
21      Houston, Texas 77002
        713.659.9600
22      jstrawn@strawnpickens.com
23
24
25
```

## Page 3

```
1              A P P E A R A N C E S
                 (Continued)
2
3
4   ALSO PRESENT:
5       Bobbie Lee Haverkamp a/k/a David Allen Haverkamp
6
7   MONITOR:
8       Drayton Everson - Lexitas
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

### C O N T E N T S

```
ERIC GUERRERO testifies:                    PAGE

DIRECT EXAMINATION BY MR. FACTOR------------------  7

                  * * * * *

        EXHIBIT LIST            PAGE

( 11)  Plaintiff's Second Amended 30(b)(6)
       Deposition Notice---------------------  24
( 12)  Second Amended Complaint-------------------  58
( 13)  Defendant Linthicum's Original Answer-------  63
( 14)  E-mail Bates-labeled TDCJ0000796-----------  84
( 15)  E-mail and attachment Bates-labeled
       TDCJ0000314-0000527------------------------  85

( 16)  Security Memorandum Bates-labeled
       TDCJ037-040---------------------------------  96
( 17)  Allocation of Necessities Bates-labeled
       TDCJ017-022---------------------------------  98

( 18)  E-mail Bates-labeled TDCJ0000226-227--------  108

       INDEX TO PRIOR EXHIBITS REFERENCED    PAGE
( 1)   Notice of Defendants' Rule 30(b)(6)
       Witness Designations-----------------  69

( 3)   Grievance Records - Bates-labeled
       Haverkamp 001-014-------------------------  41
```

HAVERKAMP v.
LANETTE LINTHICUM

4:21-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 4 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

Page 5

1
            C O N T E N T S
2          (Continued)
3                         PAGE
4   Changes and Corrections        118
5   Signature                      119
6   Reporter's Certificate         120
7   Appearances                      2
8   Stipulations                     6
9   Exhibits                         6
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1          STIPULATIONS
2     The attorneys for all parties present stipulate and
3   agree to the following items:
4
5     That the deposition of ERIC GUERRERO is being taken
6   pursuant to Notice;
7
8     That the deposition is being taken pursuant to the
9   Federal Rules of Civil Procedure;
10
11    That pursuant to FRCP Rule 30(e)(1), the signature of
12  the deponent was requested by the deponent or a party
13  before the completion of the deposition;
14
15    That the original transcript will be submitted
16  electronically for signature to the witness' attorney, Mr.
17  Michael Calb, and that the witness or the witness' attorney
18  will return the signed jurat and errata sheets to Lexitas
19  within 30 days of the date the electronic transcript is
20  provided to the witness' attorney.  If not returned, the
21  witness may be deemed to have waived the right to make the
22  changes, and an unsigned copy may be used as though signed.
23
24
25

Page 7

1     (Proceedings began at 2:03 p.m.)
2     THE REPORTER:  Mr. Guerrero, if you'll raise
3   your right hand, I will place you under oath.
4   WHEREUPON,
5          ERIC GUERRERO
6   of lawful age, being first duly sworn, says in reply to the
7   questions propounded as follows:
8               * * * * * *
9          DIRECT EXAMINATION
10  BY MR. FACTOR:
11    Q   Good afternoon, Mr. Guerrero.  Could you please
12  state your name for the record.
13    A   Eric Guerrero.
14    Q   And what's your home address?
15    A   My home address?
16    Q   Yes.
17    A   408 State Highway 75 North in Huntsville, Texas.
18    Q   I'm Ace Factor.  I'm an attorney for Bobbie
19  Haverkamp, the plaintiff in this lawsuit.  I'm going to be
20  taking your deposition today.
21        Before we get started, I'll go over some ground
22  rules.  First, do you understand that you're under oath to
23  tell the truth?
24    A   Yes, sir.
25    Q   You understand your testimony here is the same as

Page 8

1   testifying in a courtroom in front of a judge and a jury.
2   Do you understand that?
3     A   Yes, sir.
4     Q   When I ask a question that you do not understand,
5   please ask me to clarify the question; otherwise, I will
6   assume you understood my question.  Can we agree to that?
7     A   Agree.
8     Q   The court reporter needs us to communicate
9   verbally.  That means no nodding, shaking of the head,
10  "huh-uhs" or "uh-huhs."  Does that make sense?
11    A   Yes, sir.
12    Q   And I'll ask that you let me finish my question
13  before you answer, and I'll try to let you finish your
14  answer before I ask a question.  Can we agree to that?
15    A   Yes.
16    Q   Have you ever been deposed before?
17    A   Yes.
18    Q   How many times?
19    A   Approximately four to five times.
20    Q   Okay.  And what were the names of those cases in
21  which you were deposed?
22    A   One was Leon Parker, which was last week.  There
23  was one that I was deposed on a little over a month ago.
24  It was a case from the Estelle Unit.  Can't remember the
25  name of the -- of the inmate.  It was over our disability

HAVERKAMP v.
LANETTE LINTHICUM
Case 2:21-cv-00018   Document 343-4   Filed on 11/13/23 in TXSD   Page 5 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

Page 9

1  systems there that we have at the facility.  His name does
2  not cross my mind at this time, but it was a little over a
3  month ago.  And then I was deposed on a case many years
4  ago -- I want to say approximately six years ago -- on an
5  inmate who died out of the Bill Clements Unit in Amarillo.
6      Q    Okay.  Any other cases than those three?
7      A    I believe there was one more.  I just -- it's
8  been many, many years ago -- that I can't think of right
9  now.
10     Q    And in all those instances, were you a
11 representative of TDCJ or were you a -- were you being
12 deposed in your personal capacity?
13     A    As a representative of TDCJ.
14     Q    What was the Leon Parker case where you were
15 deposed last week?
16     A    It was over his request to wear dreadlocks.
17     Q    An inmate's request to wear dreadlocks?
18     A    Yes, sir.
19     Q    And the case on the Estelle Unit where you were
20 deposed a month ago, what type of case was that?
21     A    He was stating that security staff failed to
22 notify him due to a disability that he has of -- of being
23 hard of hearing that -- that staff in his case failed to
24 notify him when doors were going to be open and closed at
25 the Estelle Unit.

Page 10

1      Q    Have you ever testified in a case involving a
2  transgender inmate?
3      A    No, sir.
4      Q    Have you ever testified in any cases regarding
5  TDCJ's policies and procedures regarding transgender
6  inmates?
7      A    No, sir.
8      Q    Have you ever testified at trial in front of a
9  judge or a jury?
10     A    Once.  I think it was the late '90s, if I can
11 remember.
12     Q    And what kind of case was that?
13     A    It was a case where the inmate claimed an officer
14 used excessive force.
15     Q    Have you ever been retained as an expert witness
16 in any litigation or arbitration or other proceeding?
17     A    What do you mean by "retain"?  I was an expert
18 witness on the last deposition in the --
19     Q    Oh, okay.  That's -- that's what I meant.
20     A    Yes, sir.
21     Q    And what was your expertise about in the last
22 deposition?
23     A    Just as security procedures and practice we have
24 within the prison system.
25     Q    Have you been retained as an expert for this

Page 11

1  matter, this case, Haverkamp vs. Linthicum, et al.?
2      A    This is my first time being deposed for this
3  case.
4      Q    I think my question's a little different.
5           Have you been retained as an expert for this
6  case?
7      A    Yes, sir.
8      Q    Okay.  And what is the subject of your expert
9  testimony in this case?
10     A    Again, the security policies we have in reference
11 to transgender inmates within our -- within our care, and
12 it's just the arena of security policies and also laundry
13 services that we have in place within our institutions.
14     Q    And in your -- but in your capacity today, you're
15 not testifying as an expert; is that right?
16     A    Yes.  For the -- for the State of Texas, yes,
17 to -- for TDCJ, yes.
18     Q    Yes, you are not testifying as an expert?
19     A    Yes, I am considered an expert for this case.
20     Q    Okay.  And are you going to issue an expert
21 report in this case when expert reports are due?
22     A    No, sir.
23     Q    So you've been designated by TDCJ to testify on
24 behalf of TDCJ in response to certain 30(b)(6) topics,
25 correct?

Page 12

1      A    Yes.
2      Q    And you've prepared to testify about those
3  topics, right?
4      A    Yes.
5      Q    Am I understanding correctly that you are also
6  serving as an expert witness for TDCJ in this matter?
7      A    Yes.
8      Q    Okay.  And you will later issue an expert report
9  in this matter about these issues?
10     A    If I'm required to do so, I could, yes, sir.
11     Q    Okay.  When were you retained as an expert by
12 TDCJ in this matter?
13     A    I do not know the exact date I was retained.
14     Q    Do you have a retainer agreement with TDCJ about
15 that?
16     A    A retainer agreement?  I know I was notified of
17 being an expert witness for this case.  Not sure what
18 paperwork that was requiring.
19     Q    You didn't sign an agreement about the scope of
20 your expert testimony in this case or confirming that
21 you're going to be an expert witness in this case?
22     A    I was notified that I would be the expert witness
23 and did sign an affidavit on some interrogatories.
24     Q    Okay.  But your testimony today is not as an
25 expert witness.  You are, today, a representative of TDCJ;

HAVERKAMP v.
LANETTE LINTHICUM
Case 2:22-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 6 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

Page 13

1  is that correct?
2      A   I am designated as an expert witness for TDCJ for
3  this case.
4      Q   Okay.  I haven't received any designation of you
5  as an expert prior to today, so this comes as a bit of a
6  surprise to me, but we -- we can take that up later.
7          My understanding of your testimony today is on
8  behalf of TDCJ and is binding on behalf of TDCJ as a party
9  in this matter; is that right?
10     A   Yes, sir.  As a 30(b)(6) witness, I guess you
11  could say.  Yes, sir.
12     Q   And you are not testifying today in your capacity
13  as an expert witness for this matter, right?
14     A   That sounds correct.  I must have got it
15  confused, yes, sir.
16     Q   Other than this matter and the matter on which
17  you were deposed last week, have you ever been retained to
18  serve as an expert witness in any other matter?
19     A   Not that I can recall, no, sir.
20     Q   Have you ever prepared an expert report for any
21  lawsuit or matter?
22     A   No, sir.
23     Q   Is there any reason that you cannot give full and
24  accurate testimony today?
25     A   No, sir.

Page 14

1      Q   Mr. Guerrero, what did you do to prepare yourself
2  to testify today?
3      A   I reviewed different policies we have in place.
4  Again, our laundry policies, some of our security policies.
5  I've talked to a few wardens out there in the field that
6  houses transgenders and other safekeeping type of inmates
7  that we have throughout the state of Texas.  I reviewed our
8  Safe Prisons procedures, looked at some classification
9  procedures on inmates within our custody, refreshed my
10  memory on our grievance practices when inmates file
11  grievances while incarcerated, and looked over the
12  grievances that was submitted by Mr. Haverkamp.
13     Q   Who are the wardens that you talked to?
14     A   Elbert Holmes was a warden that I talked to.
15  Another one is Michael Britt.  I've talked to Lonnie
16  Townsend, and then I believe Christopher Norsworthy.
17     Q   Okay.  Let's start with Elbert Holmes.
18         Where is -- where is that person a warden?
19     A   He was the senior warden at the McConnell Unit.
20  He is now the Region IV director.
21     Q   Okay.  What did you and Warden Holmes talk about?
22     A   And it's been -- it was all one conversation with
23  the wardens as a group.
24         Basically, talked to them about the type of
25  inmates we have on their facility, talked about where the

Page 15

1  transgenders are located on their facility, what type of
2  policies, if any -- unit policies we had in place for them
3  while in custody at their unit, and any -- any security
4  concerns within that population.
5      Q   Okay.  Let's start with the last one you
6  mentioned.  Security concerns within the unit population.
7  And I guess that's specific to the McConnell Unit?
8      A   Yes, sir.
9      Q   What, if any, security concerns were there in
10  your discussions with Warden Holmes?
11     A   So when we have inmates that are -- are -- are
12  designating as transgender or even safekeeping, we look at
13  how do they become a security concern for the inmate
14  population there on the facility and the staff.  With them,
15  in some cases, acting as a female or projecting them as a
16  female, it does cause a security concern by staff taking
17  extra precautions when they're on the facility or walking
18  throughout the facility.
19     Q   And what specific security concerns are those?
20     A   Well, basically, when you have some inmates that
21  truly want to project themselves as a female, there is a
22  tendency for the male population to want to advance towards
23  them either in a sexual manner.  So we have to ensure
24  that -- in some cases, protect the inmate population when
25  they look more like a female.  And protection is by going

Page 16

1  extra security searches and -- and pat searches to ensure
2  that there's not -- there's not going to be any physical
3  assaults.
4      Q   And those are searches of the transgender
5  inmates?
6      A   All inmates within our custody are searched.  So
7  we do pat searches and strip searches of -- of all the
8  different custodies we have on the facility.
9      Q   Okay.  So you mentioned security concerns about
10  transgender inmates on the McConnell Unit.  And we'll talk
11  a little bit more about the actual policies, but now I'm
12  just asking about what you talked about with Warden Holmes.
13         You mentioned you-all talked about unit policies.
14  What unit policies are those?
15     A   So in some cases, in -- there's some unit SOPs,
16  special orders that we have in place.  You know, standard
17  operating procedures is an SOP.  And I was just asking him
18  if there was any standard SOPs or special orders when
19  managing those type of offenders if they were assigned to
20  their facility.
21     Q   And were there any SOP orders at the McConnell
22  Unit?
23     A   No, sir, not that I can recall.  No, sir.
24     Q   And what measures specifically did Warden Holmes
25  mention specifically relating to transgender inmates?

| Page 17 | Page 19 |
|---|---|

**Page 17**

1    A    When we have transgender inmates, there has been

2    incidents where we have a higher increase of inmate

3    protection investigations.  And so when we have those cases

4    either by the transgender themselves filing the request,

5    what we have to do is place that individual in a separate

6    housing to conduct the investigation because that

7    individual may have felt that his safety was in jeopardy or

8    just -- or being just threatened or harassed from a male

9    inmate on that -- on that facility.  And it's not just

10    McConnell.  It's -- it's across the state.

11    Q    Okay.  So increased incident reporting.  You also

12    mentioned having to house transgender inmates separately.

13        Any other issues you talked about with Warden

14    Holmes?

15    A    Transgender inmates are not housed separately.

16    They're housed within their custody.  So depending on what

17    their custody is, if they're a general population, Level 2,

18    Level 3, Level 4, Level 5, they live with that custody.

19    They are not separated by themselves.  And when I say

20    "separation" -- so if they file an inmate protection

21    investigation, that specific inmates needs to be separated.

22    Q    Okay.  Got it.

23        What is an inmate protection investigation?

24    A    So an inmate or someone else can claim that a

25    specific individual's life may be in danger.  And so what

**Page 18**

1    the -- the unit administration is required to do is to

2    separate the individual from the general population and

3    conduct an investigation to see if there is evidence to

4    support those allegations that he may -- his life may be in

5    danger.  Upon completion of the investigation, it is

6    reviewed by a unit classification committee.

7    Q    Okay.  Anything else you talked about with Warden

8    Holmes?

9    A    Not that I can recall.

10    Q    Okay.  And what about your conversation with

11    Michael -- I wrote down Rhett.

12    A    Michael Britt.

13    Q    Could you spell that for me.

14    A    B-R-I-T-T.

15    Q    Okay.  What did you and Warden Britt talking

16    about?

17    A    It was -- so it was basically a call with all the

18    wardens -- those wardens at the time -- about just the

19    inmate population they have on their facility.  So it was

20    just kind of a discussion between the group.  So it was

21    probably the same type of questions with Michael Britt,

22    L.E. Townsend, and Christopher Norsworthy.

23    Q    And what units are those wardens, wardens for?

24    A    Yes, sir.  Michael Britt is at the Estelle Unit.

25    Christopher Norsworthy was at the Stiles unit.  He has

**Page 19**

1    retired.  And -- and -- I'm going blank on my last one.

2    Elbert Holmes -- and, of course, L.E. Townsend.  L.E.

3    Townsend was the warden at the Michael unit.  He is now the

4    Region --

5    Q    At which unit?  Sorry.

6    A    Michael.

7        He is now the Region V director.

8    Q    Did you talk to anybody at the Connally Unit?

9    A    Not on that specific call.  I did talk to Warden

10    Cueto when Mr. Haverkamp was moved from Stiles to Connally.

11    Q    Okay.  But preparing for this deposition, you

12    didn't talk to anybody at the Connally Unit about TDCJ's

13    procedure?

14    A    No, sir.

15    Q    And I had asked about policies, things you talked

16    about in that call with the other wardens.  And I was

17    specifically asking you about what Warden Holmes was

18    telling you.

19        In the broader call, what else was talked about

20    besides what you already talked about in specific to Warden

21    Holmes?

22    A    I believe I -- we discussed what items were

23    available in the commissary department on a male facility.

24    In specific to Warden Holmes, I believe we discussed

25    showers, how it's done on those facilities, and may have

**Page 20**

1    discussed the distribution of laundry services to the

2    inmate population.

3    Q    Okay.  And what did you tell those wardens in

4    that call?

5    A    I think it was more of a conversation.  I don't

6    recall specifically.  I did ask them questions about

7    inmates and transgender status.  You know, just -- just

8    kind of refreshing my memory of -- of what is provided in

9    some of the policies and practices we have on the facility.

10    Q    And what did you-all discuss that was provided to

11    transgender inmates on that call?

12    A    In a commissary department, there's no specific

13    items.  It's -- it's all the same for the male population

14    on those facilities.  We -- we talked about if bras were

15    issued by -- by medical orders that, you know, it would be

16    provided through the laundry services department.  And then

17    we just discussed the procedures on showers, how an inmate

18    must be alone, not shower in front of others when they

19    decided to take a shower.

20    Q    And is that a procedure -- that shower procedure

21    specific to transgender inmates?

22    A    Yes.

23    Q    What about the provision of panties?  Did you-all

24    discuss any policies or procedures about providing panties

25    to transgender inmates?

Page 21

1    A   I don't -- I don't know if we discussed.  I know
2  that our laundry policy does not provide panties to the
3  male population.
4    Q   And did you discuss the availability of sex
5  reassignment surgery or any policies relating to sex
6  reassignment surgery with those wardens?
7    A   No, sir.
8    Q   Okay.  So other than that call you had with those
9  four wardens and the warden at the Connally Unit, who else
10  have you talked to in preparation for your testimony today?
11    A   I believe I talked to Tim Fitzpatrick -- he's our
12  director in classification -- to refresh my memory on -- on
13  where we have inmates that are considered transgender.
14    Q   Okay.  And what did Mr. Fitzpatrick tell you?
15    A   Just that they could be housed on many different
16  facilities across the state due to their possibility of
17  changing what they may decide who they are, if they're a
18  transgender inmate or not.
19    Q   Any other conversations with anybody in
20  preparation for this deposition today?
21    A   I -- I did reach out to Andrea Lozada.  She's a
22  warden at -- over at Mountain View and Hilltop.  It's a --
23  it's a complex of two facilities close by each other.  And
24  she's a warden over the female population.
25          And just discussed with her any female

Page 22

1  transgender that we have in our custody over there and if
2  there was any specific policies we had in place.
3    Q   And what did she tell you about that?
4    A   Just that she -- that there was no specific
5  policies that she has put out, any standard operating
6  procedures or -- or specific post orders in place.
7  Basically, mentioned about the same practices we have in
8  place on the female side of the house as we do on the
9  males.
10    Q   And did you discuss any security threats with
11  Ms. Lozada?
12    A   No, sir.  Not that I can recall.
13    Q   And did you talk with Dr. Linthicum about this
14  case prior to this deposition?
15    A   No, sir.
16    Q   Did you meet with any lawyers to prepare for this
17  deposition?
18    A   I did talk to Jennifer Childress and Mr. Michael
19  Calb.
20    Q   For about how long did you meet with your
21  lawyers?
22    A   A little over an hour a few days ago.
23    Q   Did they give you any documents to look at?
24    A   Yes, they did.
25    Q   Did those documents refresh your recollection?

Page 23

1    A   They did.
2    Q   Which documents were those?
3    A   Received the grievances that were submitted by
4  Mr. Haverkamp, some policies related to our barbershops,
5  policies related to our security precaution designators,
6  grievance procedures, Correctional Managed Health Care
7  procedures on inmates.  I believe there was a Safe Prison
8  policy -- a Safe Prison plan, a couple policies from there,
9  and identification cards.  And I believe there was a
10  classification procedures that was provided.
11    Q   Was anyone besides you and those lawyers present
12  at that meeting you had the other day?
13    A   No, sir.
14    Q   Did you speak with anybody at UTMB in preparation
15  for this deposition?
16    A   No, sir.
17    Q   Did you speak with anybody else at all in
18  preparation for this deposition?
19    A   No, sir.
20    Q   And I understand that you've been retained as an
21  expert in this case.  Have you spoken with any other
22  experts in this case?
23    A   No, sir.
24    Q   You understand that you're testifying at this
25  deposition today as the corporate representative at TDCJ

Page 24

1  regarding certain notice topics, right?
2    A   Yes.
3    Q   From my notes, you've been designated to testify
4  regarding Topics 2, 3, 5, 14, and I think 16 and 17; is
5  that correct?
6    A   Could you show me what those topics were.
7  Those --
8    Q   Yep.  I will -- I will introduce what I'll mark
9  as Exhibit 11.  Putting it in the chat.
10          (Exhibit No. 11 marked for identification.)
11    Q   (BY MR. FACTOR)  And this is Plaintiff's Second
12  Amended 30(b)(6) Deposition Notice.  Did you receive this
13  notice?
14    A   Yes, sir.
15    Q   And are you prepared to testify regarding Topic
16  2, which I've highlighted on this screen?
17    A   Yes.
18    Q   Are you prepared to testify about Topic 3, which
19  I've highlighted on the screen?
20    A   Yes.
21    Q   Topic 5, which I've highlighted on the screen --
22  and I think you've been designated on Topic 5 with respect
23  to TDCJ correctional officer training.
24          Are you prepared to testify on that topic today?
25    A   Yes.

HAVERKAMP v.
LANETTE LINTHICUM
3:22-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 9 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

Page 25

1  Q   The next one I have is Topic 14, and that is "All
2  policies, procedures, protocol, memoranda, circulars, or
3  other agency guidance relating to the provision of
4  long-hair passes, panties, bras, and cosmetics to inmates."
5      Are you prepared to testify on that topic today?
6  A   Yes.
7  Q   And the next one is Topic 16.  "All unit
8  transfers of Plaintiff and TDCJ's review of and responses
9  to any transfer requests."
10  Q   And 17.  "All transportation, accommodation,
11  housing, and safekeeping classifications of plaintiff and
12  inmates with gender dysphoria."
13  
14      Are you prepared to testify about Topic 17?
15  A   Yes.
16  Q   And I'm actually not sure about Topic 18, so I'll
17  ask.  "All conclusions, analyses, determinations, opinions,
18  or studies conducted, reached, or considered by UTMB, TDCJ,
19  and Defendants regarding medical treatments for gender
20  dysphoria."
21  A   No.
22  Q   Okay.  Not Topic 18?
23  A   No, sir.
24  Q   Do you understand that for those topics, you're
25  testifying regarding any knowledge that TDCJ has regarding

Page 26

1  those topics?
2  A   Yes.
3  Q   Do you understand that those answers that you
4  provide today will be binding on TDCJ?
5  A   Yes.
6  Q   Do you understand that TDCJ had an obligation to
7  prepare you to testify completely and accurate regarding
8  these topics?
9  A   Yes.
10  Q   And do you understand that when you are answering
11  my questions today, you're expressing the views of TDCJ,
12  right?
13  A   Yes.
14  Q   Do you have any medical training?
15  A   In our academy, we have some basic medical
16  training, but not beyond that.
17  Q   You're not a doctor, nurse, or other licensed
18  healthcare professional, correct?
19  A   Correct.
20  Q   And you attended Haverkamp's deposition in this
21  matter; is that right?
22  A   Yes.
23  Q   You also attended Dr. Owen Murray's deposition in
24  this matter; is that right?
25  A   Yes.

Page 27

1  Q   Did you make any notes during those depositions?
2  A   No, sir.
3  Q   Did you discuss those depositions with anyone?
4  A   No, sir.
5  Q   Please briefly describe your educational
6  background.
7  A   I have a Bachelor's degree in Criminal Justice
8  Administration.
9  Q   What year did you receive that and from where?
10  A   2019 from Columbia Southern University.
11  Q   You're currently employed by TDCJ; is that right?
12  A   Yes.
13  Q   How long have you been with TDCJ?
14  A   A little over 29 years.
15  Q   What's your current title?
16  A   I'm the Deputy Division Director for the
17  Correctional Institutions Division.
18  Q   How long have you held that role?
19  A   Three years and seven months.
20  Q   Who do you report to at TDCJ?
21  A   Bobby Lumpkin.
22  Q   And what's -- Mr. Lumpkin is the director of
23  TDCJ?
24  A   He's the director of the Correctional
25  Institutions Division.

Page 28

1  Q   Okay.  And just kind of what is the Correctional
2  Institution Division in very broad strokes?
3  A   Oversees the prisons.
4  Q   Who at TDCJ reports to you?
5  A   The regional directors, specifically the Region I
6  director and the Region IV director, and then the director
7  over classification and records.
8  Q   In what -- what roles at TDCJ did you hold prior
9  to becoming Deputy Director of the Correctional Institution
10  Division?
11  A   I held all the security ranks from a correctional
12  officer through a major of security.  I was an assistant
13  warden for a couple of years.  I was a senior warden for
14  about five years.  I was the Region VI director for three
15  years, and I was the training director for about three
16  years.
17  Q   And moving to just your current role as deputy
18  director of the Correctional Institutions Division, what
19  are your roles and responsibilities?
20  A   I help oversee the security operations of the
21  facilities all within Region I, which is in the Huntsville
22  area, and then Region IV in the South Texas area.  Just
23  managing of the wardens on the facility and all the
24  security staff.  And we do have some departments that fall
25  under the Correctional Institutions Division.  If it's

HAVERKAMP v.
LANETTE LINTHICUM
Case 4:20-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 10 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

## Page 29

1  classification, mailroom.  We have some intake staff that
2  falls under the Correctional Institutions Division that
3  falls under my purview.
4      Q    What are your roles and responsibilities with
5  regard to inmate medical requests?
6      A    My -- that is -- that is -- when an inmate is
7  submitting any type of a sick call or a request, that goes
8  directly to the facility he's assigned to, if it's the
9  University of Texas Medical Branch in this area of the
10 state; in the panhandle and the west part of the state, it
11 may be Texas Tech.  So all medical concerns or requests are
12 done by those two universities.
13     Q    Okay.  And what's your relationship to those?  Do
14 you have any role with respect to those medical requests
15 that -- UTMB and Texas Tech's review of those medical
16 requests?
17     A    Our responsibility within the Correctional
18 Institutions Division is just to ensure that the inmates
19 are taken to medical when needed and provide any basic
20 medical care while they're in the housing area.  Also --
21     Q    Go ahead.
22     A    Also, we have -- the wardens have dialogue with
23 the medical staff on the facility to see if there's any
24 needs that -- that they're needing assistance with.
25     Q    Okay.  And those medical staff on facility, those

## Page 30

1  are TDCJ employees, not UTMB employees, right?
2      A    They're -- they're UTMB employees.
3      Q    But they work on facilities?
4      A    They do, yes, sir.
5      Q    And they report to the warden?
6      A    No, sir.  So they have their own director that
7  they fall under within UTMB.
8      Q    And who is that, if you know?
9      A    I believe -- I believe Dr. Owens is the medical
10 director over UTMB.
11     Q    Dr. Murray?
12     A    I'm sorry.  Dr. Murray, yes, sir.
13     Q    What are your roles and responsibilities with
14 regard to inmate classifications?
15     A    I oversee the director and the actual
16 classification and records department.  We just ensure that
17 inmates that are brought in from the county jail is
18 appropriately housed.  There's an evaluation done of each
19 inmate when they're incarcerated, not only just from the
20 sociologists that fall under classification, but they're
21 also reviewed by the medical department on the facility.
22          And then when inmates are transferred to a new
23 facility, they go through a -- not necessarily an intake
24 process, but they are reviewed by unit classification
25 committee each time they come into a facility.

## Page 31

1      Q    And what's your responsibility personally with
2  respect to that committee and those classifications?
3      A    Just at a high level ensuring that we're
4  following our procedures in place.
5      Q    Are you on the committee --
6      A    No, sir.
7      Q    -- the classification committee?
8          What -- who is on the classification committee?
9      A    On the facility, so you have a chairman, which
10 could be the senior warden or assistant warden.  In some
11 cases, it's the major or chief of classification, but in
12 most cases, it's the warden of the facility.  Then we could
13 have a security member.  Normally, it's a three-person
14 committee.  And so we would have -- most cases, senior
15 warden, it's chief of classification, and then a security
16 member, which would be a lieutenant or above.
17          In some cases, we would have medical present
18 during those committees.  We could have the laundry captain
19 as a third member.  But you would always have a major or
20 above as a chairman.
21     Q    And the committee reports to you?
22     A    The committee reports to -- of course, the warden
23 does report to the regional director and myself.  The
24 classification committee falls under the classification
25 department, which falls under our state classification

## Page 32

1  committee.  And then, of course, our classification and
2  director.
3      Q    Okay.  And the classification director reports to
4  you, right?
5      A    Yes.
6      Q    What are your roles and responsibilities with
7  respect to inmate transfer requests?
8      A    I don't have direct roles.  That is all done by
9  the unit warden if -- depending on the situation, if he or
10 she requests a transfer.  In some cases, inmates are moved
11 to another facility because of educational needs.  Some
12 inmates are moved because of medical needs.  And that is
13 all done through the classification department.  I don't
14 have any specific roles on moving the 129,000 inmates we
15 have.
16     Q    And the classification department is responsible
17 for inmate unit transfers requests.  Is that about right?
18     A    Not necessarily.  So the -- if it's the unit
19 classification committee is requesting for a transfer, that
20 is submitted to the state classification committee, which
21 is in our classification and records department.  And they
22 would determine where to move that inmate to the most
23 appropriate facility.
24     Q    Okay.  And "they" being the state classification
25 committee; is that right?

HAVERKAMP v.
LANETTE LINTHICUM
Case 4:20-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 11 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

Page 33

1    A    The state classification would determine where
2  the appropriate facility is needed for that specific
3  inmate.
4    Q    And what are your roles and responsibilities with
5  respect to TDCJ's policies?
6    A    As a -- as a deputy director, we have our own
7  department that oversees our prison policies.  And I would
8  assist them when necessary with any revisions or with the
9  policy or -- or any issuing out to that policy to the -- to
10  the facilities itself.
11    Q    So you're involved with revisions to prison
12  policies, right?
13    A    There are -- yes.  And there's many others, yes,
14  sir.
15    Q    What other types of policies are you involved
16  with?
17    A    Well, just saying that it's not just me as a
18  deputy director that approves or looks at the revisions.
19  There's many others within TDCJ depending on what the
20  policy is discussing.  It may not just be people within the
21  prison side of the house that reviews the TDCJ policies.
22    Q    Got it.  But you're the person on the prison side
23  of the house that does review the TDCJ policies?
24    A    I am one of them, yes, sir.
25    Q    Are you on any committees that develop or update

Page 34

1  policies?  Like what are those committees called?
2    A    It's not a committee.  So we have our Plans and
3  Operations Department that requests from the field if
4  there's any recommended revisions.  And those policies
5  would come through my office for me to review to see if
6  those changes are needed or if any additional changes were
7  needed.
8    Q    Other than your role as deputy director, do you
9  hold any other roles or titles within TDCJ?
10    A    No, sir.
11    Q    Are you involved in any way with the correctional
12  health -- or Correctional Managed Health Care Committee?
13    A    We do communicate with them on -- on monthly
14  meetings.  Most cases, it is the director of the
15  Correctional Institutions Division, Mr. Lumpkin.  In some
16  cases, I will go to those meetings if they have them
17  monthly or quarterly.
18    Q    So you report to the Correctional Managed Health
19  Care Committee at their meetings?
20    A    I'm -- I'm part of their meetings at times, yes,
21  sir.
22    Q    Are you on any Correctional Managed Health Care
23  Committee subcommittees?
24    A    No, sir.
25    Q    You're not on the Suicide Prevention Working

Page 35

1  Group?
2    A    That's -- so there's -- there's some -- there's a
3  couple of different suicide prevention groups.  There's one
4  within TDCJ, but the Health Services Division does have a
5  group that goes over the suicides monthly that I do
6  participate in.  I don't know if it's called a suicide
7  committee, but there is a group that reviews the suicides
8  we had.
9    Q    There's -- I -- I thought I saw your name on a
10  list of a joint working group for the Correctional Managed
11  Health Care Committee Suicide Prevention Working Group.
12  Does that sound familiar at all?
13    A    I -- I know that I do look at our suicide
14  prevention.  And I might be part of -- I mean, I do
15  definitely work with the Health Services division and -- if
16  it's UTMB and so on.  I -- if it's called a committee, I
17  don't recall, but I do work with them, yes, sir.
18    Q    Are you involved in any way with TDCJ's policies
19  relating to transgender inmates?
20    A    Can you ask that question one more time.
21    Q    Are you involved in any way with respect to
22  TDCJ's policies relating to transgender inmates?
23    A    I would say yes, because of my role, I have the
24  ability to review our policies that we have in place.
25    Q    Okay.  Which policies specifically are you

Page 36

1  referring to with respect to policies relating to
2  transgender inmates?
3    A    So there's many different policies that discusses
4  transgenders.  One is the -- the laundry procedures manual.
5  There's one in the Safe Prisons procedures manual and then
6  our intake policies within the classification department.
7    Q    What about G-51.11?  Any involvement with that
8  policy?
9    A    I -- I am aware of that policy, but not any
10  specific role on any changes or revision, if needed.
11    Q    So you're responsible for revising and updating
12  prison policies that affect transgender inmates; is that
13  right?
14    A    Yes, sir.
15    Q    You were a warden at the McConnell Unit?
16    A    No, sir.
17    Q    Where were you a warden?
18    A    I was a warden at the Glossbrenner facility.  I
19  was a warden at Segovia/Lopez, and I was the warden at
20  Wallace/Ware.
21    Q    Did you ever work at the McConnell facility?
22    A    I did.
23    Q    While you were there, did you ever interact with
24  Bobbie Haverkamp?
25    A    Not that I can recall.

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:16-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 12 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

Page 37

1  Q   Other than your involvement with this case, have
2  you ever personally or professionally interacted with
3  Haverkamp while you've been at TDCJ?
4  A   Not that I know of, no, sir.
5  Q   Let's talk about Topic 2, which is "TDCJ's review
6  of and responses to Plaintiff's grievances."
7      What materials did you review to prepare for this
8  topic?
9  A   Just looked at the grievances themselves and our
10 responsibility to respond to the grievances when one is
11 submitted.
12 Q   And what are TDCJ's responsibilities in
13 responding to grievances?
14 A   So it depends on, if it's Mr. Haverkamp or
15 anybody else, if he filed a grievance against a specific
16 individual, then, one, that grievance is sent to the
17 grievance department on the facility, if it's a Step 1
18 grievance.
19     The grievance coordinator or supervisor is
20 responsible for getting a statement from the individual, if
21 one is filed directly against them, and to getting the
22 evidence that would either support or -- not support the
23 allegation.
24 Q   So the inmate submits a Step 1 grievance, and
25 TDCJ's grievance investigator does some fact-finding.  Is

Page 38

1  that how the process works?
2  A   Pretty much, yes, sir.
3  Q   What kind of fact-finding does the investigator
4  do for Step 1 grievances?
5  A   Well, it depends.  You know, there could be
6  different types of grievances.  You know, if it's a -- if
7  it's a medical-related grievance, that is sent over to the
8  medical department for a response.  And if it's for some
9  type of a religious accommodation, that's sent over to our
10 Rehabilitation Programs Division, and then -- but if it's
11 basic complaints within the prison, then that is -- is,
12 again, you know, looked into the facts, gather the
13 information, and then that is reviewed by the unit warden.
14 Q   Okay.  And then if a Step 1 grievance is denied,
15 what's the next step in that process?
16 A   The inmate could file a Step 2 grievance.
17 Q   And what's the process once an inmate files a
18 Step 2 grievance?
19 A   So it is -- depending on again what type of
20 grievance it is, it would be sent to -- if the ARRM
21 division, what's -- what's called the Administrative Review
22 and Risk Management, they have a grievance department.
23 They're the grievance department that oversees the
24 grievance investigators.  Because the grievance department
25 doesn't fall within the Correctional Institutions Division.

Page 39

1  Those grievances would go to them for a review, unless it's
2  medical, then it goes back to medical again.
3  Q   So Step 2, the grievance goes to a different
4  department, the grievance investigation department?
5  A   Yeah, so -- so, of course, it goes on the
6  facility, the grievance coordinator on the facility
7  receives it.  When they know it's a Step 2 grievance, then
8  it's sent off to the Administrative Review and Risk
9  Management division or back to the Health Services.
10 Q   And who at administrative management that -- that
11 committee, who's responsible for reviewing those Step 2
12 grievances?
13 A   I'm not sure who the actual supervisor in the
14 ARRM -- in the Administrative Review and Risk Management
15 division is.  You know, they have director and deputy
16 directors also.  I'm not sure exactly who the grievance
17 supervisor is.
18 Q   Okay.  So it's a couple of layers of
19 fact-finding.  At Step 1, it's the grievance investigator
20 on site and possibly some medical staff and the warden all
21 investigate and do fact-finding before they issue a
22 grievance response, right?
23 A   That'd be -- yes, sir.
24 Q   And then there's another layer of fact-finding at
25 Step 2, and that's with the administrative review

Page 40

1  department, possibly another review by medical, and again
2  by the warden?
3  A   No, sir.
4  Q   Not by the -- the second level of fact-finding is
5  just the administrative review department, and then the
6  Step 2 response goes back to the inmate; is that right?
7  A   Yes, correct.
8  Q   So my client, Bobbie Haverkamp, has submitted
9  grievances regarding denial of sex reassignment surgery
10 starting in 2015, right?
11 A   Yes, sir.
12 Q   TDCJ has denied all of Haverkamp's grievances
13 relating to sex reassignment surgery, right?
14 A   I -- I know they have not informed us of any
15 inmates who need a sex reassignment.
16 Q   And they've denied all the grievances that
17 Haverkamp has submitted, correct?
18 A   Correct.
19 Q   In the more than eight years since Haverkamp
20 submitted the first grievance for sex reassignment surgery,
21 TDCJ has not allowed Haverkamp to receive sex reassignment
22 surgery, correct?
23 A   Correct.
24 Q   TDCJ continues to not allow Haverkamp to receive
25 sex reassignment surgery, correct?

Page 41

1    A   Can you ask that question again.
2        MR. FACTOR:  Ms. McDaniel, could you read it
3    back, please.
4        THE REPORTER:  Yes.
5        (WHEREUPON, the court reporter read back the
6    question.)
7        THE WITNESS:  We have not been informed that
8    it has -- has been approved for him to have sex
9    reassignment surgery.
10   Q   (BY MR. FACTOR)  TDCJ has not approved any
11   request by Haverkamp to receive sex reassignment surgery,
12   correct?
13   A   Correct.
14   Q   I'm going to put in the chat what's previously
15   been marked as Exhibit 3.  And I'll share it on the screen.
16       (Exhibit No. 3 marked for identification.)
17   Q   (BY MR. FACTOR)  Are these the grievance
18   materials that you reviewed in preparing for this
19   deposition?
20   A   Yes.
21   Q   And I want to walk through -- and I'm going to go
22   to Page Haverkamp 003 to 004.  And I'm just looking at the
23   date here.  This is a Step 1 grievance that Haverkamp filed
24   on October 12th, 2015, correct?
25   A   Yes.

Page 42

1    Q   And Haverkamp writes:  "On October 12th, 2014, in
2    Galveston I met with Dr. Walter Meyer, GID doctor and UTMB
3    negotiator agent.  Dr. Meyer told me I had to be on hormone
4    a year before he would recommend gender reassignment."
5        Is that what this grievance says?
6    A   Yes.
7    Q   This says:  "Throughout the year on hormones,
8    January 15th, 2015, I have confirmed with Dr. Meyer I want
9    gender reassignment surgery."
10       Is that what this says?
11   A   Yes.
12   Q   And later in the grievance, Haverkamp writes:
13   "Dr. Linthicum denies me medical care by not providing me
14   with surgery that perform gender reassignment.  Her denial
15   of care is causing me anxiety to the point of mental pain."
16       Is that what this grievance says?
17   A   Yes.
18   Q   Haverkamp states:  "I've been at this, I've
19   started my fourth year and have asked for a cure, gender
20   reassignment surgery."
21       Is that what this says?
22   A   I believe it says "cure," but yes.
23   Q   And the action requested to resolve the complaint
24   is, "I want gender reassignment surgery and a treatment
25   plan that shows what takes place and when."  Signed

Page 43

1    October 12th, 2015.
2        Is that what this says?
3    A   Yes.
4    Q   So to summarize this Step 1 grievance, Haverkamp
5    had been on hormones for more than a year.  And his
6    understanding was that after a year on hormone therapy,
7    he'd be recommended for gender reassignment surgery.  Is
8    that about an accurate summary of this grievance?
9    A   That's what he -- he wrote, yes, sir.
10   Q   And two months later, TDCJ responds to
11   Haverkamp's Step 1 grievance.  And this is on
12   December 29th, 2015, that TDCJ sends the response.
13       Before we go there, who is K. Long, PM?
14   A   I don't know that specific person.  Just a
15   practice manager, according to the grievance.
16   Q   Is that practice manager, Practice Manager Long,
17   the grievance investigator?
18   A   Not the grievance investigator.  It's the -- the
19   authority within UTMB to provide a response to that
20   grievance.
21   Q   Okay.  So in the two months between October 12th,
22   2015, and December 29th, 2015, TDCJ did all those steps you
23   described.  They assigned a grievance investigator.  They
24   talked to the medical department.  The warden looked at the
25   response; is that right?

Page 44

1    A   The -- on medical grievances, that was -- is
2    reviewed by the medical staff.
3    Q   Okay.  So this grievance was reviewed by the
4    medical staff?
5    A   Uh-huh.
6    Q   Who else was this grievance reviewed by?
7    A   Well, initially, it goes to the grievance
8    department and the grievance investigator issues out the
9    grievance itself to whatever department it needs to go to,
10   if it's the Health Services Division, for any
11   medical-related grievance.
12   Q   Okay.  So this -- this grievance had two levels
13   of review, and that was the grievance department and the
14   medical department, right?
15   A   Yes.
16   Q   And did the warden also review this grievance?
17   A   I would have to see -- and that grievance, if
18   it's medical, it would be sent over to the medical
19   department.
20   Q   Okay.  And won't go back to the warden after?
21   A   No.  The grievance coordinator coded it medical.
22   Q   Okay.  And the December 29th, 2015, response
23   says:  "Offender Haverkamp, you are requesting to know when
24   you can have gender reassignment surgery.  You were seen at
25   Hospital Galveston on 12/15/15.  You inquired about surgery

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:14-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 14 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

## Page 45

1  then, but were told you must be on replacement or higher
2  estrogen for at least one year before surgery can even be
3  considered."
4      Is that what the response to this Step 1
5  grievance was?
6      A   Yes.
7      Q   And that was after that investigation process by
8  the grievance department and by medical, correct?
9      A   Yes, sir, I would assume.  Yes, sir.
10     Q   Did TDCJ do anything else to investigate and
11 respond to this grievance?
12     A   Not that I know of.
13     Q   And going to Page Bates No. Haverkamp 006, this
14 fact-finding activity worksheet says "Sent to: Medical"; is
15 that right;
16     A   Yes.
17     Q   And medical's suggested response was the response
18 that went to Haverkamp.  And that's "You inquired about
19 surgery, but were told you must be on replacement or higher
20 estrogen for at least one year before surgery can even be
21 considered."
22         Correct?
23     A   Yes.
24     Q   Who's the referenced medical personnel who wrote
25 that?

## Page 46

1      A   It should be K. Long, the practice manager.
2      Q   Did somebody at UTMB review this before it went
3  back to K. Long, practice manager?
4      A   Not that I know of.
5      Q   And there were some other steps that the
6  grievance investigator did in this worksheet.  She
7  writes -- she puts a check next to Specialty Clinic Notes;
8  is that right?
9      A   Yes.
10     Q   She provided written records required to offer
11 proof of provision of services; is that right?
12     A   Yes.
13     Q   She provided signed statements from medical,
14 dental, mental health staff who are specifically named in
15 the grievance?
16     A   Yes.
17     Q   She put a check mark next to individual medical,
18 dental, mental health discipline manager, designee findings
19 and recommendations?
20     A   Yes.
21     Q   Right?
22     A   Yes.
23     Q   And she signed and forwarded all compiled health
24 services documentation and statements to grievance
25 investigator, correct?

## Page 47

1      A   Yes.
2      Q   And after doing all that, the answer was you have
3  to be on hormones for at least one year before surgery can
4  be considered, correct?
5      A   Yes.
6      Q   And at that point, surgery -- could surgery have
7  been considered?
8      A   Yes.
9      Q   Okay.  And who would have done that considering
10 of surgery?
11         MR. CALB:  Objection as to the scope of this
12 deposition topic.  This is about the grievance responses,
13 not about, you know, who would make decisions later on.
14         MR. FACTOR:  It's responsive to the topics.
15 Particularly, the allegations in the complaint and
16 defendants' responses.
17         THE WITNESS:  The UT Medical Branch out of
18 Galveston would make the decision on any type of surgery
19 that is needed.  And they would let us know if that surgery
20 was done or not.
21     Q   (BY MR. FACTOR)  And at that point, surgery was a
22 possibility for Haverkamp; is that right?
23     A   Yes, sir.
24     Q   And who at TDCJ would be involved with that
25 decision about considering surgery?

## Page 48

1      A   It would be, that I know of, a discussion with
2  Dr. Owen Murray and the UTMB medical staff down in
3  Galveston.  And, of course, they do communicate with
4  Dr. Linthicum, that's the director over Health Services.
5      Q   Okay.  And it's obviously been more than one year
6  since the denial of this grievance in December 2015.  Has
7  Haverkamp been considered for surgery?
8      A   Not that I'm aware of, no, sir.
9      Q   Okay.  So that was the Step 1 grievance.  Then
10 Haverkamp files a Step 2 grievance on January 11th, 2015.
11     Is that this grievance we're looking at
12 Haverkamp 001?
13     A   Yes, sir.
14     Q   And the substance of the grievance, the Step 2
15 grievance is similar.  And Haverkamp's saying I want a
16 letter saying I will be approved for gender reassignment
17 surgery, period.  Dated January 5th, 2015, right?
18     A   Yes.
19     Q   Okay.  And what steps were taken to review this
20 grievance?
21     A   It would be a very similar process.  Those Step 2
22 grievances go through the grievance department.  And the
23 grievance supervisor would, in this case, code it as a
24 medical grievance and then would send it to outside the
25 facility.  Just like the regular grievance, it's not done

Page 49

1  within the facility.

2       And then we have -- within TDCJ Health Services

3  Division, we have an office that we called -- a department

4  that reviews medical grievances -- professional standards

5  for those grievances that are medical related.

6     Q   Okay. So this has two more layers of

7  fact-finding and investigation. That's the medical

8  department, again, and then TDCJ's office of professional

9  standards; is that right?

10     A   Yes, sir.

11     Q   And this grievance response says basically the

12  same thing. "A review of the Step 1 medical grievance has

13  been completed regarding your complaint on 10/17/2014. The

14  Hospital Galveston provider told you, you had to be on

15  hormones for a year before you would be considered for

16  gender reassignment. Your complaint of denial as well as a

17  request for gender reassignment surgery and a treatment

18  plan that shows what takes place and when was also

19  reviewed."

20       Is that what this first paragraph of the

21  grievance response says?

22     A   Yes.

23     Q   And then the second paragraph references CMHC

24  Policy G-51.11, right?

25     A   Yes.

Page 50

1     Q   And they tell Haverkamp that "Your requested

2  remedy is not available through the Offender Grievance

3  Program," right?

4     A   Oh, yes. Yes, sir.

5     Q   So after all those layers of investigation,

6  nobody in any of the medical departments or any of the

7  other department reviews you looked at disputes that

8  Haverkamp was told that he needed to be on hormones for one

9  year before he could be considered for -- be considered for

10  surgery, correct?

11     A   Correct.

12     Q   In fact, they wrote it in their grievance

13  responses that you have to be on hormones for a year before

14  you could be considered for surgery, correct?

15     A   Correct.

16     Q   And at that point, Haverkamp could have been

17  considered for surgery; is that right?

18     A   He could have been.

19     Q   So I guess my question is, why hasn't Haverkamp

20  been considered for surgery?

21       MR. CALB: Objection. That's a medical

22  question. Dr. Penn can talk about that.

23     A   (BY MR. FACTOR) You can say you don't know.

24     A   I do not know.

25     Q   Dr. Penn might have an answer to that?

Page 51

1     A   I would refer that back to the Health Services

2  department or UTMB.

3     Q   But after all these layers of grievance reviews,

4  Step 1, Step 2, medical department review, administrative

5  review, unit review, nobody disputes that Haverkamp was

6  told that he could receive surgery after being on hormones

7  for a year, right?

8       MR. CALB: Objection. Misstates the

9  responses. He would be considered for surgery. That's

10  very different.

11     Q   (BY MR. FACTOR) Okay. After four layers of

12  review, including by two levels of medical review, the

13  grievance investigator, the grievance administration and

14  professional department, again, the medical review, no one

15  disputed that Haverkamp was told that he could be

16  considered for surgery after being on hormones for more

17  than a year, correct?

18     A   That's correct.

19     Q   And after all these layers of review, that's what

20  they wrote in the grievance response. You have to be on

21  surgery -- on -- let me restate.

22       That's what the response to the grievance states,

23  you were told you have to be on hormones for more than a

24  year before you can be considered for surgery, correct?

25     A   Correct.

Page 52

1     Q   And this is the grievance investigation worksheet

2  for the Step 2 grievance.

3       Did you review this in your preparation for

4  today?

5     A   Yes.

6     Q   Who is Joy Matchett?

7     A   It says there Administrative Assistant IV. And I

8  don't know the person personally.

9     Q   Who is Dale Dorman, RN?

10     A   Registered Nurse within the TDCJ Health Services

11  Division.

12     Q   And so Matchett and Dorman were responsible and

13  did some fact-finding to respond to grievance --

14  Haverkamp's Step 2 grievance, correct?

15     A   Correct.

16     Q   And in the investigation worksheet -- and this

17  investigation worksheet, in general, what's the purpose of

18  this confidential Grievance Investigation Worksheet?

19     A   Can you ask that one more time.

20     Q   What is the purpose of this Grievance

21  Investigation Worksheet?

22     A   To write down information in reference to the

23  grievance itself and what they were able to determine from

24  their investigation to provide a response to Inmate

25  Haverkamp.

HAVERKAMP v.
LANETTE LINTHICUM
Case 4:21-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 16 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

Page 53

1    Q    And this Summary of Fact-Finding Activity
2  section, that is not provided to the inmate, correct?
3    A    Not that I'm aware of.  I don't -- I don't
4  believe so.
5    Q    And in the Summary of Fact-Finding Activity that
6  Haverkamp was not provided, the investigator writes:  "You
7  inquired about surgery then, but were told you must be on
8  replacement or higher estrogen for at least one year before
9  surgery can even be considered," correct?
10    A    Correct.
11    Q    And there's some additional fact-finding, which
12  is education on CMCH Policy G-51.11.
13          What was that additional education on
14  Policy G-51.11 referenced here?
15    A    I am not sure what they provided, if anything.
16    Q    There's a mention of "reference the offender
17  handbook."
18          What in the offender handbook provided insight
19  about this grievance?
20    A    The handbook should just advise the -- if an
21  inmate is in transgender status, that they'll be housed
22  within the same custody.  The Offender Orientation handbook
23  may discuss intake processing that they would have the
24  ability to identify themselves if they're transgender or
25  not, part of our Safe Prisons portion.  That's all that I

Page 54

1  can recall that's the -- in the Offender Orientation
2  handbook.
3    Q    So when TDCJ reviewed this grievance, they talked
4  to somebody at medical who confirmed what's written in the
5  grievance response, right?
6    A    I would assume so, yes, sir.
7    Q    And confirmed that Haverkamp inquired about
8  surgery, "but were told he must be on replacement estrogen
9  for at least one year before surgery can even be
10  considered," correct?
11    A    Correct.
12    Q    And they denied this grievance, right?
13    A    Yes.
14    Q    Are there any -- I know there are some grievances
15  about the provision of bras.  Did you review those?
16    A    Yes.
17    Q    Other than the provision of bras -- the
18  grievances about the provision of bras, are you aware of
19  any other grievances relating to sex reassignment surgery?
20    A    On Inmate Haverkamp's case?
21    Q    Yes.
22    A    I believe he filed multiple grievances about sex
23  reassignments.  I'm not sure how many.
24    Q    More than just these two?
25    A    I believe so, yes, sir.

Page 55

1    Q    Okay.  Were any of -- were all of those
2  grievances denied?
3    A    Yes.
4    Q    And did all those grievances go through similar
5  fact-finding processes at Level 1 and Level 2 with multiple
6  levels of investigation?
7    A    Yes, sir.  They should have been.
8    Q    So this denial of Haverkamp's Step 2 grievance
9  references G-51.11.  What's your understanding of the basis
10  for TDCJ's denial of this Step 2 grievance?
11    A    I'm not sure.  That would have to be referred
12  over to medical.  I'm not sure why it was denied.
13    Q    Okay.  You've been designated today to testify
14  about TDCJ's review of and responses to Haverkamp's
15  grievances.  I'm asking what the basis for this denial is.
16    A    The -- the CMHC policy does not prohibit the
17  surgery to happen.
18    Q    So what's the basis for the denial?
19    A    I have not discussed that with medical.  I'm not
20  sure.  I would have to refer that to the medical staff.
21    Q    You don't know the basis of the denial of the
22  Step 2 grievance?
23    A    No, sir.
24    Q    No, you don't know?
25    A    I do not know.

Page 56

1    Q    Is the basis for the denial of any of Haverkamp's
2  grievances the fact that Policy G-51.11 does not allow for
3  sex reassignment surgery as a treatment?
4    A    It does not prohibit for that to happen.
5    Q    Okay.  So why do these grievances cite
6  Policy G-51.11, if surgery is allowed?
7    A    I am not sure why it was denied.
8    Q    It's the only policy listed in the grievance
9  denial response, right?
10    A    Yes, sir.
11    Q    Are you aware of any sex reassignment surgery
12  taking place since you've been at TDCJ?
13    A    No, sir.  I do not recall one surgery taking
14  place.
15    Q    Are you -- strike that.
16          Does Policy G-51.11 allow for sex reassignment
17  surgery as a treatment for gender dysphoria?
18    A    It doesn't prohibit.  It doesn't specifically say
19  it's allowed.  It doesn't prohibit.
20    Q    Yeah, my question is different.
21          Does Policy G-51.11 allow for surgery for sex --
22  for sex reassignment surgery as a treatment for gender
23  dysphoria?
24          MR. CALB:  Objection.  Asked and answered.
25          His last answer was sufficient.

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:20-cv-00018     Document 343-4     Filed on 11/13/23 in TXSD     Page 17 of 48

Eric Guerrero
July 20, 2023

30(b)(6)

Page 57

1    Q    (BY MR. FACTOR)  You can answer.
2    A    The policy does not prohibit for the surgery to
3    happen.
4    Q    Okay.  My question is, does the policy allow it
5    to happen?
6    A    I don't believe it says it allows or denies for
7    the surgery to happen.
8    Q    So the policy is ambiguous?
9    A    It doesn't say.  It doesn't clarify.
10   Q    And as far as you know, there's been no sex
11   reassignment surgery as long as Policy G-51.11 has been in
12   place?
13   A    That's correct.
14   Q    Let's move to Topic 3, which is the --
15        MR. CALB:  Do you mind if we take a quick
16   break first?  It's been about an hour and a half.  Maybe a
17   quick bathroom break, five minutes.
18        MR. FACTOR:  Yeah, let's go off the record.
19        MR. CALB:  All right.
20        (A break was taken from 3:31 p.m. to 3:52 p.m.)
21        THE REPORTER:  Back on the record.
22   Q    (BY MR. FACTOR)  Mr. Guerrero, you understand
23   you're still under oath?
24   A    Yes, sir.
25   Q    You've been designated to testify on behalf of

Page 58

1    TDCJ with respect to Topic 3, which is, "The allegations in
2    Plaintiff's complaint and all issues identified in
3    Defendants' answers"; is that right?
4    A    Yes.
5    Q    What materials did you review to prepare for this
6    topic?
7    A    Again, just the -- part of the Safe Prisons
8    Procedures manual, some of the unit classification
9    procedures, some of our policies on laundry services, and,
10   of course, the grievances that were provided on his -- what
11   he submitted.
12   Q    Did you review the complaint?
13   A    Yes, I did.
14   Q    Did you review Defendant Linthicum's answer to
15   the complaint?
16   A    I would have to read it, if you have it with you.
17   I --
18   Q    You're not sure?
19   A    Not sure.
20   Q    Okay.  I'm going to share what I'll mark as
21   Exhibit 12.
22        (Exhibit No. 12 marked for identification.)
23   Q    (BY MR. FACTOR)  And this is plaintiff's Second
24   Amended Complaint filed in this matter.  And I'm sharing on
25   the screen the Complaint with you.

Page 59

1        In general, you understand that Haverkamp asserts
2    a constitutional claim based on TDCJ and UTMB's denial of
3    sex reassignment surgery as a treatment for gender
4    dysphoria, correct?
5    A    Is it in that specific report there?  The
6    constitutional --
7    Q    It is.  I'll point you to Paragraph 2 that
8    alleges "Haverkamp's constitutional rights have been and
9    continue to be violated by Defendants' continued and
10   consistent deliberate violation of her rights to equal
11   protection under the Fourteenth Amendment to the United
12   States Constitution."
13   A    Yes.
14   Q    Do you see that?
15   A    Yes.
16   Q    And I'm going to ask about a few different
17   allegations in this complaint.
18        I'm going to start with Paragraph 44.  And this
19   says, "Due to the natural progression of the prescribed
20   treatment provided to plaintiff by defendants, plaintiff is
21   similarly situated to cisgendered female who requires
22   vaginoplasty surgery."
23        Do you see that?
24   A    Yes.
25   Q    Defendants have denied that Haverkamp is

Page 60

1    similarly situated to a cisgender female.  Do you
2    understand that?
3    A    I see that's what's written in there, that he is
4    cisgender female, yes.
5    Q    Okay.  And do you agree that because of the
6    hormones that Haverkamp has received, that Haverkamp has
7    been chemically castrated?  Do you agree with that?
8        MR. CALB:  Objection.  That's a medical -- I
9    don't know what medical -- what terms -- that is a medical
10   term, but it seems like a medical determination that you're
11   asking him about.
12        THE WITNESS:  Yeah.  I do not know.
13   Q    (BY MR. FACTOR)  Okay.  I'm going to look at
14   Paragraph 51.  And it's the second sentence that says,
15   "Although Policy G-51.11 is silent as to gender
16   reassignment surgery, the committee and the TDCJ enforce
17   the policy in a manner that gender reassignment surgery is
18   never allowed."
19        Do you see that allegation in the complaint?
20   A    Yes.
21   Q    And do you agree that TDCJ enforces
22   Policy G-51.11 in a manner such that gender reassignment
23   surgery is never allowed?
24   A    Can you ask that question one more time.
25   Q    Yeah.

HAVERKAMP, v.
LANETTE LINTHICUM

Case 4:20-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 18 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

Page 61

1    MR. FACTOR: Ms. Court Reporter, could you
2    read it back.
3        (WHEREUPON, the court reporter read back the
4        question).
5        THE WITNESS: That is written in the
6    Complaint. I would -- it has not been approved. I'm not
7    saying that it was -- it hasn't been allowed.
8    Q    (BY MR. FACTOR) I'm not sure I understand that
9    response.
10        Do you agree that TDCJ enforces the policy in a
11    manner such that -- such that gender reassignment surgery
12    is never allowed?
13    A    The policy does not prohibit from the -- for a
14    gender reassignment surgery.
15    Q    That is an answer to a question.
16        My question is whether TDCJ enforces the policy
17    in a way such that surgery is never allowed?
18    A    I don't think so. I think they would allow it if
19    they thought necessary.
20    Q    So your testimony is that TDCJ enforces
21    Policy G-51.11 that allows for sex reassignment surgery; is
22    that right?
23    A    I think TDCJ Health Services would enforce the
24    policy that's written. That's more of a medical question.
25    I would defer to them. But TDCJ, we would enforce whatever

Page 62

1    is provided to us from Health Services or UTMB.
2    Q    I think my question's little bit different.
3        I'm asking if TDCJ enforces this policy in a way
4    that allows inmates to receive sex reassignment surgery.
5    Yes or no?
6        MR. CALB: Objection. Asked and answered.
7        You can answer.
8    Q    (BY MR. FACTOR) You can answer.
9    A    I believe TDCJ enforces the policies, and it
10    could or could not allow the surgery. Doesn't, again,
11    prohibit from it to happen.
12    Q    So you said "could or could not allow the
13    surgery." Which one is it? Is it could allow or could not
14    allow?
15    A    I'm not an expert in medical. I know it'd be
16    deferred to them. Depending, I would assume, on the
17    condition of the individual, it could or could not be
18    allowed. Again, I'm not a medical expert.
19    Q    You don't know how TDCJ enforces this policy one
20    way or another?
21    A    Not the TDCJ Health Services or UTMB, no, sir.
22    Q    And there's another claim that "Defendants
23    continue to deny Haverkamp necessaries and commissary items
24    that are available to similarly situated female inmates,
25    including a long-hair pass, panties, appropriate clothing,

Page 63

1    cosmetics, and other hygiene items."
2        Do you see that allegation?
3    A    Yes.
4    Q    And do you agree that Haverkamp has not been
5    provided a long-hair pass, panties, or other hygiene items?
6    A    When this was submitted, long hair was not
7    allowed for the male population. It is now. But we do not
8    provide panties or cosmetics or hygiene to the male
9    population.
10    Q    Okay. So let's break that down.
11        So Haverkamp has been given a long-hair pass; is
12    that right?
13    A    I am not sure.
14    Q    Okay. Has Haverkamp been given panties?
15    A    No.
16    Q    Okay. Has Haverkamp been given cosmetics?
17    A    No.
18    Q    Has Haverkamp been given other hygiene items?
19        MR. CALB: Objection. Ambiguous.
20        THE WITNESS: Not that I'm aware of.
21    Q    (BY MR. FACTOR) I'm going to share what I'll
22    mark as Exhibit 13.
23        (Exhibit No. 13 marked for identification.)
24    Q    (BY MR. FACTOR) And this is Lannette Linthicum's
25    answer to Haverkamp's complaint. Do you recognize this

Page 64

1    document?
2    A    Yes.
3    Q    And Dr. Linthicum is the defendant who represents
4    TDCJ in this lawsuit. Do you understand that?
5    A    Yes.
6    Q    Were you involved in preparing the answer to this
7    Complaint?
8    A    No, sir. Not that I'm aware of.
9    Q    You weren't involved in preparing this document?
10    A    No, sir.
11    Q    And you've reviewed this document before today?
12    A    Yes.
13    Q    This is Paragraph 3 of Defendant Linthicum's
14    answer. It says, "Defendant denies that she violated
15    Haverkamp's rights to equal protection under the Fourteenth
16    Amendment" and denies that Haverkamp is similarly situated
17    to cisgendered females.
18        Do you see that?
19    A    Yes.
20    Q    What's the basis for the denial that Haverkamp is
21    similarly situated to cisgendered females?
22    A    I could not answer for Dr. L.
23    Q    You don't know the basis for this denial in this
24    answer?
25    A    No, sir.

Page 65

1    Q   And what's the basis for the denial that
2  Defendant Linthicum has violated Haverkamp's equal
3  protection rights?
4         MR. CALB:  Objection.  That's a legal
5  question.
6    Q   (BY MR. FACTOR)  To the extent you know.
7    A   I do not know why she states she does not -- she
8  has not denied his -- his equal protection rights.
9    Q   Did you speak with Dr. Linthicum about this
10 answer?
11   A   I did not.
12   Q   Okay.  Paragraph 18.  "Defendant denies that
13 Haverkamp has been denied any necessary medical treatment."
14       What is the basis for this statement in
15 Linthicum's answer that Haverkamp has not been -- sorry,
16 strike that.
17       What is the basis for this Paragraph 18 of
18 Defendant Linthicum's answer?
19   A   I have not talked to Dr. Linthicum, so I'm not
20 sure why she would provide that statement.
21   Q   Okay.  You don't know sitting here today as the
22 designated representative of TDCJ?
23   A   I don't know -- I do not know why she stated that
24 in her response.
25   Q   You do not know the basis of Paragraph 18 of this

Page 66

1  answer on behalf of TDCJ; is that right?
2    A   Correct.
3    Q   Paragraph 24 states, "Defendant admits that WPATH
4  purports to publish standards of care and maintain that
5  this publication speaks for itself."
6         Do you see that first sentence of Paragraph 24?
7    A   Yes.
8    Q   The second sentence of Paragraph 24 says,
9  "Defendant denies that there is any recognized consensus
10 concerning the treatment of gender dysphoria as alleged..."
11       What is the basis for TDC's -- -CJ's position
12 that there is not any recognized consensus concerning the
13 treatment of gender dysphoria?
14   A   My expertise is not in medical.  I would not know
15 why they would put that in the report.
16   Q   As the designated representative for TDCJ with
17 respect to Topic 3, which is -- includes "all issues
18 identified in Defendants' answers," as it relates to TDCJ,
19 you do not know the basis of the statement and the answer
20 that defendant "denies there is any recognized consensus
21 concerning the treatment of gender dysphoria as alleged" in
22 Paragraph 24, correct?
23   A   Correct.
24   Q   "Correct" that you don't know the basis for this
25 sentence?

Page 67

1    A   That's correct.  I do not.
2    Q   And it's repeated again.  "Defendant denies that
3  there is any recognized consensus concerning the treatment
4  of gender dysphoria as alleged in Paragraph 26."
5         You, as the designated representative of TDCJ, do
6  not know the basis for this sentence and the answer,
7  correct?
8    A   Correct.
9    Q   It's repeated again.  "Defendant denies there is
10 any recognized consensus concerning the treatment of gender
11 dysphoria."
12       You do not know the basis for this sentence in
13 Paragraph 27 of Defendant Linthicum's answer; is that
14 right?
15   A   That's correct.
16   Q   When was the long-hair policy changed?
17   A   In 2022.
18   Q   Do you know what month?
19   A   I believe it was June.
20   Q   Okay.  Well, as of the date this answer was
21 filed, "Defendant admits that she has not provided
22 Haverkamp with a long-hair pass, panties, or cosmetics" as
23 of July 11th, 2022; is that correct?
24   A   Long-hair passes are not needed according to the
25 new policy.

Page 68

1    Q   Okay.  As of July 11th, 2022, Defendant had not
2  provided Haverkamp with panties, correct?
3    A   Correct.
4    Q   Or cosmetics, correct?
5    A   Correct.
6    Q   Still haven't provided either of those things,
7  right?
8    A   That's correct.
9    Q   Okay.  Paragraph 46.  The allegation in the -- or
10 the answer says at Paragraph 46, "Defendant denies that
11 Haverkamp has been denied any medically-necessary
12 treatment."
13       What's the basis for this sentence?
14   A   I'm not sure.
15   Q   Again, as the designated representative of TDCJ,
16 you do not know the basis for Paragraph 46 of this answer,
17 correct?
18   A   Correct.
19       MR. CALB:  Ace, maybe I -- maybe I can
20 clarify something.  In the 30(b)(6) witness designation
21 responses, when we said that Dr. Murray was going to answer
22 on this topic with respect to UTMB, it should have been
23 clearer in saying UTMB and/or TDCJ Health Services because
24 they both coordinate healthcare.  We were talking about Mr.
25 Guerrero for anything non-medical, more generally, not just

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:21-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 20 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

Page 69

1  non-UTMB.

2  MR. FACTOR: I'm going to introduce what

3  I'll mark as -- this has previously been marked as

4  Exhibit 1.

5  (Exhibit No. 1 marked for identification.)

6  Q  (BY MR. FACTOR) And, Mr. Guerrero, you see Topic

7  No. 3, "The allegations in Plaintiff's complaint and all

8  issues identified in Defendants' answers"?

9  A  Yes.

10  Q  The person designated is Eric Guerrero as it

11  relates to TDCJ; is that correct?

12  A  Yes.

13  Q  And it doesn't say anything about medical

14  treatment, does it?

15  A  It does not.

16  Q  It just says "TDCJ," right?

17  A  Yes.

18  Q  Going back to Exhibit -- sorry -- Exhibit 13.

19  Paragraph 56 states, "Defendant denies that

20  gender reassignment surgery is medically necessary."

21  What's the basis for this sentence in this

22  answer?

23  A  I do not know.

24  Q  As the designated representative for TDCJ, you do

25  not know the basis for the first sentence of Paragraph 56,

Page 70

1  correct?

2  A  I would refer that to our medical staff.

3  Q  Sitting here today, you do not know, correct?

4  A  Correct.

5  Q  What's the basis for this statement that

6  "Defendant denies that this Court has jurisdiction to

7  determine the standard of care for gender dysphoria as any

8  decision on this issue is foreclosed by Gibson v. Collier"?

9  A  I do not know.

10  Q  As the designated representative for TDCJ on all

11  issues identified in Defendants' answer, you do not know

12  the basis for this sentence highlighted in Paragraph 56,

13  correct?

14  A  That's correct.

15  Q  What's the basis for Paragraph 60, TDCJ's

16  affirmative defense that "Haverkamp has failed to state a

17  claim under 42 U.S.C. 1983"?

18  MR. CALB: Objection. That's a legal

19  question.

20  Q  (BY MR. FACTOR) You can answer, if you know.

21  A  I do not know.

22  Q  What's the basis for the denial that Defendant

23  Linthicum "...is a jural entity capable of suing or being

24  sued"?

25  MR. CALB: Objection. That misstates the

Page 71

1  paragraph. It says, "The defendant in her official

2  capacity as a member of CMHCC" is a jural entity.

3  Q  (BY MR. FACTOR) Okay. What's the basis for

4  Paragraph 61?

5  A  I do not know. I didn't talk to Dr. Linthicum.

6  Q  What's the basis for this assertion that "...any

7  claim premised upon a disagreement with medical treatment

8  will not support constitutional dimension under

9  42 U.S.C. 1983"?

10  MR. CALB: Objection.

11  Again, that's a legal question.

12  MR. FACTOR: I've -- I'm asking about the

13  basis for the statements in TDCJ's answer.

14  Q  (BY MR. FACTOR) You can answer, if you know.

15  A  I do not know.

16  Q  What's the basis for the defense that plaintiff

17  lacks standing to bring suit for the relief requested?

18  A  I'm not sure.

19  Q  What's the basis for the statement at

20  Paragraph 66 that "Defendant denies that any actions

21  attributable to her in their official capacities were

22  motivated by any discriminatory intent of any kind"?

23  A  I would assume as a medical professional she

24  would provide medical care to any individual.

25  Q  Do you know -- okay.

Page 72

1  And this is a defense about that the "Eighth

2  Amendment is the exclusive constitutional claim for suits

3  brought by inmates claiming that they are not receiving

4  required medical treatment and, because this claim has

5  already been adjudicated, this suit is barred by Gibson v.

6  Collier."

7  What's the basis for this defense?

8  A  Not sure.

9  Q  Paragraph 68. "Defendants assert that any

10  actions attributable to them in their official capacities

11  were taken for valid and legitimate non-discriminatory

12  reasons in the context of medical standards of care."

13  What's the basis for that defense?

14  A  Again, just they would provide medical care to

15  the staff within TDCJ custody.

16  Q  Okay. What's the basis for this defense at

17  Paragraph 69 that "Haverkamp has failed to mitigate her

18  damages"?

19  A  Not sure.

20  Q  Do you know anything about the Ex Parte Young

21  exception to Eleventh Amendment immunity?

22  A  I do not.

23  Q  Paragraph 75 states that "Haverkamp has failed to

24  exhaust his administrative remedies as required pursuant to

25  42 U.S.C. 1997e(a)."

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:21-cv-00018   Document 343-4   Filed on 11/13/23 in TXSD   Page 21 of 48

Eric Guerrero
July 20, 2023

30(b)(6)

Page 73

1    What remedies has Haverkamp failed to exhaust?
2    A   I'm not sure in reference to 42 U.S.C. 1997.
3    Q   Okay.  In general, what remedies does TDCJ claim
4 that Haverkamp has failed to exhaust?
5    A   I'm not sure.
6    Q   You don't know?
7    A   No.
8    Q   And you looked at all of Haverkamp's grievances.
9 Were there any additional grievance policies that Haverkamp
10 needed to follow but didn't?
11    A   Not that I can recall.
12    Q   You don't know sitting here today?
13    A   We follow the grievance procedures as -- as -- as
14 written following Step 1 and Step 2.
15    Q   And you don't know of any other administrative
16 remedies that Haverkamp needed to exhaust in order to file
17 suit, right?
18    A   No, sir.
19    Q   Do you know whether TDCJ has made any
20 determinations regarding whether sex reassignment surgery
21 is an elective surgery?
22    A   Can you say that one more time.
23    Q   I kind of forgot what I had just said.
24       MR. FACTOR:  Could you read it back,
25 Ms. Court Reporter.

Page 74

1       THE REPORTER:  Yes.
2       (WHEREUPON, the court reporter read back the
3       question).
4       THE WITNESS:  I would refer that to UTMB
5 Medical Branch, our university partners.
6    Q   (BY MR. FACTOR)  But as the representative of
7 TDCJ, you don't know whether TDCJ has made any
8 determinations that sex reassignment surgery is elective
9 surgery?
10    A   We're not saying that it's prohibited.  We --
11 that's -- that's something that we will refer to our
12 medical partners.
13    Q   Yeah.  My -- my question is whether TDCJ has made
14 any determination that sex reassignment surgery is elective
15 surgery.
16    A   Not that I'm aware of.
17    Q   And I'm going back to Exhibit 13.  And I just
18 want to confirm that, sitting here today, you do not know
19 the basis for this highlighted sentence that says,
20 "Defendant denies that Haverkamp was denied any necessary
21 medical treatment"; is that right?
22    A   I would have to refer that to medical.  I'm not
23 sure what medical treatment was provided or was not
24 provided.
25    Q   You don't know sitting here today?

Page 75

1    A   I do not know what type of treatment was
2 provided.
3    Q   So you don't know the basis for this denial at
4 Paragraph 11 that says Defendant denies Haverkamp was
5 denied any necessary medical treatment, right?
6    A   That's correct, I do not.
7    Q   Moving on to Topic 5, you've been designated to
8 testify on behalf of TDCJ regarding Topic 5, which is
9 "Policies, procedures, protocols, memoranda, circulars,
10 training materials, or other agency guidance relating to
11 transgender inmates or inmates experiencing gender
12 dysphoria"; is that right?
13    A   That's correct.
14       Could we take one five-minute break real quick?
15    Q   Sure.
16       THE REPORTER:  We are off the record.
17       (A break was taken from 4:27 p.m. to 4:39 p.m.)
18       THE REPORTER:  On the record.
19    Q   (BY MR. FACTOR)  Let's go -- you understand
20 you're still under oath, Mr. Guerrero?
21    A   Yes.
22    Q   Let's move to Topic 16, which is "All unit
23 transfers of Plaintiff and TDCJ's review and responses to
24 any transfer requests."
25       Are you prepared to testify about that topic

Page 76

1 today?
2    A   Yes.
3    Q   Since at least 2019, Haverkamp was housed in the
4 Stiles Unit in Beaumont, correct?
5    A   Correct.
6    Q   Haverkamp's deposition in this matter was
7 initially scheduled to take place on February 21st, 2023,
8 at the Stiles Unit, correct?
9    A   Yes.
10    Q   And after Haverkamp had lived at the Stiles Unit
11 for many years, Haverkamp was transferred to the Connally
12 Unit on February 20th, 2023; is that correct?
13    A   That sounds about right, the date.
14    Q   Like, one day before his deposition?
15    A   I believe so, yes, sir.
16    Q   And the Connally Unit is about 200 miles away
17 from the Stiles Unit, right?
18    A   Approximately, yes, sir.
19    Q   Was Haverkamp's transfer the day before his
20 scheduled deposition have anything to do with this lawsuit?
21    A   No, sir.
22    Q   What were the circumstances that resulted in
23 Haverkamp's unit transfer the day before his scheduled
24 deposition?
25    A   We were moving several inmates from the Stiles

Page 77

1   Unit. I can't remember approximately how many were moved.
2   I believe it was over 100 inmates was removed from Stiles
3   over to Connally to redesignate the population at the
4   Stiles Unit.
5          And we just looked at individuals in the housing,
6   just -- didn't look at names. We just transferred them
7   from the Stiles to Connally.
8     Q   And why the timing, February 20th, 2023? What
9   were the circumstances behind that day?
10    A   There was a discussion prior to that to move
11  inmates from one facility to another, specifically Stiles
12  to Connally. We have to coordinate with our inmate
13  transportation department to see when they have staff and
14  buses available. And when that discussion came about,
15  about moving inmates from Stiles to Connally, that was the
16  available date.
17    Q   Okay. And on April 5th, 2023, Haverkamp
18  requested a unit transfer from the Connally Unit to the
19  Hughes Unit; is that right?
20    A   I don't remember that request.
21    Q   Are you aware of any unit transfer requests from
22  Haverkamp?
23    A   Not that I can remember. No, I -- no, I think I
24  was -- yes, I think there was a request. I'm not sure
25  exactly how that request was submitted.

Page 78

1     Q   I submitted the request through counsel,
2   Mr. Garcia --
3     A   Okay.
4     Q   -- on behalf of Haverkamp.
5          Does that refresh your recollection?
6     A   Yes.
7     Q   And what was your involvement with reviewing
8   Haverkamp's transfer request?
9     A   The only thing I could remember at the time was
10  that he was appropriately housed at the Connally Unit.
11    Q   Okay. Did you review the unit transfer request?
12    A   I don't remember if it was an official document
13  from Mr. Garcia or if it was verbal. I can't remember how
14  the request was brought to my attention.
15    Q   It may have been an e-mail from me to Mr. Garcia.
16         But you remember receiving some documentation or
17  a phone call about a unit transfer request, right?
18    A   I do remember something, yes.
19    Q   Did you approve Haverkamp's transfer request to
20  go to the Hughes Unit?
21    A   I believe when I talked to Mr. Garcia, I
22  mentioned that he was appropriately assigned to --
23         MR. CALB:  I'm going to object.
24         Your discussions with Mr. Garcia were
25  privileged. Please don't discuss them.

Page 79

1     Q   (BY MR. FACTOR) What was your decision on
2   Haverkamp's unit transfer request?
3     A   My decision was he was appropriately housed.
4     Q   In the Connally Unit?
5     A   At the Connally Unit where he was at.
6     Q   And did you ever approve a request from Haverkamp
7   to be transferred to the Hughes Unit?
8     A   I don't -- I did not approve a request. He was
9   just appropriately housed at Connally.
10    Q   Well, did you ever agree with a recommendation to
11  move Haverkamp to the Hughes Unit?
12    A   No.
13    Q   Did you ever consider that request?
14    A   When requests are submitted, I review to see if
15  they're appropriately housed.
16    Q   So what's your understanding for the basis of the
17  denial of Haverkamp's unit transfer request to the Hughes
18  Unit?
19    A   That he meets the requirement as his custody. We
20  have that type of custody and those type of inmates at the
21  Connally Unit.
22    Q   And did you ever tell anybody that Haverkamp had
23  been approved to move to the Hughes Unit?
24    A   That he was approved to move to the Hughes Unit?
25  No, sir.

Page 80

1     Q   You never told anybody that Haverkamp could move
2   to the Hughes Unit?
3     A   That he could move to the unit.
4     Q   Did you ever -- I'm not trying to be tricky here.
5          Did you ever agree that Haverkamp would be
6   allowed to move to the Hughes Unit?
7     A   Well, the Hughes Unit is a facility that we do
8   have all custodies and have transgender and safekeeping.
9   That's the same case at the Connally Unit where he was
10  housed and where he's currently housed.
11    Q   And did you discuss with anyone that Haverkamp
12  would be allowed to move to the Hughes Unit?
13    A   His -- his custody would allow him to be moved to
14  the Hughes Unit.
15    Q   Well, I was told that a unit transfer request had
16  been approved for the Hughes Unit. And what I'm trying to
17  understand is what the basis for that was.
18    A   I'm not aware that his transfer was approved from
19  Connally to Hughes.
20    Q   Okay. Well, what's the basis for, you know, the
21  representation by Mr. Garcia to me that the unit transfer
22  request had been approved?
23    A   Can you ask that one more time.
24    Q   Yeah.
25         MR. FACTOR:  Ms. McDaniel, could you read it

Page 81

1  for me.
2         (WHEREUPON, the court reporter read back the
3  question).
4         THE WITNESS:  Yeah, the basis would be the
5  security -- custody con-- -- and control and custody of
6  the -- of Inmate Haverkamp.  He -- he could be assigned to
7  the Hughes Unit.  But, again, there was not a approval that
8  was -- that I know of was provided saying he should be
9  moved from Connally over to the Hughes facility.
10     Q    (BY MR. FACTOR)  Who made the final decision on
11  that unit transfer request?
12     A    That was a discussion that was brought to me
13  about he was appropriately housed at Connally.
14     Q    Okay.  Who made the decision that he was
15  appropriately housed at Connally in that discussion you
16  just referenced?
17     A    I did.
18     Q    Well, who brought it to you?
19     A    I believe it was Mr. Garcia.
20     Q    So you made the final decision that the unit
21  transfer request would be denied, right?
22     A    I made the decision upon reviewing his custody
23  and the type of inmates we have at the Connally Unit was
24  appropriate for him to stay at.
25     Q    And who had the final decision?  Was that -- who

Page 82

1  else was involved with that decision?
2     A    I'm not sure if anybody else was involved in that
3  decision.
4     Q    Just you and Mr. Garcia?
5     A    I believe so.
6     Q    So you had the final say, you weren't overruled
7  by anyone?
8     A    No, sir.
9     Q    Has Haverkamp ever posed a security threat to
10  other inmates?
11     A    I would have to look at his disciplinary history.
12     Q    Any that you know of sitting here today?
13     A    Not without looking at his disciplinary history.
14     Q    So you're not aware of anybody at TDCJ ever
15  approving a unit transfer request from Haverkamp?
16     A    Not that I'm aware of.
17     Q    Informally or otherwise?
18     A    No, sir, not that I'm aware of.
19     Q    Okay.  Moving on to Topic 17, "All
20  transportation, accommodation, housing, and safekeeping
21  classifications of Plaintiff and inmates with gender
22  dysphoria."
23         Are you prepared to testify about this topic
24  today?
25     A    Yes.

Page 83

1     Q    Haverkamp is classified as a G2 safekeeping
2  inmate; is that right?
3     A    Safekeeping would be designated as P2, but
4  it's -- it is a G2 minimum custody that we have.  But
5  safekeeping is a P2 custody.
6     Q    So Haverkamp is P2?
7     A    Yes.
8     Q    And what does that designation mean?
9     A    So we have different levels within our
10  classification plan.  G1, G2 -- it's G2 -- the number 2 is
11  Level 2 and it goes up to 5.  So Level 2, Level 3, Level 4,
12  Level 5.  Same thing with our safekeeping, it's P2 through
13  P5.  P2, P3 is our minimum custody inmates, and then P4 --
14  P5 is -- P1 through P4 -- P3, I'm sorry, is minimum
15  custody.  P4 is medium custody, and then P5 would be our
16  closed custody designation.
17     Q    Okay.  So in the scale from 2 to 5, 2 is minimum
18  and 5 is, you know, most threatening or worst, so to speak?
19     A    They just have a -- more of a disciplinary --
20  recent disciplinary violation.
21     Q    Okay.  And so Haverkamp is at the lowest
22  safekeeping classification; is that right?
23     A    That's correct.
24     Q    In that Haverkamp has had few or no disciplinary
25  violations, right?

Page 84

1     A    I would have to look at his disciplinary screen
2  to see how many disciplinary violations he has had.
3     Q    But P2 is lowest safekeeping designation there
4  is, right?
5     A    Yes.
6     Q    I'm sharing what I'll mark as Exhibit 14.
7         (Exhibit No. 14 marked for identification.)
8     Q    (BY MR. FACTOR)  And on the screen, this is --
9  it's an e-mail that you received.  "Subject:  Transgender
10  list."  And says, "FYI, please see the updated transgender
11  report."
12         What is the transgender report?
13     A    I believe that document just tells us how many
14  transgenders we have on each facility.
15     Q    And what's the purpose of this transgender report
16  or transgender list?
17     A    Just to help us know where we have transgenders
18  located so we can ensure that the wardens and the staff on
19  that facility is following our policies on whatever
20  security practices and procedures for transgender inmates.
21     Q    Who all receives this report?
22     A    The three individuals there is myself and the two
23  other deputy directors.  Of course, you see also there
24  Chris Black-Edwards.  I don't know her official title, but
25  she's a deputy director in Health Services.  It looks like

## Page 85

1   Bev -- I think it's Beverly Echols is a UTMB employee, and

2   then when we get that list, in most cases we forward that

3   to the regional directors and in some cases forward it to

4   the wardens.

5    Q   And Dr. Linthicum also gets this report?

6    A   Oh, yes, sir.

7    Q   And I don't think I actually have the one

8   attached to this e-mail, but I'm going to share a similar

9   one that I'll mark as Exhibit 15.

10    (Exhibit No. 15 marked for identification.)

11    Q   (BY MR. FACTOR) And the cover e-mail kind of has

12   a summary. But does this summary accurately show that at

13   least as of the date of this report, March 2019, there were

14   926 transgender inmates in TDCJ population?

15    A   Yes, sir.

16    Q   And then the attachment is a -- it's a redacted

17   spreadsheet. And what I'm curious about are all of these

18   different levels of the description in this category that

19   I'm looking at right here in the middle of the page.

20   I think these are all the different

21   classifications of transgender inmates; is that right?

22    A   I can't read the first five lines. They're real

23   blurry --

24    Q   Yeah, I can't really either. I think they say

25   admin seg security Detention Level 1, admin seg security

## Page 86

1   Detention Level 2, admin seg security Level 3. But, yeah,

2   it's a little blurry.

3    A   Yeah, that's -- that's all our custodies for the

4   most part that would have transgenders in that custody.

5    Q   So what are all these classifications? This

6   is just a summary of all the different transgender inmates

7   and what their classifications are?

8    A   Yes, sir. It's a P2 through P7 or a safekeeping

9   custody code we have within our prison system.

10    Q   And Haverkamp is in the safekeeping Level 2; is

11   that right?

12    A   Yes, sir.

13    Q   And what are these codes over here, these --

14   these ones on this side of the spreadsheet?

15    A   That's the unit code.

16    Q   Okay. And what is the Frequency?

17    A   I would think that would be the number we

18   currently have there at that facility at that time.

19    Q   And the Percent is the percentage of unit that is

20   transgender; is that right?

21    A   I believe that's -- that facility, DU, I believe

22   houses a little over 1,000 inmates. So if we had 6, I'm

23   not sure if that percentage adds up.

24    Q   Okay.

25    A   I'm not sure exactly back in 2019 what that

## Page 87

1   referred to.

2    Q   And what is this Management Operations

3   Transgender List used for?

4    A   Just sharing information to -- again, to the

5   deputy directors, the regional directors, and the wardens

6   of how many inmates we have transgender within our custody.

7    Q   And what's it used for?

8    MR. CALB: Objection. Asked and answered.

9    THE WITNESS: Just another document that we

10   have to advise us what -- what type of inmates we have

11   within our prison system.

12    Q   (BY MR. FACTOR) Any other uses other than just

13   to be aware of how many transgender folks there are in

14   prison?

15    A   So we have a Safe Prison department. They may

16   track the number of transgender we have within our custody.

17    Q   And they put together this report?

18    A   I believe so.

19    Q   What are the policies for classifying transgender

20   inmates as between safekeeping and general population?

21   Is there a special policy or procedure for

22   transgender classification?

23    A   Well, the inmates have the ability to inform

24   staff if they want to identify themselves as transgender.

25   That could be done on the facilities that he's at to an

## Page 88

1   office or a staff member. That could be done during the

2   intake processing with our Safe Prison staff on the

3   facility. So different -- different ways they can inform

4   us.

5   If they feel that they want to be -- or consider

6   to be transgender, that can be sent by an official -- I60

7   in a request to official indicating they want to identify

8   themselves as transgender.

9   When you're talking about safekeeping, if they

10   want to request safekeeping, that is seen by a unit

11   classification committee. And there is a policy that looks

12   at different things, and they have the ability to recommend

13   placement into safekeeping status, and that is sent to our

14   state classification committee for review.

15    Q   Okay. And what policies govern that

16   classification process?

17    A   It's going to be a classification procedures

18   manual.

19    Q   Maybe a unit -- TDCJ Protective Safekeeping Plan?

20   Does that seem about right?

21    A   That's protective safekeeping. That's a

22   different status.

23    Q   Oh, okay. There's safekeeping and then there's

24   protective safekeeping?

25    A   Yes, sir.

Page 89

1  Q   What's the difference?
2  A   Protective safekeeping is a custody that -- that
3  we feel needs to have the most protection for the
4  individual.  He is placed in a single cell.  It's more of a
5  controlled environment where he is escorted wherever he
6  needs to go.  Where the regular safekeeping is a general
7  population status where they could be double-celled, they
8  could go to education with other inmates, to chapel
9  services, chow halls, and so on.
10  Q   Got it.
11      And what about housing of transgender offenders?
12  How does that work whenever a new transgender inmate comes
13  into TDCJ custody?
14  A   They're housed within their custody that they are
15  given.  We do not separate transgender to a specific
16  housing area.  So if they are a G2, they will live with
17  other G2s, not necessarily living with another transgender.
18  You may have some transgenders in the housing area, but
19  you're housed with other similar custody.  If you're G2 or
20  G3 or G4, you live with that group.
21  Q   Okay.  So if -- I guess what policies govern
22  whether transgender inmates are housed in male facilities
23  or female facilities?
24  A   So the individual, when he comes into our
25  custody, if they're designated as a male, they go to our

Page 90

1  male facilities.
2  Q   Well, and how do they make that determination?
3  A   How do they make that determination?
4  Q   How does TDCJ make that determination?
5  A   If I can recall, it's off the birth certificate.
6  It identifies what they were born, what type of genitalia
7  they were born with.  That's the facility they'll be going
8  to.
9  Q   Okay.  So the TDCJ policy goes with the birth
10  certificate?
11  A   I believe so.  Whatever they were born with,
12  that's the facility they'll be assigned to.
13  Q   What about policies for postoperative people who
14  come into TDCJ custody?  How would those folks get housed,
15  people who have already transitioned?
16      MR. CALB:  Objection to relevance, since
17  there's no postoperative transgender person at issue in
18  this case.
19      MR. FACTOR:  Relevant to Topic 17 about
20  housing classifications for inmates with gender dysphoria.
21      THE WITNESS:  We have not had anybody come
22  into our custody with that type of surgery.  They would
23  come in as whatever they were born with to that specific
24  facility.
25  Q   (BY MR. FACTOR)  Okay.  So TDCJ hasn't had a

Page 91

1  postoperative person come into TDCJ custody yet?
2  A   Not that I'm aware of, no, sir.
3  Q   But if they did, they would be assigned to the
4  unit based on their birth certificate; is that right?
5  A   What they were born with, yes, sir.
6  Q   Is there a policy about that written down
7  anywhere?
8  A   I am not sure.
9  Q   Don't know?
10  A   I don't know off the top of my head.
11  Q   Let's talk about Topic 5, which is "Policies,
12  procedures, protocols, memoranda, circulars, training
13  materials, or other agency guidance relating to transgender
14  inmates or inmates experiencing gender dysphoria."
15      I understand that you've been designated to
16  testify about this topic just as it relates to correctional
17  officer training; is that right?
18  A   Yes, sir.
19  Q   What type of training does TDCJ provide with
20  respect to correctional officers who deal with transgender
21  inmates?
22  A   So we have a Pre-Service Academy that is almost
23  six weeks long that every correctional officer goes to
24  prior to being assigned to a unit.  And then once a year
25  after that, they go through an inservice, kind of a

Page 92

1  refresher over certain policies.  And then we have post
2  orders within our facility for the correctional staff.
3  Some of that training in the Pre-Service Academy is just
4  making them aware that we do have different types of
5  inmates within our custody but to treat them all the same,
6  you know, basically.
7      But, you know, there is policy that talks about
8  transgenders that they must be showered separately and not
9  in view of other individuals, but basically to be aware of
10  the different type of inmates, the custody, you know, if
11  they are G2 or P2.  And then, of course, if the level is --
12  is higher, then -- then they would be aware that those
13  individuals have a disciplinary history and would need more
14  security in that area to manage that type of population.
15  Q   Okay.  So there's a pre-service training.
16  Anything else?
17  A   We do have what we call on-the-job training after
18  they arrive to a facility.  Again, going over some basic
19  procedures.  When you get on to a facility, you are
20  aware -- if it's a safekeeping housing area, each staff
21  knows where they have housing rosters that would indicate
22  what type of custody is in that specific cellblock or
23  housing area.  And if they would see a P2 or a P3 or P4,
24  that officer would know that that's a safekeeping inmate in
25  that area.

HAVERKAMP v.
LANETTE LINTHICUM

Case 1:20-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 26 of 48
30(b)(6)

Eric Guerrero
July 20, 2023

Page 93

1    So that's kind of the different trainings we have
2  for them currently.
3    Q   And I've seen these operation manuals for Safe
4  Prisons/PREA operation manuals that have rules for special
5  population codes and how to handle classifications.
6        Are there any types of training manuals or other
7  documents that are created specifically relating to
8  transgender inmates other than these PREA operation
9  manuals?
10    A   So the PREA standards, our Safe Prisons
11  department reviews all those PREA standards.  So there
12  might be some Safe Prison policy that specifically talks
13  about transgender inmates and how we are supposed to manage
14  that style of population on the facility.
15        Transgender safekeeping, our Safe Prison plan,
16  our Safe Prison policies talk about during intake that --
17  that we refer them to mental health.  Once they are --
18  identify themselves as transgender, I believe there is some
19  Safe Prison procedures that discuss specific training for
20  the staff to follow.
21    Q   The Safe Prison procedures discuss specific
22  training that the staff needs to follow, but there's no,
23  like -- I don't know -- a training manual or some document
24  that's created and given to correctional officers about --
25  specific to training for transgender inmates?

Page 94

1    A   So the -- so the Safe Prison plan or policies,
2  that I can recall, doesn't refer to a specific training.
3  It just tells us how to manage the different custodies
4  within our facility.  We -- we train our staff to treat
5  them all the same, you know.  No -- we have -- of course,
6  we have male inmates on male facilities and females on
7  female facilities, and there are some different
8  security-related policies I guess we can -- I don't want to
9  say "policies."  That's the wrong word.
10        There are some different securities that we --
11  understand there's different security issues on female
12  facilities compared to male facilities.
13    Q   Right.  And I get all that.  I'm just asking
14  whether you're aware of or have ever seen, like, a specific
15  training given to correctional officers about interacting
16  with transgender inmates.
17    A   There's a training curriculum on special
18  populations that just talks about, again, the type of
19  inmates we have in our custody and that we need to be aware
20  of who they are in the housing areas and make sure we
21  follow the Safe Prison or PREA guidelines.
22    Q   Okay.  And is that publicly available?
23    A   I don't -- I'm not sure if it's publicly
24  available.
25    Q   Okay.  I can follow up about that later.

Page 95

1    Q   Okay.  Are you aware of any other correctional
2  officer training, policies, procedures, protocols,
3  memoranda, or training materials relating to transgender
4  inmates other than the ones we've talked about?
5    A   The officer post orders might mention something
6  about transgender safekeeping inmates on the facility, but
7  right now, I can't think of any other policies that might
8  discuss transgender inmates.
9    Q   Okay.  Topic 14 is designated -- for which you're
10  designated to testify on behalf of TDCJ is "All policies,
11  procedures, protocol, memoranda, circulars, or other agency
12  guidance relating to the provision of long-hair passes,
13  panties, bras, and cosmetics to inmates."
14        You're prepared to testify about that topic --
15    A   Yes.
16    Q   -- on behalf of TDCJ?
17    A   Yes, sir.
18    Q   What materials did you look at to prepare
19  yourself to testify about this topic?
20    A   Again, just looking over our, one, grooming
21  standards, our laundry policies.  I did review -- I'm
22  trying to think.
23        I did refresh my memory of the special
24  populations policies we have and training.
25        Can you repeat the question one more time so I

Page 96

1  can make sure --
2    Q   What materials did you rely on to prepare
3  yourself to testify about this topic?
4    A   I just -- you know, classification procedures,
5  some of the Safe Prison procedure manual.
6    Q   Okay.  I'll share with you what I'll mark as
7  Exhibit 16.
8        (Exhibit No. 16 marked for identification.)
9    Q   (BY MR. FACTOR)  And this is a Security
10  Memorandum about inmate grooming dated June 1st, 2022.  Do
11  you see that?
12    A   Yes.
13    Q   Is this TDCJ's current policy regarding long-hair
14  passes?
15    A   It's the policy in reference to inmate grooming,
16  yes.  This is the current policy.
17    Q   Before June 2022, TDCJ did not allow male
18  offenders to have long hair, correct?
19    A   Without a religious accommodation, that's
20  correct.  We did allow with a religious accommodation for
21  long hair.
22    Q   Right.  So if an inmate was a male who identified
23  as a transgender female, prior to June 2022 that inmate
24  could not have long hair; is that right?
25    A   That's correct.

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:21-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 27 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

Page 97

1    Q   Why did the policy change in June 2022?
2    A   If I remember, there was the last court case
3  there that's listed on that document, White v. Davis, I
4  believe.  That court case, I believe, made us look at the
5  policy again, and some revisions were made after that.
6    Q   Okay.  And what were the facts or the basic
7  nature of that case?
8    A   That I remember, it was a Native American
9  lawsuit.  I don't know the details of the case.
10    Q   So the policy changed in response to a lawsuit?
11    A   I think some of the policy changed because of
12  the -- some of the changes was because of the lawsuit.
13    Q   So are you familiar with a lawsuit filed by Lily
14  Hopkins?
15    A   I want to say there was a case on Hopkins that --
16  I'm not sure if that's the case that I was part of or not.
17  I don't remember that first name.
18    Q   Hopkins was a -- or is a transgender inmate who
19  sued TDCJ relating to a long-hair pass.  Are you familiar
20  with that lawsuit?
21    A   I don't remember if that's the case I was part
22  of.  I'm not -- I'm not sure.
23    Q   Okay.  What are TDCJ's policies relating to the
24  provision of bras to transgender inmates?
25    A   It has -- the individual has to be seen by the

Page 98

1  medical department.  If the medical department approves for
2  a male inmate to have a bra, then we would provide it from
3  the laundry department.
4    Q   And I'm sharing what I'll mark as Exhibit 17.
5        (Exhibit No. 17 marked for identification.)
6    Q   (BY MR. FACTOR)  This is a policy titled
7  Allocation of Necessities also dated June 2021.
8        Is this TDCJ's current policy on providing bras
9  to inmates?
10    A   I believe so.
11    Q   And the first sentence of this paragraph states,
12  "Necessities shall be defined as pants, shirts, gowns,
13  coveralls" -- and, relevant here, "undergarments".
14        Do you see that?
15    A   Yes.
16    Q   So undergarments are necessities under this
17  policy, right?
18    A   Yes.
19    Q   And if you look at Page TDCJ 21, there's a policy
20  about allocation of bras, and the first bullet says,
21  "Transgender male offenders must contact the unit medical
22  department and request a medical assessment for
23  consideration of being issued a bra."
24        That's the policy about bras, right?
25    A   Yes, sir.

Page 99

1    Q   Bras are also necessities under this policy,
2  right?
3    A   Can you ask that question one more time.
4    Q   Bras are also necessities under this policy,
5  right?
6    A   Yes.
7    Q   Who at the medical department within TDCJ makes a
8  determination for whether a transgender inmate is allowed
9  to receive a bra?
10    A   I would believe it would be the medical provider
11  on the unit.  It could be the director of nurses or I would
12  assume the doctor on the facility.  I'm not sure exactly,
13  but that will be referred to the medical staff on the
14  facility.
15    Q   Okay.  So they don't have to go to -- outside of
16  the facility to, like, Hospital Galveston to get a bra
17  right?
18    A   Not that I'm aware of.
19    Q   And then this policy also has some specifics for
20  measuring transgender male offenders, right?
21    A   Yes.
22    Q   Are you aware of any other policies about
23  necessities or providing undergarments to inmates?
24    A   Not that I can recall.
25    Q   This is the only policy you're aware of, right?

Page 100

1    A   I believe so.
2    Q   And are there any other policies at TDCJ relating
3  to the allocation of necessities?
4    A   No, sir.
5    Q   What are TDCJ's policies relating to the
6  provision of panties to inmates?
7    A   If you're on a female facility, that you would
8  receive panties for that population.
9    Q   But on a male facility, panties are not provided,
10  correct?
11    A   Correct.
12    Q   Is there a policy about that anywhere?
13    A   Not -- not that I can recall.
14    Q   If it would -- if there was a policy, it would
15  probably be in this policy about allocation of necessities,
16  right?
17    A   Yes.
18    Q   And this policy does not mention panties,
19  correct?
20    A   Can you go back to the top of the...
21    Q   Sure.
22    A   It mentions undergarments.  That's it.
23    Q   Right.  But you have the separate section that
24  addresses allocation of bras to male inmates.  There's not
25  anything that says anything about allocation of panties to

Page 101

1 male inmates, right?

2 A Not that I see.

3 Q So does this policy allow male inmates to receive

4 panties?

5 A No.

6 Q It doesn't prohibit it, though, right?

7 A It does not that I can see.

8 Q Okay. So for this policy where the policy is

9 silent, it doesn't say anything about panties -- panties

10 are not allowed, right?

11 A Panties are not allowed on a male facility for

12 male inmates.

13 Q Why not?

14 A Panties are -- in -- in -- in -- for many reasons. I

15 mean, inmates that wear some type of female undergarment

16 would be a -- a security challenge for the staff, you know,

17 because -- some of those male inmates who want to wear

18 female undergarments, in some cases, tend to show off that

19 undergarment and -- which causes issues from inmates within

20 that housing area.

21 They want -- in some cases want to be more

22 provocative, which causes attention to them, which become

23 security issues, where maybe another inmate would want to

24 come and assault that individual either physically or -- or

25 sexually.

Page 102

1 So it becomes a security concern when you have

2 men wearing female undergarments. Not only it causes an

3 issue with -- within the inmate population, just managing

4 them, you know, we have officers assigned to those housing

5 areas. And to try to control any type of advances,

6 sexually or physically, is a challenge for the staff in

7 some cases.

8 Q So males wearing female undergarments pose

9 security issues for the staff. Is that what I'm hearing

10 you say?

11 A It could because, you know, there's times that we

12 allow the -- the inmate population to wear shorts in the

13 dayroom, so it's not -- it's not pants. And in a lot of

14 cases, these inmates that want to wear some type of

15 undergarments that is not provided to them because they --

16 have been instances where male inmates have changed the

17 style of the garments they have now to -- that's more

18 provocative, and which has caused issues where there --

19 there has been threats to them or -- not only threats from

20 inmate to them or they felt that their life was in danger

21 because of being advanced on.

22 Q So the reason for the policy of not providing

23 male inmates with panties is a security threat to the

24 inmates; is that right?

25 A It is a security concern.

Page 103

1 Q Any other concerns?

2 Security concern for the inmate, security concern

3 for the guards, I think I heard you say.

4 Any other concerns supporting not providing

5 panties to male inmates?

6 A Well, it's not just the inmate himself. You

7 know, there's times that a male inmate within our custody

8 has wanted to look more feminine and there has been other

9 inmate assaults, not necessarily on him, because other

10 inmates feel that those individuals should belong to

11 certain people.

12 You know, we have had incidents where -- not

13 allowed but where they have relationships on the inside and

14 those relationships become issues when you have jealousy

15 involved and then you have certain individuals on male

16 facilities that want to dress more like a female -- that

17 becomes issues because of jealousy and assaults and --

18 and -- either assaults between other inmates or assault on

19 that specific inmate.

20 Q So I just want to make sure I'm really clear

21 about this. The reason you don't provide panties to

22 transgender inmates is because panties will cause assaults

23 to inmates; is that right?

24 A That's one of the reasons. Also that, you know,

25 what we provide them now is enough for them to -- to wear

Page 104

1 as an undergarment. They're provided boxers. And right

2 now, that is sufficient.

3 Q Has TDCJ done any analysis of the threats that

4 would be caused by providing transgender inmates with

5 panties?

6 A Not that I'm aware of.

7 Q And is there anything in writing documenting this

8 policy of not providing transgender inmates panties?

9 A We have not provided them panties, so there would

10 not be any documentation indicating that there would be

11 additional assaults.

12 Q Okay. And this policy, Allocation of

13 Necessities, is silent about panties, right?

14 A In this policy, yes.

15 Q And TDCJ enforces it so as to never provide

16 panties to male inmates in any instance, right?

17 A We do not provide panties to male inmates.

18 Q And Policy G-51.11 is silent about sex

19 reassignment surgery; is that right?

20 A The policy refers back to the medical staff to

21 make decisions if such treatment is needed.

22 Q But it's silent on sex reassignment surgery,

23 right?

24 A It just refers them back to the medical staff on

25 the facilities to make those decisions.

| Page 105 | Page 107 |
|---|---|

**Page 105**

1  Q   Yes or no, it's silent on sex reassignment
2  surgery?
3  A   It does not say that it's prohibited.  It does --
4  pushes back to the medical providers on a facility.  If
5  they felt that that treatment is necessary, they can review
6  it on their -- on their behalf within that UTMB.
7      Again, UTMB is not part of TDCJ.  We have a
8  Health Services division, but UTMB is a -- is a university
9  that we use as -- for our medical care.
10      MR. FACTOR:  Object to nonresponsive,
11  everything after the policy does not mention it.
12  Q   (BY MR. FACTOR)  Has TDCJ ever considered
13  allowing transgender inmates to be allocated panties if a
14  doctor determined it was medically necessary to treat the
15  inmate's gender dysphoria?
16  A   Not that I'm aware of.
17  Q   Never considered the issue, right?
18  A   I'm not aware of a discussion about providing
19  panties to male inmates.
20  Q   Does TDCJ have a blanket policy of never
21  providing panties to transgender male inmates?
22  A   I wouldn't say we have a blanket policy.  We just
23  do not allow panties.  They are provided boxers.
24  Q   Panties are prohibited in all instances, correct?
25  A   Panties are prohibited to the male population.

**Page 106**

1  Q   Panties are prohibited to all transgender men,
2  correct?
3  A   Panties are prohibited to the male population.
4  Q   So there is a prohibition on panties in male
5  prisons in TDCJ, correct?
6  A   We just do not allow panties on a male facility.
7  Q   And not allowing something is a prohibition,
8  correct?
9  A   I wouldn't say that is -- our policies and -- at
10  this time is that we do not provide panties to the male
11  population.
12  Q   Right.  They're prohibited, correct?
13  A   They're (inaudible).
14      THE REPORTER:  I'm sorry.  What was that
15  answer?  I didn't get the answer.
16      THE WITNESS:  I said, "They're not allowed."
17  Q   (BY MR. FACTOR)  And I'm just trying to get a
18  "yes" or "no" answer.  Are they prohibited?
19  A   I don't see much difference between "not allowed"
20  and "prohibited," but what -- what's the difference for why
21  you won't say they're prohibited?
22  A   There's not a difference, and they're prohibited
23  then.
24  Q   So you agree that panties are prohibited?
25  A   I agree they're not allowed.

**Page 107**

1  Q   Okay.  I'm going to share what I'll mark as --
2  well, are you aware of anyone ever -- what would happen if
3  an UTMB doctor prescribed a transgender inmate panties as a
4  treatment for gender dysphoria?
5  A   I would --
6      MR. CALB:  Objection.  That's a medical
7  question.
8  Q   (BY MR. FACTOR)  What would TDCJ do in the event
9  that an inmate was prescribed panties from their healthcare
10  provider?
11  A   Can you say that one more time.
12  Q   What would TDCJ do in the event that an inmate
13  was prescribed panties as a treatment for gender dysphoria
14  from medical?
15  A   If it was something that was ordered by a medical
16  provider, us on the security side would enforce those
17  medical -- comply with those orders.
18  Q   And do you know of any policies on the medical
19  side of things that prohibit prescriptions for panties for
20  transgender inmates?
21  A   Not that I'm aware of.
22  Q   Are you aware of medical having a policy of never
23  allowing panties or other garments -- other undergarments
24  to be deemed medically necessary?
25  A   Not that I'm aware of.

**Page 108**

1  Q   Are you aware of TDCJ medical having a policy of
2  not making any recommendations or orders for panties or
3  other female undergarments for any TDCJ offenders?
4  A   No, sir.
5  Q   Are you aware of any practices where TDCJ medical
6  would not make any recommendations for panties?
7  A   Not that I'm aware of.
8  Q   I'll introduce what I'll mark as Exhibit 18.
9      (Exhibit No. 18 marked for identification.)
10  Q   (BY MR. FACTOR)  In the bottom e-mail is a
11  June 5th e-mail from Joseph Penn, who is the Director of
12  the Gender Identity Clinic to Walter Meyer and Jesse
13  Gordon.  Subject line:  "Brief summary of our meeting
14  today."
15      Do you see that?
16  A   Yes.
17  Q   Who is Dr. Penn?
18  A   Don't know his official title, but he's our
19  mental health for -- for TDCJ.
20  Q   For your purposes, is Dr. Penn who TDCJ refers to
21  for medical decisions?
22  A   I believe so.
23  Q   Dr. Penn summarizes a meeting that he had with
24  Kelly Coates and Dr. Meyer and Jesse Gordon.
25      Do you see that, where Dr. Penn says, "Thank you

HAVERKAMP v.
Case 4:20-cv-00018     Document 343-4     Filed on 11/13/23 in TXSD     Page 30 of 48
LANETTE LINTHICUM
30(b)(6)
Eric Guerrero
July 20, 2023

Page 109

1  for meeting with Kelly Coates and me today"?

2    A   Yes.

3    Q   And the first bullet point of his summary e-mail

4  says, "Bras and undergarments." Do you see that?

5    A   Yes.

6    Q   And he says, "Under current TDCJ

7  policies/practices, no panties or other undergarments are

8  deemed as being medically necessary."

9       Do you see that?

10   A   Yes.

11   Q   So which policies and practices say that no

12  panties or other undergarments are allowed to be deemed as

13  medically necessary?

14   A   I'm not sure if there's a Correctional Managed

15  Health Care policy that indicates that.

16   Q   Well, Dr. Penn, who manages the gender identity

17  clinic, is saying under the current policies, no panties or

18  other undergarments are deemed as being medically

19  necessary, right?

20   A   Yes.

21   Q   So fair assumption that as of the date of this

22  e-mail, TDCJ's policies and practices were that no panties

23  or other undergarments are deemed as being medically

24  necessary, right?

25   A   That's what he wrote, yes, sir.

Page 110

1    Q   And he also says, "Under current TDCJ

2  policies/practices, no panties or other undergarments are

3  being deemed as medically necessary or to be recommended or

4  ordered."

5       That second part, "or to be recommended or

6  ordered," is it your understanding that the then-current

7  TDCJ policies and practices did not allow panties or

8  undergarments to be recommended or ordered?

9    A   Reading his statement on the e-mail, that's what

10  he mentioned as our current practices do not order panties

11  or undergarments.

12   Q   And as the person who's in charge of the gender

13  identity clinic, he was the one responsible for

14  implementing those policies, right?

15   A   I believe he had a big part in that, but there's

16  also our health service division that monitors those --

17  those policies and practices.

18   Q   And Health Services Division, that's

19  Dr. Linthicum, right?

20   A   Yes, sir.

21   Q   Next sentence in his e-mail says, "We should

22  avoid any language in our evaluation/notes regarding

23  anxiety or distress relating to an inability to have

24  undergarments or suggest that relief of emotional distress

25  or symptoms could be addressed by providing undergarments,

Page 111

1  hair removal/extension products, or makeup or similar

2  items."

3       Do you see that?

4    A   Yes.

5    Q   Based on this statement, at that time, was it the

6  policy of TDCJ medical to avoid any language in their

7  evaluations or notes regarding anxiety or distress relating

8  to an inability to have undergarments, right?

9    A   That's what Dr. Penn wrote.

10   Q   And Dr. Penn was the person responsible for

11  implementing the policy, right?

12   A   That I'm aware of, yes.

13   Q   And then you said Dr. Linthicum at Health

14  Services provides oversight of Dr. Penn, right?

15   A   She -- she reviews our -- our -- our practices

16  and our contracts on the facilities.

17   Q   Well, Dr. Penn tells Dr. Linthicum, "Kelly Coates

18  and I met with Dr. Meyer and Dr. Gordon." In parentheses,

19  "She is taking over Dr. Meyer's gender dysphoria

20  patients/clinics at HG today."

21       Do you see that? That's Dr. Penn sending a

22  summary e-mail to Dr. Linthicum?

23   A   Yes.

24   Q   And he says, "I reviewed with both of them the

25  importance of not making any recommendations or orders for

Page 112

1  panties or other undergarments for any TDCJ offenders."

2       Do you see that?

3    A   Yes.

4    Q   And is it your understanding that that was TDCJ's

5  policy at the time, the policy being not making any

6  recommendations or orders for panties or other

7  undergarments for TDCJ offenders?

8    A   Yes.

9    Q   Are you aware of the policy on panties or

10  undergarments changing at any time from 2018 through

11  present?

12   A   I do not.

13   Q   And you're not aware of any inmate ever -- any

14  male inmate ever being assigned or prescribed panties on

15  male units?

16   A   They have not been.

17   Q   Never, right?

18   A   No.

19   Q   And that could be because TDCJ medical has a

20  policy of not making any recommendations or orders for

21  them, right?

22   A   It's a possibility why.

23   Q   That's what this e-mail says, doesn't it?

24   A   Uh-huh, yes.

25   Q   Any other bases other than the security threat

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:20-cv-00018   Document 343-4   Filed on 11/13/23 in TXSD   Page 31 of 48

Eric Guerrero
July 20, 2023

30(b)(6)

Page 113

1  that could be caused by providing panties to transgender
2  inmates supporting TDCJ's policy of not providing panties
3  to transgender inmates?
4      A   Again, the only thing would be just the security
5  concern we have for the individual and how they would act
6  while in a housing area wearing -- and being sexually
7  provocative towards the rest of the population and just the
8  security concern that we have.
9      Q   Any other reasons?
10     A   No, sir.
11         MR. FACTOR:  Would you mind if we took,
12  like, a quick two-minute break?
13         MR. CALB:  No worries.  Sure.
14         THE REPORTER:  Off the record.
15         (A break was taken from 5:47 p.m. to 5:50 p.m.)
16         THE REPORTER:  Back on the record.
17     Q   (BY MR. FACTOR)  Mr. Guerrero, you understand
18  you're still under oath?
19     A   Yes, sir.
20     Q   Earlier today you mentioned you had a call with
21  warden -- a warden at the Stiles Unit about Haverkamp's
22  transfer.  What did you and that warden discuss?
23     A   I think what I can remember was I didn't know he
24  was one of the individuals who was being transferred to the
25  Connally Unit.  If I can recall, I told him he should have

Page 114

1  let us know that he was on the transfer list so we would
2  have kept him there to attend his deposition.
3      Q   And was that call successful?
4      A   Well, that was after he was transferred.
5      Q   After the fact?  Okay.  Got it.
6          Did you bring any notes today to your deposition
7  or any other documents do you have -- that you have with
8  you?
9      A   No, sir.
10     Q   And where are you today?
11     A   My office.
12     Q   Is that in Huntsville?
13     A   Yes.
14     Q   Is anyone there with you?
15     A   No, sir.
16     Q   And we've taken several breaks today.  Have you
17  discussed the substance of your testimony with anybody on
18  those breaks?
19     A   Just on the breakout sessions with Ms. Childress
20  and Mr. Calb.
21     Q   What did you discuss with them about the
22  substance of your testimony?
23         MR. CALB:  Objection.  Privileged
24  information that we're discussing the case.
25         MR. FACTOR:  You can't discuss substance of

Page 115

1  testimony on breaks in Texas, so I'm entitled to ask.
2          MR. CALB:  Substance of testimony.
3          THE WITNESS:  Okay.  And I -- I guess I'm
4  maybe confused on substance.  We just talked about continue
5  to answer the questions.  I don't -- maybe confused on
6  substance.
7      Q   (BY MR. FACTOR)  Well, what did you discuss about
8  your testimony?
9      A   Talked about the -- I guess the questions on --
10  the medical questions about me being the -- discussing the
11  answers, you know, about me not being my expertise in -- in
12  medical department.
13     Q   They told you you didn't have medical expertise
14  in the medical department?
15     A   I don't know if they told me.  I knew that from
16  the get-go.  I mean, I'm not an expert in medical.
17     Q   And did they tell you to not answer questions
18  where you didn't have medical expertise?
19     A   No, sir.
20     Q   What else did you discuss about the substance of
21  your testimony?
22     A   I think that just -- answer the best that I can.
23  I mean, there's -- there's some things that I was not --
24  did not know and that's why they continue to say, "Do the
25  best you can."

Page 116

1          Most of the time, it was straight to the bathroom
2  and come back.  A little discussion on the break, that was
3  it.  Told me I was doing a good job.  I mean, do my best --
4  best I can.
5      Q   Are there any answers now that we're at the end
6  of the day that you'd like to change?
7      A   Answers?
8      Q   Any of your testimony that you'd like to change?
9      A   No, sir.
10     Q   Okay.
11         MR. FACTOR:  I'll pass the witness.
12         MR. CALB:  I have no questions.
13         MR. STRAWN:  We'll reserve our questions.
14         MR. FACTOR:  Thank you, Mr. Guerrero.  I
15  think you're done.
16         THE WITNESS:  Thank you.
17         THE REPORTER:  Mr. Strawn, did you want a
18  copy of the transcript.
19         MR. STRAWN:  Yes, I guess -- actually, you
20  know what, let me double-check and I'll e-mail you.  Okay?
21         THE REPORTER:  Okay.
22         Is this a read and sign or waive signature,
23  Mr. Calb?
24         MR. CALB:  I will waive the reading, but I
25  would like to order a copy of the transcript.

## Page 117

1    THE REPORTER:  Okay.  Do you want an
2  e-trans?
3        MR. CALB:  Yes.
4        THE REPORTER:  And then Mr. Factor I think
5  we have your order?
6        MR. FACTOR:  I don't need a rush for this
7  one.
8        THE REPORTER:  All right.
9        MR. CALB:  Oh, I apologize.  We would like
10  to review and sign before --
11        THE REPORTER:  Okay.  Read and sign.  Okay.
12  And an e-trans.
13        Okay.
14        MR. STRAWN:  Chrystal, go ahead and send me
15  a copy.  I'll go ahead and get a copy of it, please.
16        THE REPORTER:  Okay.  E-trans?
17        MR. STRAWN:  Yes, please.
18        THE REPORTER:  Thank you.
19        (Deposition concluded at 5:55 p.m.)
20
21
22
23
24
25

## Page 118

1        CHANGES AND CORRECTIONS
2      WITNESS NAME:  ERIC GUERRERO - VOLUME 1
3      DATE:  JULY 20, 2023
4  Reason Codes:  (1) to clarify the record; (2) to conform to
   the facts; (3) to correct a transcription error; (4) other
5  (please explain).
6  PAGE/LINE  CHANGE          REASON CODE
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 119

1        SIGNATURE
2
3      I, ERIC GUERRERO, have read the foregoing
4  deposition and hereby affix my signature that the same is
5  true and correct, except as noted on the previous page.
6
7        _____
8        ERIC GUERRERO
9  THE STATE OF _____)
10 COUNTY OF _____)
11     Before me, _____, on this day personally
12 appeared ERIC GUERRERO, known to me (or proved to me under
13 oath or through _____) (description of identity
14 card or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged to
16 me that he executed the same for the purposes and
17 consideration therein expressed.
18     Given under my hand and seal of office this _____ day
19 of _____, 20_____.
20
21        _____
22        NOTARY PUBLIC IN AND FOR
23        THE STATE OF _____
24        COMMISSION EXPIRES:  _____
25

## Page 120

1        REPORTER'S CERTIFICATE
2  STATE OF TEXAS     )
3  COUNTY OF TRAVIS    )
4     I, CHRYSTAL H. McDANIEL, Certified Shorthand Reporter,
5  in and for the State of Texas, certify that the foregoing
6  deposition of ERIC GUERRERO was reported stenographically
7  by me at the time and place indicated, said witness having
8  been placed under oath by me; that review was requested
9  pursuant to Federal Rule of Civil Procedure 30(e)(1); and
10 that the deposition is a true record of the testimony given
11 by the witness.
12     I further certify that I am neither counsel for nor
13 related to any party in this cause and am not financially
14 interested in its outcome.
15     Given under my hand on this the 1st day of August,
16 2023.
17
18        _____
        CHRYSTAL H. McDANIEL, Texas CSR 11847
19        CSR Expiration:  12/31/2024
20
21 Time used by each party:
   Ace Factor - 3 hours; 15 minutes
22 Michael Calb - 0 hours; 0 minutes
   Jennifer Childress - 0 hours; 0 minutes
23 John Strawn - 0 hours; 0 minutes
24
25

HAVERKAMP v.
LANETTE LINTHICUM
Case 5:21-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 33 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

**-**

**-cj's** 66:11

**0**

**001** 48:12

**003** 41:22

**004** 41:22

**006** 45:13

**1**

**1** 37:17,24 38:4,14 39:19 41:23 43:4, 11 45:4 48:9 49:12 51:4 55:5 69:4,5 73:14 85:25

**1,000** 86:22

**10/17/2014** 49:13

**100** 77:2

**11** 24:9,10 75:4

**11th** 48:10 67:23 68:1

**12** 58:21,22

**12/15/15** 44:25

**129,000** 32:14

**12th** 41:24 42:1 43:1,21

**13** 63:22,23 69:18 74:17

**14** 24:4 25:1 84:6,7 95:9

**15** 85:9,10

**15th** 42:8

**16** 24:4 25:7 75:22 96:7,8

**17** 24:4 25:11,14 82:19 90:19 98:4,5

**18** 25:16,22 65:12,17,25 108:8,9

**1983** 70:17 71:9

**1997** 73:2

**1997e(a)** 72:25

**1st** 96:10

**2**

**2** 17:17 24:4,16 37:5 38:16,18 39:3,7, 11,25 40:6 48:10,14,21 51:4 52:2,14 55:5,8,10,22 59:7 73:14 83:10,11,17 86:1,10

**200** 76:16

**2014** 42:1

**2015** 40:10 41:24 42:8 43:1,12,22 44:22 48:6,10,17

**2018** 112:10

**2019** 27:10 76:3 85:13 86:25

**2021** 98:7

**2022** 67:17,23 68:1 96:10,17,23 97:1

**2023** 76:7,12 77:8,17

**20th** 76:12 77:8

**21** 98:19

**21st** 76:7

**24** 66:3,6,8,22

**26** 67:4

**27** 67:13

**29** 27:14

**29th** 43:12,22 44:22

**2:03** 7:1

**3**

**3** 17:18 24:4,18 41:15,16 57:14 58:1 64:13 66:17 69:7 83:11 86:1

**30(b)(6)** 11:24 13:10 24:12 68:20

**3:31** 57:20

**3:52** 57:20

**4**

**4** 17:18 83:11

**408** 7:17

**42** 70:17 71:9 72:25 73:2

**44** 59:18

**46** 68:9,10,16

**4:27** 75:17

**4:39** 75:17

**5**

**5** 17:18 24:4,21,22 75:7,8 83:11,12, 17,18 91:11

**51** 60:14

**56** 69:19,25 70:12

**5:47** 113:15

**5:50** 113:15

**5:55** 117:19

**5th** 48:17 77:17 108:11

**6**

**6** 86:22

**60** 70:15

**61** 71:4

**66** 71:20

**68** 72:9

**69** 72:17

**7**

**75** 7:17 72:23

**9**

**90s** 10:10

**926** 85:14

**A**

**ability** 35:24 53:24 87:23 88:12

**academy** 26:15 91:22 92:3

**accommodation** 25:11 38:9 82:20 96:19,20

**accurate** 13:24 26:7 43:8

**accurately** 85:12

**Ace** 7:18 68:19

**act** 113:5

**acting** 15:15

**action** 42:23

**actions** 71:20 72:10

**activity** 45:14 53:1,5

**actual** 16:11 30:15 39:13

**additional** 34:6 53:11,13 73:9 104:11

**address** 7:14,15

**addressed** 110:25

addresses 100:24

adds 86:23

adjudicated 72:5

admin 85:25 86:1

administration 18:1 27:8 51:13

administrative 38:21 39:8,10,14,25
40:5 51:4 52:7 72:24 73:15

admits 66:3 67:21

advance 15:22

advanced 102:21

advances 102:5

advise 53:20 87:10

affect 36:12

affidavit 12:23

affirmative 70:16

afternoon 7:11

age 7:6

agency 25:3 75:10 91:13 95:11

agent 42:3

agree 8:6,7,14 60:5,7,21 61:10 63:4
79:10 80:5 106:24,25

agreement 12:14,16,19

ahead 29:21 117:14,15

allegation 37:23 60:19 63:2 68:9

allegations 18:4 47:15 58:1 59:17
69:7

alleged 66:10,21 67:4

alleges 59:8

allocated 105:13

allocation 98:7,20 100:3,15,24,25
104:12

allowed 40:21 56:6,19 60:18,23
61:7,12,17 62:18 63:7 80:6,12 99:8
101:10,11 103:13 106:16,19,25
109:12

allowing 105:13 106:7 107:23

Amarillo 9:5

ambiguous 57:8 63:19

Amended 24:12 58:24

Amendment 59:11 64:16 72:2,21

American 97:8

analyses 25:17

analysis 104:3

and/or 68:23

Andrea 21:21

answering 26:10

answers 26:3 58:3 66:18 69:8
115:11 116:5,7

anxiety 42:15 110:23 111:7

apologize 117:9

appropriately 30:18 78:10,22 79:3,
9,15 81:13,15

approval 81:7

approve 78:19 79:6,8

approved 41:8,10 48:16 61:6 79:23,
24 80:16,18,22

approves 33:18 98:1

approving 82:15

approximately 8:19 9:4 76:18 77:1

April 77:17

arbitration 10:16

area 28:22 29:9,20 89:16,18 92:14,
20,23,25 101:20 113:6

areas 94:20 102:5

arena 11:12

arrive 92:18

ARRM 38:20 39:14

assault 101:24 103:18

assaults 16:3 103:9,17,18,22 104:11

assert 72:9

assertion 71:6

asserts 59:1

assessment 98:22

assigned 16:19 29:8 43:23 78:22
81:6 90:12 91:3,24 102:4 112:14

assist 33:8

assistance 29:24

assistant 28:12 31:10 52:7

assume 8:6 45:9 54:6 62:16 71:23
99:12

assumption 109:21

attached 85:8

attachment 85:16

attend 114:2

attended 26:20,23

attention 78:14 101:22

attorney 7:18

attributable 71:21 72:10

authority 43:19

availability 21:4

avoid 110:22 111:6

aware 36:9 48:8 53:3 54:18 56:11
63:20 64:8 74:16 77:21 80:18 82:14,
16,18 87:13 91:2 92:4,9,12,20 94:14,
19 95:1 99:18,22,25 104:6 105:16,18
107:2,21,22,25 108:1,5,7 111:12
112:9,13

## B

B-R-I-T-T 18:14

Bachelor's 27:7

back 39:2,9 40:6 41:3,5 44:20 46:3
51:1 57:21 61:2,3 69:18 73:24 74:2,
17 81:2 86:25 100:20 104:20,24
105:4 113:16 116:2

background 27:6

barbershops 23:4

barred 72:5

based 59:2 91:4 111:5

bases 112:25

basic 26:15 29:19 38:11 92:18 97:6

basically 14:24 15:20 18:17 22:7
49:11 92:6,9

basis 55:9,15,18,21 56:1 64:20,23
65:1,14,17,25 66:11,19,24 67:6,12
68:13,16 69:21,25 70:5,12,15,22
71:3,6,13,16,19 72:7,13,16 74:19
75:3 79:16 80:17,20 81:4

Bates 45:13

bathroom 57:17 116:1

Beaumont 76:4

began 7:1

behalf 11:24 13:8 57:25 66:1 75:8
78:4 95:10,16 105:6

belong 103:10

HAVERKAMP v.
LANETTE LINTHICUM

Case No. 4:14-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 35 of 48

Eric Guerrero
July 20, 2023
30(b)(6)

**Bev** 85:1

**Beverly** 85:1

**big** 110:15

**Bill** 9:5

**binding** 13:8 26:4

**birth** 90:5,9 91:4

**bit** 13:5 16:11 62:2

**Black-edwards** 84:24

**blank** 19:1

**blanket** 105:20,22

**blurry** 85:23 86:2

**Bobbie** 7:18 36:24 40:8

**Bobby** 27:21

**born** 90:6,7,11,23 91:5

**bottom** 108:10

**boxers** 104:1 105:23

**bra** 98:2,23 99:9,16

**Branch** 29:9 47:17 74:5

**bras** 20:14 25:4 54:15,17,18 95:13
97:24 98:8,20,24 99:1,4 100:24 109:4

**break** 57:16,17,20 63:10 75:14,17
113:12,15 116:2

**breakout** 114:19

**breaks** 114:16,18 115:1

**briefly** 27:5

**bring** 71:17 114:6

**Britt** 14:15 18:12,15,21,24

**broad** 28:2

**broader** 19:19

**brought** 30:17 72:3 78:14 81:12,18

**bullet** 98:20 109:3

**buses** 77:14

---

**C**

**Calb** 22:19 47:11 50:21 51:8 56:24
57:15,19 60:8 62:6 63:19 65:4 68:19
70:18,25 71:10 78:23 87:8 90:16
107:6 113:13 114:20,23 115:2
116:12,23,24 117:3,9

**call** 18:17 19:9,16,19 20:4,11 21:8
29:7 78:17 92:17 113:20 114:3

**called** 34:1 35:6,16 38:21 49:3

**capable** 70:23

**capacities** 71:21 72:10

**capacity** 9:12 11:14 13:12 71:2

**captain** 31:18

**cards** 23:9

**care** 11:11 23:6 29:20 34:12,19,22
35:11 42:13,15 66:4 70:7 71:24
72:12,14 105:9 109:15

**case** 8:24 9:3,14,19,20,23 10:1,12,13
11:1,3,6,9,19,21 12:17,20,21 13:3
22:14 23:21,22 37:1 48:23 54:20 80:9
90:18 97:2,4,7,9,15,16,21 114:24

**cases** 8:20 9:6 10:4 15:15,24 16:15
17:3 31:11,12,14,17 32:10 34:14,16
85:2,3 101:18,21 102:7,14

**castrated** 60:7

**category** 85:18

**caused** 102:18 104:4 113:1

**causing** 42:15

**cell** 89:4

**cellblock** 92:22

**certificate** 90:5,10 91:4

**chairman** 31:9,20

**challenge** 101:16 102:6

**change** 97:1 116:6,8

**changed** 67:16 97:10,11 102:16

**changing** 21:17 112:10

**chapel** 89:8

**charge** 110:12

**chat** 24:9 41:14

**check** 46:7,17

**chemically** 60:7

**chief** 31:11,15

**Childress** 22:18 114:19

**chow** 89:9

**Chris** 84:24

**Christopher** 14:16 18:22,25

**Chrystal** 117:14

**circulars** 25:2 75:9 91:12 95:11

**circumstances** 76:22 77:9

**cisgender** 60:1,4

**cisgendered** 59:21 64:17,21

**cite** 56:5

**claim** 17:24 59:2 62:22 70:17 71:7
72:2,4 73:3

**claimed** 10:13

**claiming** 72:3

**clarify** 8:5 57:9 68:20

**classification** 14:8 18:6 21:12 23:10
28:7 29:1 30:16,20,24 31:7,8,11,15,
24,25 32:1,3,13,16,19,20,21,24 33:1
36:6 58:8 83:10,22 87:22 88:11,14,
16,17 96:4

**classifications** 25:12 30:14 31:2
82:21 85:21 86:5,7 90:20 93:5

**classified** 83:1

**classifying** 87:19

**clear** 103:20

**clearer** 68:23

**Clements** 9:5

**client** 40:8

**clinic** 46:7 108:12 109:17 110:13

**close** 21:23

**closed** 9:24 83:16

**clothing** 62:25

**CMCH** 53:12

**CMHC** 49:23 55:16

**CMHCC** 71:2

**Coates** 108:24 109:1 111:17

**code** 48:23 86:9,15

**coded** 44:21

**codes** 86:13 93:5

**Collier** 70:8 72:6

**Columbia** 27:10

**commissary** 19:23 20:12 62:23

**committee** 18:6 30:25 31:2,5,7,8,14,
21,22,24 32:1,19,20,25 34:2,12,19,23
35:7,11,16 39:11 60:16 88:11,14

**committees** 31:18 33:25 34:1

**communicate** 8:8 34:13 48:3

**compared** 94:12

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:14-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 36 of 48
30(b)(6)

Eric Guerrero
July 20, 2023

compiled 46:23

complaint 42:23 47:15 49:13,16
58:2,12,15,24,25 59:17 60:19 61:6
63:25 64:7 69:7

complaints 38:11

completed 49:13

completely 26:7

completion 18:5

complex 21:23

comply 107:17

con- 81:5

concern 15:13,16 102:1,25 103:2
113:5,8

concerns 15:4,6,9,19 16:9 29:11
103:1,4

concluded 117:19

conclusions 25:17

condition 62:17

conduct 17:6 18:3

conducted 25:18

confidential 52:18

confirm 74:18

confirmed 42:8 54:4,7

confirming 12:20

confused 13:15 115:4,5

Connally 19:8,10,12 21:9 76:11,16
77:3,7,12,15,18 78:10 79:4,5,9,21
80:9,19 81:9,13,15,23 113:25

consensus 66:9,12,20 67:3,10

consideration 98:23

considered 11:19 21:13 25:18 45:3,
21 47:4,7 48:7 49:15 50:9,14,17,20
51:9,16,24 53:9 54:10 105:12,17

consistent 59:10

Constitution 59:12

constitutional 59:2,6,8 71:8 72:2

contact 98:21

context 72:12

continue 59:9 62:23 115:4,24

continued 59:9

continues 40:24

contracts 111:16

control 81:5 102:5

controlled 89:5

conversation 14:22 18:10 20:5

conversations 21:19

coordinate 68:24 77:12

coordinator 37:19 39:6 44:21

copy 116:18,25 117:15

corporate 23:25

correct 11:25 13:1,14 24:5 26:18,19
40:7,17,18,22,23,25 41:12,13,24
45:8,22 46:25 47:4 50:10,11,14,15
51:17,18,24,25 52:14,15 53:2,9,10
54:10,11 57:13 59:4 66:2,22,23,24
67:1,7,8,15,23 68:2,3,4,5,8,17,18
69:11 70:1,3,4,13,14 75:6,13 76:4,5,
8,12 83:23 96:18,20,25 100:10,11,19
105:24 106:2,5,8,12

correctional 23:6 24:23 27:17,24
28:1,9,11,18,25 29:2,17 34:11,12,15,
18,22 35:10 38:25 91:16,20,23 92:2
93:24 94:15 95:1 109:14

correctly 12:5

cosmetics 25:4 63:1,8,16 67:22
68:4 95:13

counsel 78:1

county 30:17

couple 23:8 28:13 35:3 39:18

court 8:8 41:5 61:1,3 70:6 73:25 74:2
81:2 97:2,4

courtroom 8:1

cover 85:11

coveralls 98:13

created 93:7,24

Criminal 27:7

cross 9:2

Cueto 19:10

cure 42:19,22

curious 85:17

current 27:15 28:17 96:13,16 98:8
109:6,17 110:1,10

curriculum 94:17

custodies 16:8 80:8 86:3 94:3

custody 14:9 15:3 16:6 17:16,17,18
22:1 53:22 72:15 79:19,20 80:13
81:5,22 83:4,5,13,15,16 86:4,9 87:6,
16 89:2,13,14,19,25 90:14,22 91:1
92:5,10,22 94:19 103:7

---

**D**

Dale 52:9

damages 72:18

danger 17:25 18:5 102:20

date 12:13 41:23 67:20 76:13 77:16
85:13 109:21

dated 48:17 96:10 98:7

Davis 97:3

day 23:12 76:14,19,23 77:9 116:6

dayroom 102:13

days 22:22

deal 91:20

December 43:12,22 44:22 48:6

decide 21:17

decided 20:19

decision 47:18,25 70:8 79:1,3 81:10,
14,20,22,25 82:1,3

decisions 47:13 104:21,25 108:21

deemed 107:24 109:8,12,18,23
110:3

defendant 58:14 64:3,13,14 65:2,12,
18 66:3,9,20 67:2,9,13,21 68:1,10
69:19 70:6,22 71:1,20 74:20 75:4

defendants 25:19 59:20,25 62:22
72:9

defendants' 47:16 58:3 59:9 66:18
69:8 70:11

defense 70:16 71:16 72:1,7,13,16

defer 61:25

deferred 62:16

defined 98:12

degree 27:7

deliberate 59:10

denial 40:9 42:14 48:6 49:16 55:8,
10,15,18,21 56:1,9 59:2 64:20,23
65:1 70:22 75:3 79:17

denied 38:14 40:12,16 54:12 55:2,12

HAVERKAMP v.
LANETTE LINTHICUM
Case 4:20-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 37 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

56:7 59:25 65:8,13 68:11 74:20 75:5 81:21

**denies** 42:13 57:6 64:14,16 65:12 66:9,20 67:2,9 68:10 69:19 70:6 71:20 74:20 75:4

**dental** 46:14,18

**deny** 62:23

**department** 19:23 20:12,16 30:16, 21 31:25 32:13,16,21 33:7 34:3 36:6 37:17 38:8,22,23,24 39:4 40:1,5 43:24 44:8,9,13,14,19 45:8 48:22 49:3,8 50:7 51:2,4,14 77:13 87:15 93:11 98:1,3,22 99:7 115:12,14

**departments** 28:24 50:6

**depending** 17:16 32:9 33:19 38:19 62:16

**depends** 37:14 38:5

**deposed** 8:16,21,23 9:3,12,15,20 11:2 13:17

**deposition** 7:20 10:18,22 19:11 21:20 22:14,17 23:15,18,25 24:12 26:20,23 41:19 47:12 76:6,14,20,24 114:2,6 117:19

**depositions** 27:1,3

**deputy** 27:16 28:9,17 33:6,18 34:8 39:15 84:23,25 87:5

**describe** 27:5

**description** 85:18

**designated** 11:23 13:2 24:3,22 55:13 57:25 65:22 66:16 67:5 68:15 69:10,24 70:10 75:7 83:3 89:25 91:15 95:9,10

**designating** 15:12

**designation** 13:4 68:20 83:8,16 84:3

**designators** 23:5

**designee** 46:18

**details** 97:9

**Detention** 85:25 86:1

**determination** 60:10 74:14 90:2,3,4 99:8

**determinations** 25:17 73:20 74:8

**determine** 32:22 33:1 52:23 70:7

**determined** 105:14

**develop** 33:25

**dialogue** 29:22

**died** 9:5

**difference** 89:1 106:19,20,22

**dimension** 71:8

**direct** 7:9 32:8

**directly** 29:8 37:21

**director** 14:20 19:7 21:12 27:16,22, 24 28:6,9,14,15,18 30:6,10,15 31:23 32:2,3 33:6,18 34:4,14 39:15 48:4 84:25 99:11 108:11

**directors** 28:5 39:16 84:23 85:3 87:5

**disability** 8:25 9:22

**disagreement** 71:7

**disciplinary** 82:11,13 83:19,20,24 84:1,2 92:13

**discipline** 46:18

**discriminatory** 71:22

**discuss** 20:10,24 21:4 22:10 27:3 53:23 78:25 80:11 93:19,21 95:8 113:22 114:21,25 115:7,20

**discussed** 19:22,24 20:1,17 21:1,25 55:19 114:17

**discusses** 36:3

**discussing** 33:20 114:24 115:10

**discussion** 18:20 48:1 77:10,14 81:12,15 105:18 116:2

**discussions** 15:10 78:24

**disputed** 51:15

**disputes** 50:7 51:5

**distress** 110:23,24 111:7

**distribution** 20:1

**division** 27:16,17,25 28:2,10,18,25 29:2,18 34:15 35:4,15 38:10,21,25 39:9,15 44:10 49:3 52:11 105:8 110:16,18

**doctor** 26:17 42:2 99:12 105:14 107:3

**document** 64:1,9,11 78:12 84:13 87:9 93:23 97:3

**documentation** 46:24 78:16 104:10

**documenting** 104:7

**documents** 22:23,25 23:2 93:7 114:7

**doors** 9:24

**Dorman** 52:9,12

**double-celled** 89:7

**double-check** 116:20

**dreadlocks** 9:16,17

**dress** 103:16

**DU** 86:21

**due** 9:22 11:21 21:16 59:19

**duly** 7:6

**dysphoria** 25:13,20 56:17,23 59:4 66:10,13,21 67:4,11 70:7 75:12 82:22 90:20 91:14 105:15 107:4,13 111:19

### E

**e-mail** 78:15 84:9 85:8,11 108:10,11 109:3,22 110:9,21 111:22 112:23 116:20

**e-trans** 117:2,12,16

**Earlier** 113:20

**Echols** 85:1

**education** 53:12,13 89:8

**educational** 27:5 32:11

**Eighth** 72:1

**Elbert** 14:14,17 19:2

**elective** 73:21 74:8,14

**Eleventh** 72:21

**emotional** 110:24

**employed** 27:11

**employee** 85:1

**employees** 30:1,2

**end** 116:5

**enforce** 60:16 61:23,25 107:16

**enforces** 60:21 61:10,16,20 62:3,9, 19 104:15

**ensure** 15:23 16:1 29:18 30:16 84:18

**ensuring** 31:3

**entitled** 115:1

**entity** 70:23 71:2

**environment** 89:5

**equal** 59:10 64:15 65:2,8

**Eric** 7:5,13 69:10

HAVERKAMP v.
LANETTE LINTHICUM
Case 4:14-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 38 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

**escorted** 89:5

**Estelle** 8:24 9:19,25 18:24

**estrogen** 45:2,20 53:8 54:8

**et al** 11:1

**evaluation** 30:18

**evaluation/notes** 110:22

**evaluations** 111:7

**event** 107:8,12

**evidence** 18:3 37:22

**exact** 12:13

**EXAMINATION** 7:9

**exception** 72:21

**excessive** 10:14

**exclusive** 72:2

**exhaust** 72:24 73:1,4,16

**exhibit** 24:9,10 41:15,16 58:21,22
63:22,23 69:4,5,18 74:17 84:6,7 85:9,
10 96:7,8 98:4,5 108:8,9

**experiencing** 75:11 91:14

**expert** 10:15,17,25 11:5,8,15,18,19,
20,21 12:6,8,11,17,20,21,22,25 13:2,
5,13,18,20 23:21 62:15,18 115:16

**expertise** 10:21 66:14 115:11,13,18

**experts** 23:22

**expressing** 26:11

**extent** 65:6

**extra** 15:17 16:1

---

### F

**facilities** 19:25 20:14 21:16,23 28:21
30:3 33:10 87:25 89:22,23 90:1 94:6,
7,12 103:16 104:25 111:16

**facility** 9:1 14:25 15:1,14,17,18 16:8,
20 17:9 18:19 19:23 20:9 28:23 29:8,
23,25 30:21,23,25 31:9,12 32:11,23
33:2 36:18,21 37:17 39:6 48:25 49:1
77:11 80:7 81:9 84:14,19 86:18,21
88:3 90:7,12,24 92:2,18,19 93:14
94:4 95:6 99:12,14,16 100:7,9 101:11
105:4 106:6

**fact** 50:12 56:2 114:5

**fact-finding** 37:25 38:3 39:19,21,24
40:4 45:14 49:7 52:13 53:1,5,11 55:5

**Factor** 7:10,18 24:11 41:2,10,17
47:14,21 50:23 51:11 57:1,18,22
58:23 60:13 61:1,8 62:8 63:21,24
65:6 69:2,6 70:20 71:3,12,14 73:24
74:6 75:19 79:1 80:25 81:10 84:8
85:11 87:12 90:19,25 96:9 98:6
105:10,12 106:17 107:8 108:10
113:11,17 114:25 115:7 116:11,14
117:4,6

**facts** 38:12 97:6

**failed** 9:21,23 70:16 72:17,23 73:1,4

**fair** 109:21

**fall** 28:24 30:7,20 38:25

**falls** 29:2,3 31:24,25

**familiar** 35:12 97:13,19

**February** 76:7,12 77:8

**feel** 88:5 89:3 103:10

**felt** 17:7 102:20 105:5

**female** 15:15,16,21,25 21:24,25 22:8
59:21 60:1,4 62:24 89:23 94:7,11
96:23 100:7 101:15,18 102:2,8
103:16 108:3

**females** 64:17,21 94:6

**feminine** 103:8

**field** 14:5 34:3

**file** 14:10 17:20 38:16 73:16

**filed** 37:15,21 41:23 54:22 58:24
67:21 97:13

**files** 38:17 48:10

**filing** 17:4

**final** 81:10,20,25 82:6

**findings** 46:18

**finish** 8:12,13

**Fitzpatrick** 21:11,14

**five-minute** 75:14

**folks** 87:13 90:14

**follow** 73:10,13 93:20,22 94:21,25

**force** 10:14

**foreclosed** 70:8

**forgot** 73:23

**forward** 85:2,3

**forwarded** 46:23

**Fourteenth** 59:11 64:15

**fourth** 42:19

**Frequency** 86:16

**front** 8:1 10:8 20:18

**full** 13:23

**FYI** 84:10

---

### G

**G-51.11** 36:7 49:24 53:14 56:2,6,16,
21 57:11 60:15,22 61:21 104:18

**G-51.11.** 53:12 55:9

**G1** 83:10

**G2** 83:1,4,10 89:16,19 92:11

**G2s** 89:17

**G3** 89:20

**G4** 89:20

**Galveston** 42:2 44:25 47:18 48:3
49:14 99:16

**Garcia** 78:2,13,15,21,24 80:21 81:19
82:4

**garments** 102:17 107:23

**gather** 38:12

**gender** 25:13,19 42:4,9,14,19,24
43:7 44:24 48:16 49:16,17 56:17,22
59:3 60:15,17,22 61:11,14 66:10,13,
21 67:4,10 69:20 70:7 75:11 82:21
90:20 91:14 105:15 107:4,13 108:12
109:16 110:12 111:19

**general** 17:17 18:2 52:17 59:1 73:3
87:20 89:6

**generally** 68:25

**genitalia** 90:6

**get all** 94:13

**get-go** 115:16

**Gibson** 70:8 72:5

**GID** 42:2

**give** 13:23 22:23

**Glossbrenner** 36:18

**good** 7:11 116:3

**Gordon** 108:13,24 111:18

**govern** 88:15 89:21

**gowns** 98:12

---

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:14-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 39 of 48

Eric Guerrero
July 20, 2023
30(b)(6)

**grievance** 14:10 23:6 37:15,16,17,
18,19,24,25 38:7,14,16,18,20,22,23,
24 39:3,4,6,7,16,19,22 40:20 41:17,
23 42:5,12,16 43:4,8,11,15,17,18,20,
23 44:3,6,7,8,9,11,12,13,16,17,21
45:5,8,11 46:6,15,24 47:12 48:6,9,10,
11,14,15,20,22,23,24,25 49:11,12,21
50:2,12 51:3,13,20,22 52:1,2,13,14,
18,20,23 53:19 54:3,5,12 55:8,10,22
56:8 73:9,13

**grievances** 14:11,12 23:3 37:6,9,10,
13 38:4,6 39:1,12 40:9,12,16 44:1
48:22 49:4,5 54:14,18,19,22 55:2,4,
15 56:2,5 58:10 73:8

**grooming** 95:20 96:10,15

**ground** 7:21

**group** 14:23 18:20 35:1,5,7,10,11
89:20

**groups** 35:3

**guards** 103:3

**Guerrero** 7:2,5,11,13 14:1 57:22
68:25 69:6,10 75:20 113:17 116:14

**guess** 13:10 15:7 50:19 89:21 94:8
115:3,9 116:19

**guidance** 25:3 75:10 91:13 95:12

**guidelines** 94:21

**H**

**hair** 63:6 96:18,21,24 111:1

**half** 57:16

**halls** 89:9

**hand** 7:3

**handbook** 53:17,18,20,22 54:2

**handle** 93:5

**happen** 55:17 56:4 57:3,5,7 62:11
107:2

**harassed** 17:8

**hard** 9:23

**Haverkamp** 7:19 11:1 14:12 19:10
23:4 36:24 37:3,14 40:8,17,19,21,24
41:11,22,23 42:1,12,18 43:4 44:23
45:13,18 47:22 48:7,10,12 50:1,8,16,
19 51:5,15 52:25 53:6 54:7 59:1,25
60:6 62:23 63:4,11,14,16,18 64:16,20
65:13,15 67:22 68:2,11 70:16 72:17,
23 73:1,4,9,16 74:20 75:4 76:3,10,11
77:17,22 78:4 79:6,11,22 80:1,5,11

81:6 82:9,15 83:1,6,21,24 86:10

**Haverkamp's** 26:20 40:12 43:11
48:15 52:14 54:20 55:8,14 56:1 59:8
63:25 64:15 65:2 73:8 76:6,19,23
78:8,19 79:2,17 113:21

**head** 8:9 91:10

**health** 23:6 34:12,18,22 35:4,11,15
39:9 44:10 46:14,18,23 48:4 49:2
51:1 52:10 61:23 62:1,21 68:23 84:25
93:17 105:8 108:19 109:15 110:16,18
111:13

**healthcare** 26:18 68:24 107:9

**heard** 103:3

**hearing** 9:23 102:9

**held** 27:18 28:11

**HG** 111:20

**high** 31:3

**higher** 17:2 45:1,19 53:8 92:12

**highlighted** 24:16,19,21 70:12
74:19

**Highway** 7:17

**Hilltop** 21:22

**history** 82:11,13 92:13

**hold** 28:8 34:9

**Holmes** 14:14,17,21 15:10 16:12,24
17:14 18:8 19:2,17,21,24

**home** 7:14,15

**Hopkins** 97:14,15,18

**hormone** 42:3 43:6

**hormones** 42:7 43:5 47:3 49:15
50:8,13 51:6,16,23 60:6

**Hospital** 44:25 49:14 99:16

**hour** 22:22 57:16

**house** 17:12 22:8 33:21,23

**housed** 17:15,16 21:15 30:18 53:21
76:3 78:10 79:3,9,15 80:10 81:13,15
89:14,19,22 90:14

**houses** 14:6 86:22

**housing** 17:6 25:12 29:20 77:5
82:20 89:11,16,18 90:20 92:20,21,23
94:20 101:20 102:4 113:6

**Hughes** 77:19 78:20 79:7,11,17,23,
24 80:2,6,7,12,14,16,19 81:7,9

**huh-uhs** 8:10

**Huntsville** 7:17 28:21 114:12

**hygiene** 63:1,5,8,18

**I**

**I60** 88:6

**identification** 23:9 24:10 41:16
58:22 63:23 69:5 84:7 85:10 96:8
98:5 108:9

**identified** 58:2 66:18 69:8 70:11
96:22

**identifies** 90:6

**identify** 53:24 87:24 88:7 93:18

**identity** 108:12 109:16 110:13

**immunity** 72:21

**implementing** 110:14 111:11

**importance** 111:25

**inability** 110:23 111:8

**inaudible** 106:13

**incarcerated** 14:11 30:19

**incident** 17:11

**incidents** 17:2 103:12

**includes** 66:17

**including** 51:12 62:25

**increase** 17:2

**increased** 17:11

**indicating** 88:7 104:10

**individual** 17:5,7 18:2 37:16,20
46:17 62:17 71:24 89:4,24 97:25
101:24 113:5

**individual's** 17:25

**individuals** 77:5 84:22 92:9,13
103:10,15 113:24

**inform** 87:23 88:3

**Informally** 82:17

**information** 38:13 52:22 87:4
114:24

**informed** 40:14 41:7

**initially** 44:7 76:7

**inmate** 8:25 9:5 10:2,13 15:13,24
17:2,9,20,23,24 18:19 20:2,17 21:18
29:5,6 30:14,19 32:7,17,22 33:3
37:24 38:16,17 40:6 52:24 53:2,21

54:20 77:12 81:6 83:2 89:12 92:24
96:10,15,22,23 97:18 98:2 99:8
101:23 102:3,12,20 103:2,6,7,9,19
107:3,9,12 112:13,14

**inmate's** 9:17 105:15

**inmates** 10:6 11:11 14:6,9,10,25
15:11,20 16:5,6,10,25 17:1,12,15,21
20:7,11,21,25 21:13 23:7 25:4,13
29:18 30:17,22 32:10,12,14 35:19,22
36:2,12 40:15 62:4,24 72:3 75:11
76:25 77:2,11,15 79:20 81:23 82:10,
21 83:13 84:20 85:14,21 86:6,22
87:6,10,20,23 89:8,22 90:20 91:14,21
92:5,10 93:8,13,25 94:6,16,19 95:4,6,
8,13 97:24 98:9 99:23 100:6,24
101:1,3,12,15,17,19 102:14,16,23,24
103:5,10,18,22,23 104:4,8,16,17
105:13,19,21 107:20 113:2,3

**inquired** 44:25 45:18 53:7 54:7

**inservice** 91:25

**inside** 103:13

**insight** 53:18

**instance** 104:16

**instances** 9:10 102:16 105:24

**Institution** 28:2,9

**institutions** 11:13 27:17,25 28:18,
25 29:2,18 34:15 38:25

**intake** 29:1 30:23 36:6 53:23 88:2
93:16

**intent** 71:22

**interact** 36:23

**interacted** 37:2

**interacting** 94:15

**interrogatories** 12:23

**introduce** 24:8 69:2 108:8

**investigate** 39:21 45:10

**investigation** 17:6,21,23 18:3,5
39:4 45:7 49:7 50:5 52:1,16,17,18,21,
24 55:6

**investigations** 17:3

**investigator** 37:25 38:3 39:19
43:17,18,23 44:8 46:6,25 51:13 53:6

**investigators** 38:24

**involved** 33:11,15 34:11 35:18,21
47:24 64:6,9 82:1,2 103:15

**involvement** 36:7 37:1 78:7

**involving** 10:1

**issue** 11:20 12:8 39:21 70:8 90:17
102:3 105:17

**issued** 20:15 98:23

**issues** 12:9 17:13 44:8 58:2 66:17
69:8 70:11 94:11 101:19,23 102:9,18
103:14,17

**issuing** 33:9

**items** 19:22 20:13 62:23 63:1,5,18
111:2

**IV** 14:20 28:6,22 52:7

### J

**jail** 30:17

**January** 42:8 48:10,17

**jealousy** 103:14,17

**Jennifer** 22:18

**jeopardy** 17:7

**Jesse** 108:12,24

**job** 116:3

**joint** 35:10

**Joseph** 108:11

**Joy** 52:6

**judge** 8:1 10:9

**July** 67:23 68:1

**June** 67:19 96:10,17,23 97:1 98:7
108:11

**jural** 70:23 71:2

**jurisdiction** 70:6

**jury** 8:1 10:9

**Justice** 27:7

### K

**Kelly** 108:24 109:1 111:17

**kind** 10:12 18:20 20:8 28:1 38:3
71:22 73:23 85:11 91:25 93:1

**knew** 115:15

**knowledge** 25:25

### L

**L.E.** 18:22 19:2

**lacks** 71:17

**language** 110:22 111:6

**Lannette** 63:24

**late** 10:10

**laundry** 11:12 14:4 20:1,16 21:2
31:18 36:4 58:9 95:21 98:3

**lawful** 7:6

**lawsuit** 7:19 13:21 64:4 76:20 97:9,
10,12,13,20

**lawyers** 22:16,21 23:11

**layer** 39:24

**layers** 39:18 49:6 50:5 51:3,11,19

**legal** 65:4 70:18 71:11

**legitimate** 72:11

**Leon** 8:22 9:14

**letter** 48:16

**level** 17:17,18 31:3 40:4 55:5 83:11,
12 85:25 86:1,10 92:11

**levels** 44:12 51:12 55:6 83:9 85:18

**licensed** 26:17

**lieutenant** 31:16

**life** 17:25 18:4 102:20

**Lily** 97:13

**lines** 85:22

**Linthicum** 11:1 22:13 42:13 48:4
64:3 65:2,9,19 70:23 71:5 85:5
110:19 111:13,17,22

**Linthicum's** 58:14 63:24 64:13
65:15,18 67:13

**list** 35:10 84:10,16 85:2 87:3 114:1

**listed** 56:8 97:3

**litigation** 10:16

**live** 17:18 89:16,20

**lived** 76:10

**living** 89:17

**located** 15:1 84:18

**long** 22:20 27:13,18 43:13,16 46:1,3
57:11 63:6 91:23 96:18,21,24

HAVERKAMP, et al. v.
LANETTE LINTHICUM

4:20-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 41 of 48
30(b)(6)

Eric Guerrero
July 20, 2023

**long-hair** 25:4 62:25 63:5,11 67:16, 22,24 95:12 96:13 97:19

**Lonnie** 14:15

**looked** 14:8,11 37:9 38:12 43:24 50:7 73:8 77:5

**lot** 102:13

**lowest** 83:21 84:3

**Lozada** 21:21 22:11

**Lumpkin** 27:21,22 34:15

---

## M

**made** 73:19 74:7,13 81:10,14,20,22 97:4,5

**mailroom** 29:1

**maintain** 66:4

**major** 28:12 31:11,19

**make** 8:10 27:1 47:13,18 90:2,3,4 94:20 96:1 103:20 104:21,25 108:6

**makes** 99:7

**makeup** 111:1

**making** 92:4 108:2 111:25 112:5,20

**male** 15:22 17:8 19:23 20:13 21:3 63:7,8 89:22,25 90:1 94:6,12 96:17, 22 98:2,21 99:20 100:9,24 101:1,3, 11,12,17 102:16,23 103:5,7,15 104:16,17 105:19,21,25 106:3,4,6,10 112:14,15

**males** 22:9 102:8

**manage** 92:14 93:13 94:3

**Managed** 23:6 34:12,18,22 35:10 109:14

**management** 38:22 39:9,10,14 87:2

**manager** 43:15,16 46:1,3,18

**manages** 109:16

**managing** 16:19 28:23 102:3

**manner** 15:23 60:17,22 61:11

**manual** 36:4,5 58:8 88:18 93:23 96:5

**manuals** 93:3,4,6,9

**March** 85:13

**mark** 24:8 46:17 58:20 63:22 69:3 84:6 85:9 96:6 98:4 107:1 108:8

**marked** 24:10 41:15,16 58:22 63:23 69:3,5 84:7 85:10 96:8 98:5 108:9

**Matchett** 52:6,12

**materials** 37:7 41:18 58:5 75:10 91:13 95:3,18 96:2

**matter** 11:1 12:6,9,12 13:9,13,16,18, 21 26:21,24 58:24 76:6

**Mcconnell** 14:19 15:7 16:10,21 17:10 36:15,21

**Mcdaniel** 41:2 80:25

**means** 8:9

**meant** 10:19

**measures** 16:24

**measuring** 99:20

**medical** 20:15 25:19 26:14,15 29:5, 9,11,14,15,19,20,23,25 30:9,21 31:17 32:12 38:8 39:2,20 40:1 42:13 43:24 44:1,2,4,14,18,21 45:8,14,24 46:13, 17 47:17 48:2,24 49:4,5,7,12 50:6,21 51:4,12,14 54:4 55:12,19,20 60:8,9, 10 61:24 62:15,18 65:13 66:14 69:13 70:2 71:7,23,24 72:4,12,14 74:5,12, 21,22,23 75:5 98:1,21,22 99:7,10,13 104:20,24 105:4,9 107:6,14,15,17,18, 22 108:1,5,21 111:6 112:19 115:10, 12,13,14,16,18

**medical's** 45:17

**medical-related** 38:7 44:11

**medically** 69:20 105:14 107:24 109:8,13,18,23 110:3

**medically-necessary** 68:11

**medium** 83:15

**meet** 22:16,20

**meeting** 23:12 108:13,23 109:1

**meetings** 34:14,16,19,20

**meets** 79:19

**member** 31:13,16,19 71:2 88:1

**memoranda** 25:2 75:9 91:12 95:3, 11

**Memorandum** 96:10

**memory** 14:10 20:8 21:12 95:23

**men** 102:2 106:1

**mental** 42:15 46:14,18 93:17 108:19

**mention** 16:25 53:16 95:5 100:18 105:11

**mentioned** 15:6 16:9,13 17:12 22:7 78:22 110:10 113:20

**mentions** 100:22

**met** 42:2 111:18

**Meyer** 42:2,3,8 108:12,24 111:18

**Meyer's** 111:19

**Michael** 14:15 18:11,12,21,24 19:3,6 22:18

**middle** 85:19

**miles** 76:16

**mind** 9:2 57:15 113:11

**minimum** 83:4,13,14,17

**minutes** 57:17

**misstates** 51:8 70:25

**mitigate** 72:17

**monitors** 110:16

**month** 8:23 9:3,20 67:18

**monthly** 34:13,17 35:5

**months** 27:19 43:10,21

**motivated** 71:22

**Mountain** 21:22

**move** 32:22 57:14 75:22 77:10 79:11, 23,24 80:1,3,6,12

**moved** 19:10 32:10,12 77:1 80:13 81:9

**moving** 28:17 32:14 75:7 76:25 77:15 82:19

**multiple** 54:22 55:5

**Murray** 30:11,12 48:2 68:21

**Murray's** 26:23

---

## N

**named** 46:14

**names** 8:20 77:6

**Native** 97:8

**natural** 59:19

**nature** 97:7

**necessaries** 62:23

**necessarily** 30:23 32:18 89:17 103:9

**necessities** 98:7,12,16 99:1,4,23 100:3,15 104:13

**needed** 29:19 33:2 34:6,7 36:10 47:19 50:8 67:24 73:10,16 104:21

**needing** 29:24

**negotiator** 42:3

**nodding** 8:9

**non-discriminatory** 72:11

**non-medical** 68:25

**non-utmb** 69:1

**nonresponsive** 105:10

**Norsworthy** 14:16 18:22,25

**North** 7:17

**notes** 24:3 27:1 46:7 111:7 114:6

**notice** 24:1,12,13

**notified** 12:16,22

**notify** 9:22,24

**number** 83:10 86:17 87:16

**nurse** 26:17 52:10

**nurses** 99:11

**O**

**oath** 7:3,22 57:23 75:20 113:18

**object** 78:23 105:10

**Objection** 47:11 50:21 51:8 56:24 60:8 62:6 63:19 65:4 70:18,25 71:10 87:8 90:16 107:6 114:23

**obligation** 26:6

**October** 41:24 42:1 43:1,21

**offender** 44:23 50:2 53:16,18,22 54:1

**offenders** 16:19 89:11 96:18 98:21 99:20 108:3 112:1,7

**offer** 46:10

**office** 34:5 49:3,8 88:1 114:11

**officer** 10:13 24:23 28:12 91:17,23 92:24 95:2,5

**officers** 91:20 93:24 94:15 102:4

**official** 71:1,21 72:10 78:12 84:24 88:6,7 108:18

**on-the-job** 92:17

**open** 9:24

**operating** 16:17 22:5

**operation** 93:3,4,8

**operations** 28:20 34:3 87:2

**opinions** 25:17

**order** 73:16 110:10 116:25 117:5

**ordered** 107:15 110:4,6,8

**orders** 16:16,18,21 20:15 22:6 92:2 95:5 107:17 108:2 111:25 112:6,20

**Orientation** 53:22 54:1

**overruled** 82:6

**oversee** 28:20 30:15

**oversees** 28:3 33:7 38:23

**oversight** 111:14

**Owen** 26:23 48:2

**Owens** 30:9

**P**

**p.m.** 7:1 57:20 75:17 113:15 117:19

**P1** 83:14

**P2** 83:3,5,6,12,13 84:3 86:8 92:11,23

**P3** 83:13,14 92:23

**P4** 83:13,14,15 92:23

**P5** 83:13,14,15

**P7** 86:8

**pain** 42:15

**panhandle** 29:10

**panties** 20:23,24 21:2 25:4 62:25 63:5,8,14 67:22 68:2 95:13 100:6,8,9, 18,25 101:4,9,11,14 102:23 103:5,21, 22 104:5,8,9,13,16,17 105:13,19,21, 23,24,25 106:1,3,4,6,10,24 107:3,9, 13,19,23 108:2,6 109:7,12,17,22 110:2,7,10 112:1,6,9,14 113:1,2

**pants** 98:12 102:13

**paperwork** 12:18

**paragraph** 49:20,23 59:7,18 60:14 64:13 65:12,17,25 66:3,6,8,22 67:4, 13 68:9,10,16 69:19,25 70:12,15 71:1,4,20 72:9,17,23 75:4 98:11

**parentheses** 111:18

**Parker** 8:22 9:14

**part** 29:10 34:20 35:14 53:25 58:7 86:4 97:16,21 105:7 110:5,15

**Parte** 72:20

**participate** 35:6

**partners** 74:5,12

**party** 13:8

**pass** 62:25 63:5,11 67:22 97:19 116:11

**passes** 25:4 67:24 95:12 96:14

**pat** 16:1,7

**patients/clinics** 111:20

**Penn** 50:22,25 108:11,17,20,23,25 109:16 111:9,10,14,17,21

**people** 33:20 90:13,15 103:11

**Percent** 86:19

**percentage** 86:19,23

**perform** 42:14

**period** 48:17

**person** 14:18 33:22 43:14 52:8 69:10 90:17 91:1 110:12 111:10

**personal** 9:12

**personally** 31:1 37:2 52:8

**personnel** 45:24

**phone** 78:17

**physical** 16:2

**physically** 101:24 102:6

**place** 7:3 11:13 14:3 15:2 16:16 17:5 22:2,6,8 31:4 35:24 42:25 49:18 56:12,14 57:12 76:7

**placement** 88:13

**plaintiff** 7:19 25:8,12 59:20 71:16 75:23 82:21

**plaintiff's** 24:11 37:6 58:2,23 69:7

**plan** 23:8 42:25 49:18 83:10 88:19 93:15 94:1

**Plans** 34:2

**PM** 43:13

**point** 42:15 47:6,21 50:16 59:7 109:3

**policies** 10:5 11:10,12 14:3,4 15:2 16:11,13,14 19:15 20:9,24 21:5 22:2, 5 23:4,5,8 25:2 33:5,7,12,15,21,23 34:1,4 35:18,22,24,25 36:1,3,6,12 58:9 62:9 73:9 75:9 84:19 87:19 88:15 89:21 90:13 91:11 92:1 93:16 94:1,8,9 95:2,7,10,21,24 97:23 99:22 100:2,5 106:9 107:18 109:11,17,22

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:14-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 43 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

110:7,14,17

**policies/practices** 109:7 110:2

**policy** 21:2 23:8 33:9,20 36:8,9
49:14 53:12,14 55:16 56:2,6,8,16,21
57:2,4,8,11 60:15,17,22 61:10,13,16,
21,24 62:3,19 67:16,25 87:21 88:11
90:9 91:6 92:7 93:12 96:13,15,16
97:1,5,10,11 98:6,8,17,19,24 99:1,4,
19,25 100:12,14,15,18 101:3,8
102:22 104:8,12,14,18,20 105:11,20,
22 107:22 108:1 109:15 111:6,11
112:5,9,20 113:2

**population** 15:4,6,14,22,24 17:17
18:2,19 20:2,13 21:3,24 63:7,9 77:3
85:14 87:20 89:7 92:14 93:5,14 100:8
102:3,12 105:25 106:3,11 113:7

**populations** 94:18 95:24

**portion** 53:25

**pose** 102:8

**posed** 82:9

**position** 66:11

**possibility** 21:16 47:22 112:22

**possibly** 39:20 40:1

**post** 22:6 92:1 95:5

**postoperative** 90:13,17 91:1

**practice** 10:23 43:15,16 46:1,3

**practices** 14:10 20:9 22:7 84:20
108:5 109:11,22 110:7,10,17 111:15

**pre-service** 91:22 92:3,15

**PREA** 93:8,10,11 94:21

**precaution** 23:5

**precautions** 15:17

**premised** 71:7

**preparation** 21:10,20 23:14,18 52:3

**prepare** 14:1 22:16 26:7 37:7 58:5
95:18 96:2

**prepared** 12:2 13:20 24:15,18,24
25:5,14 75:25 82:23 95:14

**preparing** 19:11 41:18 64:6,9

**prescribed** 59:19 107:3,9,13 112:14

**prescriptions** 107:19

**present** 23:11 31:17 112:11

**Pretty** 38:2

**prevention** 34:25 35:3,11,14

**previously** 41:14 69:3

**prior** 13:5 22:14 28:8 77:10 91:24
96:23

**prison** 10:24 23:7,8 33:7,11,21,22
36:12 38:11 86:9 87:11,14,15 88:2
93:12,15,16,19,21 94:1,21 96:5

**prisons** 14:8 28:3 36:5 53:25 58:7
93:10 106:5

**Prisons/prea** 93:4

**privileged** 78:25 114:23

**procedure** 19:13 20:20 87:21 96:5

**procedures** 10:5,23 14:8,9 16:17
20:17,24 22:6 23:6,7,10 25:2 31:4
36:4,5 58:8,9 73:13 75:9 84:20 88:17
91:12 92:19 93:19,21 95:2,11 96:4

**proceeding** 10:16

**proceedings** 7:1

**process** 30:24 38:1,15,17 45:7 48:21
88:16

**processes** 55:5

**processing** 53:23 88:2

**products** 111:1

**professional** 26:18 49:4,8 51:14
71:23

**professionally** 37:2

**Program** 50:3

**Programs** 38:10

**progression** 59:19

**prohibit** 55:16 56:4,18,19 57:2 61:13
62:11 101:6 107:19

**prohibited** 74:10 105:3,24,25 106:1,
3,12,18,20,21,22,24

**prohibition** 106:4,7

**project** 15:21

**projecting** 15:15

**proof** 46:11

**propounded** 7:7

**protect** 15:24

**protection** 15:25 17:3,20,23 59:11
64:15 65:3,8 89:3

**protective** 88:19,21,24 89:2

**protocol** 25:2 95:11

**protocols** 75:9 91:12 95:2

**provide** 21:2 26:4 29:19 43:19 52:24
63:8 65:20 71:24 72:14 91:19 98:2
103:21,25 104:15,17 106:10

**provided** 20:8,10,16 23:10 46:10,13
53:2,6,15,18 58:10 59:20 62:1 63:5
67:21 68:2,6 74:23,24 75:2 81:8
100:9 102:15 104:1,9 105:23

**provider** 49:14 99:10 107:10,16

**providers** 105:4

**providing** 20:24 42:13 98:8 99:23
102:22 103:4 104:4,8 105:18,21
110:25 113:1,2

**provision** 20:23 25:3 46:11 54:15,
17,18 95:12 97:24 100:6

**provocative** 101:22 102:18 113:7

**publication** 66:5

**publicly** 94:22,23

**publish** 66:4

**purports** 66:4

**purpose** 52:17,20 84:15

**purposes** 108:20

**pursuant** 72:24

**purview** 29:3

**pushes** 105:4

**put** 22:5 41:14 46:17 66:15 87:17

**puts** 46:7

**Putting** 24:9

**Q**

**quarterly** 34:17

**question** 8:4,5,6,12,14 35:20 41:1,6
50:19,22 56:20 57:4 60:24 61:4,15,
16,24 65:5 70:19 71:11 74:3,13 81:3
95:25 99:3 107:7

**question's** 11:4 62:2

**questions** 7:7 18:21 20:6 26:11
115:5,9,10,17 116:12,13

**quick** 57:15,17 75:14 113:12

**R**

**raise** 7:2

**ranks** 28:11

**reach** 21:21

**reached** 25:18

**read** 41:2,5 58:16 61:2,3 73:24 74:2 80:25 81:2 85:22 116:22 117:11

**reading** 110:9 116:24

**real** 75:14 85:22

**reason** 13:23 102:22 103:21

**reasons** 72:12 101:14 103:24 113:9

**reassignment** 21:5,6 40:9,13,15,20, 21,25 41:9,11 42:4,9,14,20,24 43:7 44:24 48:16 49:16,17 54:19 56:3,11, 16,22 57:11 59:3 60:16,17,22 61:11, 14,21 62:4 69:20 73:20 74:8,14 104:19,22 105:1

**reassignments** 54:23

**recall** 13:19 16:23 18:9 20:6 22:12 35:17 36:25 54:1 56:13 73:11 90:5 94:2 99:24 100:13 113:25

**receive** 24:12 27:9 40:21,24 41:11 51:6 62:4 99:9 100:8 101:3

**received** 13:4 23:3 60:6 84:9

**receives** 39:7 84:21

**receiving** 72:3 78:16

**recent** 83:20

**recognize** 63:25

**recognized** 66:9,12,20 67:3,10

**recollection** 22:25 78:5

**recommend** 42:4 88:12

**recommendation** 79:10

**recommendations** 46:19 108:2,6 111:25 112:6,20

**recommended** 34:4 43:7 110:3,5,8

**record** 7:12 57:18,21 75:16,18 113:14,16

**records** 28:7 30:16 32:21 46:10

**redacted** 85:16

**redesignate** 77:3

**refer** 51:1 55:20 70:2 74:4,11,22 93:17 94:2

**reference** 11:10 52:22 53:16 73:2 96:15

**referenced** 45:24 53:14 81:16

**references** 49:23 55:9

**referred** 55:11 87:1 99:13

**referring** 36:1

**refers** 104:20,24 108:20

**refresh** 21:12 22:25 78:5 95:23

**refreshed** 14:9

**refresher** 92:1

**refreshing** 20:8

**regard** 29:5 30:14

**Region** 14:20 19:4,7 28:5,6,14,21,22

**regional** 28:5 31:23 85:3 87:5

**Registered** 52:10

**regular** 48:25 89:6

**Rehabilitation** 38:10

**related** 23:4,5 49:5

**relates** 66:18 69:11 91:16

**relating** 16:25 21:5 25:3 35:19,22 36:1 40:13 54:19 75:10 91:13 93:7 95:3,12 97:19,23 100:2,5 110:23 111:7

**relationship** 29:13

**relationships** 103:13,14

**relevance** 90:16

**relevant** 90:19 98:13

**relief** 71:17 110:24

**religious** 38:9 96:19,20

**rely** 96:2

**remedies** 72:24 73:1,3,16

**remedy** 50:2

**remember** 8:24 10:11 77:1,20,23 78:9,12,13,16,18 97:2,8,17,21 113:23

**removal/extension** 111:1

**removed** 77:2

**repeat** 95:25

**repeated** 67:2,9

**replacement** 45:1,19 53:8 54:8

**reply** 7:6

**report** 11:21 12:8 13:20 27:20 30:5 31:23 34:18 59:5 66:15 84:11,12,15, 21 85:5,13 87:17

**reporter** 7:2 8:8 41:4,5 57:21 61:1,3 73:25 74:1,2 75:16,18 81:2 106:14 113:14,16 116:17,21 117:1,4,8,11,16,

18

**reporting** 17:11

**reports** 11:21 28:4 31:21,22 32:3

**representation** 80:21

**representative** 9:11,13 12:25 23:25 65:22 66:16 67:5 68:15 69:24 70:10 74:6

**represents** 64:3

**request** 9:16,17 17:4 29:7 41:11 49:17 77:20,24,25 78:1,8,11,14,17,19 79:2,6,8,13,17 80:15,22 81:11,21 82:15 88:7,10 98:22

**requested** 42:23 50:1 71:17 77:18

**requesting** 32:19 44:23

**requests** 25:9 29:5,11,14,16 32:7, 10,17 34:3 75:24 77:21 79:14

**required** 12:10 18:1 46:10 72:4,24

**requirement** 79:19

**requires** 59:21

**requiring** 12:18

**reserve** 116:13

**resolve** 42:23

**respect** 24:22 29:14 31:2 32:7 33:5 35:21 36:1 58:1 66:17 68:22 91:20

**respond** 37:10 45:11 52:13

**responding** 37:13

**responds** 43:10

**response** 11:24 38:8 39:22 40:6 43:12,19,25 44:22 45:4,17 49:11,21 51:20,22 52:24 54:5 56:9 61:9 65:24 97:10

**responses** 25:8 37:6 47:12,16 50:13 51:9 55:14 68:21 75:23

**responsibilities** 28:19 29:4 30:13 32:6 33:4 37:12

**responsibility** 29:17 31:1 37:10

**responsible** 32:16 36:11 37:20 39:11 52:12 110:13 111:10

**responsive** 47:14

**rest** 113:7

**restate** 51:21

**resulted** 76:22

**retain** 10:17

HAVERKAMP v.
LANETTE LINTHICUM

Case 4:17-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 45 of 48

30(b)(6)

Eric Guerrero
July 20, 2023

**retained** 10:15,25 11:5 12:11,13
13:17 23:20

**retainer** 12:14,16

**retired** 19:1

**review** 25:8 29:15 33:23 34:5 35:24
37:5,7 38:21 39:1,8,14,25 40:1,5
44:13,16 46:2 48:19 49:12 51:4,5,12,
14,19 52:3 54:15 55:14 58:5,12,14
75:23 78:11 79:14 88:14 95:21 105:5
117:10

**reviewed** 14:3,7 18:6 30:21,24 38:13
41:18 44:2,3,6 49:19 54:3 64:11
111:24

**reviewing** 39:11 78:7 81:22

**reviews** 33:21 35:7 49:4 50:7 51:3
93:11 111:15

**revising** 36:11

**revision** 36:10

**revisions** 33:8,11,18 34:4 97:5

**Rhett** 18:11

**rights** 59:8,10 64:15 65:3,8

**Risk** 38:22 39:8,14

**RN** 52:9

**role** 27:18 28:17 29:14 34:8 35:23
36:10

**roles** 28:8,19 29:4 30:13 32:6,8,14
33:4 34:9

**rosters** 92:21

**rules** 7:22 93:4

**rush** 117:6

---

**S**

**Safe** 14:8 23:7,8 36:5 53:25 58:7
87:15 88:2 93:3,10,12,15,16,19,21
94:1,21 96:5

**safekeeping** 14:6 15:12 25:12 80:8
82:20 83:1,3,5,12,22 84:3 86:8,10
87:20 88:9,10,13,19,21,23,24 89:2,6
92:20,24 93:15 95:6

**safety** 17:7

**scale** 83:17

**scheduled** 76:7,20,23

**scope** 12:19 47:11

**screen** 24:16,19,21 41:15 58:25
84:1,8

**searched** 16:6

**searches** 16:1,4,7

**section** 53:2 100:23

**securities** 94:10

**security** 9:21 10:23 11:10,12 14:4
15:3,6,9,13,16,19 16:1,9 22:10 23:5
28:11,12,20,24 31:13,15 81:5 82:9
84:20 85:25 86:1 92:14 94:11 96:9
101:16,23 102:1,9,23,25 103:2
107:16 112:25 113:4,8

**security-related** 94:8

**seg** 85:25 86:1

**Segovia/lopez** 36:19

**send** 48:24 117:14

**sending** 111:21

**sends** 43:12

**senior** 14:19 28:13 31:10,14

**sense** 8:10

**sentence** 60:14 66:6,8,25 67:6,12
68:13 69:21,25 70:12 74:19 98:11
110:21

**separate** 17:5 18:2 89:15 100:23

**separated** 17:19,21

**separately** 17:12,15 92:8

**separation** 17:20

**serve** 13:18

**service** 110:16

**services** 11:13 20:1,16 35:4,15 39:9
44:10 46:11,24 48:4 49:2 51:1 52:10
58:9 61:23 62:1,21 68:23 84:25 89:9
105:8 110:18 111:14

**serving** 12:6

**sessions** 114:19

**sex** 21:4,5 40:9,13,15,20,21,25 41:8,
11 54:19,22 56:3,11,16,21,22 57:10
59:3 61:21 62:4 73:20 74:8,14
104:18,22 105:1

**sexual** 15:23

**sexually** 101:25 102:6 113:6

**shaking** 8:9

**share** 41:15 58:20 63:21 85:8 96:6
107:1

**sharing** 58:24 84:6 87:4 98:4

**shirts** 98:12

**shorts** 102:12

**show** 24:6 85:12 101:18

**shower** 20:18,19,20

**showered** 92:8

**showers** 19:25 20:17

**shows** 42:25 49:18

**sick** 29:7

**side** 22:8 33:21,22 86:14 107:16,19

**sign** 12:19,23 116:22 117:10,11

**signature** 116:22

**signed** 42:25 46:13,23

**silent** 60:15 101:9 104:13,18,22
105:1

**similar** 48:15,21 55:4 85:8 89:19
111:1

**similarly** 59:21 60:1 62:24 64:16,21

**single** 89:4

**sir** 7:24 8:3,11 9:18 10:3,7,20 11:7,22
12:10 13:10,11,15,19,22,25 15:8
16:23 18:24 19:14 21:7 22:12,15
23:13,16,19,23 24:14 25:23 27:2,4
30:4,6,12 31:6 33:14,24 34:10,21,24
35:17 36:14,16 37:4 38:2 39:23 40:3,
11 43:9 45:9 47:23 48:8,13 49:10
50:4 54:6,25 55:7,23 56:10,13 57:24
62:21 64:8,10,25 73:18 76:15,21
79:25 82:8,18 85:6,15 86:8,12 88:25
91:2,5,18 95:17 98:25 100:4 108:4
109:25 110:20 113:10,19 114:9,15
115:19 116:9

**site** 39:20

**sitting** 65:21 70:3 73:12 74:18,25
82:12

**situated** 59:21 60:1 62:24 64:16,21

**situation** 32:9

**sociologists** 30:20

**SOP** 16:17,21

**SOPS** 16:15,18

**sound** 35:12

**sounds** 13:14 76:13

**South** 28:22

**Southern** 27:10

**speak** 23:14,17 65:9 83:18

---

HAVERKAMP v.
LANETTE LINTHICUM
Case 1:19-cv-00018   Document 343-4   Filed on 11/13/23 in TXSD   Page 46 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

**speaks** 66:5

**special** 16:16,18 87:21 93:4 94:17 95:23

**Specialty** 46:7

**specific** 15:7,19 17:21,25 19:9,20,24 20:12,21 22:2,4,6 32:14 33:2 36:10 37:15 43:14 59:5 89:15 90:23 92:22 93:19,21,25 94:2,14 103:19

**specifically** 16:24,25 19:17 20:6 28:5 35:25 46:14 56:18 77:11 93:7,12

**specifics** 99:19

**spell** 18:13

**spoken** 23:21

**spreadsheet** 85:17 86:14

**staff** 9:21,23 15:14,16 28:24 29:1,23, 25 39:20 44:2,4 46:14 48:2 55:20 70:2 72:15 77:13 84:18 87:24 88:1,2 92:2,20 93:20,22 94:4 99:13 101:16 102:6,9 104:20,24

**standard** 16:16,18 22:5 70:7

**standards** 49:4,9 66:4 72:12 93:10, 11 95:21

**standing** 71:17

**start** 14:17 15:5 59:18

**started** 7:21 42:19

**starting** 40:10

**state** 7:12,17 11:16 14:7 17:10 21:16 29:10 31:25 32:20,24 33:1 70:16 88:14

**stated** 65:23

**statement** 37:20 65:14,20 66:19 70:5 71:19 110:9 111:5

**statements** 46:13,24 71:13

**states** 42:18 51:22 59:12 65:7 66:3 69:19 72:23 98:11

**stating** 9:21

**status** 20:7 53:21 88:13,22 89:7

**stay** 81:24

**step** 37:17,24 38:4,14,15,16,18 39:3, 7,11,19,25 40:6 41:23 43:4,11 45:4 48:9,10,14,21 49:12 51:4 52:2,14 55:8,10,22 73:14

**steps** 43:22 46:5 48:19

**Stiles** 18:25 19:10 76:4,8,10,17,25 77:2,4,7,11,15 113:21

**straight** 116:1

**Strawn** 116:13,17,19 117:14,17

**strike** 56:15 65:16

**strip** 16:7

**strokes** 28:2

**studies** 25:18

**style** 93:14 102:17

**subcommittees** 34:23

**subject** 11:8 84:9 108:13

**submits** 37:24

**submitted** 14:12 23:3 32:20 37:11 40:8,17,20 58:11 63:6 77:25 78:1 79:14

**submitting** 29:7

**substance** 48:14 114:17,22,25 115:2,4,6,20

**successful** 114:3

**sued** 70:24 97:19

**sufficient** 56:25 104:2

**suggest** 110:24

**suggested** 45:17

**suicide** 34:25 35:3,6,11,13

**suicides** 35:5,7

**suing** 70:23

**suit** 71:17 72:5 73:17

**suits** 72:2

**summarize** 43:4

**summarizes** 108:23

**summary** 43:8 53:1,5 85:12 86:6 108:13 109:3 111:22

**supervisor** 37:19 39:13,17 48:23

**support** 18:4 37:22 71:8

**supporting** 103:4 113:2

**supposed** 93:13

**surgery** 21:5,6 40:9,13,20,22,25 41:9,11 42:9,14,20,24 43:7 44:24,25 45:2,19,20 47:3,6,10,18 19,21,25 48:7,17 49:17 50:10,14,17,20 51:6,9, 16,21,24 53:7,9 54:8,9,19 55:17 56:3, 6,11,13,17,21,22 57:2,7,11 59:3,22 60:16,17,23 61:11,14,17,21 62:4,10, 13 69:20 73:20,21 74:8,9,14,15 90:22 104:19,22 105:2

**surprise** 13:6

**sworn** 7:6

**symptoms** 110:25

**system** 10:24 86:9 87:11

**systems** 9:1

---

**T**

**takes** 42:25 49:18

**taking** 7:20 15:16 56:12,13 111:19

**talk** 14:21 16:10 19:8,9,12 22:13,18 37:5 50:22 71:5 91:11 93:16

**talked** 14:5,13,14,15,24,25 16:12,13 17:13 18:7 19:15,19,20 20:14 21:10, 11 43:24 54:3 65:19 78:21 95:4 115:4,9

**talking** 18:15 68:24 88:9

**talks** 92:7 93:12 94:18

**TDC's** 66:11

**TDCJ** 9:11,13 11:17,23,24 12:6,12, 14,25 13:2,8 23:25 24:23 25:18,25 26:4,6,11 27:11,13,20,23 28:4,8 30:1 33:19,21,23 34:9 35:4 37:3 40:12,21, 24 41:10 43:10,12,22 45:10 47:24 49:2 52:10 54:3 56:12 58:1 59:2 60:16,21 61:10,16,20,23,25 62:3,9, 19,21 64:4 65:22 66:1,16,18 67:5 68:15,23 69:11,16,24 70:10 72:15 73:3,19 74:7,13 75:8 82:14 85:14 88:19 89:13 90:4,9,14,25 91:1,19 95:10,16 96:17 97:19 98:19 99:7 100:2 104:3,15 105:7,12,20 106:5 107:8,12 108:1,3,5,19,20 109:6 110:1,7 111:6 112:1,7,19

**TDCJ's** 10:5 19:12 25:8 33:5 35:18, 22 37:5,12,25 49:8 55:10,14 70:15 71:13 75:23 96:13 97:23 98:8 100:5 109:22 112:4 113:2

**Tech** 29:11

**Tech's** 29:15

**telling** 19:18

**tells** 84:13 94:3 111:17

**tend** 101:18

**tendency** 15:22

**term** 60:10

**terms** 60:9

**testified** 10:1,4,8

**testify** 11:23 12:2 14:2 24:3,15,18,24
25:5,14 26:7 55:13 57:25 75:8,25
82:23 91:16 95:10,14,19 96:3

**testifying** 8:1 11:15,18 13:12 23:24
25:25

**testimony** 7:25 11:9 12:20,24 13:7,
24 21:10 61:20 114:17,22 115:1,2,8,
21 116:8

**Texas** 7:17 11:16 14:7 28:22 29:9,11,
15 115:1

**That'd** 39:23

**then-current** 110:6

**therapy** 43:6

**thing** 49:12 78:9 83:12 113:4

**things** 19:15 68:6 88:12 107:19
115:23

**thought** 35:9 61:19

**threat** 82:9 102:23 112:25

**threatened** 17:8

**threatening** 83:18

**threats** 22:10 102:19 104:3

**three-person** 31:13

**Tim** 21:11

**time** 9:2 11:2 18:18 30:25 35:20
52:19 60:24 73:22 78:9 80:23 86:18
95:25 99:3 106:10 107:11 111:5
112:5,10 116:1

**times** 8:18,19 34:20 102:11 103:7

**timing** 77:8

**title** 27:15 84:24 108:18

**titled** 98:6

**titles** 34:9

**today** 7:20 11:14 12:24,25 13:5,7,12,
24 14:2 21:10,20 23:25 24:24 25:5
26:4,11 52:4 55:13 64:11 65:21 70:3
73:12 74:18,25 76:1 82:12,24 108:14
109:1 111:20 113:20 114:6,10,16

**told** 42:3 45:1,19 49:14 50:8 51:6,15,
23 53:7 54:8 80:1,15 113:25 115:13,
15 116:3

**top** 91:10 100:20

**topic** 24:15,18,21,22,24 25:1,5,7,14,
16,22 37:5,8 47:12 57:14 58:1,6
66:17 68:22 69:6 75:7,8,22,25 82:19,
23 90:19 91:11,16 95:9,14,19 96:3

**topics** 11:24 12:3 24:1,4,6 25:24
26:1,8 47:14

**Townsend** 14:16 18:22 19:2,3

**track** 87:16

**train** 94:4

**training** 24:23 26:14,16 28:15 75:10
91:12,17,19 92:3,15,17 93:6,19,22,
23,25 94:2,15,17 95:2,3,24

**trainings** 93:1

**transcript** 116:18,25

**transfer** 25:9 32:7,10,19 75:24
76:19,23 77:18,21 78:8,11,17,19
79:2,17 80:15,18,21 81:11,21 82:15
113:22 114:1

**transferred** 30:22 76:11 77:6 79:7
113:24 114:4

**transfers** 25:8 32:17 75:23

**transgender** 10:2,5 11:11 15:12
16:4,10,25 17:1,4,12,15 20:7,11,21,
25 21:13,18 22:1 35:19,22 36:2,12
53:21,24 75:11 80:8 84:9,10,12,15,
16,20 85:14,21 86:6,20 87:3,6,13,16,
19,22,24 88:6,8 89:11,12,15,17,22
90:17 91:13,20 93:8,13,15,18,25
94:16 95:3,6,8 96:23 97:18,24 98:21
99:8,20 103:22 104:4,8 105:13,21
106:1 107:3,20 113:1,3

**transgenders** 14:6 15:1 36:4 84:14,
17 86:4 89:18 92:8

**transitioned** 90:15

**transportation** 25:11 77:13 82:20

**treat** 92:5 94:4 105:14

**treatment** 42:24 49:17 56:3,17,22
59:3,20 65:13 66:10,13,21 67:3,10
68:12 69:14 71:7 72:4 74:21,23 75:1,
5 104:21 105:5 107:4,13

**treatments** 25:19

**trial** 10:8

**tricky** 80:4

**truth** 7:23

**two-minute** 113:12

**type** 9:20 14:6,24 15:1 16:19 18:21
29:7 38:9,19 47:18 75:1 79:20 81:23
87:10 90:6,22 91:19 92:10,14,22
94:18 101:15 102:5,14

**types** 33:15 38:6 92:4 93:6

## U

**U.S.C.** 70:17 71:9 72:25 73:2

**Uh-huh** 44:5 112:24

**uh-huhs** 8:10

**undergarment** 101:15,19 104:1

**undergarments** 98:13,16 99:23
100:22 101:18 102:2,8,15 107:23
108:3 109:4,7,12,18,23 110:2,8,11,
24,25 111:8 112:1,7,10

**understand** 7:22,25 8:2,4 23:20,24
25:24 26:3,6,10 57:22 59:1 60:2 61:8
64:4 75:19 80:17 91:15 94:11 113:17

**understanding** 12:5 13:7 43:6 55:9
79:16 110:6 112:4

**understood** 8:6

**unit** 8:24 9:5,19,25 14:19 15:2,3,6,7
16:10,13,14,15,22 18:1,6,24,25 19:3,
5,8,12 21:9 25:7 30:24 32:9,17,18
36:15 38:13 51:5 58:8 75:22 76:4,8,
10,12,16,17,23 77:1,4,18,19,21
78:10,11,17,20 79:2,4,5,7,11,17,18,
21,23,24 80:2,3,6,7,9,12,14,15,16,21
81:7,11,20,23 82:15 86:15,19 88:10,
19 91:4,24 98:21 99:11 113:21,25

**United** 59:11

**units** 18:23 112:15

**universities** 29:12

**university** 27:10 29:9 74:5 105:8

**update** 33:25

**updated** 84:10

**updating** 36:11

**UT** 47:17

**UTMB** 23:14 25:18 29:15 30:1,2,7,10
35:16 42:2 43:19 46:2 48:2 51:2 62:1,
21 68:22,23 74:4 85:1 105:6,7,8
107:3

**UTMB's** 59:2

## V

**vaginoplasty** 59:22

**valid** 72:11

**verbal** 78:13

**verbally** 8:9

HAVERKAMP v.
LANETTE LINTHICUM
4:21-cv-00018    Document 343-4    Filed on 11/13/23 in TXSD    Page 48 of 48
30(b)(6)
Eric Guerrero
July 20, 2023

**VI** 28:14

**view** 21:22 92:9

**views** 26:11

**violated** 59:9 64:14 65:2

**violation** 59:10 83:20

**violations** 83:25 84:2

---

### W

**waive** 116:22,24

**walk** 41:21

**walking** 15:17

**Wallace/ware** 36:20

**Walter** 42:2 108:12

**wanted** 103:8

**warden** 14:14,18,19,21 15:10 16:12,
24 17:13 18:7,15 19:3,9,17,20,24
21:9,22,24 28:13 30:5 31:10,12,15,22
32:9 36:15,17,18,19 38:13 39:20 40:2
43:24 44:16,20 113:21,22

**wardens** 14:5,13,23 18:18,23 19:16
20:3 21:6,9 28:23 29:22 84:18 85:4
87:5

**ways** 88:3

**wear** 9:16,17 101:15,17 102:12,14
103:25

**wearing** 102:2,8 113:6

**week** 8:22 9:15 13:17

**weeks** 91:23

**west** 29:10

**White** 97:3

**word** 94:9

**work** 30:3 35:15,17 36:21 89:12

**working** 34:25 35:10,11

**works** 38:1

**worksheet** 45:14 46:6 52:1,16,17,
18,21

**worries** 113:13

**worst** 83:18

**WPATH** 66:3

**write** 52:22

**writes** 42:1,12 46:7 53:6

**writing** 104:7

**written** 46:10 54:4 60:3 61:5,24
73:14 91:6

**wrong** 94:9

**wrote** 18:11 43:9 45:24 50:12 51:20
109:25 111:9

---

### Y

**year** 27:9 42:4,7,19 43:5,6 45:2,20
47:3 48:5 49:15 50:9,13 51:7,17,24
53:8 54:9 91:24

**years** 9:3,4,8 27:14,19 28:13,14,15,
16 40:19 76:11

**you-all** 16:13 20:10,23

**Young** 72:20